# In the United States Court of Federal Claims

Nos. 01-46C, 01-251C, 01-416C

(Filed: September 22, 2003)

| | | |
|---|---|---|
| | * | |
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | * | Summary judgment; Breach of contract; HUD section 8 housing program; HAP contracts; 1994 amendments to Housing Act of 1937; HUD Directive 95-12; Repudiation of HAP contracts; *Prima facie* breach; Unmistaka-bility doctrine – provenance examined; *Winstar*; Unmistakability doctrine inapplicable; Breach; Accord and satisfac-tion; Damages. |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |

**OPINION**

*Fred Joseph Livingstone*, Taft, Stettinus & Hollister, Cleveland, OH, for plaintiff.

*Timothy Paul McIlmail*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Assistant Attorney General Robert D. McCallum, Jr.*

**ALLEGRA, Judge:**

Janus was the god of gates in Roman mythology, often portrayed having two faces – one looking forward, the other backward. A similar profile often is exhibited by the United States in contracts effectuating government programs – like Janus, it simultaneously displays the visages both of an ordinary contracting party and the sovereign. The former eagerly looks forward to the societal benefits often only derivable through the cooperation of its contracting partners, while the latter charily views its contract obligations backwards through the prism of uniquely-enjoyed sovereign defenses. Knotty questions arise when, in such transactions, the United States subsequently improves its contracting position by flexing its sovereign muscles, often by enacting legislation. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839 (1996).

This case poses such questions. It is the legacy of a series of events that began in the late 1970s, when the Cuyahoga Metropolitan Housing Authority (CMHA or plaintiff), based in Cleveland,

Ohio, entered into a series of contracts with the Department of Housing and Urban Development (HUD) to provide low-income housing under the United States Housing Act of 1937 (the Housing Act of 1937). Plaintiff asserts that its rights under these contracts were repudiated by the Congress in 1994, when it amended the Housing Act to alter how rent subsidies were to be determined. According to plaintiff, that repudiation eventually ripened into a series of contract breaches. Not so, defendant responds, asseverating that the particular rights in question never existed and thus could neither be repudiated nor breached. Within this context, defendant aggressively invokes one of the sovereign defenses mentioned above – the labyrinthine unmistakability doctrine. Nonetheless, for the reasons that follow, the court holds that the United States, indeed, breached the contracts in question and is liable for that breach.

## I. FACTUAL AND STATUTORY BACKGROUND[1]

In 1974, Congress amended the Housing Act of 1937 to create what is known as the Section 8 housing program. *See* 42 U.S.C. § 1437f. That program provides federally subsidized housing to millions of low income tenants by authorizing, *inter alia*, the payment of rent subsidies to private owners and developers of low-income housing. Under the program, tenants make rental payments based on their income and ability to pay; HUD then makes "assistance payments" to the private landlords to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. 42 U.S.C. §§ 1437a(a), 1437f(c)(3)(A); *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997) (describing the program); *Crest A Apts. Ltd. II v. United States*, 52 Fed Cl. 607, 609 (2002) (same).

In 1978 and 1979, CMHA and HUD entered into three Housing Assistance Payments ("HAP") contracts under the Section 8 housing program.[2] The framework for these contracts was governed, in part, by 42 U.S.C. § 1437f(c)(1), under which, an initial maximum monthly contract rent was established for each dwelling unit. As originally enacted, 42 U.S.C. §1437f(c)(2) provided for adjustments in this maximum monthly rent thusly –

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

---

[1] These facts shall be deemed established for purposes of future proceedings in this case. RCFC 56(d).

[2] Each contract concerned one of three properties: Quarrytown Tower Apartments (Quarrytown), Severance Tower Apartments (Severance) and Ambleside Tower Apartments (Ambleside). The contracts' anniversary dates are January 31, May 1, and August 15, respectively.

* * * * *

> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(A) and (C) (1982). The HAP contracts in question implemented these provisions in a two-fold fashion: (i) providing that adjustment of rents will be made annually on the basis of a reasonable formula, but (ii) stipulating as an "overall limitation" that, notwith-standing any other provision of the contract, adjustments shall not produce material differences between the rents at comparable assisted and unassisted units. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 13 (1993) (describing a similar contract provision).

The first of these requirements – that of the annual adjustment – was implemented through Section 1.8b ("Automatic Annual Adjustments") of the HAP contracts, which provides, in pertinent part –

> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective Date of the Contract.

The Automatic Annual Adjustment Factors (AAAFs) referenced here are generated by HUD's Office of Economic Affairs, which uses two market studies, the Consumer Price Index and the Bureau of the Census American Housing Surveys, to produce a percentage by which rents will be adjusted. HUD establishes a limited number of AAAFs to cover the entire country.[3]

---

[3] *See, e.g.*, Notice of Final Fiscal Year (FY) 1999 Fair Market Rents, 63 Fed. Reg. 52,858 (Oct. 1, 1998); Notice of Final Fiscal Year (FY) 1998 Fair Market Rents, 62 Fed. Reg. 50,724 (Sept. 26, 1997); Notice of Final Fiscal Year (FY) 1997 Fair Market Rents, 61 Fed. Reg. 49,576 (Sept. 20, 1996); Notice of Final Fiscal Year (FY) 1996 Fair Market Rents, 61 Fed. Reg. 6,690 (Feb. 21, 1996); *see also Acacia Villa v. United States*, 36 Fed. Cl. 277, 278 (1996); *see also Charlotte*

Consistent with 42 U.S.C. § 1437f(c)(2)(C), the HAP contracts in question also contain, in Section 1.8d, an "Overall Limitation" that states:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HUD regulations in effect at the time the contracts in question were entered mirrored these requirements. *See* 24 C.F.R. § 880.609(c) (1979). To protect the differences which "existed with respect to the initial Contract Rents," HUD developed what is known as the "initial difference," equal to the difference between the initial Section 8 contract rents and the original comparables.

In the early 1980s, HUD became increasingly concerned that application of the AAAFs was yielding rents well above those for comparable unassisted units. Accordingly, the agency began to undertake, with respect to certain projects, "comparability studies" as a means of determining the rents it believed were being charged in comparable unassisted units. Those studies would select three to five comparable projects in a relevant geographic area; the agency would then conduct appraisals to see whether the rents at those projects were materially different from the Section 8 project rents. If they were, the rents determined through the comparability studies would serve as a "cap" of the rental increase produced by the more general AAAFs. *Alpine Ridge*, 508 U.S. at 14.

Litigation ensued. Section 8 project owners not only challenged the process by which HUD conducted comparability studies, but also claimed that the mere use of such studies to limit increases under the AAAFs violated their contracts.

In *Rainier View Associates. v. United States Department of Housing & Urban Development*, 848 F.2d 988, 991 (9th Cir. 1988) (per curiam), *cert. denied*, 490 U.S. 1066 (1989), the Ninth Circuit rejected HUD's interpretation of the law and language of the contracts, and concluded that HUD could not use comparability studies as an independent cap to formula-based rent increases. The *Rainier View* court stated that section 1437f(c)(2)(A) of Title 42 allows HUD to choose either the market-survey or the reasonable-formula method for adjusting rents, and that "[t]he overall limitation provision [of the statute and the contract] . . . is clearly a limitation on the calculation of the formula used to adjust rents, not an independent basis for making annual rent adjustments." 848 F.2d at 991. The court found that, having elected to use a reasonable formula in the HAP Contracts, HUD could not retract that choice by applying a market-survey cap through the comparability studies. In the court's

---

*Housing for the Elderly v. Cuomo*, 89 F. Supp. 2d 70, 71 (D.C.D.C. 2000).

view, that approach would nullify the formula method that the statute authorizes and that HUD elected. In other words, the court believed that, under HUD's regulations, the "overall limitation" on rents had to be integrated into, not superimposed upon, the adjustment formula. *Id*. (citing 24 C.F.R. § 888.204 (1987)). In short, *Rainier View* acknowledged that adjustments were limited by comparable rents, but held that comparability determinations had to be considered in creating the AAAFs, not applied as a separate cap.

Shortly before the panel ruled in *Rainier View*, Congress amended Section 8 to validate HUD's use of comparability studies to cap AAAF increases. Specifically, it added the following sentence to section 1437f(c)(2)(C): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988), *codified at* 42 U.S.C. 1437f(c)(2)(C).[4] Although the court of appeals was advised of that amendment, it denied rehearing. And the Supreme Court, in turn, denied the government's petition for a writ of certiorari. 490 U.S. 1066 (1989).

Passage of the 1987 Act, however, did not end the imbroglio between HUD and Section 8 project owners over the use of comparability studies. Far from it. HUD continued to believe that *Rainier View* was wrongly decided and declined to apply that decision outside the Ninth Circuit. For their part, section 8 project owners continued to assert they were entitled to automatic formula-based rent adjustments without application of a separate comparability cap. These differences again erupted into litigation, which, in turn, caused the Congress, in December of 1989, to enact Section 801 of the Reform Act (the Reform Act), Pub. L. No. 101-235, 103 Stat. 2057-2059 (codified at 42 U.S.C. 1437f(c)(2)(C) (Supp. II 1990) and 42 U.S.C. 1437f note (Supp. II 1990). This legislation was intended to "ensure a reasonable rate of return to the owners while effectuating the original

---

[4] Regarding this amendment, the accompanying Conference Committee Report explained:

> The House amendment contained a provision that was not contained in the Senate bill to require that rent adjustments not result in material differences between rents for assisted and unassisted units of similar quality and age in the same market area and that [an] automatic annual adjustment factor be used if the Secretary or appropriate State agency fails to submit a comparability study to the project owner 60 days before the anniversary date of the assistance contract. The conference report contains the House provision . . . .

H. R. Conf. Rep. No. 100-426 at 177 (1987); *see also* H. Rep. 100-122(I) at 33 (1987).

congressional objective . . . of avoiding excessive rents and rates of return for section 8 projects."[5] The Reform Act prescribed new procedures for calculating rent adjustments, both retrospectively and prospectively. The retrospective provisions required HUD to pay landlords an increased amount, above what the comparability studies required HUD to pay under its interpretation of the contracts, while the prospective provisions established a limited role, under defined criteria, for HUD's future use of comparability studies.

To deal with HUD's prior use of comparability studies, the Reform Act provided for increased rental payments to certain Section 8 project owners. § 801(a), 103 Stat. 2057-2058. This provision applied to owners whose rental adjustments were limited because of HUD's use of a comparability study as an independent cap, as well as to owners who did not request rental readjustments because they anticipated that HUD would reduce their project rents. For the period from fiscal year 1980 until the date when HUD promulgated new regulations to govern future rental adjustments, the provision required HUD to calculate rental adjustments in an amount equal to the AAAF times the portion of the contract rent that was not used for debt service. At the request of an owner, HUD was then to pay the amount by which that rental- adjustment figure exceeded the rental adjustments actually approved by HUD for the relevant years. In no event, however, was such a retroactive payment to be less than thirty percent of the AAAF times the full contract rent, less rental subsidies actually approved. Thus, this provision required HUD retroactively to increase, to at least thirty percent of the AAAF level, payments made to owners whose adjustments were limited by comparability studies.[6] HUD issued detailed regulations to govern the process of making such retroactive payments. 56 Fed. Reg. 20,078 (1991).

Looking prospectively, the Reform Act required HUD to promulgate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments . . . would result in such material differences" between assisted and unassisted units, and to use those studies to establish a "modified annual adjustment factor" for a geographically smaller area. § 801(c), 103 Stat. 2058. The statute described, in detail, the methodology to be used by the Secretary in conducting such comparability studies. It also stipulated

---

[5] 135 Cong. Rec. S16,602 (daily ed. Nov. 21, 1989) (remarks of Sen. D'Amato). The Senate Banking, Housing, and Urban Affairs Committee explained that "[t]he Committee did not . . . share the Ninth Circuit's interpretation of HUD's authority to perform individualized comparability studies. Clearly, a market reality test must be an integral component of the Section 8 program to ensure that HUD pays reasonable rents." *Id*. at S16,600.

