Nos. 01-46C, 01-251C, 01-416C
(Judge Allegra)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CUYAHOGA METROPOLITAN HOUSING AUTHORITY,

Plaintiff,
v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DAMAGES AND CROSS-MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DAMAGES, WITH APPENDIX

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

Of Counsel:
CHARLES W. WILLIAMS
U.S. Department of Housing
and Urban Development
Office of the Assistant General Counsel

ANDREW P. AVERBACH
Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Fax: (202) 514-7965

February 3, 2004

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DAMAGES AND CROSS-MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. The Properties And Entry Into The HAP Contracts . . . . . . . . . . . . . . . . . . . . . . . . 3

II. The HAP Contracts And The Legislative and Regulatory Scheme In Place At The Time The Contracts Were Entered . . . . . . . . . . . . . . . . . 3

III. The 1994 Amendments And HUD Notice 95-12 . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. Rent Adjustments After 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V. The Court's September 23, 2003 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. Plaintiff's Damages Are Limited To The Cost Of Additional Performance Occasioned By The Breach And To An Increase For Ambleside In 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. The Breach Did Not Exempt Cuyahoga From The Reach Of The 1994 Amendments Or Notice 95-12 . . . . . . . . . . . . . . . . . 13

B. The Additional Damages Plaintiff Claims To Have Sustained Were Not Caused By Defendant's Breach And Could Have Been Avoided Through Mitigation . . . . . . . . . . . . . . . 19

II. Even If Plaintiff Were Entitled To Expectation Damages, Many Of The Adjustments It Seeks Result In A Material Difference Between The Contract Rent And The Rent For Comparable, Unassisted Units . . . . . . . . . . . . 20

A. Increases In Rent Are Capped At The Sum Of Comparable Unassisted Rents And The Initial Difference . . . . . . . . . . . . . . . . . . . . . . . 20

B. Pursuant To The 1986 Memorandum, A Finding That The Adjusted Rent Is More Than 120 Percent Of The Sum Of The Contract Rent And The Rent For Comparable, Unassisted Units Is Sufficient, But Not Necessary, To Create A Material Difference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. Plaintiff Is Not Entitled To Damages For The Alleged "1% Breach" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III. The Court Should Deny Cuyahoga's Claim To Interest, Because Congress Has Not Waived Immunity Against Interest In HAP Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

**Cases**

Brazos Elec. Power Co-Op. v. United States,
52 Fed. Cl. 121 (2002) . . . . . . . . . . . . 27

Cisneros v. Alpine Ridge Group,
508 U.S. 10 (1993) . . . . . . . . . . . . 16

Cuyahoga Metro. Hous. Auth. v. United States,
57 Fed. Cl. 751 (2003) . . . . . . . . . . . . 2, 11, 12, 14

General Dynamics Corp. v. United States,
47 Fed. Cl. 514 (2000) . . . . . . . . . . . . 17

IBM Corp. v. United States,
201 F.3d 1367 (Fed. Cir. 2000) . . . . . . . . . . . . 27

Koby v. United States,
53 Fed. Cl. 493 (2002) . . . . . . . . . . . . 19

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . . . 27

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . 16

National Leased Hous. Ass'n v. United States,
32 Fed. Cl. 762 (1994), aff'd, 105 F.3d 1423 (Fed. Cir. 1997) . . . . . . . . . . . . 21, 22

Park Village Apartments v. United States,
32 Fed. Cl. 441 (1994), aff'd, 152 F.3d 943 (Fed. Cir. 1998) (table) . . . . . . . . . . . . 21, 22

Smith v. Principi,
281 F.3d 1384 (Fed. Cir. 2002) . . . . . . . . . . . . 27, 28

Southern Cal. Fed. Savs. & Loan Assoc. v. United States,
57 Fed. Cl. 598 (2003) . . . . . . . . . . . . 19

Winstar v. United States,
518 U.S. 839 (1996) . . . . . . . . . . . . 13, 15

**Statutes and Regulations**

42 U.S.C. § 1437f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

24 C.F.R. § 888.205 (proposed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 01-46C, 01-251C, 01-416C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DAMAGES AND CROSS-MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DAMAGES**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court deny plaintiff's motion for summary judgment with respect to damages and grant defendant's motion for summary judgment with respect to damages in accordance with the method for calculating damages set forth below. In support of our opposition and cross-motion, we rely upon our brief, the declaration of Dennis G. Morton ("Morton Decl. ¶ __"), our second proposed findings of uncontroverted facts ("DPFUF ¶ __"), plaintiff's second proposed findings of uncontroverted facts ("PPFUF ¶ __") and our response, and the appendix accompanying this motion ("Def. App. at __").

**DEFENDANT'S BRIEF**

**PRELIMINARY STATEMENT**

This action arises from three contracts between plaintiff, Cuyahoga Metropolitan Housing Authority ("Cuyahoga"), and the United States Department of Housing and Urban Development ("HUD") pursuant to which HUD makes assistance payments to Cuyahoga, the owner of low-income rental housing units in Cleveland, Ohio. By order dated September 22, 2003 (Cuyahoga

Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751 (2003)), this Court granted summary judgment in favor of Cuyahoga upon the issue of liability, holding that the United States had breached the contracts through 1994 legislation and a 1995 directive by HUD, which altered the mechanism for determining the increases, if any, in assistance payments to which owners such as Cuyahoga are entitled. The Government believes that there is no genuine issue of material fact with respect to the method for calculating the damages to which Cuyahoga is entitled as a result of the contractual breaches identified by the Court in its September 22, 2003 order. Accordingly, defendant submits this brief in opposition to Cuyahoga's motion for summary judgment and in support of its cross-motion for summary judgment with respect to damages.

## STATEMENT OF THE ISSUES

1. Whether plaintiff is entitled to expectation damages, in the form of rent increases, for a breach of contract occasioned by legislation and an agency directive, where plaintiff failed to act in compliance with the legislation and directive and, under that statute and directive, is not eligible for rent increases.

