**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | ) | |
| Plaintiff, | ) | |
| | ) | Nos. 01-46C, 01-251C, 01-416C |
| v. | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF DENNIS G. MORTON**

I, Dennis G. Morton, make the following declaration in accordance with 28 U.S.C. § 1746:

1. I am employed by the United States Department of Housing and Urban Development ("HUD") as the Director of the Cleveland Multifamily Program Center ("CMPC"). I submit this declaration in support of defendant's opposition to plaintiff's motion for summary judgment with respect to damages and in support of defendant's cross-motion for summary judgment with respect to damages.

2. In my capacity as Director of the CMPC, I am responsible for oversight of the assistance payments made by HUD with respect to the units at three properties owned by Cuyahoga Metrolitan Housing Authority ("Cuyahoga") that are at issue in this litigation, known as "Quarrytown," "Severance" and "Ambleside."

3. In connection with this litigation, my office has been asked to estimate, in accordance with a memorandum issued on January 14, 1986 by Mr. Silvio J. DeBartolomeis, Deputy Assistant Secretary for Multifamily Housing Programs (the"1986 memorandum"), the amount that would have been needed to operate units at projects comparable to Quarrytown,

Severance, and Ambleside between 1995 and 2001. In order to implement the 1986 memorandum, such an analysis would have been employed (assuming the rent dictated by the automatic adjustment factor ("AAF") did not exceed 120% times the sum of comparable rents and the "initial difference") to determine whether a material difference existed between the adjusted rent and the rent for comparable units. As set forth on page 3 of the 1986 memorandum, a material difference would exist if (1) the adjusted rent would exceed the rent for comparable units by more than the initial difference; and (2) the adjusted rent would exceed the amount needed to operate comparable projects.

4. "Attachment #1" to the1986 memorandum provides guidance concerning how to test for condition number 2. Accordingly, I (with assistance from my colleagues) have performed an analysis recreating, to the extent possible given the lapse of time and the need to estimate certain information, the analysis that HUD would have performed pursuant to Attachment #1 to determine whether the adjusted rents Cuyahoga seeks would exceed the amounts necessary to operate comparable projects. Our analysis confirms that, for the time period at issue, the amount needed to operate comparable assisted projects in or near the Cleveland metropolitan area was substantially less than the adjusted rents that Cuyahoga seeks in this case. Although the methodology we employed is (out of necessity) an approximation, the margin by which the adjusted rent exceeds operating costs is so significant as to obviate the need for a more refined analysis.

5. In order to conduct our analysis, I asked colleagues in my office (who were not aware of the reason for my inquiry) to provide me with a list of HUD-assisted projects in the Cleveland metropolitan area that would be considered "comparable" based on building type, size,

date of completion and location. Nine high rise/elevator buildings with between 100 and 200 one and two bedroom apartments were selected. Five of the buildings are in Cleveland, one is in Cleveland Heights, one is in Akron, one is in Canton, and one is in Strongsville, Ohio. The buildings were built between 1976 and 1983.

6. Attachment #1 to the 1986 memorandum instructs that the first step is to calculate the "rent potential" that would result from application of the AAF. This is simply the 1994 contract rent, multiplied by the applicable AAF from 1995 to 2001, on a compounded basis. I understand these amounts to range from $576 (for Quarrytown in 1995) to $657 (for Quarrytown in 2001) or $674 (for Quarrytown in 2001 if, as Cuyahoga contends, the "1% deduction" for non-turnover units is inapplicable).

7. Step 2 of Attachment 2 is the critical step in the inquiry. It requires HUD to estimate operating expenses for comparable projects and add it to the project's debt service, thereby ascertaining the "cash requirement."

8. For each project, we first ascertained the typical annual operating expense (either as reported on the project owners' annual financial statements provided to HUD or, if this information was not directly available, by subtracting the debt service on the project from the total rental revenues and arriving at an "imputed expense" figure that, to the extent it errs, overstates operating expenses and thus benefits Cuyahoga). The typical annual operating expense for a given project is simply the average of each discrete amount of annual operating expenses we identified for the years 1995 to 2001. Using this amount, we were in turn able to calculate the average per-unit-per-month ("PUPM") operating expense for each project during the time period in question. From these figures on the nine comparable projects we developed a

composite PUPM operating expense of $369.

