Nos. 01-46C, 01-251C, 01-416C
(Judge Allegra)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CUYAHOGA METROPOLITAN HOUSING AUTHORITY,

Plaintiff,
v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF'S REPLY BRIEF AND BRIEF OPPOSING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

---

FRED J. LIVINGSTONE
Attorney
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 (facsimile)

Attorney for Plaintiff

Of Counsel:

Mark J. Valponi
Majeed G. Makhlouf
TAFT, STETTINIUS & HOLLISTER LLP

LaVerne Nichols Boyd
CUYAHOGA METROPOLITAN
HOUSING AUTHORITY

March 5, 2004

# TABLE OF CONTENTS

**Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Plaintiff's Reply Brief and
Brief Opposing Summary Judgement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Law and Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. The 1994 Amendments and Directive 95-12 Cause Annual and Multiple Breaches of the HAP Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. The Amendments Wrongfully Limit Rent Adjustment To Comparable Rent, Deduct 1% For Units Occupied By The Same Tenant And Require CMHA To Establish Comparable Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2. The Directive Implements the Wrongful Statutory Limitations on Rent Adjustments and In Addition Wrongfully Imposes a 60 Day Requirement for Rent Adjustment Applications. . . 7

3. There was No Opportunity to Mitigate Damages in Connection with the Government's Breaches of Contract. . . . . . . . . . . . . . 7

B. The Overall Limitation Provision Requires Inclusion of a Material Difference Factor Which HUD and Uniform Precedents in This Court Have Established at 20%. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C. The 1986 HUD Memorandum Establishes Only One Valid Overall Limitation Standard: 120% of the Sum of Comparable Rent and Initial Difference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D. Even Assuming Relevance of the Declaration of Director Morton, the Declaration was Prepared for Litigation, is Speculative, Not Based on Personal Knowledge and, Therefore, Not Admissible as Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Appendix 4

Affidavit of Fred J. Livingstone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Park Village Apts. v United States Defendant's Post-Trial Brief . . . . . . . . . . . . . . . 2

**QUESTIONS PRESENTED**[1/]

1. Whether Plaintiff is entitled to expectancy damages, equal to the difference between properly calculated rent and what was allowed, for annual breaches of contract caused by legislation and an agency directive where such breaches reduce the automatic annual adjustment factors by one percent for units occupied by the same tenant.

2. Whether Plaintiff is entitled to expectancy damages, equal to the difference between properly calculated rent and what was allowed, for annual breaches of contract caused by legislation and an agency directive where such breaches limit the adjustment of rent to the sum of comparable rent and the initial difference instead of 120% of said sum.

3. Whether Plaintiff is entitled to restitution damages, equal to the costs involved in obtaining comparable rent surveys, for annual breaches of contract caused by legislation and an agency directive where such breaches required the Plaintiff to perform a duty required of Defendant.

---

1/ Plaintiff apologizes to the Court for having omitted Questions Presented from its Memorandum in support of its Motion for Summary Judgment and trusts that no undue inconvenience was caused thereby.

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page1**

Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751 (2003). . . . . . . . . 4, 5, 7

Franconia Assoc. v. United States, 536 U.S. 129, 122 S.Ct. 1993 (2002) . . . . . . . . . . . 3

Nat'l Leased Hous. Ass'n v. United States, 32 Fed. Cl. 454 (1994) . . . . . . . . . . . . . . . 9, 11

Nat'l Leased Hous. Ass'n v. United States, 22 Cl. Ct. 649 (1991) . . . . . . . . . . . . . . . . . 9

Park Village Apts. v. United States, 32 Fed. Cl. 441 (1994) . . . . . . . . . . . . . . . . . . . . . 9 -12

Park Village Apts. v. United States, 25 Cl. Ct. 729 (1992) . . . . . . . . . . . . . . . . . . . . . . 2, 9

United States v. Winstar Corp., 518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## FEDERAL STATUTES

42 U.S.C. § 1437f(c)(2)(A) ("Amendments") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-9, 14

42 U.S.C. § 1437f(c)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## HUD ISSUANCES

Directive 95-12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4, 6-9, 14

Memorandum of January 14, 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11, 13, 14

## OTHER SOURCES

Government's Post Trial Brief dated June 17, 1994 (excerpts) . . . . . . . . . . . . . 9, 10, 11, 13

