**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 01-46C, 01-251C, 01-416C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE THE DECLARATION OF DENNIS G. MORTON, WITH APPENDIX**

Defendant, the United States, submits the following opposition to plaintiff's motion to strike the declaration of Dennis G. Morton. We rely upon the following brief and the second declaration of Dennis G. Morton ("Second Morton Decl. ¶ __"), which is appended hereto. The contents of this opposition are reproduced in our reply brief in further support of our cross-motion for summary judgment.[1]

**DEFENDANT'S BRIEF**

**ARGUMENT**

**The Declaration Of Dennis G. Morton Is Appropriately Considered**

Nowhere in opposing defendant's cross-motion for summary judgment, or in moving to strike the declaration of Dennis G. Morton, does Cuyahoga contest, or provide evidence rebutting, the fundamental conclusions that Mr. Morton reaches – (1) the adjusted rents Cuyahoga seeks in this litigation substantially exceed the amount that would have been necessary

[1] "Pl. Opp." refers to the memorandum of law in support of plaintiff's opposition to our motion for summary judgment. "Pl. Mot. St." refers to the memorandum of law in support of plaintiff's motion to strike the declaration of Dennis G. Morton. "Def. App." refers to the appendix we submitted in conjunction with our cross-motion for summary judgment with respect to damages.

to operate comparable units, and (2) following the 1986 memorandum, the amount Cuyahoga seeks would create a material difference between adjusted and comparable rents and, therefore, would not be allowable.[2]

Instead, Cuyahoga attacks the reliability of Mr. Morton's declaration using a variety of arguments that are uncompelling and, to the extent they raise any legitimate issues, are merely reflective of the fact that the 1986 memorandum has been superseded. Mr. Morton performed his analysis in response to Cuyahoga's assertion that the 1986 memorandum, rather than Notice 95-12, is the current source of guidance for determining the extent that an AAF adjustment should be recognized. Although Cuyahoga's litigation position has forced Mr. Morton to reconstruct a "hypothetical" world that is at odds with reality, placing Mr. Morton in this world does not make his calculations or conclusions any less reliable.

---

[2] The analysis in Mr. Morton's declaration hinges in large part upon Cuyahoga's status as the owner of the subject properties. <u>See</u> Morton Decl. ¶ 14 (Def. App. at 213-14). This status dictates the amount of the allowance calculated in Step 4 of the analysis. Def. App. at 184. In preparing his declaration, Mr. Morton relied upon the representations in each of Cuyahoga's complaints that it is the owner of the subject properties. Def. App. 127, 150, 161, 190. However, the Government has received information since Mr. Morton executed his declaration indicating that Cuyahoga leases at least one of the properties pursuant to a 50-year lease. If this is correct, and if this long-term lease is not deemed to be "ownership" of the properties, the allowance Mr. Morton calculated could conceivably change (and may affect his ultimate conclusion). However, the Government lacks information concerning the "initial owner equity" in the property. Given that Cuyahoga has alleged in its complaints that it is the owner of the subject properties and has not objected to that characterization in Mr. Morton's declaration, Cuyahoga cannot now contest its lack of ownership (if it does not indeed own the properties) at this time. At a minimum, if the issue is dispositive of the Court's resolution of this matter (and if the Court does not deem Cuyahoga's long-term lease to constitute "ownership"), the Government requests that Cuyahoga furnish information concerning the initial equity investment in the properties so that Mr. Morton can update his analysis.

**A. The Declaration Is More Reliable, Not Less Reliable, Because Mr. Morton Did Not Select The Properties**

Cuyahoga first attempts to impugn the reliability of Mr. Morton's declaration by attacking the decision to have his colleagues select comparable projects to use in the analysis. As Mr. Morton noted in his first declaration, however, his colleagues were asked to prepare a list of projects that HUD would consider comparable based upon a variety of applicable factors, and were not told the reason that this list should be compiled. The reason the selection was performed in this manner is self-evident – so as to remove any doubt that the properties were not selected in a manner as to skew the results.[3] As confirmed in his second declaration, Mr. Morton has personal knowledge of the properties used in the analysis he performed and, based on his experience, considers them to be "comparable" for purposes of performing the analysis required by the 1986 memorandum. Second Morton Decl. ¶ 3. As a result, Cuyahoga's suggestion that Mr. Morton lacks the requisite knowledge concerning the properties to perform an analysis upon them is uncompelling.

**B. The Analysis Mr. Morton Has Performed Is Sound**

Cuyahoga next attacks Mr. Morton's statistical analysis on two grounds. Neither provides a basis for disregarding his conclusions.