[6] Furthermore, the Reform Act provided that, at a project owner's request, HUD would make a one-time redetermination of the contract rent as a basis for future rent adjustments. § 801(d), 103 Stat. 2058-2059. Under that provision, the contract rent would be the greater of: (i) the currently approved contract rent, or (ii) the contract rent as calculated under the retroactive provisions in Section 801(a).

that if a modified adjustment factor could not be established or failed to eliminate material differences between rents at comparable assisted and unassisted units, the Secretary could apply another methodology "for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units." *Id.* In keeping with those provisions, HUD promulgated regulations to govern the conduct and use of comparability studies to generate modified adjustment factors, and, in cases in which such factors were ineffective, to provide for a system of adjusting rents through comparability studies. *See* 24 C.F.R. § 888.301 *et seq.*; *see also Charlotte Housing*, 89 F. Supp.2d at 73.

In 1993, the Supreme Court, in *Alpine Ridge*, upheld the amendments to section 801 made by the Reform Act. Various property holders had argued that the provision authorizing HUD to limit automatic rent adjustments through the use of comparability studies violated the Due Process Clause of the Fifth Amendment. The Court, however, held that the contracts at issue in that case, which were virtually identically to those at issue here, did not prohibit HUD from using comparability studies to cap formula-based rate adjustments. Finding that the property owners "have no contract right to unobstructed formula-based rent adjustments," the Court concluded that it had "no occasion to consider whether § 801 of the Reform Act unconstitutionally abrogated such a right." 508 U.S. at 21.

Following this decision, Congress, still concerned that HUD was paying too much in subsidies, amended section 1437f(c)(2)(A) of Title 42 by adding the following language:

> However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) ("the 1994 Act" or "1994 amendments").[7] The 1994 Act further provided that the amendment "shall apply to all contracts

---

[7] In introducing S. 2049, which later became this law, Senator Riegle placed in the record an explanation of the bill prepared by HUD. Regarding the provision quoted above, that explanation stated:

> In general, while assisted projects continue to have a place in national low-income housing policy, HUD can no longer afford to over-subsidize projects. "Material differences" do exist between assisted and unassisted properties. The money the

for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under section 8(c)(2)(A) of [the United States Housing Act of 1937] by applying an annual adjustment factor." *Id.* Subsequent amendments cumulatively made the provision applicable to "fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, during fiscal year 1999 and thereafter."[8]

On March 7, 1995, HUD issued Notice 95-12, designed, by its terms, "[t]o effect all applicable contracts with HAP anniversary dates from [March 7, 1995] to the end of Federal [fiscal year] 1995 (through September 30, 1995)." In critical terms, this directive prescribed, with exceptions not herein relevant –

> If current project rents on a . . . contract (before the application of the AAF) are above the published [fair market rent] for the area then in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date, form HUD 92273, Estimates of Market Rent by Comparison, . . . completed by a non-identity of interest, state certified, general appraiser, FOR EACH UNIT TYPE (e.g. 1BR, 2BR, etc.). This form must contain at least three examples of unassisted housing in the same market area of similar age, type and quality.

Regarding the consequences of not filing the cited comparability study, the notice indicated –

> If the owner fails to submit the information required by this Notice at least 60 days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date, rather the new rent levels will go into effect 60 days after receipt of the required information. However, if the owner fails to submit this information by the date of the FY 1996 HAP contract anniversary, then no increase will be granted for the FY 1995 contract year.

According to the directive, if the owner demonstrated that comparable, unassisted rents were more than five percent over contract rents, then HUD would increase contract rents to the lesser of: (i)

---

> Department spends on rental assistance helps fewer households when it is tied to unreasonably high-rent projects. Public confidence in HUD programs is also undermined whenever HUD is seen to be paying rents well above the going rate or continuing to prop up undeserving projects.

140 Cong. Rec. S4388, S4869 (April 26, 1994).

[8] *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub. L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub. L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

contract rents adjusted according to the AAAF; or (ii) the comparable, unassisted rent plus the so-called "initial difference."[9]

Except as noted below, CMHA last received rent adjustments based upon published AAAFs in 1994.[10] CMHA took no action with regard to contract rent adjustments until 1999, when it requested payment of the past due annual rent increases that HUD failed to make after the 1994 contract year. CMHA first provided information regarding comparable unassisted units for Quarrytown on November 17, 2000, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $560 contract rent in every year from 1995 through 2000. On January 23, 2001, it filed complaint No. 01-46C in this court, seeking contract rent increases for Quarrytown for 1995 through 2000. On January 26, 2001, HUD retroactively increased Quarrytown's 1995 rents to $576, after determining that Notice 95-12 did not apply to 1995 for Quarrytown because of its effective date.

As for Severance, CMHA first provided comparability information for that property on March 2, 2001, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $572 contract rent in every year from 1995 to 1997. On March 27, 2001, HUD retroactively increased the 1996 Severance rents to $582 after determining that Notice 95-12 did not apply to the property for 1996. On April 26, 2001, CMHA filed complaint No. 01-251C in this court, seeking contract rent increases for Severance for 1995 through 2000. On May 16, 2002, HUD increased Severance contract rents to $601 for 2000, and to $603 for 2001.

---

[9] The directive gave several examples of how these rules should be implemented, including one in which the project was eligible to receive the AAAF based on the comparable and another in which the project was eligible only for the comparable rents.

[10] Since the 1994 contract rent adjustments, the government published AAAFs each year for 1995 through 2001, as follows:

| Year | Non-Turnover Units | Turnover Units |
|---|---|---|
| 1995 | 1.018 | 1.028 |
| 1996 | 1.008 | 1.018 |
| 1997 | 1.013 | 1.023 |
| 1998 | 1.020 | 1.030 |
| 1999 | 1.024 | 1.034 |
| 2000 | 1.033 | 1.043 |
| 2001 | 1.003 | 1.013 |

Lastly, CMHA provided its first comparability study for the Ambleside property on May 15, 2001, indicating that the sum of comparable rents plus the initial difference did not exceed the 1994, $575 contract rent until 1997. On July 17, 2001, CMHA filed complaint No. 01-416C in this court, seeking contract rent increases for Ambleside for 1995 through 2001. On March 19, 2002, HUD retroactively increased 1996 Ambleside rents to $585, and on May 16, 2002, increased contract rents for Ambleside for 2000 to $604, and for 2001 to $606.

Thus, in approximately the first half of 2001, CMHA filed three independent actions in this court – one for each project. On July 24, 2001, this court ordered the cases consolidated. On April 1, 2002, plaintiff filed a motion for summary judgment. Defendant filed its opposition to plaintiff's motion for summary judgment and cross-motion for summary judgment on May 31, 2002. After oral argument, supplemental briefing was completed on March 13, 2003.

## II. DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

CMHA brings this action for breach of contract, seeking damages resulting from the HUD's failure to provide it automatic rent increases for various years for Quarrytown, Severance and Ambleside.[11] The gravamen of its complaint is that, under the express terms of the HAP contracts, it is entitled to those increases based upon the application of the AAAFs published by HUD. It asserts that the United States repudiated its HAP contracts when Congress passed the 1994 amendments – leading to a breach allegedly compounded when HUD issued, and subsequently relied, upon, HUD Directive 95-12. The latter directive, plaintiff maintains, established requirements beyond those even in the 1994 amendments, further abridging its right to the automatic increases. Defendant mounts a multi-faceted counterattack on these contentions, beginning with the simple proposition that the 1994 amendments and HUD Directive 95-12 did not alter any contract rights that CMHA actually possessed. In this regard, while defendant does not invoke the so-called "sovereign acts" doctrine, it does argue that, under the so-called "unmistakability doctrine," HUD, acting on behalf of the United States, *sub silentio* reserved the right to pass legislation of the sort at issue as part of the HAP contracts. Finally, defendant raises other more narrow objections to plaintiff's entitlement to damages for particular years.

The court will take up the issues posed by the parties' arguments *seriatim*.

[11] For Quarrytown, plaintiff seeks damages for the years 1996 through 2001. For Severance and Ambleside, the relevant years are 1995 and 1997 through 2001.

**A. Was there a *prima facie* breach here?**

To determine whether plaintiff's contractual rights were breached, the court first must determine what those rights are. *See San Carlos Irrigation and Drainage District v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Several interpretational guides mark this decisional path. First, as an overarching matter, the court, in interpreting a contract, seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir.1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)). Toward that end, contract interpretation "begins with the plain meaning of the agreement." *Id.* at 1274; *see also Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir. 1998); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997). "[A]n interpretation which gives a reasonable meaning to all parts," the law provides, "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 575 F.2d at 863; *see also Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 458-59 (2001).

The HAP contracts at issue indicate that "Automatic Annual Adjustment Factors will be determined by the Government at least annually" and that "[o]n each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." The "automatic" references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without CMHA having to take any significant action. *See American Heritage Dictionary of the English Language* 122 (4th ed. 2000) ("automatic" means "[a]cting or operating in a manner essentially independent of external influence or control").[12] Of course, the automatic nature of these adjustments is qualified by the "overall limitation," which indicates that "[n]otwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government . . ." The latter provision requires HUD to determine whether there is a material difference, but does not identify whether it or the project owners must bear the burden of showing, respectively, that there is or is not a material difference. Logic, however, suggests that for the

---

[12] In *Brighton Village Associates v. United States*, 52 F.3d 1056 (Fed. Cir. 1995), the Federal Circuit construed the pre-1987 version of the statute and focusing on its use of the word "shall," concluded: "[t]he statute unambiguously requires the HAP contract to provide for at least annual rent adjustments." *Id.* at 1061; *see also Brown Park Estates – Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1451 (Fed. Cir. 1997) ("In addition to setting initial contract rents, HUD is responsible for adjusting the contract rents on at least an annual basis."); *Acacia Villa*, 36 Fed. Cl. at 280 ("The title of Section 1.8(b), 'Automatic Annual Adjustments,' anticipates that rent adjustments will occur automatically and annually.").

adjustments in the first part of the contract to be truly "automatic," the burden of demonstrating a material difference must lie on HUD.

Among the constellation of opinions construing HAP contracts, none has pinpointed this issue. Yet, the exegeses of the overall limitation provision in these opinions consistently indicate that a project owner would receive an automatic adjustment unless HUD came forward with evidence triggering the limitation. Take, for example, *Alpine Ridge*, which involved whether HUD could use comparability studies as a check on automatic adjustments. There, the Supreme Court explained the "overall limitation" provision thusly:

> The rent adjustments indicated by the automatic adjustment factors remain the presumptive adjustment called for under the contract. It is only those presumably exceptional cases where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue. Because the automatic adjustment factors are themselves geared to reflect trends in the local or regional housing market, theoretically it should not be often that the comparability would suggest material differences between Section 8 and private-market rents.

508 U.S. at 19-20. Both the Court's reference to comparability studies being invoked only in "exceptional cases" and to automatic adjustments being "presumptive" clash with the notion, advanced by the government here, that the same contract provision can be construed to require property owners to provide comparability studies as a precondition to receiving an "automatic" adjustment.[13] Further indication that the Court believed that HUD was required to conduct the relevant studies may be found in its admonition that "if respondents have been denied formula-based rent increases based on shoddy comparisons, their remedy is to challenge the particular study, not to deny HUD's authority to make comparisons." *Id.* at 20-21; *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1431 (Fed. Cir. 1997). Other cases proceed similarly from the notion that the critical statutory language here places on HUD, and only on HUD, the burden of coming forward to show that a particular adjustment would violate the limitation. *See, e.g., Acacia Villa*, 36 Fed. Cl. at 280-81; *Park*

---

[13] Indeed, the Court's interpretation of this provision appears to have sprung directly from the government's opening brief, which asserted –

> The language of that provision clearly expresses the requirement that adjustments that result in material differences between assisted and unassisted projects will not be made, and ***it necessarily envisions that HUD will conduct a survey of some kind in order to determine the prevailing rent levels in the unassisted market***.

Brief for Petitioner (No. 92-551) at 19 (emphasis added).

*Village Apts. v. United States*, 32 Fed. Cl. 441, 453 (1994), *aff'd (per curiam)*, 152 F.3d 943 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 962 (1998); *Nat'l Leased Hous. Ass'n v. United States*, 22 Cl. Ct. 649, 656-60 (1991), a*ff'd*, 105 F.3d 1423 (Fed. Cir. 1997).