2. Whether plaintiff is entitled to rent increases for years during which such increases would have resulted in contract rents exceeding the sum of (1) rents for comparable, unassisted housing units and (2) the "initial difference" that originally existed between contract rents and comparable, unassisted rents.

3. Whether plaintiff is entitled to damages for a "1% breach" where there has been no finding that such a breach has occurred.

4 Whether plaintiff is entitled to interest where the United States has not waived sovereign immunity against interest upon retroactive rent payments.

## STATEMENT OF THE CASE

### I. The Properties And Entry Into The HAP Contracts

In 1978 and 1979, Cuyahoga and HUD entered into three Housing Assistance Payments contracts, or "HAP" contracts, pursuant to 42 U.S.C. § 1437, et seq. Def. App. at 1-2, 15-18, 26-30. Cuyahoga agreed to lease housing units to low-income families, Def. App. at 1, 15, 26 ¶ 1.3(a), and HUD in turn agreed to make monthly payments to Cuyahoga representing the difference between "contract rents" and the actual amounts paid by the families. Id. ¶ 1.3(b)(1).

Each contract concerned one of three newly constructed buildings: Quarrytown Tower Apartments ("Quarrytown"), Severance Tower Apartments ("Severance"), and Ambleside Tower Apartments ("Ambleside"). PPFUF ¶¶ 1, 3, 5. The contracts provided for a base term of five years, with optional additional terms of five years each. Def. App. at 1, 15, 26 ¶¶ 1.1(b), (c). The Quarrytown and Severance contracts provided for a maximum total term of 30 years, Def. App. at 15, 26 ¶ 1.1(d), and the Ambleside contract provided for a maximum total term of 40 years. Def. App. at 1 ¶ 1.1(d).

### II. The HAP Contracts And The Legislative and Regulatory Scheme In Place At The Time The Contracts Were Entered

At the time Cuyahoga and HUD entered into the contracts, 42 U.S.C. § 1437f(c)(2)(A) provided, in its entirety:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

42 U.S.C. § 1437f(c)(2)(A) (1976). In compliance with that provision, each contract includes an "Automatic Annual Adjustments" provision that states:

> (1) Automatic Annual Adjustment Factors ["AAFs" or "AAAFs"] will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Def. App. at 6, 17, 29 ¶ 1.8(b) (bracketed information added).

The contracts also include an "Overall Limitation" provision that states:

> Not withstanding [sic] any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Id. at ¶ 1.8(d). That provision tracked the language of 42 U.S.C. § 1437f(c)(2)(C), which, at the time, provided, in its entirety:

> Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(C) (1976).

The contracts do not define the term "material differences," or describe how the Government shall determine the existence of material differences. However, on January 14, 1986, HUD's Deputy Assistant Secretary for Multifamily Housing Programs issued a memorandum (the "1986 memorandum") setting forth two alternate ways for determining whether a material difference exists, and which HUD employed in ascertaining the existence of a material difference. Specifically, the 1986 memorandum explained that a material difference would exist

> whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference

or where

> (1) The adjusted Section 8 rent would exceed the correlated unassisted rent for comparable units by more than the initial difference for that unit type
>
> and
>
> (2) The adjusted Section 8 rents would exceed the amount needed to "operate" comparable projects.[1]

Def. App. at 178.

The contracts also include a "Reports and Access to Premises and Records" provision that requires the owner to "furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." Def. App. at 12, 23, 37 ¶ 2.6.

The Quarrytown contract bears a contract anniversary date of January 31, the Severance contract bears a contract anniversary date of May 1, and the Ambleside contract bears a contract

---

[1] Attachment 1 to the 1986 memorandum sets forth guidelines for determining the amount needed to operate comparable projects. Def. App. at 184-85.

anniversary date of August 15. Def. App. at 1, 15, 26 ¶ 1.1(a). Quarrytown contains 180 one-bedroom units, Severance contains 190 one-bedroom units, and Ambleside contains 201 one-bedroom units. Def. App. at 14, 25, 48. Initial contract rents were $310 per month for Quarrytown, $299 for Severance, and $298 for Ambleside. Id. The "initial difference" between contract rents and comparable, unassisted rents was $62 for Quarrytown, $61 for Severance, and $60 for Ambleside. PPFUF at ¶¶ 7-9. In 1994, contract rents were $560 for Quarrytown, $572 for Severance, and $575 for Ambleside. Id.

## III. The 1994 Amendments And HUD Notice 95-12

On September 28, 1994, Congress enacted the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2298 (1995). The Act, 108 Stat. at 2315, included an amendment that added two sentences to the end of 42 U.S.C. § 1437f(c)(2)(A). Pursuant to that amendment, section (c)(2)(A) now provides:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula. However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(A) (1994) (emphasis added).[2]

On March 7, 1995, HUD issued Notice 95-12. Def. App. at 49. Referring to the September 28, 1994 Act, the notice recited that "[a]mong the many measures developed by [the Act], emphasis was placed on utilizing the mechanism in the Section 8 contract language which permits an analysis on the reasonableness of the AAF formula as it is applied to each project unit type." Id. The notice announced that "review of AAF under the Overall Limitation clause of the HAP Contract would apply to Section 8 New Construction and Substantial Rehabilitation Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR)." Id.

Notice 95-12 also explained that, if current contract rents were above the published fair market rents for the area, in order to receive a rent increase, the owner must submit a study of comparable, unassisted rents. Def. App. at 51. If the owner demonstrated that comparable, unassisted rents were more than five per cent over contract rents, then HUD would increase contract rents to the lesser of (1) contract rents adjusted according to the annual adjustment factor and (2) the comparable, unassisted rent plus the initial difference. Def. App. at 52. If the owner provided this information at least 60 days before the contract anniversary date, the increase would take effect on the contract anniversary date. Def. App. at 51. If the owner did not provide the information at least 60 days before the contract anniversary date, HUD would increase rents

---

[2] The Act provided, 108 Stat. at 2315, that the amendment "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under section 8(c)(2)(A) of such Act by applying an annual adjustment factor." Subsequent amendments made the provision applicable to "fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter." 42 U.S.C. § 1437f(c)(2)(A) (1994 Supp. V).

effective 60 days after the owner submitted the information. Id. If, however, the owner did not provide information by the next contract anniversary date, HUD would not increase rents for the preceding year.[3] Id.