9. Next, we calculated the per-unit-per-month initial debt service for each comparable project. We used the debt service for the individual projects, rather than the debt service for the Cuyahoga properties, because the amount of the initial debt service for the Cuyahoga properties was not available to us. The debt service on each of the comparable projects was based on an interest rate between 6.875% and 11.53%. Significantly, the eight projects in the sample constructed before 1980 (like the Cuyahoga project) carried a debt service based on an initial interest rate of 9% or less. However, the higher interest project was not excluded from our debt service sample. We ascertained the average monthly debt service for the nine projects – $153 – simply by dividing the initial annual debt service for each project by 12, adding these monthly figures together, and dividing by the number of projects (9).

10. Our findings are summarized in the following table. The sum of the average PUPM operating expense and the average PUPM monthly debt service – $522 – represents the "total cash requirement" called for by Step 2 of Attachment #1:

| *Project* | *Year Built* | *Average Annual Expense* | *Units* | *PUPM Operating Expense* | *Interest Rate* | *Initial Annual Debt Service* | *PUPM Debt Service* | *PUPMT otal Cash Require ments* |
|---|---|---|---|---|---|---|---|---|
| **St. Andrews Tower,** Cleveland, OH | 1975 | 817,042 | 176 | 387 | 9% | 211,098 | 100 | 487 |
| **St. Clair Place,** Cleveland, OH | 1979 | 1,326,117 | 200 | 553 | 9% | 339,006 | 141 | 694 |
| **Hamilton Place/Morningstar,** Cleveland, OH | 1983 | 909,466 | 200 | 379 | 11.53% | 473,118 | 197 | 576 |
| **Canton Towers,** Canton, OH | 1977 | 659,457 | 199 | 276 | 7.5% | 386,000 | 162 | 438 |
| **Antioch Towers,** Cleveland, OH | 1976 | 628,593 | 171 | 306 | 8% | 333,487 | 163 | 469 |
| **Westwood Place,** Strongsville, OH | 1978 | 619,306 | 150 | 344 | 7.5% | 294,086 | 163 | 507 |
| **William Presser Tower,** Akron, OH | 1979 | 394,145 | 100 | 328 | 6.88% | 220,153 | 183 | 511 |
| **Warrensville Manor,** Cleveland Heights, OH | 1978 | 425,447 | 100 | 355 | 7.5% | 153,448 | 128 | 483 |
| **Abington Arms,** Cleveland, OH | 1979 | 699,790 | 152 | 384 | 6.875% | 260,494 | 143 | 527 |
| **AVERAGE** | | | | **$369** | | | **$153** | **$522** |

11. Step 3 of Attachment #1 requires the calculation of "cash throw-off," which simply requires subtraction of the cash requirements (Step 2) from the rent potential (Step 1). This yields a throw-off somewhere between $54 ($576 less $522) and $152 ($674 less $522).

12. The final step in the analysis set forth in Attachment #1 is to ascertain whether the throw-off would exceed the "allowance for owner distributions or operating contingencies" contemplated by Step 4. In this case, the applicable allowance is 2% of the rent potential,

because the properties are owned by Cuyahoga, a non-profit. This 2% allowance translates (depending on the unit rent) to somewhere between $11.52 and $13.48 per unit per month – in all cases considerably less than the calculated cash throw-off.

13. The conclusion that the cash throw-off exceeds the allowance for owner distributions or operating contingencies means that the proposed AAF rents would, in HUD's estimation, exceed the amounts needed to operate comparable projects. Under these circumstances, paragraph 5 of Attachment #1 instructs that the rent should be calculated in accordance with Question #3 (page 4) of the 1986 memorandum, and should thus be set at the lesser of (1) the rent as adjusted by the annual adjustment factor or (2) the sum of the comparable rent (as determined by a comparability study) plus the initial difference.

14. The "General Rule" set forth in response to Question #3 sets out an "Exception" that would appear in some cases to be applicable had the 1986 memorandum been in effect. However, even if HUD determined to apply this exception (which is merely discretionary, as opposed to mandatory, under the 1986 memorandum), rents would still be capped at the sum of the cash requirements and the allowance calculated in accordance with Attachment #1, no more than $535, an amount significantly less than the contract rents in effect for each of the Cuyahoga properties during the time period in question in this litigation.

I declare under penalty of perjury that the foregoing is true and correct Executed on January 29th, 2004.

DENNIS G. MORTON