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CUYAHOGA METROPOLITAN HOUSING AUTHORITY,** | ) | **CONSOLIDATED CASE NOS. 01-46C, 01-251C AND 01-416C** |
| **Plaintiff,** | ) | **JUDGE ALLEGRA** |
| **v.** | ) | **PLAINTIFF'S REPLY BRIEF AND BRIEF OPPOSING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

## I. INTRODUCTION

On December 11, 2003 Plaintiff, Cuyahoga Metropolitan Housing Authority ("CMHA" or "Cuyahoga") filed its Motion for Summary Judgment with Memorandum in Support ("Plaintiff's Memorandum"). On February 3, 2004, the Government filed the Defendant's Opposition to Plaintiff's Motion for Summary Judgment with Respect to Damages and Cross-Motion for Summary Judgment with Respect to Damages, with Appendix ("Government's Post Trial Brief"). With the within filing, Plaintiff opposes the Government's request for summary judgment and supports its own request for summary judgment.

## II. LAW AND ARGUMENT

### A. The 1994 Amendments and Directive 95-12 Cause Annual and Multiple Breaches of the HAP Contracts

The Housing Assistance Payment Contracts ("HAP Contracts" or "Contracts") at issue here were executed in the late 1970's and require, among other things, a series of annual actions by HUD to adjust Contract Rents over the 30 or 40 year term of the Contracts. With reference to those actions, Judge Andewelt of this Court has stated:

> Under the HAP Contract, each year created new obligations for each party. Even assuming HUD calculated the rent for one particular year improperly, under the terms of the Contract, the next year HUD would be under a separate and distinct obligation to have the new rent not materially different from the rents then charged for comparable unassisted units. In the event HUD failed to so modify the rents in a particular year, Plaintiff had a new cause of action for the violation for that year.

Park Village Apts. v. United States, 25 Cl. Ct. 729, 734 (1992).

In 1994, Amendments were passed to the Housing Act which HUD implemented by issuing Directive 95-12 ("Directive"). 42 U.S.C. § 1437f ("Amendments"). The Amendments required HUD to change the way it adjusted Contract Rents under the Contracts. HUD embellished its performance and the required performance of its contracting party with a few changes of its own in the Directive. This Court found those actions, when implemented, constituted multiple breaches of the Contracts.

This Court has properly characterized one of the Contract breaches as a Winstar-type breach. A Winstar-type breach is one caused by the passage of legislation targeted at a set of Government contracts; in other words, a breach resulting from legislation which requires the Government to perform in a way other than as required by the contract to the detriment of the Government's contracting party. See United States v. Winstar Corp., 518 U.S. 839 (1996). The Government contends that Winstar would limit CMHA's damages to the cost of performing the comparability studies imposed by the new legislation.

However, the factual situation presented in this case is different from those in Winstar and related cases. In the Winstar cases, the Government's breach occurred when the federal agency implemented the requirements of FIRREA and disallowed the contractually agreed treatment of "supervisory good will". The implementation of FIRREA caused the various savings and loans to take actions, most of which caused them damage, in order to comply with the new requirements and for which they have sought damages in actions pursued in this Court. In contrast, the breaches here take place on an annual basis when HUD adjusts Contract Rent as Congress has commanded in the Amendments instead of using the process established in the Contracts.

It is not disputed that when HUD adjusts Contract Rents, it will be required to perform as Congress has commanded in the Amendments and not as the Contracts require. CMHA is making no argument to the contrary as the Government's Brief seems to suggest. It is because Congress has commanded HUD to change its performance in adjusting Contract Rents, that a breach of the Contracts occurs. Under such circumstances, CMHA can elect to regard the breach as occurring either when the Amendments were passed or at the time performance is due under the Contracts. Franconia Assoc. v. United States, 536 U.S. 129, 139, 122 S.Ct. 1993, 2000 (2002). Because under the Amendments HUD is required to make the rent adjustments annually on the anniversary date of the Contracts, CMHA has elected to regard the breach occurring and continuing to occur each and every year when HUD's adjustment of Contract Rent performance is due. This will cause a series of contract breaches unless Congress changes the legislation to remove the cause of the breach.[2/]

---

[2/] Franconia suggests that Congress can subsequently retract the legislation causing the breach and enable the Government to perform as required under the Contracts. In fact, the

Contrary to the Government's contention, CMHA is not claiming that the Amendments and the Directive do not apply to its Contracts. What CMHA is claiming is that at such annual times as HUD has applied the Amendments to CMHA, the Amendments and Directive have caused a breach of CMHA's Contracts for which it is entitled to damages. In the future, for each and every year as long as the Amendments and Directive stay in place, similar breaches of contract will occur.