First, Cuyahoga questions the use of two properties in Akron and Canton, Ohio, and asserts that HUD has recognized them as markets separate from Cleveland for purposes of rental pricing. Although Canton, Akron, and Cleveland are indeed separate markets for purposes of

---

[3] Cuyahoga acknowledges the inherent subjectivity of a comparability study, recognizing that the selection of comparables in the appraisal process is "more of an art than a science." Pl. Opp. at 11. The decision to have other HUD employees select comparable projects was simply a prophylactic step to protect against an allegation of taint due to this subjectivity.

pricing, this conclusion does not mean that they are appreciably different for purposes of calculating expenses (which is the sole focus of Mr. Morton's analysis), or that they should not be compared together when performing a comparable-expenses calculation. Second Morton Decl. ¶ 4. Moreover, even if the two properties about which Cuyahoga complains were factored out of the analysis, Mr. Morton's ultimate conclusion would not change because the "total cash requirement" calculated in Step 2 of Attachment #1 to the 1986 memorandum would only increase to $535, an amount that would still yield a "cash throw-off" (Step 3) that far exceeds 2 percent of the rent potential (Step 4), and would thus preclude increasing the rents above the contract rents in effect for the Cuyahoga properties during the time period in question in this litigation. Id. ¶ 5. As a result, any error that might hypothetically exist in Mr. Morton's analysis is harmless.

Second, Cuyahoga questions the use of a composite average, based upon the years 1997 to 2001, to calculate the "total cash requirement," and asserts that the total cash requirement should have been calculated on an annual basis. Although such an analysis is more cumbersome (and for this reason was eschewed in favor of using an average) and not necessarily more accurate, Mr. Morton explains in his second declaration that the results do not change if the total cash requirements are calculated annually. Using such an annual calculation, the "throw off" would still substantially exceeds 2 percent of the rent potential for each year, and would thus preclude adjusting the rent above the contract prices already in place.[4] Second Morton Decl. ¶¶ 6-7. Again, there is neither error in the analysis nor harm arising from the alleged mistake.

[4] Cuyahoga also takes issue with the use of "imputed expenses." However, as Mr. Morton explained, any error in using this figure inured to Cuyahoga's benefit, as it increased the amount of operating expenses for the comparable units. Morton Decl. ¶ 8.

**C. Cuyahoga's Additional Arguments**

Cuyahoga also asserts that there is no evidence that the alternative method for ascertaining the existence of a material difference set forth in the 1986 memorandum "was ever implemented on any project in the Cleveland area during that time frame." Pl. Mot. Str. at 5. This argument is unpersuasive. First, there is no reason why the inquiry should be limited to Cleveland. Second, plaintiff's arguments are refuted by Mr. Morton's statements that (1) "[i]n order to implement the 1986 memorandum, such an analysis would have been employed (assuming the rent dictated by the automatic adjustment factor ("AAF") did not exceed 120% times the sum of comparable rents and the "initial difference") to determine whether a material difference existed between the adjusted rent and the rent for comparable units" Morton Decl. ¶ 3.; and (2) "[w]hile the '1986 memorandum' was in effect, CMPC frequently performed th[is] type of analysis," Second Morton Decl. ¶ 2. The alternative methodology reflected HUD policy prior to the issuance the 1994 amendments and Notice 95-12 and, regardless of whether it was implemented in particular circumstances in Cleveland or elsewhere, any attempt to turn back the clock, as Cuyahoga seeks to do in this case, must take this methodology into account.

Finally, Cuyahoga asserts that, prior to 1994, it received AAF increases in every year except 1988, in which year its rent was "limited to the sum of comparable rent plus the initial difference." Although in that year the alternative methodology did not dictate the adjustment, two important facts bear noting: first, HUD elected not to check the box indicating that the "operating needs formula" (i.e.,, the alternate methodology that Mr. Morton employed in his declaration) had been used; and second, the adjusted rent was capped, consistent with the "general rule" set forth in question 3 of the 1986 memorandum, at the sum of comparable rents

and the initial difference. As noted above, Cuyahoga can hardly complain that HUD has breached the agreement by using a "new" formula when it employed the same formula more than 15 years ago to deny Cuyahoga a full AAF adjustment.