It is, of course, true that unlike in *Alpine Village*, the issue here is not whether HUD may use comparability studies to limit automatic adjustments; nor, as in *Park Village*, whether HUD might use such studies to reduce preexisting rents; nor, as in *Acacia Village*, whether HUD must employ such studies within the year the automatic adjustment is owed. Yet, the construction of the overall limitation reflected in these cases represents, in this court's view, its most natural reading. Indeed, that this language gave rise to so many *bona fide* disputes concerning HUD's role in setting rents illustrates just how far the government seeks to elasticize those same words in arguing not that HUD ***may*** use such comparability studies to limit the automatic adjustments, but that the property owners ***must*** use such studies to qualify for them. In the court's view, this conceptualization stretches the language of the contracts and the underlying statute well past its breaking point.[14]

Of course, unlike normal contractual undertakings, the contracts here had their source in legislation passed by the Congress, requiring the court to consider that legislation in construing the contracts. *See, e.g., Bennett v. Kentucky Dept. of Educ*., 470 U.S. 656, 669 (1985); *Barseback Kraft AB*, 121 F.3d at 1480-81 (construing an agreement in light of the underlying legislation). Far from supporting defendant, however, the history of the legislation, in fact, only confirms the interpretation that proceeds naturally from the contracts' plain language.

When the HAP contracts were signed, the Housing Act stated that contracts in the Section 8 program "shall provide for adjustment annually or more frequently," subject to the proviso that such adjustment "shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(A), (C) (Supp. V. 1975).[15] Subsequently, HUD interpreted the latter clause as authorizing it to use

---

[14] In fact, even if the contracts were ambiguous on this count – which they are not – the doctrine of *contra preferentum* would dictate that any ambiguity in that language be interpreted against the drafter, here, HUD, ultimately leading the court to the same interpretation. *See, e.g., United States v. Seckinger*, 397 U.S. 203, 210 (1970) ("[A] contract should be construed most strongly against the drafter, which in this case was the United States."); *S.W. Aircraft Inc. v. United States*, 551 F.2d 1208, 1212 (Ct. Cl. 1977); *Park Village*, 32 Fed. Cl. at 446 n.3. *See, however, Adrienne Village v. United States*, 25 Cl.Ct. 457, 459 (1992) (doctrine of *contra preferentum* does not apply to construction of the "overall limitation" in the HAP contracts as the limitation is "straight-forward" and "very precise").

[15] The comparability limitation originated in the House bill. *See* H.R. 15361, 93rd Cong., § 201 (1974). The House committee report explained –

Assistance contracts would have to provide for periodic adjustments, at annual or more

comparability studies to preclude adjustments that would otherwise result in rents materially in excess of rents at comparable unassisted projects. Congress explicitly ratified that action in the 1987 Act,[16] but qualified this authority by providing that if HUD did not submit a comparability study to a Section 8 owner within 60 days of the anniversary date of the contract, the full AAAF would apply. 42 U.S.C. § 1437f(c)(2)(C) (1988). In the Reform Act, Congress again confirmed HUD's authority to conduct comparability studies, but required HUD to publish regulations for conducting such studies and provided a procedure for HUD to use such studies to develop a "modified annual adjustment factor." At the same time, Congress retained the sixty-day limitation adopted in the 1987 Act, thus adhering to the view that HUD's failure to perform a comparability study would lead to an automatic adjustment. 42 U.S.C. § 1437f(c)(2)(C) (Supp. II 1990). These provisions were left undisturbed when, in the 1994 amendments, Congress finally indicated that where the maximum monthly rent to be adjusted using an AAAF "exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that adjusted rents would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437(f)(2)(A), (C) (Supp. II 1996).

Thus, from the passage of Section 8 in 1974 until it was modified in 1995, the statutory mechanism clearly envisioned that annual adjustments were to be automatic unless HUD promptly

---

> frequent intervals, in maximum monthly rents to reflect changes in the fair market rentals established for the housing are for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable . . . However, authorized adjustments in maximum rents could not result in material differences between the rents charged for assisted and comparable unassisted units.

H. Rep. No. 93-1114 at 59 (1974); *see also id.* at 21. Interestingly, the report also indicates that the committee was aware of possible efforts by the Administration to modify the Section 8 Program via "executive fiat," in response to which the committee indicated that "future modifications in or terminations of housing subsidy programs are to be effected through the legislative process only." *Id.* at 18. The Conference Report indicated that this House provision was being adopted and indicated that under it, "rents would be adjusted at least annually to reflect changes in fair market rentals in the area, and permitted HUD to adjust rents on the basis of a reasonable formula." H. Conf. Rep. No. 94-1279 at 140.

[16] HUD took this view of the legislation when it adopted regulations specifying how it would conduct comparability studies. *See* 57 Fed. Reg. 49120 (1992). These regulations indicated that "[s]ection 801(c) of the Reform Act amended section 8(c)(2)(C) of the 1937 Act to ***clarify and affirm*** HUD's ability to use comparability studies as a basis for adjusting contract rents where the Secretary has reason to believe that the application of the [A]AAFs would result in a material difference between rents for assisted and similar unassisted units in the same market area." *Id.* at 49121 (emphasis added).

performed a comparability study. Certainly, this was the intent underlying the 1987 Act and the Reform Act, in which Congress ratified HUD's interpretation of the statute as authorizing it to limit increases that would create material differences, thereby confirming that HUD's view of the statute was Congress' from the start. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (quoting *Red Lion Broadcasting Co., Inc. v. FCC*, 395 U.S. 367, 380-81 (1969)). Both acts, of course, limited how and when HUD could exercise this authority. One might wonder why Congress bothered to pass such limits if, as defendant contends, HUD always had the power, under the original Section 8 program, to require the project owners to present a comparability study as a precondition to receiving an adjustment. The simple fact is – it did not have that power. That Congress instead amended the statute to impose the latter burden suggests that the imposition thereof was, contrary to defendant's claims, latent neither in the earlier legislation nor in any contracts based thereupon. Indeed, unlike with the 1987 Act, there is not the slightest hint in the legislative history that Congress believed that the 1994 amendments confirmed a preexisting right. *Per contra*. Every indication is that Congress knew it was fundamentally altering the process for determining adjustments in preexisting contracts and was doing so to reduce outlays. Hence, Congress' view of the Housing Act, prior to the 1994 amendments, comports with this court's interpretation of the contract provisions at issue, which mirror that statute.[17]

Accordingly, this court holds that the HAP contracts expressly require HUD to provide CMHA with annual adjustments barring the agency's invocation of the overall limitation. As such, the passage of the 1994 amendments was a repudiation of this contract provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into an apparent breach of contract. *See Franconia*, 536 U.S. at 142-43; *see also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); Restatement (Second) of Contracts § 235(2) (1981). That *prima facie* breach was then exacerbated when HUD, in its 1995 directive, imposed additional requirements not envisioned in either the HAP contracts or the prior legislation. In this regard, the court rejects

---

[17] In asserting that the subsequent modification of the legislation did not effectuate a breach, defendant notes that the contracts recite that they are entered into "pursuant to 42 U.S.C. § 1437." It claims the latter reference suggested that the agreements were subject to that law, as amended, citing *Bowen v. Public Agencies Opposed to Social Security Entrapment (POSSE),* 477 U.S. 41 (1986). To be sure, in *POSSE*, the Court reached a similar conclusion, but there Congress, in the statute authorizing the agreements that were allegedly breached, expressly reserved to itself "[t]he right to alter, amend, or repeal any provision of" the Act." 42 U.S.C. § 1304. The Supreme Court stressed this – "[t]he State accepted the Agreement under an Act that contained the language of reservation. That language expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself." 477 U.S. at 54. Here, there was no such reservation and CMHA thus was not placed on notice that it was to assume the risk of subsequent legislation. *See also Winstar,* 518 U.S. at 910 (Souter, J.).

defendant's contention that the sixty-day time limit imposed by the directive was a "reasonable exercise of HUD's authority to administer HAP contracts." To the contrary, that requirement appears to represent yet another new and fundamental change in the deal previously executed.

The court treads carefully in referring to this as only as a *prima facie* breach, because to this point in the analysis, the court has considered only the express provisions of the HAP contracts. For there to be actual liability here, the court also must determine whether the government reserved the right to pass the 1994 amendments under the so-called "unmistakability doctrine." Only if this is not true, can the court then say, with confidence, that defendant actually breached the contracts in question.

**B. Does the unmistakability doctrine shield defendant from liability?**

We begin with the general rule that "[w]hen the United States enters into contract relations, its rights and duties therein are generally governed by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also Franconia Associates v. United* States, 536 U.S. 129, 141 (2002); *Mobil Oil Exporting & Producing, S.E., Inc. v. United States*, 530 U.S. 604, 607 (2000); *Perry v. United States*, 294 U.S. 330, 351 (1935). This general precept, however, ordinarily is not viewed as limiting the government's sovereign powers. "Sovereign power," the Supreme Court has stated, "governs all contracts subject to the sovereign jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Winstar*, 518 U.S. at 872 (1996) *(quoting Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982)); *see also Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1578 (Fed. Cir. 1997), *cert. denied*, 524 U.S. 951 (1998). The latter sentence encapsulates the so-called "unmistakability doctrine" – as easily summarized as it is poorly delineated, the latter owing to a welter of conflicting opinions, no less than four of which are in *Winstar* itself.

In truth, the most unmistakable thing about the "unmistakability doctrine" is the sheer number of unresolved questions it engenders. For one thing, it is less than clear in what type of actions this doctrine applies – is it a "defense" only when a plaintiff seeks to exempt itself from a statute in an injunctive action or does it also shield the United States from liability when damages are sought due to an alleged breach of contract? Also in need of elucidation is whether the doctrine hinges on either the nature of the contractual undertaking or the role played by the government therein – is it available in a regular procurement and, if not, does it apply to hybrid contracts of the sort at issue here? A third tenebrous issue is whether the "sovereign powers" protected by the doctrine include all exercises of legislative power, among them laws abrogating specific government obligations under a particular class of contracts, or are implicated only when the Congress passes general legislation that incidentally impacts upon a contract or contractor. In shorter form, this issue sometimes takes the form whether the "unmistakability" doctrine applies only to actions first covered by the so-called "sovereign acts" doctrine, which generally shields from liability the United States' "public and general acts as a

sovereign." *Horowitz v. United States*, 267 U.S. 458, 461 (1925).[18] Finally, even if the "unmistakability" doctrine applies, there remain unconcluded issues as to what sort of unmistakable promise will prevent the government from exercising its sovereign powers and, subsidiarily, whether the degree of that unmistakability varies by the nature of the contract, with more exactitude required in some settings.

To answer at least some of these questions, the court ultimately must attempt to reconcile the seeming paradoxes posed by *Winstar* – a daunting task that this court believes, in the first instance, is best approached by developing a healthier understanding of the provenance of the unmistakability doctrine itself. To that topic, the court now turns.

### 1. The Provenance of the Unmistakability Doctrine

#### a. Early Cases

The unmistakability doctrine has its roots in several early Supreme Court cases involving the application of the Contracts Clause, U.S. Const., art. I, § 10, cl. 1, which commands that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . ."[19] Perhaps the earliest of these

---

[18] The sovereign acts doctrine dates back to one of the earliest decisions of the Court of Claims, *Deming v. United States*, 1 Ct. Cl. 190 (1865). In that case, brought by an Army supplier whose costs had increased because of a new statute, the court also recognized the Janus-like character of the United States as contracting party and sovereign, observing "the United States as a contractor are not responsible for the United States as a lawgiver." *Id.* at 191. In *Jones v. United States*, 1 Ct. Cl. 383 (1865), the court extended the doctrine to executive branch actions in concluding that the government was not liable when the presence of federal troops hindered a surveyor under contract to the government. It stated: "Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct, or violate the particular contracts into which it enters with private persons." *Id.* at 384. The "public and general" language in *Jones* was eventually adopted by the Supreme Court in *Horowitz.* More recently, the Federal Circuit indicated that determining whether the government, in passing legislation, is acting as a contractor or a sovereign, requires "a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic*, 112 F.3d at 1575. For a further discussion of the history of, and policies underlying, the sovereign acts doctrine, *see* Edward A. Fitzgerald, *"Conoco, Inc. v. United States*: Sovereign Authority Undermined by Contractual Obligations on the Outer Continental Shelf," 27 Pub. Cont. L.J. 755, 777-81 (1998) (hereinafter "Fitzgerald").