## IV. Rent Adjustments After 1994

Cuyahoga's contract rents remained higher than fair market rents from 1994 through 2001. Def. App. at 90-109, PPFUF at ¶¶ 7-9. Even though its contract rents were above fair market rents, however, Cuyahoga failed to take any action with regard to contract rent adjustments until 1999, as otherwise required by 42 U.S.C. § 1437f(c)(2)(A). Def. App. at 110.

Cuyahoga provided no information regarding comparable, unassisted units for Quarrytown until November 17, 2000. Def. App. at 122. That comparability information indicated that the sum of comparable rents plus the initial difference did not exceed the contract rent already in place ($560). Def. App. at 124-25. Nevertheless, on January 23, 2001, Cuyahoga filed Complaint No. 01-46C, seeking contract rent increase for Quarrytown for 1995 through 2000. Def. App. at 126 ¶ 1. On January 26, 2001, HUD determined that, because of its effective date, Notice 95-12 did not apply to 1995 for Quarrytown, and informed Cuyahoga that it would retroactively increase Quarrytown 1995 rents from $560 to $576. Def. App. at 132. Cuyahoga agreed to that increase on February 15, 2001. Def. App. at 144.

Cuyahoga did not provide comparability information for Severance until March 2, 2001. Def. App. at 137. That comparability information indicated that the sum of comparable rents plus the initial difference did not exceed the contract rent already in place ($572). Def. App. at

[3] Although Notice 95-12 expired on September 30, 1995, later notices have reinstated its provisions. Def. App. at 49, 72, 89.

140-41. On March 27, 2001, HUD determined that Notice 95-12 did not apply to 1996 for Severance, and informed Cuyahoga that it would retroactively increase 1996 Severance rents from $572 to $582. Def. App. at 142. Cuyahoga agreed to that increase on April 16, 2001. Def. App. at 146-48. On April 26, 2001, however, Cuyahoga filed Complaint No. 01-251C, seeking contract rent increase for Severance for 1995 through 2000. Def. App. at 158 ¶ 1.

Cuyahoga provided no comparability information for Ambleside until May 15, 2001. Def. App. at 164. That comparability information indicated that the sum of comparable rents plus the initial difference did not exceed the contract rent already in place ($575). Def. App. at 158-59. On July 17, 2001, Cuyahoga filed Complaint No. 01-416C, seeking contract rent increases for Ambleside. Def. App. at 169. Even though the Ambleside 2001 contract anniversary date had not yet arrived, Cuyahoga sought rent increases for Ambleside for 1995 through 2001. Id. ¶ 1. On March 19, 2002, HUD determined that Notice 95-12 did not apply to 1996 for Ambleside, and informed Cuyahoga that it would increase 1996 Ambleside rents from $575 to $585. Def. App. at 166. On September 26, 2003 (and pursuant to the Court's September 22, 2003 order), Cuyahoga filed an amended complaint with respect to the Ambleside property, seeking damages for 2001.

On May 16, 2002, HUD increased contract rents for Ambleside for 2000 to $604, and for 2001 to $606. Def. App. at 169. Also on May 16, 2002, HUD increased Severance contract rents to $601 for 2000, and to $603 for 2001. Def. App. at 172.

The tables below summarize rent information for the three buildings for the years for which, in its complaints, Cuyahoga seeks rent increases.[4]

| **QUARRYTOWN** | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| CONTRACT RENT | $576 | $576 | $576 | $576 | $576 | $576 |
| FAIR MARKET RENT | $418 | $412 | $422 | $434 | $480 | $500 |
| COMPARABLE RENT | $385 | $395 | $405 | $430 | $440 | $470 |
| COMP PLUS ID | $447 | $457 | $467 | $492 | $502 | $532 |
| CLAIMED AAF RENT | $576 | $576 | $576 | $590 | $602 | $628 |

| **SEVERANCE** | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|
| CONTRACT RENT | $582 | $582 | $582 | $582 | $582 | $601 |
| FAIR MARKET RENT | $418 | $412 | $422 | $434 | $480 | $500 |
| COMPARABLE RENT | $460 | $470 | $490 | $525 | $550 | $570 |
| COMP PLUS ID | $521 | $531 | $551 | $586 | $611 | $631 |
| CLAIMED AAF RENT | $582 | $582 | $595 | $613 | $634 | $661 |

[4] In the tables, "CONTRACT RENT" includes adjustments to contract rents to date. "FAIR MARKET RENT" refers to the one-bedroom ("1BR") fair market rent for the Cleveland "FMR AREA" in effect on the contract anniversary dates for each of the three contracts. Def. App. at 90-109. "COMPARABLE RENT" refers to the comparable, unassisted rents that are reflected in Cuyahoga's comparability studies. PPFUF ¶ 11; Def. App. at 124-25, 140-41, 158-59. "COMP PLUS ID" refers to comparable, unassisted rents plus the initial difference. Id.; PPFUF ¶¶ 7-9, 11-12. "CLAIMED AAF RENT" refers to the annual adjustment factor-based rents (subject to the overall limitation) to which Cuyahoga claims entitlement or has otherwise agreed. PPFUF ¶ 18. Based upon the "n/a," notation in the table set forth at PPFUF ¶ 18, the Government does not understand Cuyahoga to seek adjustments for Severance or Ambleside for 1995.