As set forth in Plaintiff's Brief, the Amendments and the Directive have occasioned several types of contract breaches, each of which caused Plaintiff damage. It is instructive to review the various breaches and the distinct damages which flow from each.

**1. The Amendments Wrongfully Limit Rent Adjustment To Comparable Rent, Deduct 1% For Units Occupied By The Same Tenant And Require CMHA To Establish Comparable Rent.**

This Court has determined that pursuant to Section 1.8b(2) of the Contracts, HUD must annually calculate the adjusted rent to which the contract owner is entitled by applying the Automatic Annual Adjustment Factor to the existing Contract Rent. Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751, 762 (2003). This Court has also determined that the second step in the process is for HUD to determine whether the Overall Limitation provision in Section 1.8d[3/] ("Overall Limitation") in some way limits the adjustment tentatively made by

---

Amendments were initially effective for only one year and, therefore, would not have caused breaches of contract in subsequent years. However, the Amendments were extended on a year-to-year basis and made permanent commencing with 1999.

[3/] Section 1.8d. Notwithstanding any other provision of this Contract, adjustments as provided in this Section shall not result in **material differences** between the rents charged for assisted and comparable unassisted units, as determined by the Government; **provided, that this limitation shall not be construed to prohibit differences in rents between**

step one. Ibid. It is important to note that the proviso in Section 1.8d requires the inclusion of Initial Difference in determining the Overall Limitation.

However, the Amendments vary the contractually agreed process and its results.[4/] Specifically, the Amendments have adversely affected CMHA in four ways, each of which constitutes a breach of contract:

1. The Contracts provide for a two step process requiring only the HUD actions described above; whereas the Amendments require the contract owner to demonstrate its entitlement to an increase if Contract Rents exceed the HUD published threshold of fair market rents. This Court has found that changing the procedure and shifting the burden of establishing the owner's entitlement to an increase was a breach of the Contracts. Ibid. at 762, 779.

2. The Amendments limit any rent increases to comparable rents for unassisted units ("Comparable Rents") instead of including the Initial Difference[5/] as part of the calculation, which the Contract requires.

---

**assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.** (emphasis added)

[4/] The Amendments provide in pertinent part: "...However, where the maximum monthly rent...to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality , type and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(A)

[5/] The difference between the initial Contract Rent and fair market rent for comparable, unassisted units.

3. The Amendments omit any reference to the Contract requirement and the continuing earlier statutory requirement[6/] that the adjusted rents not result in material differences from rents for comparable, unassisted units.

4. The Amendments require a deduction of 1% from the automatic annual adjustment factor for units occupied by the same tenant during the contract year. The Contracts authorize no such deduction in the Contract rent.

As demonstrated in Plaintiff's Memorandum, breaches numbered 1 give rise to restitution damages (Plaintiff's Memorandum at Section III B), whereas breaches numbered 2, 3 and 4 give rise to expectancy damages as does part of breaches numbered 1 (Plaintiff's Memorandum at Section III A).

An additional word needs to be said about the 1% reduction breach. Section 1.8b(1) of the HAP Contracts provides:

> Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim adjustments may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

Defendant's Appendix to its Cross-Motion for Summary Judgment, Tab 2 at 17.

This provision authorizes a reduction in the AAAF only where utilities are paid by the tenants. It does not authorize a reduction for any other reason. Accordingly, the Amendments requirement of a 1% reduction for units occupied by the same tenant constituted a breach of contract for which CMHA can claim damages as explained above.

6/ 42 U.S.C. §1437f(c)(2)(C)

### 2. The Directive Implements the Wrongful Statutory Limitations on Rent Adjustments and In Addition Wrongfully Imposes a 60 Day Requirement for Rent Adjustment Applications.

HUD implemented the Amendments in the Directive and, in one way, possibly eliminated one of the breaches caused by the Amendments. The Directive included Initial Difference as an addition to comparable rent in establishing the Overall Limitation. However, neither the Directive nor the Amendments made any provision for a material difference factor in determining when the Overall Limitation should apply. Finally, as this Court has held, the inclusion of the requirement that applications for adjustment had to be filed at least 60 days prior to their date of implementation ("60 Day Requirement") was an unreasonable exercise of HUD's authority and thereby caused a breach of contract. Ibid. at 762. Because the 60 Day Requirement exceeded HUD's authority, it could also be regarded as a legal nullity with which no compliance was necessary.