**CONCLUSION**

For the foregoing reasons, the Court should deny plaintiff's motion to strike the declaration of Dennis G. Morton.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Andrew P. Averbach
ANDREW P. AVERBACH
Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:
CAROLE W. WILSON
Associate General Counsel
for Litigation

HOWARD SCHMELTZER
Assistant General Counsel
for Litigation

ALLEN C. VILLAFUERTE
Trial Attorney
Office of General Counsel

CHARLES W. WILLIAMS
Office of the Assistant General
Counsel

Department of Housing and
Urban Development

March 22, 2004

# APPENDIX

## SECOND DECLARATION OF DENNIS G. MORTON

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 01-46C, 01-251C, 01-416C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**SECOND DECLARATION OF DENNIS G. MORTON**

I, Dennis G. Morton, make the following declaration in accordance with 28 U.S.C. § 1746:

1. I am employed by the United States Department of Housing and Urban Development ("HUD") as the Director of the Cleveland Multifamily Program Center ("CMPC"). I submit this declaration in further support of defendant's cross-motion for summary judgment with respect to damages, and in opposition to plaintiff's motion to strike my first declaration.

2. While the "1986 memorandum" was in effect, CMPC frequently performed the type of analysis described in my first declaration. Although such an analysis was not performed in every case, it is one of the methods used to calculate whether rent should be increased to the full extent contemplated by the annual adjustment factor.

3. As I stated in my first declaration, as an initial step in ascertaining the operating expenses of projects comparable to Cuyahoga pursuant to the 1986 memorandum, I asked certain of my colleagues to prepare a list of projects that HUD would consider comparable based upon a variety of applicable factors. I did not tell my colleagues the reason I wanted the list compiled so as to remove any doubt that the properties were not selected in a manner as to skew the results.

However, this does not mean that I did not confirm that these projects are appropriately considered as "comparable". Based on my experience as the director of the CMPC and nearly 27 years at HUD and my familiarity in this capacity with the preparation of comparability studies, I consider each property to be "comparable" for purposes of performing the expense analysis required by the 1986 memorandum.

4. Cuyahoga asserts in its motion to strike that it was inappropriate to use projects from Akron and Canton, Ohio. This assertion is incorrect for a number of reasons. First, there is a finite number of projects to choose from in Cleveland and, for this reason, it is appropriate to consider the expenses of other comparable projects in cities near Cleveland. Further, the mere fact that Canton, Akron, and Cleveland are separate markets for purposes of ascertaining fair market value for rents does not mean that the cost of operating otherwise comparable projects in these cities is appreciably different.

5. In any event, even if the Akron and Canton properties about which Cuyahoga complains were factored out of the analysis, the ultimate conclusions I reached in my original declaration would not change because the "total cash requirement" calculated in Step 2 of Attachment #1 to the 1986 memorandum (which is simply the average of the total cash requirements for each comparable property) would only increase to $535. This amount that would still yield a "cash throw-off" (Step 3) that far exceeds 2% of the rent potential (Step 4) for each property, and would thus preclude increasing the rents above the contract rents in effect for the Cuyahoga properties during the time period in question in this litigation.

6. Cuyahoga also claims that the analysis is flawed because it employs a composite average, based upon the years 1995 to 2001, to calculate the "total cash requirement" for

comparable properties, and asserts that the total cash requirement should have been calculated on an annual basis for each year in which any increase is sought (1997 through 2001, since I understand that the parties are in agreement as to the contract rents for 1995 and 1996 for each property). Although such an analysis is substantially more cumbersome and not necessarily more accurate, it would not change my conclusions. For each year, the "throw off" would still substantially exceed 2% of the rent potential for each year in which Cuyahoga seeks a rent increase.

7. The annualized analysis is summarized in the following table. For purposes of this analysis, it was only necessary to consider the years 1997 through 2001, since it is only in those years that Cuyahoga is actually seeking a rent increase in this litigation. In addition, and for the sake of simplicity, a rent potential of $590 was employed across the board. This figure, which is the smallest adjusted rent (for Quarrytown in 1998) that Cuyahoga seeks for any particular property in any particular year at issue in this litigation, was employed for two reasons. First, using a smaller rent potential decreases the amount of the cash throw-off, and thus would tend to suggest that a material difference would not exist. Second, using the same rent potential across the board (rather than one that increases over time) controls for the possibility that the AAF rent will not have been granted in any preceding years, and establishes that, even as the cost of operating a project increased over time, the increased cost was still not enough to exceed even the lowest AAF adjustment that Cuyahoga seeks.

| | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Rent Potential (Step 1) | $590 | $590 | $590 | $590 | $590 |
| Total Cash Requirement (Step 2) | $501 | $501 | $517 | $517 | $529 |
| Throw-off (Step 3) | $89 | $89 | $83 | $83 | $61 |
| Allowance (Step 4) | $12 | $12 | $12 | $12 | $12 |

I declare under penalty of perjury that the foregoing is true and correct Executed on March 17, 2004.

DENNIS G. MORTON