[19] Early applications of the Contracts Clause yielded another defense sometimes wielded by the government in breach of contract actions – the reserved powers doctrine. That doctrine, used to void contracts *ab initio*, simply provides that the sovereign may not contract away "'an essential

cases is *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514 (1830), where the Court construed the Rhode Island legislature's charter of a bank. The bank claimed that a subsequent tax had diminished the value of that charter and sought an injunction against the imposition of the tax. Writing for a unanimous court, Justice Marshall held that, absent an explicit exclusion from increased taxation, the State's power to tax could not be enjoined, reasoning that "[t]he power of legislation . . . resides in government as part of itself, and need not be reserved when property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies." *Id*. at 563.

A few years later, in *Charles River Bridge v. Warren Bridge*, 36 U.S. (11 Pet.) 420 (1837), the proprietor of a bridge spanning the Charles River from Boston to Cambridge under a Massachusetts charter, sued for damages and to prevent the construction and operation of a nearby bridge under a second charter. It argued that its charter impliedly was exclusive. Surveying various English and American precedents, Justice Taney extended the ruling in *Providence Bank* to any situation where the government acts "to promote the happiness and prosperity of the community." *Id*. at 547. Narrowly construing the charter possessed by the proprietor, Justice Taney readily concluded that it did not contain an implicit right against further charters being granted, stating that "in grants by the public nothing passes by implication." *Id*. at 546. Amplifying this point, he further wrote that – "[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the end of its creation[.]" *Id*. at 548.

*Providence Bank* and *Charles River Bridge* are typical of early cases involving the unmistakability doctrine – they involved state corporate charters and rights that allegedly were appurtenant thereto (often, however, unstated); mostly (though not exclusively) sought injunctive relief; and focused on whether the state government (or a political subdivision thereof) had retained generally acknowledged sovereign powers, such as the right to tax, control navigation, or foreclose on property via eminent domain. In these cases, and others decided over the next seventy years or so, the Supreme Court held that the Contracts Clause was not violated when the relevant charter was silent as to the reservation of these sovereign powers.[20] While none of these cases appears actually to have employed

attribute of its sovereignty.'" *See Winstar*, 518 U.S. at 888 (quoting *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977)). Defendant, however, has not asserted this defense herein.

[20] *See also, e.g., Rogers Park Water Co. v. Fergus*, 180 U.S. 624, 628-29 (1901) (charter including schedule of rates could be altered by city government to reduce rates, holding that the latter authority "cannot be held to have been stipulated away by doubtful or ambiguous provisions")*; Covington v. Kentucky*, 173 U.S. 231, 233-34 (1899) (upholding state property tax on city's waterworks despite earlier law providing that such waterworks shall remain "forever" exempt from tax); *Vicksburg, Shreveport & Pacific Railroad v. Dennis*, 116 U.S. 665, 670 (1886) (under unmistakability presumption, tax exemption in charter construed to apply only to railroad once it became operational); David B. Toscano, "Forbearance Agreements: Invalid Contracts for the

the term "unmistakable," let alone the paradigmatic "unmistakability doctrine," the Court came closest to enunciating the doctrine in its modern terms in *St. Louis v. United Railways Co.*, 210 U.S. 266, 280 (1908), where it indicated that a government's power to tax was unaffected by a contract, unless it "has been specifically surrendered in terms which admit of no other reasonable interpretation."

Another line of authority, however, was crystallizing during this same general period. In these cases, often involving utilities, the Supreme Court held that the government must observe the same contracting rules as private parties – what one leading commentator refers to as the "rule of congruence."[21] A prime example is *Cleveland v. Cleveland City Railway*, 194 U.S. 517 (1904), where the Court struck down a local ordinance that required a train company to reduce its cross-town rates to four cents. The Court noted that an earlier charter to the same company had expressly reserved to the city the power to decrease fares, but that the current charter was silent on this point. *Id*. at 536. On that basis, it concluded that it was "free from doubt" that the ordinance "was an impairment of the contracts embodied in the prior ordinances." *Id.* at 537; *see also Detroit v. Detroit Citizens' Street Ry. Co.*, 184 U.S. 368, 382 (1902) (noting as to city's contract with street railway, "[t]he contract once having been made, the power of the city over the subject, so far as altering the rates of fare or other matters properly involved in and being a part of the contract, is suspended for the period of the running of the contract").

At times, these utility cases referred to – and made short shrift of – principles resembling the unmistakability doctrine. For example, in *Los Angeles v. Los Angeles Gas & Electric Co.*, 251 U.S. 32 (1919), where an utility argued that it had an exclusive franchise, preventing the city from using its power of eminent domain, the Supreme Court noted that under California law, "'[e]very intendment is to be indulged in favor of [a law's] validity; and doubts resolved in a way to uphold the law-making power.'" *Id*. at 37 (quoting *Ex Parte Haskell*, 112 Cal. 412 (Cal. 1896)). Yet, in this and other cases, the Court appeared to distinguish between the exercise of archetypal sovereign powers, such as the power of eminent domain, or the taxing and police powers, and other actions taken by the government in more of a corporate, proprietary or business role.[22] Actions in the latter roles were

---

Surrender of Sovereignty," 92 Colum. L. Rev. 426, 452-53 (1992) (describing these cases); Fitzgerald, 27 Pub. Cont. L.J. at 788 (same).

[21] *See* Joshua I. Schwartz, "Liability for Sovereign Acts: Congruence and Exceptionalism in Government Contracts Law," 64 Geo. Wash. L. Rev. 633 (1996); *see also* Alan R. Burch, "Purchasing the Right to Govern: Winstar and the Need to Reconceptualize the Law of Regulatory Agreements," 88 Ky. L.J. 245, 273 (2000) (hereinafter "Burch").

[22] *See, e.g., Los Angeles Gas & Elec.*, 251 U.S. at 40 ("It will be observed that we are not concerned with the duty of the corporation operating a public utility to yield uncompensated obedience to a police measure adopted for the protection of the public, but with a proposed uncompensated taking or disturbance of what belongs to one lighting system in order to make way for another.");

deemed more susceptible to the traditional rules of contracts: "If [the government] comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same rules that govern individuals there." *Cooke v. United States*, 91 U.S. 389, 398 (1895); *see also* Burch, *supra*, at 274 n.113 (listing numerous other such "congruence" cases).

The tracks of these two parallel lines of authority – those of the unmistakability doctrine and the congruence principle – can be spoored into the middle of the last century. As to the unmistakability doctrine, there were several additional cases during this period involving the Contracts Clause, highlighted by *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934) and *Veix v. Sixth Ward Building & Loan Association of Newark*, 310 U.S. 32 (1940). In the first of these, the Supreme Court indicated that, absent express terms, "the reservation of essential attributes of sovereign power is . . . read into [the] contract[] as a postulate of the legal order." *Home Building*, 290 U.S. at 435. It elucidated –

> But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the preexisting and higher authority of the laws of nature, of nations, or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur.

*Id.* at 435-36 (quoting *Long Island Water Supply Co. v. Brooklyn*, 166 U.S. 685, 692 (1897)). Later burnishing this rule in *Veix*, the Court indicated that such sovereign authority involved not only legislation to promote "health, morals and safety," but also "extends to economic needs as well." *Veix*, 310 U.S. 32, 38-39 (1940).[23]

This same period, however, also yielded two decisions commonly viewed as twin paeans to the congruence rule – *Lynch v. United States*, 292 U.S. 571 (1934) and *Perry v. United States*, 294 U.S. 330 (1935). *Lynch* involved life insurance policies issued to veterans by the government during

---

*Vicksburg v. Vicksburg Waterworks, Co.*, 206 U.S. 496, 508 (1907) ("That a state may, in matters of proprietary rights, exclude itself from the right to make regulations of this kind, . . . has been too frequently declared to admit of doubt.").

[23] Other cases to similar effect during this period include: *New York Rapid Transit Corp. v. City of New York*, 303 U.S. 573, 590-93 (1938); *Puget Sound Power & Light Co. v. Seattle*, 291 U.S. 619, 627 (1934); *see also United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25 (1977).

World War I under the War Risk Insurance Act of 1917, §§ 400-405, 40 Stat. 409. When it discovered that these policies would eventually cost the government a billion dollars, Congress terminated them in the Economy Act of 1933, §17, 48 Stat.11, which provided that "all laws granting or pertaining to yearly renewable term insurance are hereby repealed." Rejecting the government's assertion that the contracts had been annulled, Justice Brandeis, writing for a unanimous Court, first held that the insurance policies were contracts of the United States, rather than mere gratuities that could be "redistributed or withdrawn at any time in the discretion of the Congress," and thus "create vested rights." 292 U.S. at 577.[24] Then, in one of the most definitive statements of the congruence rule, Justice Brandeis declared that "[w]hen the United States enters into contract relations, its rights and duties therein are governed by the law applicable to contracts between private individuals." *Id*. at 579. The Court noted that while federal contracts may be abrogated when "the action taken falls within the federal police power or some other paramount power," *id*., there was no suggestion that Congress had "abrogate[d] these contracts in the exercise of [such] power." *Id.* at 580. Rather, it appeared that the legislation had been motivated by a simple intent to maintain the government's credit by reducing its obligations, triggering the following, somewhat scolding response from the Court –

> Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation.

*Id.* Because the government had not reserved the "power to curtail the amount of the benefits which Congress contracted to pay," *id*. at 578, the Court opined, Congress could not modify the prior contracts for "'[t]he United States are as much bound by their contracts as are individuals.'" *Id*. at 580 (quoting *Union Pac. R.R. v. United States*, 99 U.S. 700, 719 (1878)).

The following term, in *Perry,* plaintiffs who possessed U.S. bonds promising payment of principal in "United States gold coin of the present standard of value" challenged another Depression-era law that declared clauses in contracts requiring payment in gold, including those involving the United States, were "against public policy." The same law required such payment to be in any "coin or currency which at the time of payment is legal tender." Joint Resolution of June 5, 1933, ch. 48, 48

---

[24] In this regard, the Court stated further –

> True, these contracts, unlike others, were not entered into by the United States for a business purpose . . . But the policies, although not entered into for gain, are legal obligations of the same dignity as other contracts of the United States and possess the same legal incidents.

292 U.S. at 576-77.

Stat. 112. In a companion case to *Perry*, the Court held that under the Commerce Clause, Congress could retroactively invalidate gold clauses in private contracts. *See Norman v. Baltimore & Ohio R.R.*, 294 U.S. 240 (1935). But, in *Perry*, the Court held that abrogation of the same gold clauses in the U.S. bonds was impermissible, citing *Lynch* in observing:

> There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of Congress to alter or repudiate the substance of its own engagements . . . . To say that the Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government.

294 U.S. at 350-51. Rejecting, as inapplicable, the argument that "the Government cannot by contract restrict the exercise of a sovereign power," the Court found instead that "the right to make binding obligations is a competence attaching to sovereignty." 294 U.S. at 353. The Court thereby viewed its holding as not restricting, but reaffirming, Congress' power to borrow money under Article I, §8, cl.2 of the Constitution, reasoning, in this regard, that "[t]he binding quality of the promise of the United States is of the essence of the credit which is so pledged." 294 U.S. at 353. Despite this ground-breaking analysis, the Court ultimately concluded that plaintiff was entitled only to the face value of the bonds, "recover[ing] no more than the loss he had suffered and of which he may rightly complain." *Id*. at 354.[25]

Immediately after *Lynch* and *Perry*, one schooled in the law might have reconciled those cases with decisions applying the unmistakability doctrine by blithely surmising that the States simply fared better under the Contracts Clause than the United States did under the Fifth Amendment. While subsequent cases would show this reasoning to be faulty,[26] there was little precedent in the 1950s to indicate as much, because although the unmistakability doctrine by then was over 120 years old, the

---

[25] Four dissenting Justices, led by Justice McReynolds, characterized the latter holding as "amount[ing] to a declaration that the Government may give with one hand and take away with the other." *Id.* at 377. *See also* Leo P. Martinez, "Of Fairness and Might: The Limits of Sovereign Power to Tax After Winstar," 28 Ariz. St. L.J. 1193, 1211 (1997).