| **AMBLESIDE** | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|
| CONTRACT RENT | $575 | $585 | $585 | $585 | $585 | $604 | $606 |
| FAIR MARKET RENT | $418 | $412 | $422 | $434 | $480 | $500 | $521 |
| COMPARABLE RENT | $506 | $515 | $530 | $570 | $590 | $610 | $620 |
| COMP PLUS ID | $560 | $575 | $590 | $630 | $650 | $670 | $680 |
| CLAIMED AAF RENT | $575 | $585 | $599 | $617 | $638 | $665 | $674 |

## V. <u>The Court's September 23, 2003 Order</u>

By order dated September 23, 2003, the Court ruled that both the 1994 amendments and Notice 95-12 effected a breach of the HAP contracts. The Court ruled that the 1994 amendments "repudiat[ed]" HUD's obligation "to provide CMHA with annual adjustments barring the agency's invocation of the overall limitation," and that the breach was "exacerbated when HUD, in [Notice 95-12], imposed additional requirements not envisioned in either the HAP contracts or the prior legislation." Order at 15, 57 Fed. Cl. at 762. However, the Court declined to determine the measure of damages traceable to the breach:

> Finally, both parties would have this court press ahead and consider specifically what damages are owed CMHA. On brief, plaintiff proceeds from the notion that this court's rejection of defendant's unmistakability doctrine argument means that the 1994 amendments do not apply to it and that, instead, it is entitled to the adjustments owed under the original HAP contracts. For its part, defendant contends that the court should enter judgment in its favor to the extent that CMHA failed to timely demonstrate entitlement to contract rent increases under the 1994 amendments. At this point, both contentions seem wrong--this court does not hold that either the 1994 amendments or the 1995 HUD directive are inapplicable to CMHA, as would be the case, for example, were such amendments unconstitutional or the directive invalid; rather; it holds that the amendments and the directive ultimately effectuated a breach of plaintiff's HAP contracts. In the court's view, this means that plaintiff is entitled to whatever damages are appropriate, under the circumstances, on account of that breach. In

> theory, such damages may hinge on the extent of the breach here and likely will fall within the traditional categories of expectancy, reliance or restitution damages. As such, they may or may not track those damages that have been awarded in Winstar savings and loan cases, such as LaSalle Talman Bank v. United States, 317 F.3d 1363 (Fed. Cir. 2003) and Bluebonnet Sav. Bank v. United States, 266 F.3d 1348 (Fed. Cir. 2001). To determine this, however, the court believes that additional briefing and, potentially, fact-finding is required. Accordingly, the court declines to award any damages at this time.

Order at 40, 57 Fed. Cl. at 781.

## SUMMARY OF ARGUMENT

Cuyahoga's motion for summary judgment with respect to damages proceeds from the assumptions that it is entitled to (1) "expectation" damages, which are arrived at by calculating the difference, for each individual year and for each individual unit, between the contract rent and the rent as calculated pursuant to the applicable AAF, subject to the overall limitation (which, it contends, only applies when the sum of the adjusted rent and initial difference is more than 120 percent of the rent for comparable assisted units); and (2) what it characterizes as "restitution" for the cost of conducting comparability studies. Following the rationale of the Court's September 23, 2003 opinion, the Government cannot object to the award of damages for the second category of damages for timely submitted comparability studies (even if those damages are not properly considered as "restitution"), or damages for timely submitted adjustments, to the extent they are properly calculated and consistent with the overall limitation. However, for the reasons set forth below, Cuyahoga's damages are limited as a matter of law to these amounts. In the alternative, Cuyahoga has both improperly designated the correct rate for the AAFs (inasmuch as Cuyahoga challenges what it refers to as the "1% deduction") and has not set forth the appropriate means of

calculating the overall limitation. Because there is no genuine issue of material fact with respect to these issues and the calculation of damages follows as a matter of law, summary judgment in accordance with the Government's method for calculating damages, explained in further detail below, is warranted.

## ARGUMENT

### I. PLAINTIFF'S DAMAGES ARE LIMITED TO THE COST OF ADDITIONAL PERFORMANCE OCCASIONED BY THE BREACH AND TO AN INCREASE FOR AMBLESIDE IN 2001

#### A. The Breach Did Not Exempt Cuyahoga From The Reach Of The 1994 Amendments Or Notice 95-12

Cuyahoga's claim for expectation damages rests on the argument that inasmuch as the 1994 amendments and Notice 95-12 effected a breach of its HAP contracts, Cuyahoga is simply not subject to the provisions of these legislative and regulatory directives and that, as a result, it is entitled to the full amount of the adjustments that it would have received had these directives never been implemented. However, this argument mispprehends the consequences of the type of breach identified in Winstar v. United States, 518 U.S. 839 (1996), and its progeny. Although the Winstar Court recognized that the legislation at issue in that case in fact effected a breach of contract for which damages were available to the plainitff, it did not suggest that the breach created a "carve-out" that exempted the contracting party from the requirements under the law. Rather, Winstar stands for the proposition that a party whose contract with the Government is breached by virtue of legislative enactment is not exempt from the law, but is entitled to recover damages (assuming that damages are an appropriate and adequate remedy) as a result of the injury suffered as a result of having to comply with the law. 518 U.S. at 881 ("Nor do the

damages respondents seek amount to exemption from the new law . . ."), 910 (remanding for determination of damages flowing from the breach).

This Court recognized as much in its September 22, 2003 order when it expressly rejected the assertion that "either the 1994 amendments or the 1995 HUD directive are inapplicable to CMHA, as would be the case, for example, were such amendments unconstitutional or the directive invalid." Order at 40, 57 Fed. Cl. at 781. This recognition was consistent with the statements made by Cuyahoga's counsel at oral argument on the parties' cross-motions for summary judgment, during which plaintiff's counsel conceded that the breach at issue was a "Winstar type breach," as a result of which the statutory amendments in fact applied to the HAP contracts. Indeed, during oral argument, the Court specifically inquired of counsel for Cuyahoga whether the alleged breach occurred either (1) because HUD erroneously applied the 1994 amendments and Notice 95-12 to Cuyahoga and, as result, failed to award rent increases with respect to the subject properties or (2) by virtue of the change in law effected by the 1994 amendments and Notice 95-12, to which Cuyahoga was subject. The Court characterized the second form of breach as a "Winstar type breach," and Cuyahoga's counsel without reservation conceded the appropriateness of characterizing the breach as one in which the new enactments applied to, and therefore modified, the HAP contracts. Def. App. at 200.