### 3. There was No Opportunity to Mitigate Damages in Connection with the Government's Breaches of Contract.

The Government argues that CMHA could have mitigated its damages by complying with the Directive earlier than it did. However, the Government never explains how that could have come about. Even if CMHA had made application within the mandates of the 60-day Requirement, the same claims for breach of contract would still exist. HUD would have applied the requirements of the Directive and not the Contract terms thereby breaching the Contracts. CMHA would still be claiming as damages the difference between the amount of annual adjustment of rent required by the Contracts subject to the Overall Limitation provision

in the Contracts[7/] less what HUD actually paid. CMHA would also be claiming the same restitution damages for the costs of the rent surveys it had to submit to establish comparable rent. No intervening circumstance could have lessened CMHA's damages. Accordingly, there is no basis for the claim that CMHA failed to mitigate its damages.

The Government also argues that CMHA's earlier compliance with the Directive would have avoided this litigation. How could it when HUD was commanded by Congress in the Amendments to act in a way contrary to that required by the Contracts. Further, conceivably, HUD could have settled these claims prior to litigation, when CMHA made its demands for rent adjustments in accordance with the Contracts, but HUD refused. The administrative problems of which the Government laments were of its own doing. It could have recognized that the Amendments caused multiple breaches of the Contracts and paid CMHA's claims.

### B. The Overall Limitation Provision Requires Inclusion of a Material Difference Factor Which HUD and Uniform Precedents in This Court Have Established at 20%.[8/]

The Government has argued that in the exercise of its discretion, HUD had determined in the Directive that the Initial Difference was the Material Difference required by the Contracts. However, nowhere in the Directive is the phrase "material difference" mentioned. As HUD's 1986 Memorandum demonstrates, when HUD proposes to deal with the term "material difference" it uses those words and does not rely on an inference as the Government's argument requires.

---

[7/] CMHA has argued that the Overall Limitation in the Contracts is calculated by 120% times the sum of comparable rent plus the Initial Difference. See Plaintiff's Memorandum at Section III A 4.

[8/] Section III A. 4. of Plaintiff's Memorandum responds initially to the Government's argument.

Congress has continually authorized HUD to set initial Contract Rent 10% to 20% above fair market rent for comparable units. Plaintiff's Memorandum Section III A at page 13. In some measure, the Initial Difference is a recognition of that fact. In this case, it is agreed that HUD allowed 20% as the Initial Difference. PPFUF ¶ 7, 8, 9, DPFUF ¶ 14. However, the Contracts provide additionally for a Material Difference. To argue that the Initial Difference is the Material Difference does away with one or the other of these contractually required factors. One can only conclude that both the Amendments and the Directive intended to eliminate Material Difference as a factor to be considered. Since that conflicted with the Contract language in Section 1.8d, a breach of contract occurred whenever HUD, in implementing the Amendments, did not consider the Material Difference factor along with Comparable Rent and the Initial Difference.

This Court, in four separate decisions, National Leased Hous. Ass'n v. United States, 22 Cl. Ct. 649, 661 (1991); Park Village Apts. v. United States; 25 Cl. Ct. 729 (1992); Park Village Apts. v. United States, 32 Fed. Cl. 441 (1994) ("Park Village II") *aff'd* 105 F.3d 1612 (Fed. Cir. 1997); National Leased Hous. Ass'n v. United States, 32 Fed. Cl. 411, 454 (1994) *aff'd* 152 F.3d 943 (Fed. Cir. 1998), has concluded that HUD's 1986 Memorandum has established that 120% of the sum of the Comparable Rent and the Initial Difference ("120% Standard") is the appropriate way to calculate the Overall Limitation contained in Section 1.8d of the Contracts. The Court in these cases did not arrive at this definition on its own. In Park Village II, the Government has argued to this Court in its Post Trial Brief that the 120% Standard was HUD's sole standard for determining Material Difference:

> A HUD memorandum dated January 14, 1986, advised all of HUD's regional directors of housing that "a material difference

> exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference." This definition of material difference refers to those situations in which the AAF ("factored") rent would exceed the comparable rent.

Defendant's Post-Trial Brief dated June 17, 1994, Park Village II, ("Post Trial Brief") (Appendix 4 at 3).