[26] *See, e.g., Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 472-73 (1985); *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984).

Supreme Court had yet to apply it to the United States.[27] The state of the law in this regard, indeed, would remain unchanged for approximately another thirty years.

Finally, in 1982, the Court invoked that doctrine on behalf of another sovereign – not the United States, but a Native American Tribe. In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), the Tribe granted private parties rights to oil and natural gas underlying tribal land; the lease prevented the Tribe from raising the rent or royalty payments provided therein, but did not say anything about taxes. *Id*. at 135. When the Tribe imposed a severance tax on oil and natural gas production, the developer sued, claiming a breach of contract. The Supreme Court, however, upheld the tax, reasoning that: "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Id.* at 148. By noting that the unmistakability doctrine applied to sovereign power "without regard to its source," the Court thus paved the way for that doctrine to apply to the United States.

It did not take long for that potential to become a reality – the year was 1986, the case was *Bowen v. Public Agencies Opposed to Social Security Entrapment* (POSSE), 477 U.S. 41 (1986) and the statute involved was the Social Security Act of 1935. Every State had taken advantage of the 1950 amendments to that Act to enter into long-term contracts with the Federal government to obtain Social Security coverage for their employees and those of their local governments. Mirroring a provision in section 418(g) of the 1950 amendments, these contracts permitted the States to terminate the contracts on behalf of certain groups of state or local employees by giving two years advance notice. In 1983, after various States, including California, had begun increasingly to exercise these rights, Congress repealed the termination provision retroactively, *see* Social Security Amendments Act

---

[27] In 1879, the Supreme Court hinted that the unmistakability doctrine might apply to the federal government in deciding two companion cases that became known as the Sinking Fund Cases. *See Union Pacific R.R. Co. v. United States*, 99 U.S. 700 (1879) and *Central Pacific Ry. v. Gallatin*, 99 U.S. 727 (1879). These cases did not involve contracts *per se*, but rather Civil War legislation that authorized the building of the intercontinental railroad. To fund that railroad, Congress authorized the issuance of various bonds payable by railroads in thirty years. In 1878, concerned with the railroad's long-term solvency, Congress added a requirement that the railroads deposit half of their earnings into a sinking fund within the Treasury. The Court upheld this requirement as against a Due Process challenge, and intimated that the United States, though not subject to the Contract Clause, might benefit from a rule similar to the unmistakability doctrine, stating that – "The United States cannot, any more than a State, interfere with private rights, except for legitimate governmental purposes." *Union Pacific*, 99 U.S, at 718. It noted further that if a state were to pass the same law, "it would not be seriously contended that such legislation was unconstitutional, either because it impaired the obligations of the charter contract, or deprived the corporation of its property without due process of law." *Id*. at 721-22; *see also* Burch, *supra*, at 284.

of 1983, Pub. L. No. 98-21, 97 Stat. 65, thereby preventing the local government's from withdrawing their employees from the Social Security system, even where notices had previously been given. 477 U.S. at 46-48.

The States claimed that this legislation had effectuated a taking of their contract rights. Rejecting this argument, Justice Powell, writing on behalf of a unanimous Court, reasoned –

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights, *see Perry v. United States*, . . . ; *Lynch v. United States*, . . . , we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in' the contract. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, . . . . Rather, we have emphasized that '[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' *Ibid*. Therefore, contractual arrangements, including those to which a sovereign itself is party, "remain subject to subsequent legislation" by the sovereign. *Id.*, at 147.

477 U.S. at 52. In so holding, the Court distinguished between the Section 418 agreements and other contracts, noting, *inter alia*, that Congress had explicitly reserved the right in the original Social Security Act to modify its provisions. *Id*. at 53-54. Then, in a critical passage, Justice Powell distinguished *Lynch* and *Perry*, noting:

> [t]he provision constituted neither a debt of the United States, *see Perry* . . . , nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, *see Lynch* . . . . The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

*Id.* at 55.[28]

---

[28] In the most recent Supreme Court case to apply the unmistakability doctrine to absolve the United States from liability, *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700 (1987), the Court held that a treaty granting an Indian Tribe ownership of a river bed did not abrogate the right of the United States to regulate the navigability of the river. Specifically, it held the assertion of the navigational servitude did not effect a taking. In so holding, the court held that the Tribe did not "gain[] an exemption from the servitude simply because it received title to the riverbed" under its treaty. *Id*. at

Read in isolation, Justice Powell's statement in POSSE that "sovereign power . . . will remain intact unless surrendered in unmistakable terms," *id.* at 52, appears broad and unqualified – defendant, in fact, would have this court so hold Yet, by distinguishing, rather than overruling, *Lynch* and *Perry*, the Court clearly signaled that the unmistakability doctrine has limits. What are they? If history is any guide, they are not so dependent on the nature of the underlying agreement as they are on that of the allegedly breaching legislation. A key then is whether that legislation invokes or embodies the types of sovereign power encompassed by the doctrine – those that "promote the happiness and prosperity of the community," *Charles River Bridge*, 36 U.S. at 547, or involve the health, morals, safety or economic needs of the citizenry, *Veix*, 310 U.S. at 38-39. If such is the case – where, for example, the challenged legislation represents a general exercise of the taxing or police powers – the unmistakability doctrine readily applies. If it is not – where, for example, the challenged legislation represents a bald "repudiation" of a contractual obligation prompted by Congress' desire to correct what it perceives to be an overly generous deal – the unmistakability doctrine will avail the government naught. It follows, *a fortiori*, that the unmistakability doctrine is not triggered by the passage of just any legislation – contrary to defendant's importunings, the power of Congress to pass legislation under Article I of the Constitution is neither coextensive nor coterminous with the doctrine. Rather, the doctrine is more limited – owing those limitations to its historical roots in the Contracts Clause cases and its peaceful coexistence with the congruence line of cases for more than a century. It remains to test these propositions in the harrowing crucible that is *Winstar*.

**b. The *Winstar* decision.**

*Winstar*, of course, was one (actually a trio) of many cases spawned when the Congress enacted a statute that precluded regulatory agencies from accepting a particular regulatory treatment that had allegedly been promised by contract to various entities acquiring insolvent thrift institutions. There, as here, the United States made the unmistakability doctrine the centerpiece of its defense, wielding, as both a buckler and shield, the broad statement of that rule in *POSSE* quoted above. The Supreme Court rejected that argument in a judgment supported by three opinions: a plurality opinion authored by Justice Souter, a separate concurring opinion by Justice Breyer, and an opinion concurrent in the judgment written by Justice Scalia.

The plurality opinion in *Winstar* decided that the unmistakability doctrine was inapplicable. Summarizing some of the same history discussed above, Justice Souter stated that the "application of the [unmistakability] doctrine . . . turns on whether enforcement of the contractual obligation would block the exercise of a sovereign power of the Government." 518 U.S. at 87. He found that the latter was not the case, as the thrifts were not seeking to preclude the United States from exercising its sovereign powers, but rather to collect damages arising from the regulatory change. Five justices,

---

707. "Such a waiver of sovereign authority will not be implied," the Court continued, "but instead must be 'surrendered in unmistakable terms.'" *Id*. (quoting *POSSE*, 477 U.S. at 52).

however, disagreed with this conclusion, with the three concurring justices opining that the plurality's approach clashed with precedent, which had "not made the availability of these sovereign defenses (as opposed to their validity on the merits) depend upon the nature of the contract at issue." *Id*. at 919 (Scalia, J., concurring); *see also id.* at 926 (Rehnquist, C.J., dissenting). Three of these justices – those who concurred in the judgment – believed that the doctrine applied, but that the contracts in question contained an unmistakable promise to continue the favorable regulatory treatment. *Id*. at 920-21 (Scalia, J.). The two dissenting justices also believed that the doctrine applied, but found that the contract failed to contain an unmistakable promise against further regulatory action. *Id*. at 935-36 (Rehnquist, C.J., dissenting).

Each of these opinions, however, intimates that the application of the unmistakability doctrine turns on the nature of the legislation or other action alleged to have breached the contract. Invoking *Lynch* and *Perry*, Justice Souter, for example, noted that "the National Government has some capacity to make agreements binding future Congresses by creating vested rights," albeit acknowledging that "the extent of that capacity . . . remains somewhat obscure." *Id*. at 876. Attempting to reconcile the unmistakability and congruence lines of cases, Justice Souter explained further –

> *Merrion*, *Bowen*, and *Cherokee Nation* thus announce no new rule distinct from the canon of construction adopted in *Providence Bank* and *Charles River Bridge*; their collective holding is that a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power. The cases extending back into the 19th century thus stand for a rule that applies when the Government is subject either to a claim that its contract has surrendered a sovereign power (*e.g.*, to tax or control navigation), or to a claim that cannot be recognized without creating an exemption from the exercise of such a power (*e.g.*, the equivalent of exemption from Social Security obligations). The application of the doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government.

*Id*. at 878-79. Justice Souter then supplied an important definition as to which sovereign powers were protected by the doctrine, *to wit*:

> 'Sovereign power' as used here must be understood as a power that could otherwise affect the Government's obligation under the contract. The Government could not, for example, abrogate one of its contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government contracts. No such legislation would provide the Government with a defense under the sovereign acts doctrine, . . .

*Id*. at 878 n. 22 (citation omitted).

The latter definition would have been unremarkable had it been in the plurality's discussion of the sovereign acts doctrine; its conspicuous placement within the plurality's response to the government's unmistakability argument, however, is significant, as it suggests a nexus between the two doctrines that hinges on whether a given enactment truly represents the exercise of a "sovereign power." This linkage is all the more significant given the plurality's statement that under the sovereign acts doctrine, the legislature can enact laws that are "relatively free of Government self-interest," but not "statutes tainted by a governmental object of self-relief." *Id*. at 896. The plurality viewed such self-interest as "instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." *Id*. Thus, in terms reminiscent of *Lynch* and *Perry*, the plurality thereby demarcated, more clearly perhaps than before, the point at which the influence of both the sovereign acts and unmistakability doctrines wanes and the congruence principles take hold.

That the unmistakability doctrine hinges on the nature of the government's breaching act is a leitmotif found in both concurring opinions. Thus, Justice Breyer began his opinion by observing: "Both common sense and precedent make clear that an 'unmistakable' promise to bear the risk of a change in the law is not required in every circumstance in which a private party seeks contract damages." *Id*. at 911. By way of example, he noted that in neither *Lynch* nor *Perry* "did the Court suggest that an 'unmmistakable' promise, beyond that discernible using ordinary principles of contract interpretation, was necessary before liability could be imposed on the Government." *Id*. at 912. "This approach is unsurprising," he added, "for in practical terms it ensures that the government is able to obtain needed goods and services from parties who might otherwise, quite rightly, be unwilling to undertake the risk of government contracting." *Id*. at 913. Surveying decisions such as *POSSE* in light of such congruence principles, Justice Breyer observed that –

> [i]t is difficult to believe that the Court intended its 'umistakability' language in these unusual cases to disable future courts from inferring, from language and circumstances under ordinary contract principles, a more narrow promise in more typical cases – say, a promise not to abrogate, or to restrict severely through legislation and without compensation, the very right that a sovereign explicitly granted by contract (*e.g.*, the right to drill for oil, or to use the riverbed).

*Id*. at 916-17. Summarizing, Justice Breyer indicated that the foregoing considerations, "along with the general principle that the government is ordinarily treated like a private party when it enters into contracts," meant that the "unmistakability" language in cases like POSSE "might have grown out of unique features of sovereignty, believed present in those cases, which, for reasons of policy, might have made appropriate a special caution in implying the claimed promise." *Id*. at 918. Finding that "there is no special policy reason related to sovereignty which would justify applying an 'unmistakability' principle here," Justice Breyer thus agreed that the doctrine was inapplicable. *Id*.

For his part, Justice Scalia disagreed with the contention that the unmistakability doctrine did not apply because the suits in question sought damages. *Id*. at 919-20. Yet, still concluding that the doctrine did not shield the government from liability under the contracts at issue, he too focused on the nature of the action taken by the government. In this regard, Justice Scalia wrote:

> it is reasonable to presume *(unless the opposite clearly appears)* that the sovereign does *not* promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised action.