To be sure, the circumstance in Winstar is slightly different in that, in Winstar, the Court considered the effect of legislation that required parties to conduct themselves in a particular manner and did not have before it the issue of eligibility for a payment increase (which the beneficiary can forego without changing its conduct). However, this argument should not change the result. In addition to employing a distinction between mandatory and permissive conduct that

in many circumstances would not be ascertainable, the argument fails for the simple reason that legislative and regulatory enactments do not create two parallel universes – one in which the law applies and one in which it doesn't because of a prior contractual relationship between the Government and a contracting party. As the Supreme Court recognized in Winstar, and as this Court previously stated, a contracting party's remedy in the event of a legislatively or regulatorily created breach is to comply with the law and to recover damages based upon the costs imposed as a result of additional performance. The remedy is not to declare unilaterally that the law does not apply.[5]

Moreover, the notion that plaintiff should somehow be exempted from the reach of the 1994 amendments or Notice 95-12 (as opposed to being compensated for the damages flowing from having to comply with these enactments) unduly elevates the extent of the breach identified by the Court. Unlike cases such as Winstar, in which the Supreme Court recognized that the enactment of FIRREA "eliminate[d] the very accounting 'gimmicks' that acquiring thrifts had been promised" and thus deprived plaintiffs of a substantial portion of the consideration that they had been promised, 519 U.S. at 900, the 1994 amendments and Notice 95-12 merely engrafted procedural requirements upon the existing statute, and did not fundamentally alter the benefit of the bargain – i.e., the entitlement to rent at rates at or slightly above market value – that Cuyahoga negotiated. Indeed, the ultimate effect of the requirements with which Section 8

---

[5] This case does not present a scenario at the end of the spectrum identified in Winstar, in which legislation is focused on rewriting the relationship with one particular contractor. See, e.g., 518 U.S. at 877 n.22. In such an instance, the motivation behind the legislation would, at a minimum, raise serious questions concerning the legislation’s enforceability. By contrast, the 1994 amendments and Notice 95-12 were enacted on a program-wide basis, and apply to a wide swath of property owners (many of whom entered into HAP contracts after 1994 or 1995).

owners must now comply in order to receive rent adjustments is to shift the burden from the Government (to establish non-entitlement to rent increase) to the Section 8 owner (to establish entitlement in a timely manner). Although the Court may have concluded that this change effected a material breach, this burden-shift is not of such a fundamental character as to deprive Section 8 housing owners of the essential benefit of their bargain or to constitute a "total breach" of the HAP contracts. See Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 608 (2000) (citing Restatement (Second) of Contracts § 243 and distinguishing between "total" and "partial" breaches).

In this regard, two additional considerations bear noting. First, even after the 1994 amendments and Notice 95-12, a Section 8 housing owner is entitled to an automatic adjustment when the "maximum monthly rent" does not exceed the fair market rental rate for an existing dwelling unit published by HUD. See 42 U.S.C. § 1437f(c)(2)(A); Def. App. at 51 (to obtain adjustment, owner must submit comparability study "if current project rents on a . . . contract (before the application of the AAF) are above the published [fair market rate] for the area"). It is only in what the Supreme Court has referred to as a "presumably exceptional" circumstance, i.e., when the rent to be adjusted already exceeds the published fair market value for the market area, see Cisneros v. Alpine Ridge Group, 508 U.S. 10, 19 (1993), that resort to localized information is warranted, and that comparability studies even become an issue. The 1994 amendments and Notice 95-12 thus leave intact a substantial portion of the "bundle of rights" that Cuyahoga obtained through the HAP contracts, and are not even implicated in many cases.

Second, the obligation to submit comparability studies is consistent with Cuyahoga's HAP contracts, which each obligate the property owner to "furnish such information and reports

pertinent to the Contract as reasonably may be required from time to time by the Government." Def. App. at 12, 23, 37 ¶ 2.6. This obligation belies any assertion that the essence of what Cuyahoga bargained for was the right to receive automatic adjustments without having to provide information to or otherwise having to assist HUD.

This aspect of the breach identified by the Court distinguishes this case from the only precedent, General Dynamics Corp. v. United States, 47 Fed. Cl. 514 (2000), that Cuyahoga offers in support of its damage theory. In General Dynamics, this Court found that the creation of a statutory cap on executive compensation breached a contractual provision that spelled out the compensation to which the contractor was entitled and that neither contained nor incorporated any such ceilings. Id. at 545. In General Dynamics, payment for its work was undoubtedly the essence of the consideration supplied to the contractor, and, as a result, the Government's unilateral placement of a cap on this consideration may have entitled the contractor to damages as though the legislation had never been enacted.[6] However, even assuming that the Court actually endorsed this measure of damages in General Dynamics, it is inapposite here, for the procedural requirements identified by the Court as a breach in this case do not serve to limit the consideration to which plaintiff is entitled under its HAP contracts. Moreover, and in contrast to General Dynamics, the HAP contracts already impose a limit upon the consideration that the contractor can receive. See, e.g., Alpine Ridge, 508 U.S. at 20 ("[T]he contract language is plain that no project owner may claim entitlement to formula-based rent

[6] Plaintiff contends that, in General Dynamics, the Court "implied that the measure of damages would be the difference between what would have been the allowable cost for executive compensation under the former regulation less what was allowed after passage of the act." (Pl. Br. at 9). The source of this implication, however, is not apparent.

adjustments that materially exceed market rents for comparable units."). At most, the "breach" identified by the Court constitutes a new set of procedural rules for obtaining adjustments in the exceptional case in which the adjusted rents already exceed the published fair market values for a particular area. It does not impose a new and unexpected limitation on the consideration plaintiff expected to receive.