In Park Village II, the plaintiff was arguing that the AAAF rents were lower than comparable rent and therefore, it should be entitled to the comparable rent figure. The Government in its Post Trial Brief argued contra:

> HUD did not anticipate that the overall limitation provision would be applicable to those situations in which the comparable rent would exceed the factored rent. PX8 at page 3. Accordingly, HUD did not develop a policy statement for determining when a material difference existed in this reverse situation. Common sense suggests, however, that a mirror image approach would be appropriate for those situations where comparable rent exceeds the factored rent. To develop a mirror image approach, we need to examine how HUD's policy was implemented.
>
> The 1986 memorandum demonstrates that HUD's goal was to eliminate material differences, not all differences. PX8 at attachment 2. If the comparable rent plus initial difference equaled $360, the 120 percent material difference limitation would cap the annual adjustment at $432. Id. At example 1B. A factored rent that exceeded $432 would be materially different from the comparable rent plus initial difference. Id. Accordingly, HUD would eliminate the material difference by approving an adjusted contract rent of $432. The Section 8 program participant would receive an adjusted contract rent that was 120 percent greater than the comparable rent plus initial difference. Id. Nonetheless, this would not constitute a material difference. Id.

Appendix 4 at 4.

It is interesting to note that Director David M. Cohen, who is one of the signers of the Government's Motion herein, also signed the Park Village II Post Trial Brief.

The 120% threshold is a reasonable balance of competing factors. Park Village II at 453. The Park Village II Court pointed out that the 120% threshold assures that AAAFs will ordinarily control. Next, it brings comparability into issue where rents depart "fairly substantially" from comparable rent. Finally, it provides an incentive for HUD to establish a reasonable threshold because the threshold cuts both ways: it authorizes adjusted rents both 20% above and 20% below the sum of Comparable Rent and Initial Difference. Ibid. It has the effect of applying the Overall Limitation only in exceptional cases. National Leased Hous. Ass'n v. United States, 32 Fed Cl. 454 at 466. No other cases have held that there is any other way of doing so.

The concept of Material Difference is also a recognition that fair market value is established by the appraisal process which is more of an art than a science. See Park Village II at 449. The appraisal process involves many judgmental factors; first, the choice of comparables and next, adjustments to arrive at fair market rent based on location, size, age, amenities, dates of viewing, condition, etc. in order to equate comparable units with the subject property. Few units, if any, are exactly the same. Accordingly, this Court has recognized that it makes sense to permit the leeway afforded by the 120% Material Difference factor.

**C. The 1986 HUD Memorandum Establishes Only One Valid Overall Limitation Standard: 120% of the Sum of Comparable Rent and Initial Difference.**

Even though the Government has apparently uniformly endorsed the 120% Standard prior to this point as reflected by their June 17, 1994 Post Trial Brief and the uniform opinions of this Court, the Government now argues that another Standard applies. It would not overstate the matter to suggest that the 1986 Memorandum is not a model of clarity. It is in the form of questions and answers. Not all the answers comply with the contract requirement of Material Difference as they purport to do. Question #2 asks whether a market analysis must be conducted every year for every project. Its initial answer is that in some cases one can show that rents are not materially different without a market survey. See pgs. 2 and 3 of the 1986 Memorandum. What are those cases? As best we can make them out, Case 1. If the adjusted rent would not exceed the 120% Standard. Case 2. Within the 120% Standard's limit established by Case 1, if both a) adjusted rent would not exceed the sum of comparable rent and initial difference and b) adjusted rent would not exceed the amount needed to "operate" comparable projects[9/].

It is clear that Case 2 includes the situation where both a) and b) result in small sums like $1 exceeding the limits therein set. Contrary to the Government's assertion that $1 would satisfy the Material Difference requirement, the cases cited in Section B above indicate the contrary. Park Village II suggests the criteria for judging the Material Difference factor; namely, that the AAAFs should ordinarily control and that the Overall Limitation should come

---

9/ The word "operate" is defined as the total cash requirements including debt service, operating expenses and allowable equity percentages (2% for non-profits, 6% for profits).

into play only where the rents "fairly substantially" depart from Comparable Rent. One dollar or similar small amounts would not satisfy either of these criteria. 23 Fed. Cl. 441 at 453.[10/]

The answer to Question #3 is equally defective and inconsistent in principle with the answer to Question #2. Question #3 deals with the situation where a market analysis has been done. In that situation the answer to Question #3 gives a general rule: the adjusted rent is the lesser of AAAF adjusted rent or the sum of comparable rent and initial difference. That provides for <u>no difference</u> whatsoever and is inconsistent with the answer to Question #2 which would require <u>some</u> excess. The answer also gives an exception: if reasonable and necessary operating expenses and the owner's allowance as defined in the answer to Question #2 exceed the sum of comparable rent and debt service, the lowest of the following figures become the adjusted rent: a. AAAF rent, b. the 120% Standard or c. the operating expenses plus the owner's allowance. The latter choice is also inconsistent with the answer to Question #2 which again requires some excess. As pointed out, the general rule makes no provision for Material Difference and the exception does not in the cases of small differences as outlined above in our response to the Memorandum's Answer to Question #2.