*Id*. at 921. Were the government "free to make its own performance impossible through its manner of regulation," Justice Scalia concluded, the result would be to place performance within one party's unilateral control – "an absolutely classic description of an illusory promise," *id*. at 921, tantamount to "no promise regarding the future at all – not even so much as a peppercorn's worth." *Id*. at 922. Finally, commenting on the relationship between the unmistakability doctrine and the sovereign acts doctrine, Justice Scalia stated that "[i]n my view the 'sovereign acts' doctrine adds little, if anything at all, to the 'unmistakability' doctrine and is avoided whenever that one would be – *i.e.*, whenever it is clear from the contract in question that the Government was committing itself not to rely upon its sovereign acts in asserting . . . the doctrine of impossibility." *Id*. at 923. As further support for the latter contention, Justice Scalia returned to *Lynch* and *Perry*, noting that "[i]n both of them, as here, Congress specifically set out to abrogate the *essential bargain* of the contracts at issue – and in both we declared such abrogation to amount to impermissible repudiation." *Id*. at 924.

Even in dissent, Chief Justice Rehnquist seemed to distinguish between the true exercise of a "sovereign power" in support of the public good and the passage of legislation that merely targets a specific government obligation under a contract. For example, in commenting on the plurality's opinion, he stated:

> The second reason the principal opinion advances for its limitation on the unmistakability doctrine is that if it were applied to all actions for damages, it would impair the Government's ability to enter into contracts. But the law is well established that Congress may not simply abrogate a statutory provision obligation performance without breaching the contract and rendering itself liable for damages . . . Equally well established, however, is that the sovereign does not shed its sovereign powers just because it contracts.

*Id.* at 929. Though he agreed with little else in the majority opinions, the Chief Justice, in fact, acquiesced in two critical propositions: (i) that "*Lynch* stands for the proposition that the congressional repeal of a statute authorizing the payment of money pursuant to a contractual agreement is a breach of that contract," *id*. at 933, and (ii) that "[a] moment's reflection suggests that the unmistakability doctrine and the sovereign acts doctrine are not entirely separate principles." *Id*. at 937.

While one might struggle mightily to weave a controlling rule of law from the opinions in *Winstar*,[29] the Justices all appear to share several foundational juridical principles that are relevant here: First, they agree that the application of the unmistakability doctrine hinges on whether the challenged legislation subsidiarily involves the exercise of a "sovereign power" protected by that doctrine. *See, e.g.*, 518 U.S. at 878-79 (Souter, J.). Second, they are conjoined in the view that those "sovereign powers" are not encompassed or invoked in all forms of legislation – citing the congruence cases and viewing the unmistakability doctrine as a canon of construction, they concur that certain reservations of power by the sovereign are implicit in contracts, while others are not. Third, each opinion, in its own way, suggests that the "sovereign powers" that are protected by the doctrine share features with the acts covered by the "sovereign acts" doctrine. These powers are, in the words of Justice Souter, those "that could otherwise affect the Government's obligation under the contract," *id*. at 878 n.22, exhibiting, as Justice Breyer wrote, "unique features of sovereignty" warranting "special caution," *id*. at 918; they are those that Justice Scalia described as "needful for the public good," *id.* at 921, and, according to sampling of the opinions, include the police and taxing powers, the power of eminent domain and of navigational servitude. Fourth, each opinion plainly excludes from the doctrine's protection legislation modifying what Congress simply perceives as a bad deal – the "sovereign powers" doctrine thus is not invoked by an enactment that targets for elimination the "essential bargain of the contract at issue," *id*. at 924 (Scalia, J.), "the very right that [the] sovereign explicitly granted by contract," *id*. at 917 (Breyer, J.), or a "statute authorizing the payment of money pursuant to a contractual agreement," *id*. at 933 (Rehnquist, C.J.). In the end, then, *Winstar* confirms that, in deciding whether the unmistakability doctrine applies in a given case, the nature of the legislation alleged to have breached the contract in question is truly pivotal.

### c. More Recent Cases

This court is not the first to draw these conclusions. In *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997), the first significant case to construe *Winstar*, the Federal Circuit was faced with an electric utility, which claimed that a federal assessment imposed by the Energy Policy Act of 1992 to help decommission uranium enrichment facilities, breached the

---

[29] Regarding the precedential impact of such split decisions, the Supreme Court has instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976)); *see also Texas v. Brown*, 460 U.S. 730, 737 (1983) (stating that a plurality view that does not command a majority is not binding precedent); *Hertz v. Woodman*, 218 U.S. 205, 213-14 (1910) ("[T]he principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts").

government's prior contract with the utility to supply enriched uranium at a fixed price. Distinguishing *Lynch* and *Perry*, the court began by noting that the Energy Policy Act "constitutes a general exercise of Congress' taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." 112 F.3d at 1577. Having concluded, on that basis, that this assessment was a public and general act protected by the "sovereign acts" doctrine, the court next determined whether the unmistakability doctrine applied. *Id*. While noting that, under *Winstar*, the "application of the doctrine is unrelated to the nature of the underlying contracts," the court observed that "[i]mportantly, however, the plurality also expressly stated that application of the unmistakability doctrine turns on whether enforcement of the contractual obligation would effectively block the exercise of a sovereign power of the Government." *Id*. at 1579. Applying this analysis, the court observed that "the assessment at issue in the present case is a general, sovereign act," that involved "the exercise of [the] sovereign power to tax." *Id*. As such, in the court's view, the unmistakability doctrine applied.

Several subsequent cases in this court have construed *Yankee Atomic* as defining when an act of Congress qualifies for protection under the unmistakability doctrine. For example, in *Coast-to-Coast Financial Corp. v. United States*, 45 Fed. Cl. 796 (2000), this court construed the unmistakability doctrine in the course of resolving a discovery dispute. Focusing, in particular, on what constitutes a "sovereign power" under the doctrine, this court explained –

> In describing when the unmistakability doctrine should be applied, the Supreme Court has stated that 'The application of the doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a *sovereign power* of the Government.' . . . In defining 'sovereign power' in turn, the Court emphasized that the unmistakability doctrine was not designed to protect efforts to target government contractors if the targeting would otherwise be improper.

*Id*. at 802. After quoting, *haec verb*a, Justice Souter's footnote definition of "sovereign power," this court then construed that language stating – "In other words, the *Winstar* plurality supports [the] argument that an inquiry into the alleged 'targeted' nature of the . . . legislation is relevant to determining whether the Government can take advantage of the unmistakability doctrine in the present case." *Id*. Summarizing, this court concluded that "[f]or an act of Congress to qualify as an exercise of sovereign power, it cannot have been designed merely to eliminate an obligation that arose under one of the Government's contractual relationships." *Id.* at 803.[30]

---

[30] Commenting on Justice Scalia's concurrence in *Winstar*, the court later reemphasized:

> Under this view, the inquiry into possible 'targeting' by Congress is relevant to determining whether the alleged breach is merely an incidental effect of a sovereign act designed to promote the public good, or instead is a deliberate attempt by Congress to

Consistent with this view, two subsequent decisions of this court have explicitly linked the sovereign acts and unmistakability doctrines, holding that enactments not covered by the former are, for that reason, outside the latter. Thus, in *General Dynamics Corp. v. United States*, 47 Fed. Cl. 514 (2000), the court, after reviewing both *Winstar* and *Yankee Atomic*, concluded "[i]t seems clear . . . that what the Supreme Court and the Federal Circuit had in mind when they referred to sovereign power was that power exercised by government for 'public and general' purposes, as opposed to releasing government from its contractual obligations." *Id*. at 542. More recently, in *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (2002), this court reconsi-dered a prior opinion, *see* 46 Fed. Cl. 629 (2000), and reversed its holding that the sovereign acts and unmistakability doctrines should be considered separately. Instead, adopting the reasoning in *General Dynamics*, the court concluded that the statute in question was not a "sovereign act," and thus also was not covered by the unmistakability doctrine, because it specifically targeted particular individuals and was designed to avoid

---

> alter its previous bargain with the contractor. If the former, the parties are presumed to have intended that no liability attach to Congress's action (absent unmistakable language to the contrary). If the latter, however, the [concurrence's] unmistakability defense is not available, because it is not reasonable to presume that contractors intend for the Government to deliberately target the elimination of rights that would, under normal rules of
> construction, accrue to the contractor, particularly where the contract imposes an obligation of good faith and fair dealing on both parties.

*Id*. at 804; *see also Pitney Bowes, Inc. v. U.S. Postal Serv*., 27 F.Supp.2d 15, 23 (D.D.C. 1998); *see generally*, Steven J. Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 Harv. L. Rev. 369 (1980).

a government contractual obligation. 51 Fed. Cl. at 440-41.[31] Other decisions of this and others courts are to similar effect.[32]

**2. Redux**

The foregoing should make obvious that the basic proposition announced above – that, at least in the context of legislation, the unmistakability doctrine applies only when the Congress invokes one of the sovereign powers protected by the doctrine – finds support in a wealth of authorities. *Winstar*, as well as its progenitors and progeny, teach that the orbit of this doctrine significantly intersects that of the sovereign acts doctrine – both apply when the Congress acts to protect public safety, morals or the economy; neither applies when the Congress instead targets the government's contractual obligations in an effort to obtain a better deal. Several additional reasons support this conclusion.

First, it should not be overlooked that the unmistakability doctrine is designed to "avoid[] difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." *Winstar*, 518 U.S. at 875. In other words, the doctrine is a rule of constitutional avoidance that specifically evolved to avert unnecessary applications of the "reserved powers" doctrine. As such, it is significant that the latter doctrine is itself limited to the uniquely important sovereign powers "necessary to protect the public health, or the public morals." *New Orleans Gas-Light Co. v.*

[31] The nexus between the sovereign acts and unmistakability doctrines proceeds from a common objective – to shield exercises of the lawmaking function that involve sovereign powers. This nexus is neither historical nor, strictly speaking, rationale-driven. Thus, while the doctrines incorporate similar requirements, they proceed from independent lines of authority: the sovereign acts doctrine from early Court of Claims decisions (circa 1865) applying concepts of sovereign immunity; the unmistakability doctrine from early Supreme Court decisions (circa 1830) construing the Contracts Clause. This perhaps explains why the court in *Adams v. United States*, 42 Fed. Cl. 463, 485 (1998), concluded that the unmistakability doctrine was available, even where the sovereign acts doctrine was not. This court, however, disagrees with *Adams* to the extent that it can be read to suggest that the sovereign powers protected by the unmistaka-bility doctrine vary significantly from the actions protected by the sovereign acts doctrine.

[32] *See, e.g.*, *Kimberly Associates v. United States*, 261 F.3d 864, 869 (9th Cir. 2001) (adopting the construction of "sovereign power in *General Dynamics*, while reemphasizing that "an unmistakability doctrine analysis requires examination of . . . [in] what capacity was the United States acting when it breached its contractual obligations"); *Resolution Trust Corp v. Fed. Savings and Loan Ins. Corp.*, 34 F.3d 982, 984 (10th Cir. 1994); *United States v. Westlands Water Dist*., 134 F.Supp.2d 1111, 1151 & n.88 (E.D. Cal. 2001); *Conoco, Inc. v. United States*, 35 Fed. Cl. 309, 335 (1996), *rev'd, on other grounds, sub nom., Marathon Oil Exploration & Producing SE, Inc. v. United States*, 177 F.3d 1331 (Fed. Cir. 1999), *rev'd, sub nom., Mobil Oil Co. v. United States*, 530 U.S. 604 (2000); *see also Tamarind Resort Assoc. v. Virgin Islands*, 138 F.3d 107, 112 (3d Cir. 1998).

*Louisiana Light Producing & Manuf'g Co.*, 115 U.S. 650, 669 (1885).[33] Outside the application of these powers, the Supreme Court has enforced, as against the assertion of the "reserved powers" doctrine, a variety of state and municipal contracts that made promises in return for substantial consideration.[34] In the court's view, this is significant for it makes little sense to afford a prophylactic rule – the unmistakability doctrine – a broader berth than the constitutional dilemma it is designed to avoid. This observation, in turn, buttresses the court's conclusion that the unmistakability doctrine protects only certain forms of legislation, *to wit*, those truly invoking "sovereign powers."