As a result, the damages to which plaintiff is entitled are not calculated by imagining a world in which neither the 1994 amendments nor Notice 95-12 is the law, or where the HAP contracts were repudiated in their entirety as a result of a "total" breach by the Government. Instead, the relevant inquiry is whether the plaintiff has incurred any injury that is directly traceable to the breach and that is not traceable to Cuyahoga's failure to meet the post-1994 AAF eligibility requirements. The only items of damage that Cuyahoga identifies that fall into this category are (1) the additional cost of performing the contract by preparing comparability studies;[7] and (2) an AAF adjustment for Ambleside for 2001, to the extent consistent with the overall limitation.[8]

---

[7] These costs are, of course, subject to a reasonableness requirement, inasmuch as the Government should not be obligated to reimburse Cuyahoga for costs that are excesssive or unnecessary. For this reason, the Government's obligation to reimburse Cuyahoga for the cost of performing comparability studies should be limited to those studies that were timely submitted, and should not extend to comparability studies that, under applicable regulations, cannot be acted upon.

[8] Each of the other adjustments Cuyahoga seeks are either untimely or have been settled. On November 17, 2000, Cuyahoga submitted comparability information for Quarrytown. Def. App. at 122. On March 9, 2001, Cuyahoga submitted comparability for Severance, and on May 15, 2001, for Ambleside. Def. App. at 137, 155. As a result, Cuyahoga allowed the 1995 through 2000 contract anniversary dates to pass without providing HUD the comparability studies necessary to adjust contract rents. The parties have settled the rent with respect to the window

(continued...)

**B. The Additional Damages Plaintiff Claims To Have Sustained Were Not Caused By Defendant's Breach And Could Have Been Avoided Through Mitigation**

A critical element of a claim for damages for breach of contract is that the breach substantially cause (and not merely be a but-for cause) of the damages at issue. See, e.g., Southern Cal. Fed. Savs. & Loan Assoc. v. United States, 57 Fed. Cl. 598 (2003) (citing Bluebonnet Savs. Bank v. United States, 266 F.3d 1348, 1356 (Fed. Cir. 2001)). Stated somewhat differently but of equal consequence in this case, a plaintiff cannot recover damages that, through the exercise of reasonable mitigative steps, could have been avoided. See, e.g., Koby v. United States, 53 Fed. Cl. 493, 496-97 (2002) (relevant inquiry is whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages).

Here, it is an intervening act – namely, Cuyahoga's failure to comply with the post-1994 requirements for eligibility for rent increases – and, thus, to mitigate its damages, that is the cause of its inability to recover the additional AAF rents that it now seeks. Cuyahoga is presumed, as a matter of law, to be on notice of changes in legislation that affect its entitlement to rent increases, and has never contended that it did not receive a copy of Notice 95-12 or was not otherwise on notice of that directive. It easily could have avoided at least some of the damages it now seeks, which far exceed $1 million, by taking the simple step of performing and timely submitting comparability studies. In fact, the submission of this information would be

[8](...continued)
during which Notice 95-12 was not applicable (for Quarrytown in 1995, and for Ambleside and Severance in 1996).

consistent with, if not obligated by, its agreement in the HAP contracts to "furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." Def. App. at 12, 23, 37 ¶ 2.6. Plaintiff's failure to take such a step, and to make itself eligible for rent increases for the years at issue, bars it from obtaining relief.

Importantly, it does make a difference that plaintiff resorted to litigation to attempt to recover the increases in the form of "expectation damages" rather than complying with the law and obtaining these sums by properly submitting applications for rent increases. First, Cuyahoga's failure to submit comparability studies in a timely manner has resulted in complex and time-consuming litigation that might not have been necessary had it submitted its studies on time. Moreover, recovery of the increases through litigation would require the Government to recalculate the rent increases for each subsequent year (since each year's rent depends on the rent for the year before). Such a process places an undue administrative burden on the Government and the means by which HUD keeps track of the rents on Section 8 properties. A rule that prevents the rents from being determined until they are settled through litigation and permits this and other plaintiffs to dredge up previously agreed-upon rents solely because they have determined not to abide by validly enacted procedural requirements should not be condoned.

## II. EVEN IF PLAINTIFF WERE ENTITLED TO EXPECTATION DAMAGES, MANY OF THE ADJUSTMENTS IT SEEKS RESULT IN A MATERIAL DIFFERENCE BETWEEN THE CONTRACT RENT AND THE RENT FOR COMPARABLE, UNASSISTED UNITS

### A. Increases In Rent Are Capped At The Sum Of Comparable Unassisted Rents And The Initial Difference

As noted above, neither the contract nor Section 1437f(c)(2)(C) provides a definition of the term "material difference," and each leaves it to the Government to determine. See Alpine

Ridge, 508 U.S. at 21 (overall limitation provision expressly assigns to the Government the determination of whether there exist material differences between the rents charged for assisted and comparable unassisted units); Park Village Apartments v. United States, 32 Fed. Cl. 441, 448 (1994) (phrase 'as determined by the Government' grants HUD discretion in determining when a difference in rents is 'material'"), aff'd, 152 F.3d 943 (Fed. Cir. 1998) (table). Where a contract grants one party discretion to make material determinations, a court ordinarily will not overturn that party's determination unless the determination is arbitrary and capricious. National Leased Hous. Ass'n v. United States, 32 Fed. Cl. 762, 763 (1994), aff'd, 105 F.3d 1423 (Fed. Cir. 1997).