Accordingly, the alternate to the 120% Standard being urged by the Government sometimes provides no difference, and when it does, is vague and does not uniformly provide a Material Difference. The only clear and valid standard for Material Difference set forth in the 1986 Memorandum is the 120% Standard. The Government argues on page 23 of its Brief

---

[10/] The Government argues in footnote 10 on page 22 of its Brief that CMHA is only entitled to an "immaterial" difference. It must envision a line on one side of which differences are material and on the other side, they are immaterial. We suggest that there is not a dividing line between those two ideas but instead, a lot of area in between what might be considered material and what might be considered immaterial. But, in any case, the statute and the contract use the word "material".

that its proposed but never finalized 1992 Regulation should be recognized as HUD's determination of Material Difference. The fact that HUD decided not to promulgate the proposed Regulation is reason enough to disregard it. However, when coupled with HUD's arguing some two years later that the 120% Standard was the true measurement of Material Difference (Post Trial Brief), its total irrelevance is completely demonstrated. That argument showed that the Government also recognized that the 120% Standard was the only clear and valid standard for the Court to apply. This Court accepted the argument and incorporated same in its decisions in the 1990's and should continue to apply that 120% Standard in the absence of a reasonable and non-arbitrary standard previously determined by HUD.

### D. Even Assuming Relevance of the Declaration of Director Morton, the Declaration Was Prepared for Litigation, is Speculative, Not Based on Personal Knowledge and, Therefore, Not Admissible as Testimony.

Accompanying this Reply is a Motion to Strike the Declaration of Director Dennis G. Morton, the contents of which are incorporated herein by reference.

## III. CONCLUSION

This Court in its earlier decision in this case held that the 1994 Amendments and HUD's implementation of the Directive caused a breach of the HAP Contracts. The breaches were multiple and occurred on an annual basis on the anniversary of each of the Contracts when HUD was required to adjust the Contract Rent. Instead of HUD adjusting the existing Contract Rent by applying the annual adjustment factor and the Overall Limitation contained in the Contracts, the Amendments and Directive improperly required CMHA to demonstrate that Comparable Rents were at least 5% more than the HUD published rents for the area by

submitting a Rent Survey prepared by a recognized appraiser. Upon such showing, the Amendments and Directive required that rents for units occupied by the same tenant be reduced by 1% from the AAAF. Finally, the Directive required that the adjusted rent not exceed the sum of Comparable Rents and the Initial Difference. The latter limitation ignored the contract requirement that the adjusted contract rents not be **materially different** than the sum of Comparable Rents and the Initial Difference. Unbroken precedent in this Court and previous arguments of HUD have approved the HUD determined 120% Standard as the definition of Material Difference.

The damages flowing from these annual breaches were that CMHA: 1) received less rent than if the AAAFs would have been applied, including less for continuously occupied units; 2) received less rent than it would have had a 20% Material Difference factor been applied to the sum of Comparable Rent and Initial Difference in determining the Overall Limitation; and 3) had to bear the expense of demonstrating Comparable Rent.

Accordingly, this Court should grant CMHA's requested relief and deny the relief requested by the Government.

Respectfully submitted,

Dated: March 5, 2004

/s/ *Fred J. Livingstone*

Fred J. Livingstone (0009528)
flivingstone@taftlaw.com
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 (facsimile)

Attorney for Plaintiff

<u>Of Counsel</u>:

Mark J. Valponi (0009527)
Majeed G. Makhlouf (Ohio No. 0073853; District of Columbia No. 481643)
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838

LaVerne Nichols Boyd (0009279)
CUYAHOGA METROPOLITAN HOUSING AUTHORITY
1441 West 25th Street
Cleveland, Ohio 44113-3101
(216) 348-5000
(216) 348-4925 (facsimile)

## CERTIFICATE OF SERVICE

The foregoing Plaintiff's Motion for Summary Judgment and Memorandum of Authority for Motion for Summary Judgment was filed electronically with the Court on March 5, 2004, with notice of this filing being sent to all parties by operation of the Court's electronic filing system.

/s/ *Fred J. Livingstone*
Fred J. Livingstone