Second, the court's construction of the unmistakability doctrine finds support in several relatively recent decisions of the Supreme Court analyzing that doctrine in its original context, *i.e.*, a State's potential violation of the Contracts Clause. For example, in *Allied Structural Steel v. Spannaus*, 438 U.S. 234 (1977), the Court refused to apply the unmistakability line of cases in holding that a Minnesota pension statute severely impaired established contractual relations between employers and employees. Although the case did not involve contracts to which the State itself was a party, the Court's rationale, nonetheless, provides indication as to the type of sovereign powers that are safeguarded by the unmistakability doctrine:

> This Minnesota law simply does not possess the attributes of those state laws that in the past have survived challenge under the Contract Clause of the Constitution. The law was not even purportedly enacted to deal with a broad, generalized economic or social problem. It did not operate in an area already subject to state regulation at the time the

---

[33] *See also Grand Trunk Western Ry. Co. v. City of South Bend*, 227 U.S. 544, 554 (1913) (application of reserved powers doctrine cannot be based on government's reconsideration of "inconveniences" of contract that were foreseeable from the outset); *New Orleans Gas-Light*, 115 U.S. at 665- 69 (citing other cases); *Stone v. Mississippi*, 101 U.S. 814, 820-21 (1879); *see generally*, Janice C. Griffith, "Local Government Contracts: Escaping from the Governmental/ Proprietary Maze," 75 Iowa L. Rev. 277, 290-99 (1990) (summarizing the early development of the reserved powers doctrine); Stewart E. Sterk, "The Continuity of Legislatures: Of Contracts and the Contracts Clause, 88 Colum. L. Rev. 647, 698 (1988).

[34] *See, e.g., Wood v. Lovett*, 313 U.S. 362 (1941) (challenges to validity of tax sales); *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95 (1938) (tenure of public education teachers); *Appleby v. City of New York*, 271 U.S. 364, 380 (1926) (state can contract that specific land will be "free from subsequent regulatory control"); *St. Cloud Pub. Serv. Co. v. City of St. Cloud*, 265 U.S. 352, 355 (1924) (municipal contract can "suspend, during its life, the governmental power of fixing and regulating . . . rates"); *Russell v. Sebastian*, 233 U.S. 195, 210 (1914) (utility regulation); *American Smelting & Refining Co. v. Colorado ex rel. Lindsley*, 204 U.S. 103, 115 (1907) (conditions for foreign corporations to transact business); *United States ex re. Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall.) 535, 554-55 (1866) (taxation); *see also United States v. Bekins*, 304 U.S. 27, 51-52 (1938).

> company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State. It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships – irrevocably and retroactively. And its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees.

Id. at 250 (citations omitted). Other recent decisions have likewise emphasized that the enactments protected by the unmistakability doctrine (and the reserved powers doctrine) must serve broad societal purposes and not be directed at the abrogation of particular contracts. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412-413 n.14 (1983) (government excused from breach of Contracts Clause where legislation designed to remedy "a broad or general social or economic problem"); *U.S. Trust Co.*, 431 U.S. at 25, 26 n. 25 (doctrine applies where exercise of sovereign power is "reasonable and necessary to serve an important public purpose"); *City of El Paso v. Simmons*, 379 U.S. 497, 508 (1965) (doctrine applies to "essential attributes of sovereign power" designed to protect the "general welfare"); *see also In re Seltzer*, 104 F.3d 234, 235 (9th Cir. 1996).

Third, although not determinative in its own right, the view of the doctrine adopted herein is also more in accord with its roots as rule of contract construction. *See Jefferson Branch Bank v. Skelly*, 66 U.S. (1 Black) 436, 446 (1861); *see also Winstar*, 518 U.S. at 873-74 (citing *Minot v. Philadelphia & Baltimore R.R.*, 85 U.S. (18 Wall.) 206, 225 (1873)). As described by Justice Scalia in *Winstar*:

> [The unmistakability doctrine] is simply a rule of presumed (or implied-in- fact) intent. . . . Generally, contract law imposes upon a party to a contract liability for any impossibility of performance that is attributable to that party's own actions . . . . When the contracting party is the government, however, it is simply *not* reasonable to presume an intent of the sort.

518 U.S. at 920-21. Even under this "reverse-presumption," the government is not presumed to have retained the power to target undesirable provisions of particular contracts for subsequent modification. *See Coast-to-Coast*, 45 Fed. Cl. at 804; Joshua I. Schwartz, "The Status of the Sovereign Acts and Unmistakability Doctrines in the Wake of Winstar: An Interim Report," 51 Ala. L. Rev. 1177, 1197 (2000) ("The government is not entitled to any exceptional sovereignty-based defense when it singles out a particular contracting partner for impairment of its contract rights."). When the latter occurs, the general rule regarding impossibility of performance applies and, to the extent the government renders its own performance impossible, it is liable.

Finally, it bears noting, as others have before, that there is no logical limit to the government's plenary characterization of the unmistakability doctrine. While defendant does not – and in good faith could not – deny the existence of the congruence line of cases, it generally seeks to limit those cases to their facts, never offering an acceptable theoretical basis upon which to conclude when the unmistakability doctrine ceases to apply and ordinary contract principles control. Carried to its logical extreme, the government's position would transform the unmistakability doctrine from a shield into a meat axe that would allow the Congress to reserve the choicest portions of the government's contracts and discard the rest – if the price offered for goods or services under preexisting contracts or statutory mechanism were too high, Congress could lower them; if those willing to offer goods or services under a given program were in short supply or eligible to leave a program, Congress could simply extend the agreements already in force; and, if instead the need for a program had diminished, Congress could then discard pre-existing contracts, despite the reasonable expectations of their private partners. *See Winstar*, 518 U.S. at 922 (Scalia, J.).[35] While such actions might be deemed a compensable taking of the private party's contract rights or other property interests under the Fifth Amendment, *see Chancellor Manor v. United States*, 331 F.3d 891, 903 (Fed. Cir. 2003)*; Cienega Gardens v. United States*, 331 F.3d 1319, 1353 (Fed. Cir. 2003), the fact remains that, unless based upon the invocation of a sovereign power, they also constitute a breach of contract.[36] In short, although the

---

[35] As Justice Souter observed in *Winstar*, "[t]he Government's position would not only thus represent a conceptual expansion of the unmistakability doctrine beyond its historical and practical warrant, but would place the doctrine at odds with the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." 518 U.S. at 883; *see also Perry*, 294 U.S. at 351 ("To say that the Congress may withdraw or ignore that pledge, is to assume . . . a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor."). One might argue that an everyday response to these concerns would be for private parties to negotiate contracts that contain "unmistakable promises" regarding the government's use of its sovereign powers. But, setting aside the question whether the government would agree to such a provision, private parties should not have to guard against the possibility that the government would target essential provisions of their contract for later unilateral revision, thereby obtaining a second promise from the government not to do what it should not do in the first instance. Indeed, absent specific judicial imprimatur, any such language might well be ultimately viewed as not being "unmistakable." One can only speculate what would happen in the marketplace if prominently displayed in every contract were a provision explicitly indicating that the government reserved the right to change unilaterally any provision subsequently deemed by the Congress or executive agency to be unduly expensive or otherwise ill-advised.

[36] Indeed, in *Cienega*, *supra*, the Federal Circuit rejected the notion that the mortgage contracts there did not give rise to vested rights, but instead were subject to subsequent regulation and modification, stating:

> This case is instead comparable to Winstar, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964. Though Winstar was a breach of contract case and not a takings case, it

contours of the unmistakability doctrine remain somewhat imprecise, there is a clear basis for concluding when that doctrine does ***not*** apply – as Locke said, "[t]hough no man can draw a stroke between the confines of night and day, still light and darkness are on the whole tolerably distinguishable."

### 3. Does the unmistakability doctrine apply to this case?

It remains to determine whether the unmistakability doctrine is triggered on the facts of this case. The court holds that it is not.

In passing the 1994 amendments, the Congress did not act to protect public safety, morals or the economy, through the exercise, for example, of its police powers. Rather, in an appropri-ations measure, it deliberately targeted, at HUD's behest, that agency's contractual obligations under preexisting HAP contracts in an effort to reduce outlays under the Section 8 program. As a prelude to taking this action, the House Appropriation Committee noted the "lack of sufficient outlays necessary to support a number of critical programs," H. Rep. 104-555 at 1, while its counterpart in the Senate complained that it and the subcommittee dealing with HUD "have faced extraordinary difficulties due to limited amounts available for domestic discretionary spending," S. Rep. 103-311 at 6. The Senate report then proposed that Congress adopt a number of HUD-sponsored changes to the Section 8 program to save money, among them the amendment *sub judice*, stating:

> The 1995 budget also contains a number of legislative proposals that are designed to produce outlay savings. These legislative proposals include: a proposal to reduce preservation cost limits from 120 percent to 100 percent of the fair market rent; a proposal to round down the annual adjustment factor to the next lowest whole dollar; a

---

> showed that the abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, there banking, because the contracts embodied the commitments of the contracting parties. *Id*. at 896-97, 116 S.Ct. 2432. The Owners' contractual prepayment rights are such clear, unqualified rights. The purpose of contracts is precisely to fix obligations and entitlements so that they will not be affected by subsequent background changes. Nor were the Owners' rights subject to divestiture simply because of their voluntary participation in a housing program under government control. To hold otherwise would mean that Congress could have changed the mortgage contracts in any way to affect any of the rights established by the contracts – including changing the contracts to extend their term from forty to, for example, eighty years – and the Owners would be without a remedy. Again, this is not and cannot be the law.

331 F.3d at 1334.

> proposal to monitor income reporting and match it with IRS reported income; a proposal to limit the annual adjustment factor rent increases to cases where rents are less than the local market average; a proposal to refinance high cost section 8 debt; a proposal to limit section 8 new construction/substantial rehabilitation rents to the fair market rent for renewals; a proposal to eliminate the subsidy for loan management units when they are vacated; a proposal to reduce the annual adjustment factor rent increases for tenants who stay in section 8 and section 202/811 projects; and a proposal to reduce the fair market rent from the 45th to the 40th percentile of local market rent.

*Id*. at 40. This same report further indicated that the limitations on automatic adjustments will "generate[] $110,000,000 in outlay savings in 1995," and that the Committee "believes that the projects can absorb this freeze on the [A]AAF." *Id*. at 70. Further revealing the nature of this legislation, written statements submitted by HUD officials in response to questions posed by members of the House Appropriations Committee indicate that the agency had sponsored the provision in question because the Administration had unsuccessfully attempted to freeze outright the AAAFs for Section 8 projects. *See Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations for FY 1995: Hearings before the Subcomm. on VA, HUD and Independent Agencies of the House Comm. on Appropriations*, 103rd Cong., 2d Sess. 374 (1994).

Notwithstanding this history, defendant contends that the 1994 amendments represented the exercise of an important sovereign power – namely, preserving the integrity of, and public confidence in, the Section 8 program by ensuring that HUD was not over-subsidizing these housing projects. Consistent with the Supreme Court's "Contracts Clause" jurisprudence, the court must scrutinize this assertion of Congress' purpose with an extra measure of vigilance "because the [govern-ment's] self-interest is at stake." *U.S. Trust Co.*, 431 U.S. at 26; *see also McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12, 16 (1st Cir. 1996) ("it is clear that a state must do more than mouth the vocabulary of the public weal in order to reach safe harbor"). Indeed, defendant's assertion has a decidedly hollow ring in several respects.

First, any notion that the primary purpose of the amendments was to preserve the integrity of the program is belied by the fact that the legislation did not make permanent changes to the program, but rather, initially, was in effect only for fiscal year 1995. Subsequent appropriation bills then extended the new provisions, but only to certain defined periods, including specific days in fiscal year 1996; it was not until the latter part of 1997 that Congress made the provision permanent for fiscal year 1999 and thereafter.[37] The halting, pock-marked structure of these effective date provisions belies any broad

---

[37] For reasons unrevealed, two of these subsequent amendments created and preserved a window from April 26, 1996, through September 30, 1996, during which the amendment did not apply. *See* The Balanced Budget Act of 1997, Pub.L. No. 105-33, § 2003, 111 Stat. 251 (1997)

programmatic goal to bring Section 8 rents closer to what was perceived as market rents, for if that were the goal, the provisions would have made that change without temporal exception or interruption. Instead, the structure of the provisions, as well as parts of the accompanying legislative history,[38] suggest that Congress was more concerned about reducing outlays and used the temporal limitations to sweep in enough adjustments to produce the desired fiscal result. Indeed, it should not be overlooked that prior to the 1994 amendments, the statute already contained provisions calibrating rents to the market, including the overall limitation provision. What the 1995 legislation instead accomplished was to shift the responsibility and risk of demonstrating that a particular annual adjustment is warranted from HUD to the project owners, notwithstanding prior agreements to the contrary. In the court's view, this is precisely the type of targeted abrogation of contractual rights that the various opinions in *Winstar* made clear is neither covered nor protected by the unmistakability doctrine.