In this case, Notice 95-12 represents HUD's interpretation of the term "material difference," and, even if the procedural requirements set forth elsewhere in 95-12 effected a breach of the HAP contracts,[9] there is no reason why this definition should be second-guessed. Notice 95-12 explained that if contract rents exceeded published fair market rents, HUD would adjust the rents by the automatic adjustment factor if the owner demonstrated that comparable, unassisted rents were more than five per cent over contract rents, and only to the lesser of (1) contract rents adjusted according to the annual adjustment factor and (2) the comparable, unassisted rent plus the initial difference. Def. App. at 52. As a result of this interpretation, under no circumstances can an adjustment exceed the sum of a comparable, unassisted rent plus the initial difference. Id. Thus, Notice 95-12 represents HUD's determination that a material

---

[9] The Government does not understand the Court to have held in its September 22, 2003 order that the portions of 95-12 that relate to the definition of material differences constitute a breach of the HAP contracts. Rather, the Government understands the Court's finding of a breach to be limited to that portion of Notice 95-12 that imposed additional requirements upon Section 8 property owners seeking rent increases, rather than the effect of Notice 95-12 on the amount of increase to which Section 8 property owners are entitled.

difference necessarily results where an adjusted contract rent exceeds the rent for a comparable, unassisted unit, plus the initial difference.

HUD cannot be considered to be have acted arbitrarily or capriciously or in bad faith in defining material difference in this manner because this definition comports with Congressional guidance set forth in the 1994 Amendments (which do not contemplate a 20 percent difference). Moreover, the Section 8 program seeks to provide property owners with as much income (and, as evidenced by the existence of the overall limitation, with only as much income) as they would have received had they leased space to non-HUD tenants, including by compensating them for the additional cost of running Section 8 housing as reflected in the initial difference, see Alpine Ridge, 508 U.S. at 12; National Leased Hous., 32 Fed. Cl. at 466 . However, there is no "entitlement," as Cuyahoga would have it, either by statute or by contract, to compensation that places owners in the position of receiving materially more than they would have received had they rented the properties privately.[10] Nothing in the Act, the regulations or the contract protects an entitlement to such an interest, or prevents HUD from recasting its definition so as to maintain, as accurately as possible, the parties' expectations (and Congress's directive) that contract rents not "stray too far from market rents," Park Village, 32 Fed. Cl. at 447 (quoting National Leased Hous., 32 Fed. Cl. at 466); cf. Alpine Ridge, 508 U.S. at 18 (rejecting the holding in Ranier View Associates, 848 F.2d 988 (9th Cir. 1988), that HUD could not "change its

[10] By definition, plaintiff's only entitlement is to an "immaterial" difference. If, as plaintiff contends, this means that there must be some difference, the Government believes that a nominal difference of $1 would be appropriate.

mind" and adopt a market survey method in lieu of a formula-based method in determining the appropriate annual adjustment). If anything, the statute encourages precisely such an effort.

Moreover, Notice 95-12 is consistent with a regulatory definition of material difference that HUD proposed in 1992, but did not promulgate. The proposed regulation would have defined a material difference between the assisted and comparable unassisted rent as "a dollar amount equal to five percent of the comparable rent plus one dollar, or the initial difference plus one dollar, whichever is greater."[11] 57 Fed. Reg. 49,120, 49,125 (proposed Oct. 29, 1992) (to have been codified at 24 C.F.R. § 888.205(c)(1)). That HUD formally proposed this definition as early as 1992 demonstrates that, contrary to Cuyahoga's contentions, the definition imposed by Notice 95-12 was not simply crafted in response to Congress's desire to reduce the sums being paid to the owners of Section 8 housing. In fact, and as set forth in the next section, this proposal is very similar to an alternate formulation of material difference set forth in the 1986 memorandum itself and reflects HUD's longstanding belief that the initial difference is generally adequate to provide compensation to the owners of Section 8 housing in accordance with their reasonable expectations under the HAP contracts.

---

[11] The proposed regulation, 24 C.F.R. § 888.205, "Use of AAFs," provided, at section (c):

> Limitation. Adjustments of Contract Rents must not result in a material difference between the rents charged for assisted units and unassisted units of similar age, quality, and type in the same market area, except to the extent that the differences existed with respect to the Initial Contract Rents (initial difference).
>
> (1) A material difference between the assisted and comparable unassisted rent is defined as a dollar amount equal to five percent of the comparable rent plus one dollar, or the initial difference plus one dollar, whichever is greater.

Finally, Cuyahoga's suggestion that HUD must adhere to a 20-percent material difference assumes that this standard was part of the parties' agreement. However, the 1986 memorandum upon which Cuyahoga relies for the 20-percent standard not only does not restrict the definition of material difference to 20 percent (as discussed in the next section), but was not promulgated until years after the HAP contracts at issue in this case were executed. Cuyahoga has not established that it has any kind of expectation interest in a 20 percent material difference standard.

Applying HUD's 1995 material difference standard to Cuyahoga's claims shows that the Government is entitled to judgment as a matter of law upon many of Cuyahoga's rent increase claims, or that the overall limitation limits the amount to which Cuyahoga is entitled. For Quarrytown (for which 1995 is no longer an issue), the contract rent in place from 1996 to 2000 already exceeds the sum of comparable, unassisted rents plus the initial difference, and any increase of that contract rent would, by definition, create even more of a material difference. Def. App. at 90-109, PPFUF ¶ 7. For Severance (for which 1995 and 1996 are no longer an issue), the contract rent in place for 1997 already exceeds the sum of comparable, unassisted rents plus the initial difference, and, for each year thereafter, the adjusted rent Cuyahoga seeks exceeds of the sum of comparable rents and the initial difference. Def. App. at 90-109, PPFUF ¶ 8. Cuyahoga is not entitled to additional contract rent adjustments for any of those years in which its contract rents in place already exceed the sum of comparable rents and the initial difference, or to the extent the adjustments it seeks exceed this sum.