Second, to the extent that Congress' concern was that the subsidized rents in Section 8 housing frequently exceeded HUD's "fair market rents," *see, e.g.*, H. Rep. 105-149 at 518, it bears stressing that the latter term is not synonymous with the more familiar concept of "fair market value." Congress has repeatedly observed as much, with a 1996 report examining the Section 8 program, which accompanied one of the extensions of the 1994 amendments, finding:

> Despite its best efforts, HUD's [fair market rents] FMRs do not always accurately reflect true market rents for certain areas and submarkets within broadly defined areas. In fact, the description most often made of FMRs is that they are neither fair nor market. . . . When FMRs are inaccurate – a significant problem in the past – subsidies may be too high for prevailing rents in some submarkets and too low in others.

---

(applying the provision to FY 1995, FY 1996 prior to April 26, 1996, FY 1997, FY 1999, and thereafter); Pub. L. No. 105-65, § 201(c)(1), 111 Stat. 1344 (1997) (applying provision to FY 1995, FY 1996 prior to April 26, 1996, FY 1997 and FY 1998); Pub. L. No. 104-204, § 201(g), 110 Stat. 2874 (1996) (applying provision to FY 1995 and FY 1997).

[38] For example, the House report accompanying the passage of Pub. L. No. 105-65, indicates that the limitation on automatic adjustments was one of a "number of administrative provisions designed to reduce costs at HUD." H. Rep. 105-175 at 45; s*ee also* S.Rep. 104-318 at 29 (noting, in regards to P.L. 104-19, that "[c]entral to the Committee's program is the critical task of reversing the ever-increasing cost of Federal housing subsidy commitments, which cannot be sustained if the Federal budget is to be brought into balance"); *id.* at 47 (noting that reviewing new subsidy proposals for "overall economic and budgetary effect . . . provides some external discipline to what has been little more than a popularity contest."); H. Rep. 104-628 at 1 (describing the rationale for HUD's FY 1997 budget as "reflect[ing] a fundamental recognition that significant changes are required if the goal of a balanced budget is to be realized"); H.Rep. 105-175 at 4 (same as to FY 1998 budget).

H. Rep. 104-461 at 100-01; *see also* H. Rep. 105-76 at 130 (same); S. Rep. 102-28(I) at 303 (citing studies criticizing the FMRs as "arbitrary"); S. Rep. 101-249(I) at 291 (same). Accordingly, in seeking to limit AAAFs so as to bring the subsidized rents closer to the HUD-established fair market rents, Congress again appeared more concerned with lowering HUD's expenditures than with calibrating the rents to some objective barometer of reasonableness. Indeed, even if Congress' sole intent was to make HUD's expenditures under the HAP contracts more in accord with the market, it remains that such a retroactive adjustment of the price to be paid under contracts fails to invoke any of the sovereign powers implicated by the unmistakability doctrine and thus remains actionable. *See Winstar*, 518 U.S. at 917; Burch, *supra* at 396. Understandable as Congress' desire to save money may be, the rule for it, like private parties, sometimes is *pacta sunt servanda* – colloquially, "a deal is a deal."

Finally, the court rejects categorically any claim that the 1994 amendments come under the unmistakability doctrine because they saved money that, in turn, could be employed for the general welfare. Such a bootstrapping argument would reduce to a nullity any limitations on the scope of the doctrine, for it would be the rare case, indeed, in which Congress could not resort to this safe harbor while targeting undesirable contract provisions. *Per contra*. In the court's view, the sovereign powers implicated by the unmistakability doctrine must be directly invoked in the legislation under study – the doctrine does not apply where instead Congress uses the funds saved from reneging on the government's contractual obligations for other public purposes. As noted by the Supreme Court in *Lynch*, 292 U.S. at 580, "[t]o abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation." *Cf. U.S. Trust Co.*, 431 U.S. at 26 ("A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."). In this regard, the legislation in question thus poses exactly the concerns that Justice Souter had in mind when he indicated that ordinary breach of contract principles ought to apply to "instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." *Winstar*, 518 U.S. at 896; *see also Centex Corp. v. United States*, 49 Fed. Cl. 691, 710-11 (2001).

A final observation on this point: in many ways, the government's case here is less compelling than in *Winstar*. There, the legislation in question, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 183, obligated the newly-created Office of Thrift Supervision to "prescribe and maintain uniformly applicable capital standards" for all savings associations, and not just those that had previously contracted with the government. 12 U.S.C. § 1464(t)(1)(A). Moreover, while these provisions were enacted as part of a comprehensive response to the savings and loan crisis, there was no indication that the legislation was specifically targeted at the prior contracts in an effort to reduce government outlays. Yet, the Supreme Court, nonetheless, assumed that such legislation effectuated a breach of contract, stating: "Legislation can almost always be written in a formally general way, and the want of an identified target is not much security when a measure's impact nonetheless falls substantially upon the Government's contracting partners." 518 U.S. at 902-03. Here, of course, the impact of the 1994 amendments fell not substantially, but exclusively

upon the government's contracting partners, with an avowed intent to reduce outlays during times of budget constraints. As such, defendant's suggestion that this action was protected by the unmistakability doctrine is wholly unconvincing.

Defendant has plainly rendered its performance under the HAP contracts impossible. Accordingly, the court holds that the United States is liable to CMHA for breach of contract.

**C. The Parties' Remaining Contentions**.

Having decided that the 1994 amendments, and the subsequent HUD directive, effectuated a general breach of contract, it remains to resolve several other issues raised by defendant that impact upon whether CMHA is entitled to damages with respect to particular properties or particular years.

First, defendant argues – and plaintiff apparently agrees – that the contract rents granted by HUD for Quarrytown in 1995 and for Severance and Ambleside for 1996 represent the rents owed under the HAP contracts. As such, CMHA's claims to increases for those particular projects for the year(s) specified are moot. CMHA, however, hastens to add that it has not agreed that the increases reflected in these rents satisfied its claims for later years. The court agrees.

Second, defendant contends that there was no obligation to adjust the contract rent for Ambleside for 2001 at the time the Ambleside complaint was filed herein. To be sure, CMHA filed the referenced complaint on July 17, 2001, approximately one month prior to the August 15, 2001, anniversary date for the Ambleside contract. CMHA, however, argues that raising the claim for 2001 in its initial complaint was both necessary and appropriate under the circum-stances, as it was attempting to avoid having to file two separate suits as to Ambleside, while minimizing concerns regarding the running of the statute of limitations as to its 1995 claim.[39] The court, however, notes that defendant never filed a "responsive pleading" to the complaint (No. 01-416C) that raised this matter.[40] Accordingly, under RCFC 15(a), the court deems plaintiff's statements on brief as the equivalent of

---

[39] These concerns were well-founded, given that defendant initially pressed statute of limitations arguments in this case. Those assertions were apparently jettisoned in light of the government's loss in *Franconia Associates v. United States*, 536 U.S. 129 (2003), *rev'g*, 240 F.3d 1358 (Fed. Cir. 2001).

[40] It is well-accepted that neither a motion to dismiss nor one for summary judgment is a "responsive pleading" within the meaning of Federal Rule of Civil Procedure 15(a). *See, e.g. Centifanti v. Nix*, 865 F.2d 1422, 1431 n.9 (3d Cir. 1989); *Allen v. Veterans Admin.*, 749 F.2d 1386, 1388 (9th Cir. 1984); *LaBatt v. Twomey*, 513 F.2d 641, 651 (7th Cir. 1975). The court sees no reason why these precedents ought not apply to RCFC 15(a). *See Devon Energy Corp. v. United States*, 45 Fed. Cl. 519, 525 (1999) (defining a "responsive pleading" as not including a motion to dismiss).

motion to amend the subject complaint to raise this claim and, so deemed, allows that motion.[41] *See Spehr v. United States*, 51 Fed. Cl. 69, 83 (2001). Therefore, on or before October 1, 2003, plaintiff shall formally file an amended complaint in case No. 04-416C, raising its entitlement to damages for 2001 on account of Ambleside.

Third, defendant urges that CMHA's claim for rent increases for Severance for 1996 is barred by the doctrine of accord and satisfaction. Accord and satisfaction discharges a claim when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002). CMHA requested a $27 increase for Severance for 1996. HUD, however, approved only a $10 increase, to $582. Defendant contends that, on April 16, 2001, CMHA responded to this increase indicating that it would charge the $582 and expressed "no reservations" regarding HUD's approval of only a $10 increase, thereby agreeing to accept this increase in satisfaction of its claim. But, by this time, CMHA had not only filed suit on the basis that the 1994 amendments effectuated a breach of its HAP contracts, but also had, on February 15, 2001, provided HUD with a position paper, drafted by its counsel, detailing its objections to HUD's general approach. In the court's view, without more, the latter facts preclude this court from concluding, as a matter of law, that there was the requisite meeting of minds of the parties to extinguish the claim in question. *See O'Connor*, 308 F.3d at 1240 (accord and satisfaction requires a "meeting of the minds of the parties"); *Safeco Credit v. United States*, 44 Fed. Cl. 406, 419 (1999) (same); Restatement (Second) Contracts § 281. Hence, the court must reject defendant's cross-motion on this point, as well.

Finally, both parties would have this court press ahead and consider specifically what damages are owed CMHA. On brief, plaintiff proceeds from the notion that this court's rejection of defendant's unmistakability doctrine argument means that the 1994 amendments do not apply to it and that, instead, it is entitled to the adjustments owed under the original HAP contracts. For its part, defendant contends that the court should enter judgment in its favor to the extent that CMHA failed to timely demonstrate entitlement to contract rent increases under the 1994 amendments. At this point, both contentions seem wrong – this court does not hold that either the 1994 amendments or the 1995 HUD directive are inapplicable to CMHA, as would be the case, for example, were such amendments unconstitutional or the directive invalid; rather; it holds that the amendments and the directive ultimately effectuated a breach of plaintiff's HAP contracts. In the court's view, this means that plaintiff is entitled to whatever damages are appropriate, under the circumstances, on account of that breach. In theory, such damages may hinge on the extent of the breach here and likely will fall within the traditional categories of expectancy, reliance or restitution damages. As such, they may or may not track those damages that have been awarded in *Winstar* savings and loan cases, such as *LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) and *Bluebonnet Sav. Bank v. United States*, 266

[41] Even were defendant deemed to have responded to the complaint, the court would, nonetheless, exercise its discretion to allow CMHA to amend its pleadings – under RCFC 15(a), such leave "shall be freely given when justice so requires."

F.3d 1348 (Fed. Cir. 2001). To determine this, however, the court believes that additional briefing and, potentially, fact-finding is required. Accordingly, the court declines to award any damages at this time.

## III. CONCLUSION

This court need go no further. The story goes that the gates of the *Ianus Geminus*, the temple of Janus, served an important symbolic function – when they were opened, Rome was at war; when they were closed, it was at peace. In the case *sub judice*, those figurative gates remain open, but with hopes that their closure draws nearer.

Based on the foregoing, plaintiff's motion for summary judgment is **GRANTED, IN PART**, and defendant's cross-motion for summary judgment is **DENIED**. The court concludes that both the 1994 amendments and HUD Directive 95-12 effectuated a breach of the HAP contracts in question and that defendant is liable for the breach. On or before October 10, 2003, the parties shall file a joint status report indicating whether they believe that additional motions

on damages should be filed or, instead, that this case should proceed immediately to trial. In anticipation of the receipt of that report, the court will schedule a status conference in this matter.

**IT IS SO ORDERED**.

s/Francis M. Allegra
Francis M. Allegra
Judge