### B. Pursuant To The 1986 Memorandum, A Finding That The Adjusted Rent Is More Than 120 Percent Of The Sum Of The Contract Rent And The Rent For Comparable, Unassisted Units Is Sufficient, But Not Necessary, To Create A Material Difference

Plaintiff has gone to great lengths to argue that HUD cannot base its material difference definition on Notice 95-12 because that provision is either inapplicable to its HAP contracts or unreasonable, and that calculations of material difference must be ascertained in accordance with the guidelines that existed prior to 1995 and, specifically, pursuant to the 1986 memorandum. Plaintiff further contends that the 1986 memorandum provides that a material difference only exists whenever the sum of the initial difference and adjusted rent exceeds 120% of the rent for comparable unassisted units, and that the overall limitation therefore does not prevent the increases it seeks. However, the 1986 memorandum expressly indicates that the "120% rule" is not the only condition that warrants a finding that a material difference exists. Rather, by the terms of the 1986 memorandum (to which Cuyahoga attaches talismanic significance), even if the sum of the initial difference and the adjusted rent does not exceed 120% of the rent for comparable unassisted units, the difference will still be deemed material if two conditions are met:

> (1) the adjusted rent exceeds the rent for comparable unassisted units by more than the amount of the initial difference; and
>
> (2) the adjusted rents would exceed the amount needed to "operate" comparable projects.

Def. App. at 178. As set forth in the declaration of Dennis G. Morton, condition (2) is in this case satisfied. In accordance with "Attachment 1" annexed to the 1986 memorandum, HUD performed the analysis required to determine the cost of operating comparable projects, and

determined (1) that the adjusted rents that Cuyahoga seeks for each of the properties would exceed by a considerable margin the amount needed to operate comparable projects throughout the time period at issue; and (2) under the 1986 memorandum, rents would therefore have been capped either at the sum of comparable rents and the initial difference, or at the amount necessary to operate comparable projects (which amount, no more than $535, is in all cases less than the contract rents already in place, and therefore would not entitle plaintiff to any relief). Morton Decl. ¶¶ 4-14, Def. App. at 210-14. It follows that, even if resort to the 1986 memorandum were deemed appropriate for purposes of determining whether the adjustments Cuyahoga seeks create a material difference, Cuyahoga would still not be entitled to increases to the extent that the adjusted rent it seeks for any particular year exceeds the sum of comparable unadjusted rents and the initial difference. Stated differently, the old regime that plaintiff claims is applicable either yields the same result (i.e., a cap on rents at the sum of comparable rents and the initial difference) or dictates a rent that is lower than the contract rents that are already in effect.

### C. Plaintiff Is Not Entitled To Damages For The Alleged "1% Breach"

In its motion for summary judgment, Cuyahoga argues for the first time in this litigation that it is entitled to damage as a result of the so-called "1% breach" because "[t]he opinion recognized that the [1994] Amendments were proposed to Congress by HUD and adopted by Congress as away to save money on its HAP contracts" and that "[t]he 1% deduction was part of that money-saving package." This argument is baseless. The grant of summary judgment with respect to liability, and the entirety of the parties' briefing and arguments to date, addressed the procedural requirements set forth in the 1994 amendments and Notice 95-12 relating to eligibility

for annual adjustments, and not to the amount of these adjustments. To the extent plaintiff argues that the "deductions" (which are in reality a two-tiered calculation of the AAFs published in the Federal Register, depending on whether the units at issue are “turnover” or “non-turnover” units) cannot be enforced because they are part of a cost-cutting measure, it has completely failed to establish that the adjustment rates are in any way improper or unreasonable or have effected a breach of the HAP contracts. The Court has not yet recognized the “1% breach,” and should not find such a breach, because HUD has the contractual discretion to determine the amount of the AAFs. Def. App. at 6, 17, 29 ¶ 1.8(b). To the extent any rent adjustments are warranted, the turnover and non-turnover AAFs should be applied, as appropriate, in accordance with existing HUD policy.

## III. THE COURT SHUOLD DENT CUYAHOGA'S CLAIM TO INTEREST, BECAUSE CONGRESS HAS NOT WAIVED IMMUNITY AGAINST INTEREST IN HAP CASES

The parties' first set of motions for summary judgment raised the issue of Cuyahoga's alleged entitlement to interest on the damages it seeks, but was not resolved in the September 23, 2003 order. Cuyahoga claims entitlement to interest upon any retroactive rent increases it recovers. Pursuant to the "no-interest" rule, however, a plaintiff cannot recover interest from the United States absent an express waiver of sovereign immunity by Congress. Library of Congress v. Shaw, 478 U.S. 310, 315 (1986); Smith v. Principi, 281 F.3d 1384, 1387 (Fed. Cir. 2002), cert. denied, 537 U.S. 821 (2002); IBM Corp. v. United States, 201 F.3d 1367, 1370 (Fed. Cir. 2000); see also Brazos Elec. Power Co-Op. v. United States, 52 Fed. Cl. 121, 133 (2002) ("sue and be sued" exception does not apply where plaintiff sue the United States pursuant to the Tucker Act). Section 1437f does not mention the payment of interest for retroactive annual rent increases, a

deficiency that is controlling. See Smith, 281 F.3d at 1387. The Court should, accordingly, deny Cuyahoga's claim to interest with respect to any award of retroactive rent increases.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion for summary judgment with respect to damages, grant defendant's cross-motion with respect to damages, and order that plaintiff is entitled to damages solely for the cost of completing timely submitted comparability studies and to a properly calculated 2001 Ambleside adjustment, subject to the overall limitation. Should the Court deem additional expectation damages appropriate, it should award damages only to the extent that the rents sought for a particular year (calculated in accordance with the turnover and non-turnover AAFs, as appropriate) do not exceed the rents for comparable units by more than the amount of the initial difference.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Andrew P. Averbach
ANDREW P. AVERBACH
Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Fax: (202) 514-7965

Of Counsel:
CHARLES W. WILLIAMS
U.S. Department of Housing
and Urban Development
Office of the Assistant General Counsel

February 3, 2004

Attorneys for Defendant