**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CUYAHOGA METROPOLITAN HOUSING AUTHORITY,** | ) | **CONSOLIDATED CASE NOS. 01-46C, 01-251C AND 01-416C** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE ALLEGRA** |
| | ) | |
| **v.** | ) | |
| | ) | **<u>NOTICE OF SUPPLEMENTAL AUTHORITY</u>** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff, Cuyahoga Metropolitan Housing Authority, respectfully gives notice to the Court and Defendant that it intends to rely on the May 18, 2004 decision of the United States Court of Claims in *First Commerce Corp. v. United States*, U.S. Court of Claims No. 92-731C, 2004 U.S. Claims LEXIS 121 (Fed.Cl. May 18, 2004) (copy attached), at the June 18, 2004 oral argument of the parties' motions for summary judgment.[1] In *First Commerce Corp.*, the Court examined the history of the doctrine of judicial estoppel and its acceptance in the Court of Federal Claims and the Federal Circuit. The Court explained that the doctrine of judicial estoppel is "that where the party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." *Id.*, 2004 U.S. Claims Lexis at *16. Judicial Estoppel "is intended to protect the courts rather than the litigants," and its invocation therefore "lies within the court's discretion." *Id.*

[1] *See also Minn. Mining and Mfg. Co. v. Chemique, Inc.*, 303 F.3d 1294 (Fed.Cir. 2002).

As explained in Plaintiff's briefings before the Court which we filed before issuance of the *First Commerce Corp.* decision, the Government successfully took an inconsistent position in *Park Village Apts. v. United States*, 32 Fed.Cl. 441 (1994), regarding the interpretation and applicability of the 1986 Memorandum. The doctrine of judicial estoppel therefore applies to prevent the Government from taking inconsistent positions in different judicial proceedings as the exigencies of the moment dictate.

Dated: June 4, 2004

Respectfully submitted,

/s/ Fred J. Livingstone
Fred J. Livingstone (Ohio No. 0009528)
flivingstone@taftlaw.com
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 (facsimile)

Attorney for Plaintiff

Of Counsel:

Mark J. Valponi (Ohio No. 0009527)
Majeed G. Makhlouf (Ohio No. 0073853; District of Columbia No. 481643)
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838

LaVerne Nichols Boyd (Ohio No. 0009279)
CUYAHOGA METROPOLITAN HOUSING AUTHORITY
1441 West 25th Street

Cleveland, Ohio 44113-3101
(216) 348-5000

**CERTIFICATE OF SERVICE**

The foregoing *Notice of Supplemental Authority* was filed electronically with the Court on June 4, 2004, with notice of this filing being sent to all parties by operation of the Court's electronic filing system.

/s/ Fred J. Livingstone______________
Fred J. Livingstone

LEXSEE 2004 U.S. CLAIMS LEXIS 121

**FIRST COMMERCE CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant.**

**No. 92-731C**

**UNITED STATES COURT OF FEDERAL CLAIMS**

***2004 U.S. Claims LEXIS 121***

**May 18, 2004, Filed**

**PRIOR HISTORY:** *First Commerce Corp. v. United States, 335 F.3d 1373, 2003 U.S. App. LEXIS 14232 (Fed. Cir., 2003)*

**DISPOSITION:** Plaintiff's motion for summary judgment granted and Defendant's motion for summary judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company sued defendant United States (US) for breach of contract. The parties moved for summary judgment.

**OVERVIEW:** The company submitted a bid letter for the acquisition of a troubled thrift, to the Federal Home Loan Bank Board (FHLBB). The company submitted a formal application to the Federal Savings and Loan Insurance Corporation (FSLIC) to acquire the thrift. The FHLBB approval letter directed the issuance of a forbearance letter to the thrift; the forbearance letter provided for amortization of goodwill over no more than 25 years. The company acquired the thrift and utilized the 25-year amortization forbearance. The forbearance letter was a counteroffer, and the company's performance in proceeding with the acquisition in response to the counteroffer was unambiguous acceptance. The company manifested asset to the terms of the counteroffer, and the parties had mutuality of intent to contract for the 25-year amortization. Consideration flowed to the US, as acquisitions of ailing thrifts reduced liquidation costs; consideration flowed to the company, as the counteroffer promised favorable accounting treatment. Inter alia, *12 U.S.C.S. § 1725*(c) provided adequate authority for a contract regarding 25-year amortization between the company and the U.S.

**OUTCOME:** The company's motion was granted, and the US's motion was denied.

**CORE TERMS:** goodwill, forbearance, judicial estoppel, counteroffer, mutual, amortization, acquisition, accounting, regulation, supervisory, thrift, reply, successor, summary judgment, mutuality, statutory authority, unambiguous, formation, insured institution, bargained, contract language, inducement, delegated authority, acquiring, favorable, breach of contract, contracting, conversion, prior proceeding, contractual

**LexisNexis (TM) HEADNOTES - Core Concepts:**

***Civil Procedure > Summary Judgment > Summary Judgment Standard***
[HN1] Summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. U.S. Ct. Fed. Cl. R. 56(c). Material facts are those facts that might affect the outcome of the suit. A dispute over a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. All justifiable inferences from the evidence must be drawn in favor of the non-movant.

***Civil Procedure > Summary Judgment > Summary Judgment Standard***
[HN2] When the court considers cross-motions for summary judgment, each motion is evaluated under the same standard.

***Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel***

[HN3] The doctrine of judicial estoppel has been applied in the Federal Circuit to bar a party from adopting a position inconsistent with another position argued in a prior proceeding.

***Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel***

[HN4] The United States Court of Appeals for the Federal Circuit has extensively discussed the doctrine of judicial estoppel in patent infringement cases, and has adopted the doctrine more generally.

***Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel***

[HN5] The doctrine of judicial estoppel is that where the party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed. Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants. The decision whether to invoke judicial estoppel lies within the court's discretion.

***Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel***

[HN6] The United States Court of Federal Claims has declined to apply judicial estoppel where the positions taken in the prior and current proceeding were not truly inconsistent. The court has applied judicial estoppel where the prior and current positions are inconsistent. Thus, the court compares the allegedly inconsistent prior and current positions of a party to see if there is true inconsistency.

***Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel***

[HN7] The United States Court of Federal Claims has declined to apply judicial estoppel when the party accused of adopting an inconsistent position in a current proceeding was not "successful" in the prior proceeding. "Success" in the prior proceeding does not always mean success on the merits. Thus, the court examines whether the court in the prior proceeding adopted the prior position of a party in reaching an outcome or resolution of an issue.

***Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel***

[HN8] The United States Court of Federal Claims reviews a party's allegedly inconsistent positions to determine whether specific elements justifying judicial estoppel are present. The court, in its discretion, looks at a variety of specific elements, beyond the basic requirements of true inconsistency and judicial acceptance, in determining whether judicial estoppel is warranted in a particular case.

***Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel***

[HN9] The United States Supreme Court's description of the elements which might justify judicial estoppel are instructive: First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. The United States Court of Federal Claims has cited and applied this formulation of the elements justifying judicial estoppel.

***Contracts Law > Formation > Formation Generally***

[HN10] The requisite elements of a contract, as set out by the United States Court of Appeals for the Federal Circuit, are mutual intent, including an unambiguous offer and acceptance; consideration; and authority on the part of the government representative to bind the government.

***Contracts Law > Formation > OfferContracts Law > Formation > Acceptance***

[HN11] As a general matter, counteroffers may be accepted by conduct.

***Contracts Law > Formation > OfferContracts Law > Formation > Acceptance***

[HN12] Mutuality of intent is demonstrated when an unambiguous offer is answered by an unambiguous acceptance which manifests assent to the terms of the offer.

***Contracts Law > Formation > Offer***

[HN13] A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer.

***Contracts Law > Consideration > Sufficient ConsiderationContracts Law > Formation > Formation Generally***

[HN14] To constitute consideration, a performance or a return promise must be bargained for. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

***Banking Law > Federal Acts > Competitive Equality Banking ActBanking Law > Federal Acts > National Housing & Fair Housing Acts***
[HN15] See *12 U.S.C.S. § 1725*(c)(3).

***Banking Law > Regulatory Agencies > Federal Home Loan Bank System***
[HN16] See *12 C.F.R. § 563b.28(c).*

**COUNSEL: [*1]** Rosemary Stewart, Washington, DC, for plaintiff. Vivek K. Hatti, Washington, DC, of counsel.

Maureen A. Delaney, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. John N. Kane, Jr., Luke P. Levasseur and James Whitman, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, of counsel.

**OPINIONBY:** HEWITT

**OPINION:** HEWITT, Judge

The court has before it Defendant's Motion for Summary Judgment upon Liability Following Remand from the Federal Circuit (Def.'s Mot. or defendant's motion) and Plaintiff First Commerce Corporation's Cross-Motion for Summary Judgment on Liability for Breach of Contract and Opposition to Defendant's Motion for Summary Judgment upon Liability (Pl.'s Mot. or plaintiff's motion). The motions have been fully briefed. n1 Oral argument was held on April 16, 2004 and the transcript of that argument (Tr.) is also before the court. For the following reasons, the court GRANTS plaintiff's motion and DENIES defendant's motion.

n1 Filings include Appendix to Defendant's Motion for Summary Judgment upon Liability Following Remand from the Federal Circuit (Def.'s App.), Appendix to Plaintiff First Commerce Corporation's Cross-Motion for Summary Judgment on Liability for Breach of Contract (Pl.'s App.), Defendant's Uncontroverted Statement of Facts for Motion for Summary Judgment upon Liability Following Remand from the Federal Circuit (Def.'s Facts), Plaintiff FCC's Response to Defendant's Uncontroverted Statement of Facts for Motion for [Summary] Judgment upon Liability Following Remand from the Federal Circuit (Pl.'s Counter-Facts), Plaintiff First Commerce Corporation's Proposed Findings of Uncontroverted Fact in Support of its CrossMotion for Summary Judgment on Liability for Breach of Contract (Pl.'s Facts), Defendant's Statement of Genuine Issues (Def.'s Counter-Facts), Defendant's Reply Brief in Support of its Motion for Summary Judgment upon Liability, and Response to Plaintiff First Commerce Corporation's Cross-Motion for Summary Judgment on Liability (Def.'s Reply), Plaintiff First Commerce Corporation's Reply in Support of its Cross-Motion for Summary Judgment on Liability for Breach of Contract (Pl.'s Reply), defendant's Exhibit 33 filed on April 2, 2004 (Def.'s Ex. 33), defendant's Exhibit 34 filed on April 8, 2004 (Def.'s Ex. 34), defendant's Exhibits 35 & 36 filed on April 14, 2004 (Def.'s Exs. 35 & 36), Defendant's Supplemental Brief Pursuant to the Court's April 16, 2004 Order (Def.'s Supp.) and Plaintiff's Brief Providing Additional Information Relevant to *12 U.S.C. § 1729(f)* (Pl.'s Supp.).

**[*2]**

I. Background

A. Business History

The background facts of this case are set out in detail in *First Commerce Corp. v. United States, 53 Fed. Cl. 38, 39-41 (2002)* (First Commerce I). A detailed account of the facts relevant to contract formation issues is provided in the appeal of that decision, *First Commerce Corp. v. United States, 335 F.3d 1373, 1376-79 (Fed. Cir. 2003)* (First Commerce II). Only the facts essential to the analysis of liability for breach of contract will be presented here. Facts cited to the filings of only one party do not appear to be in dispute.

First Commerce Corporation (FCC or First Commerce), n2 plaintiff in this case, submitted a bid letter for the acquisition of Mutual Federal Savings Bank (Mutual or Mutual Federal), a troubled thrift, to the Federal Home Loan Bank Board (FHLBB) on June 4, 1987. Pl.'s Mot. at 11; Def.'s App. at 589-596; *First Commerce I, 53 Fed. Cl. at 39*. Included in that bid letter was a statement that "First Commerce proposes that the FSLIC grant the following regulatory forbearances," the first listed of which was:

> Amortization of Intangibles. The FSLIC [Federal **[*3]** Savings and Loan Insurance Corporation] shall agree that, notwithstanding generally accepted accounting principles [GAAP], for regulatory accounting purposes, the value of any intangible assets resulting from [the] accounting for the merger of First Commerce into Mutual in accordance with the purchase method may be amortized by the Resulting Institution over a period of 25 years using the straight line method.

Def.'s App. at 593. The parties agree that this type of forbearance is a "forbearance from GAAP [generally accepted accounting principles]," Def.'s Mot. at 10; Pl.'s Mot. at 12 ("more favorable than GAAP"), and that such a forbearance provides a longer period of time to amortize the goodwill n3 resulting from an acquisition, Pl.'s Facts P 22.

n2 Plaintiff's appellation, FCC or First Commerce, is used in this opinion to refer to both First Commerce Group (FCG), the partnership that formed First Commerce Corporation as a holding company, and First Commerce Corporation itself, unless a distinction is required to clarify which entity acted in a specific circumstance. See Def.'s Facts P 2; Def.'s App. at 399, 589. **[*4]**

n3 First Commerce I has a fuller explanation of how this type of forbearance, related to the accounting of an intangible asset such as goodwill, would have provided benefits to plaintiff. *53 Fed. Cl. at 44 n.11, 45 n.13.*

FCC submitted a formal application in November 1987 to the FSLIC to acquire Mutual, Pl.'s Facts P 24; Def.'s App. Ex. 1, and Mutual filed a formal application to convert from a mutual to a stock association at about the same time, Def.'s Facts P 4; Def.'s App. Ex. 9. Neither of these applications requested 25-year amortization of intangibles such as goodwill, Pl.'s Facts PP 29-30; Def.'s App. at 10-13, 895-98, as had the bid letter.

The FHLBB approved both applications-FCC's acquisition application and Mutual's conversion application-in one document, an approval letter dated May 26, 1988. Def.'s App. Ex. 10. The FHLBB approval letter "directed and authorized" the issuance of a forbearance letter to Mutual. Id. at 1102. The FHLBB forbearance letter of the same date, Def.'s App. Ex. 11, begins with the words "in connection with the approval by the Federal **[*5]** Home Loan Bank Board ("Board") of the supervisory conversion of [Mutual] from a federal mutual savings bank to a federal stock savings bank and acquisition by [FCC], the following forbearances are granted," id. at 1104, and stated in relevant part:

> For purposes of reporting to the Board, the value of any intangible assets resulting from the application of push-down accounting[ n4 ] in accounting for the purchase, may be amortized by Mutual over a period not to exceed 25 years by the straight line method.

Id. at 1105.

n4 The terms push-down accounting and purchase method accounting have the same meaning for the purposes of this case. *First Commerce II, 335 F.3d at 1378 n.2.*

The FHLBB approval letter contained ten specific conditions to be met by Mutual and FCC, and stated that a penalty for noncompliance with these conditions would be "all approvals given under this letter and concurrent letters, if any, shall be canceled and withdrawn." Id. at 1103. The third **[*6]** condition specified that FCC and Mutual were required to "execute a regulatory capital and dividend limitation agreement [RCMA]," id. at 1101, and on July 1, 1988, FCC and the FSLIC did enter into a "Regulatory Capital Maintenance/Dividend Agreement," id. Ex. 14 (FCC RCMA). The FCC RCMA stated in relevant part that

> all references to regulations of the Board [FHLBB] or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's [FCC's] obligation under this Agreement.

Id. at 1238.

It is undisputed that FCC acquired Mutual on July 1, 1988 and that the 25-year amortization forbearance was utilized by FCC. Pl.'s Facts P 44; Pl.'s App. at 169. The new bank was called First Commerce Bank (FCB). Pl.'s App. at 190. On August 9, 1989, the Financial Institutions Reform, Recovery, and Enforcement Act

(FIRREA) became law. Pub. L. No. 101-73, 103 Stat. 183 (codified in relevant part at *12 U.S.C. § 1464 (2000)*). FIRREA resulted in changes to the amortization schedule **[*7]** of intangibles. *First Commerce I, 53 Fed. Cl. at 46*. FCB experienced a "need for additional capital" after FIRREA was enacted. Def.'s Counter-Facts P 53. FCC infused additional capital into FCB in 1990. Pl.'s Facts P 54. FCB's capital compliance with regulatory requirements worsened, and on June 14, 1991, the Resolution Trust Corporation (RTC) was appointed receiver for FCB. Id. PP 55-56.

B. Procedural History

On October 20, 1992, FCC filed its n5 complaint in this court, requesting relief valued at approximately $ 2,315,000, plus "costs, attorney's fees, and interest allowed by law" on a variety of contract and takings theories. Compl. at 31-32, PP 60-75. Since November 2, 1998, the primary focus of the litigation has been on the issue of liability for breach of contract. See Plaintiff First Commerce Corporation's Motion for Summary Judgment on Liability for Breach of Contract filed on November 2, 1998; Defendant's Response to Plaintiff First Commerce Corporation's Motion for Partial Summary Judgment on Liability and in Support of Defendant's Motion to Dismiss and CrossMotion for Summary Judgment on Liability filed on October 10, 2000; Transcript **[*8]** of March 7, 2002 Status Conference, at 17 (stating that the court "thinks we just need to focus on the liability issue"); Pl.'s Mot. at 4 ("This motion relates only to the proof of FCC's contract and the government's breach of that contract.").

> n5 FCC is the only plaintiff that remains in this suit. See Order of April 22, 2002.

In First Commerce I, this court decided the contract liability issue for the government, finding that no contract had been formed. *53 Fed. Cl. at 39*. In that decision, this court analyzed the facts of this case and did not find "the existence of offer, acceptance and mutuality of intent necessary to contract formation." *Id. at 48*. In particular, the court compared FCC's acquisition application, the supposed "offer," with the FHLBB forbearance letter, the supposed "acceptance," and found that there was a "disconnect" that showed no mutuality of intent to contract on the issues of regulatory treatment of goodwill and the amortization period for goodwill. **[*9]** See *id. at 45-46* (noting plaintiff's contention that "'there was a meeting of minds regarding both the regulatory treatment of the goodwill and the amortization period'" (quoting plaintiff), but finding that "the terms of the [FHLBB forbearance letter] on which plaintiff relies for the terms of the government's acceptance simply do not match the language of First Commerce's application to the FHLBB on which plaintiff relies for the terms of its 'offer'"). This court also found that "surrounding circumstances" did not demonstrate an intent to contract, because "the amortization period was not a central consideration in First Commerce's acquisition of Mutual Federal," *id. at 47*, and the "surrounding circumstances in this case do not support the view that the transaction involved any effort to hammer out contract terms," *id. at 48*.

On appeal, the Federal Circuit approved this court's finding of a "discrepancy between offer and acceptance," but vacated and remanded the First Commerce I decision because "the government made a counteroffer to First Commerce." n6 *First Commerce II, 335 F.3d at 1376*. The Federal Circuit **[*10]** concluded that the FHLBB forbearance letter was the government's counteroffer, applying "common law" rules. *Id. at 1381* (applying *Restatement (Second) of Contracts § 59* (1979), which states that "[a] reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."). The Federal Circuit also noted that "treating the FHLBB's forbearance letter as a counteroffer fits the transaction neatly into the mold of a unilateral contract, in which the government promised favorable accounting treatment in exchange for First Commerce's performance of acquiring Mutual Federal." *Id. at 1382 n.5*. Finally, the Federal Circuit stated that "as a general matter, counteroffers may be accepted by conduct," and remanded for "the determination of whether First Commerce accepted the FHLBB's counteroffer." *Id. at 1382*.

> n6 The Federal Circuit noted that, apparently, "First Commerce did not raise the counteroffer argument before the Court of Federal Claims," but concluded that "it would be inappropriate to truncate the contractual analysis at this point." *First Commerce II, 335 F.3d at 1382 n.6*.

**[*11]**

Because three defenses, presented by the government on appeal, were not addressed by this court in First Commerce I, the Federal Circuit remanded these as well:

> the United States argues . . . [1] that the signatories of the FHLBB's approval letter (the Office of General Counsel [OGC] and Office of Regulatory Policy, Oversight and Supervision [ORPOS])

> lacked the delegated authority to contract on behalf of the FHLBB; [2] that the FHLBB itself had statutory authority only to contract with FSLIC-insured institutions (thrifts), not with holding companies such as First Commerce; and [3] that the Regulatory Capital Maintenance Agreement [FCC RCMA] executed between First Commerce and the FSLIC assigned the risk of regulatory change to First Commerce.

*Id. at 1382.*

Thus the task of this court is to decide, on these cross-motions for summary judgment on liability, whether FCC accepted the government's counteroffer of "treating supervisory goodwill as regulatory capital and permitting its amortization over an extended [25 year] period of time," and if it did, resolving whether any of the three remanded defenses absolves the government from **[*12]** contract liability. *Id. at 1383.*

II. Discussion

A. Standard of Review: Cross-Motions for Summary Judgment

[HN1] "Summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1037 (Fed. Cir. 2003)*; see *Rules of the United States Court of Federal Claims (RCFC) 56(c).* Material facts are those facts that might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* A dispute over a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All justifiable inferences from the evidence must be drawn in favor of the non-movant. *Id. at 255.* [HN2] When the court considers cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 457 (1999).*

B. Analysis

1. Judicial Estoppel

Defendant argues that judicial estoppel should prevent plaintiff from asserting its current **[*13]** position regarding contract liability because this new position, based on accepting the government's counteroffer, is inconsistent with plaintiff's prior position on contract formation. See Def.'s Mot. at 16 (stating that "plaintiff has also conceded in its pleadings that it was not induced by, and did not condition the acquisition on, the FHLBB's forbearance because its position, all along, has been that its application was its 'offer' and promise upon which it intended to consummate the merger"); Def.'s Reply at 6 & n.3 (same). Defendant also asserts that judicial estoppel prevents plaintiff from relying on statute sections, ones which plaintiff previously argued were not "'involved'" in the facts of this case, for new arguments that those statutory sections might provide a basis for the government's contracting authority in this case. Def.'s Reply at 16 n.12 (quoting Plaintiff First Commerce Corporation's Reply to Defendant's Response to Plaintiff FCC's Motion for Partial Summary Judgment on Liability and Opposition to Defendant's Cross Motion for Summary Judgment on Liability, filed on November 16, 2000, at 27, found at Def.'s App. at 1664). [HN3] The doctrine of judicial estoppel **[*14]** has been applied in this circuit to bar a party from adopting a position inconsistent with another position argued in a prior proceeding. See, e.g., *San Carlos Irrigation and Drainage Dist. v. United States, 111 F.3d 1557, 1568 (Fed. Cir. 1997)* (San Carlos) (stating that "the Claims Court did not abuse its discretion in concluding that [plaintiff] was barred by judicial estoppel from relitigating the issue"); *Kraft, Inc. v. United States, 30 Fed. Cl. 739, 763 (1994)* (stating that "because the elements of judicial estoppel are present defendant is estopped from challenging the veracity of the very same data it successfully presented to the Tax Court in [a prior proceeding]"). The court first describes the doctrine of judicial estoppel before considering defendant's request.

[HN4] The Federal Circuit has extensively discussed the doctrine of judicial estoppel in patent infringement cases, see *Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 665* & nn.3-4, 666 (Fed. Cir. 1988) (Water Technologies) (discussing Seventh Circuit judicial estoppel principles and refusing to apply judicial estoppel because "there has been no judicial **[*15]** acceptance of the asserted inconsistent position"); *Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1454 n.26 (Fed. Cir. 1988)* (noting "our[, the Federal Circuit's,] agreement with, and adoption of, the doctrine of inconsistent positions set forth by this court in Jackson Jordan"); *Jackson Jordan, Inc. v. Plasser Am. Corp., 747 F.2d 1567, 1578-80 (Fed. Cir. 1984)* (analyzing the authority for the application of "estoppel based on inconsistent positions" and distilling the elements that would justify judicial estoppel), and has adopted the doctrine more generally, see *San Carlos, 111 F.3d at 1568 (Fed. Cir. 1997)* (approving the use of judicial estoppel in the underlying Court of Federal Claims decision); *Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1564-65 (Fed. Cir. 1996)* (Data General) (stating that "the [General Services Administration Board of Contract Appeals] did not abuse its discretion in declining to hold

that GSA is judicially estopped from supporting the validity of the reinstatement of the contract").

The Federal Circuit has delimited judicial estoppel by stating that:

> [HN5] The doctrine of judicial **[*16]** estoppel is that where the party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed. Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants. The decision whether to invoke judicial estoppel lies within the court's discretion . . . .

*Data General, 78 F.3d at 1565* (citations omitted). The Federal Circuit also has elaborated specific elements, in the patent infringement suit context, which might justify the application of judicial estoppel if requested by the opposing party:

> (1) [the opposing party's] personal reliance on the decision granted in the prior suit, (2) prejudice to [the opposing party's] litigation of the issues in the present suit by reason of the decision in the prior suit, or (3) the patent holder's apparent misuse of the court.

*Hybritech Inc. v. Abbott Labs., 849 F.2d at 1453-54* (citing *Jackson Jordan, 747 F.2d at 1578-80*). The court now reviews how the doctrine of judicial estoppel **[*17]** has been elaborated in the United States Court of Federal Claims.

[HN6] This court has declined to apply judicial estoppel where the positions taken in the prior and current proceeding were not truly inconsistent. See *Westinghouse Elec. Co. v. United States, 56 Fed. Cl. 564, 571 (2003)* (comparing two legal defenses and stating that "the position the government is taking in this case and the position taken [by the government] in the [prior] case are not truly inconsistent"). This court has applied judicial estoppel where the prior and current positions are inconsistent. See *Adams v. United States, 38 Fed. Cl. 572, 574-75 (1997)* (holding that "the doctrine of judicial estoppel precludes plaintiffs from now maintaining that the court cannot decide the exemption issue based on the parties' stipulation of facts and joint exhibits" where "plaintiffs' [prior] position, whether express or implied, [was] that the joint stipulation of facts and joint exhibits could be the basis for the court's summary judgment ruling"), rev'd on other grounds, *178 F.3d 1306 (Fed. Cir. 1998)*. Thus, this court compares the allegedly inconsistent prior and current **[*18]** positions of a party to see if there is true inconsistency.

[HN7] This court has declined to apply judicial estoppel when the party accused of adopting an inconsistent position in a current proceeding was not "successful" in the prior proceeding. See, e.g., *Buckley v. United States, 57 Fed. Cl. 328, 341 (2003)* (refraining from using judicial estoppel against the government because, among other reasons, "the government received no benefit from taking the [prior] position"); *La Gloria Oil and Gas Co. v. United States, 56 Fed. Cl. 211, 225 (2003)* (stating that because "that [prior] position appears to be a litigating concession which did not yield success to defendant," the prior position "does not appear to be an apt subject for application of the doctrine of judicial estoppel"). This court has also stated that "success" in the prior proceeding does not always mean success on the merits. See *Nat'l Med. Enters., Inc. v. United States, 28 Fed. Cl. 540, 546 n.2 (1993)* ("'The "prior success" requirement does not mean that the party against whom the judicial estoppel doctrine is to be involved must have prevailed on the merits. "Rather, **[*19]** judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition."'" (citations omitted)). Thus, this court examines whether the court in the prior proceeding adopted the prior position of a party in reaching an outcome or resolution of an issue.

[HN8] This court has also reviewed a party's allegedly inconsistent positions to determine whether specific elements justifying judicial estoppel are present. See, e.g., *Sunoco, Inc. v. United States, 59 Fed. Cl. 390, 399 (2004)* (citing *Hybritech, 849 F.2d at 1453-54*, and discerning none of the elements of "personal reliance [of the opposing party] on the decision granted in the prior suit, or prejudice, or misuse of the court"); *Kraft, 30 Fed. Cl at 763* (citing *Water Technologies, 850 F.2d at 665-66*, and *Jackson Jordan, 747 F.2d at 1579-80*, and identifying seven factors n7 that might justify judicial estoppel including "'judicial acceptance' of the previously asserted inconsistent position," "effect of the pleading party's actions on the integrity of the judicial **[*20]** process," "perception that the court has been misled," "reliance by the opposing party," "prejudice to the opposing party's case as a result of the inconsistent position" and "'benefit from the previously taken position'"). n8 This court, in its discretion, has looked at a variety of specific elements, beyond the basic requirements of true inconsistency and judicial

acceptance, in determining whether judicial estoppel is warranted in a particular case.

n7 These factors have been converted from negative statements, where judicial estoppel is unwarranted, to positive statements, where judicial estoppel might be warranted. See *Kraft, 30 Fed. Cl. at 763*.

n8 Kraft, in its reliance on *Water Technologies, 850 F.2d at 665-66*, may have imported some elements from Seventh Circuit judicial estoppel doctrine. See *30 Fed. Cl at 763* (stating that "the Federal Circuit has held [that judicial estoppel is not warranted if four elements are present]" and citing Water Technologies for those elements); see also *Aleutian Constructors v. United States, 24 Cl. Ct. 372, 388-89 (1991)* (similarly stating that "as decided in the Federal Circuit" and citing four factors from Water Technologies as pertinent to judicial estoppel doctrine). The Federal Circuit in Water Technologies was applying Seventh Circuit law to the judicial estoppel issue. See *850 F.2d at 665 n.3* ("In addressing this procedural challenge to the validity of the four patents, we apply the law of the regional circuit-the Seventh Circuit-where the appeal would lie but for the patent counts."). The Federal Circuit cited several Seventh Circuit decisions for its statement, "the Seventh Circuit has considered and applied the [judicial estoppel] doctrine," *id. at 665 n.4*, but it should be noted that the Federal Circuit also cited in the same section of its opinion the Fifth, Sixth, and District of Columbia Circuits, as well as its own Jackson Jordan opinion, *Water Technologies, 850 F.2d at 665-66* & n.4. Any holding on judicial estoppel doctrine that can be gleaned from Water Technologies should, however, be described as the Federal Circuit's application of Seventh Circuit law.

**[*21]**

Finally, the Supreme Court has commented recently on the doctrine of judicial estoppel and, while it did "not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," n9 *New Hampshire v. Maine, 532 U.S. 742, 751, 149 L. Ed. 2d 968, 121 S. Ct. 1808 (2001)*, [HN9] the Court's description of the elements which might justify judicial estoppel are instructive:

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id. at 750-51* (citations **[*22]** omitted). This court has cited and applied this formulation of the elements justifying judicial estoppel. See, e.g., *Westinghouse, 56 Fed. Cl. at 570-72* (declining to apply judicial estoppel because of plaintiff's "failure to satisfy the factors identified by the Supreme Court in New Hampshire").

n9 The Court cited to every circuit except the Tenth, Eleventh and Federal Circuit in its review of judicial estoppel doctrine. *New Hampshire, 532 U.S. at 748-51*. Because the Federal Circuit was not specifically included in the analysis summarized as "several factors typically inform the decision whether to apply the doctrine in a particular case," *id. at 750*, this court draws guidance from both Federal Circuit precedent and the Supreme Court on the factors that warrant judicial estoppel.

The court now turns to defendant's specific requests that the doctrine of judicial estoppel be applied in this case.

As to defendant's first request for judicial estoppel regarding **[*23]** plaintiff's prior and current positions on contract formation, Def.'s Mot. at 16; Def.'s Reply at 6 & n.3, the court notes that neither this court nor the Federal Circuit accepted plaintiff's prior position on contract formation, *First Commerce I, 53 Fed. Cl. at 48* (concluding that "the undisputed material facts . . . do not support the existence of offer, acceptance and mutuality of intent necessary to contract formation" and granting defendant's crossmotion for summary judgment on liability for breach of contract); *First Commerce II, 335 F.3d at 1382-83* (vacating and remanding First Commerce I based on reasoning accepting plaintiff's current position that "the written documents in this case

express the government's promise to offer favorable accounting treatment, and thereby constitute a counteroffer to First Commerce's application"). Because there was no judicial acceptance of plaintiff's prior position on contract formation, there was no "success;" therefore, judicial estoppel is not warranted against plaintiff's current contract formation arguments before the court. See *New Hampshire, 532 U.S. at 751* ("Absent success **[*24]** in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." (citations omitted)).

As to defendant's second request for judicial estoppel regarding plaintiff's prior and current positions on statute sections that might give the government authority to contract in this case, Def.'s Reply at 16 n.12, the court notes that this court did not reach the issue of authority and thus could not have accepted plaintiff's prior position on statute sections that were or were not involved in the facts of this case, see *First Commerce I, 53 Fed. Cl. at 43 n.10* (stating that "the court does not reach the authority issue in this case"). The Federal Circuit also did not reach the issue of statutory authority for the government to enter this contract. See *First Commerce II, 335 F.3d at 1382-83* (stating that "we decline to address" the remaining defenses of the government (including the issue of statutory authority) because this "court did not reach [them] in light of its disposition of the case on summary judgment"). To the extent that the Federal Circuit's **[*25]** discussion of "regulatory capacity" might be construed to have indirectly addressed the issue of authority, see *id. at 1383* (stating that "the government surely was acting in its regulatory capacity"), the Federal Circuit did not discuss, rely on or refute plaintiff's arguments regarding particular statutory provisions, but relied instead on Federal Circuit and Supreme Court precedent, *id.* (stating that defendant's "argument that the government is immune from contractual liability because it was acting in its regulatory capacity was rejected squarely by this court and the Supreme Court in Winstar"). There was no judicial acceptance of plaintiff's prior position regarding the applicability or inapplicability of certain statutory provisions to the facts of this case.

It is also not clear that plaintiff's current position on statutory authority is truly inconsistent with its prior position. Compare Pl.'s Mot. at 34 n.24 (quoting *Hughes v. United States, 58 Fed. Cl. 291, 302 (2003)*, for the proposition that "'*sections 1729(f)(3) and 1730a(m)* provide ample statutory authority for FSLIC to enter into a contract [with a holding company] **[*26]** in this situation [specifically, acquiring a troubled thrift in a particular set of circumstances]'" with Plaintiff First Commerce Corporation's Reply to Defendant's Response to Plaintiff FCC's Motion for Partial Summary Judgment on Liability and Opposition to Defendant's Cross Motion for Summary Judgment on Liability, filed on November 16, 2000, at 27 n.27, found at Def.'s App. at 1664 n.27 ("Three additional FHLBB statutes provided express authority for various kinds of FHLBB/FSLIC assistance agreements: *12 U.S.C. § 1730a(m)*, *§ 1730(f)(2)* and *§ 1729(f)(3)*. . . . Thus, FSLIC was authorized to provide companies acquiring troubled thrifts with the same kind of assistance it could provide to acquiring thrifts.").

Because there was no judicial acceptance of plaintiff's prior position regarding the applicability or inapplicability of certain statutory provisions to the facts of this case, and because these prior and current positions do not appear to the court to be truly inconsistent, plaintiff's current position on these provisions is not estopped.

2. Contract Formation

[HN10] "The requisite elements of a contract[,]" as set out by the Federal Circuit, **[*27]** are "mutual intent, including an unambiguous offer and acceptance; consideration; and authority on the part of the government representative to bind the government." *First Commerce II, 335 F.3d at 1380.*

a. Acceptance by Conduct

Because the point of departure of the court's analysis is that the FHLBB forbearance letter was a counteroffer to FCC, the initial pertinent inquiry is whether FCC accepted the government's counteroffer with its beneficial terms related to the amortization of goodwill from the Mutual acquisition. Compare Pl.'s Mot. at 24 ("FCC accepted the FHLBB's counteroffer of 25-years goodwill amortization by performance, i.e., by its acquisition of Mutual Federal.") with Def.'s Mot. at 17 ("In this case, there is no evidence of FCC's 'acceptance' or 'intent' because there is no evidence that FCC intended to be contractually bound.").

Defendant concedes that, in contract law, "an offer (or counteroffer) generally may be accepted . . . by actually rendering the requested performance." Def.'s Mot. at 17. Defendant, however, in the very next sentence of its brief, advances a different formulation of the law of acceptance: "Acceptance requires **[*28]** more than mere approval and acceptance of an offeror's promise; it requires a showing of inducement, and intent to be contractually bound." Id. Defendant argues that, in the Federal Circuit, "acting in conformance with an offer is not enough to establish acceptance" and "that performance must have been induced by, and rendered in reliance upon, the offer." Id. at 18.

For its "showing of inducement" and "reliance" components of acceptance, defendant relies upon *Wells*

*Fargo Bank, N.A. v. United States, 88 F.3d 1012 (Fed. Cir. 1996)* (Wells Fargo II). Def.'s Mot. at 17. Defendant relies, in particular, on a portion of a sentence in the Wells Fargo II opinion: "As that court [the United States Claims Court] pointed out, '"a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon."'" See id. at 18 (quoting *Wells Fargo II, 88 F.3d at 1018* (quoting *Wells Fargo Bank, N.A. v. United States, 26 Cl. Ct. 805, 810 (1992)* (Wells Fargo I) (quoting *Nat'l Rural Utils. Coop. Fin. Corp. v. United States, 14 Cl. Ct. 130, 137 (1988)* **[*29]** (National Rural), aff'd, *867 F.2d 1393 (Fed. Cir. 1989))))*. The court notes that the Wells Fargo I court did indeed characterize the government's offer as having "induced plaintiff to make loans it otherwise would not have made." *26 Cl. Ct. at 810*. And, in National Rural, the court held that a unilateral contract was formed when the plaintiff "advised [the government] that it was prepared to make a long-term loan to [an electric power cooperative] if [the government] . . . would provide security." *14 Cl. Ct. at 132*. In National Rural, the court observed that the plaintiff was "surely apprised of the terms and conditions for a lien accommodation [from the government, by receiving a copy of a letter stating the conditions for receiving such a lien accommodation]," and that plaintiff "was entitled to rely on [the government's promise] in deciding on its course of action with respect to the proposed loan to [the electric power cooperative]." *Id. at 137*. Certainly, as Wells Fargo I and National Rural demonstrate, the concepts of inducement and reliance are helpful in analyzing the circumstances **[*30]** giving rise to a contract, but defendant's assertion that these concepts are elements of acceptance appears doubtful to this court.

These cases could be cited just as aptly, however, for the simple proposition that performing in response to an offer in a unilateral contract proves unambiguous acceptance. See *Wells Fargo I, 26 Cl. Ct. at 810* ("A [unilateral] contract comes into existence as soon as the other party commences performance."); *National Rural, 14 Cl. Ct. at 137* (stating that once the plaintiff "had wired $ 8 million to [the electric power cooperative's creditor] on behalf of [the electric power cooperative], [the government's] obligation to grant a lien accommodation for this and any future sums advanced depended solely on whether [conditions put on performance] set forth in the lien accommodation letter were satisfied."). Neither court stated that inducement and/or reliance were separate elements that were required to supplement requested performance in order to accept an offer in a unilateral contract. Rather than construct a test for acceptance out of a phrase in Wells Fargo I and National Rural that appears to focus **[*31]** on the circumstances surrounding a contract rather than acceptance, this court chooses to follow the Federal Circuit's guidance in First Commerce II on the subject of acceptance.

[HN11] "As a general matter, . . . counteroffers may be accepted by conduct." *First Commerce II, 335 F.3d at 1382* (citing *Union Realty Co. v. Moses, 984 F.2d 715, 721 n.6 (6th Cir. 1993)*; *Buesing v. United States, 47 Fed. Cl. 621, 633 (2000))*. A closer examination of these two cases cited by the Federal Circuit is helpful in elucidating the standard for acceptance of a counteroffer.

In Union Realty, a seller was trying to enforce an earnest money forfeiture condition of a real estate sales agreement. *984 F.2d at 716-17*. In the trial court, the buyers avoided contract liability because it appeared that the seller had made a counteroffer, after the execution of the original agreement, setting conditions with which the buyers never complied. *Id. at 720*. But the Sixth Circuit found that the buyers had later responded with what might be deemed a counter-counteroffer, which was accepted by conduct of the seller. n10 *Id. at 720-21*. **[*32]** None of the Sixth Circuit's reasoning required inducement or reliance to supplement the seller's acceptance by conduct. The issue was whether the accepting party proceeded with the deal in accordance with the terms of the counteroffer (or, in that case, the counter-counteroffer). See *id. at 721-22* (holding that seller's counsel "responded affirmatively" by acting in conformity with the contract modifications proposed in the buyers' counter-counteroffer and thus created a contract where the buyers and the seller were bound).

n10 The Sixth Circuit did not exclude the possibility that other acceptance theories would support the existence of a contract in that case, but focused on the acceptance of the countercounteroffer as adequate justification for reversing and remanding for judgment in favor of seller. *Union Realty, 984 F.2d at 720 n.4, 722*.

In Buesing, a taxpayer asserted that he and the IRS had a contract "'to settle the value of tax liens on his property . . . .'" *47 Fed. Cl. at 629* **[*33]** (quoting the plaintiff). In the course of negotiating with the IRS, the taxpayer made "an offer in compromise," including a $ 30,000 payment and certain other terms. *Id. at 631*. The IRS made a counteroffer which accepted all of the contract terms except a timing term. *Id. at 631-33*. The taxpayer claimed he had accepted this counteroffer by performing. *Id. at 633*. This court disagreed, stating that "a close examination of plaintiff's conduct indicates that he [the taxpayer] was not accepting the counteroffer. Instead, plaintiff still was attempting to implement the terms of his original . . . offer which had not been

accepted [because of the material term concerning timing] by the IRS." *Id. at 633-34*. Because the taxpayer was proceeding on the timing term of the original offer and not on the timing term of the counteroffer, the court found there was no "meeting of the minds" and no contract. *Id. at 634*. Again, the court's analysis rested on whether or not the accepting party was proceeding with the deal according to the terms of the counteroffer. *See id.* (finding that plaintiff "was not assenting **[*34]** to the terms of defendant's counteroffer" and that there "could not have been an acceptance").

Therefore, the court, in this case, limits its analysis of acceptance to an examination of whether FCC proceeded with the Mutual acquisition according to the terms of the government's counteroffer. Defendant does not dispute the fact that FCC acquired Mutual, Def.'s Counter-Facts P 41, or the fact that FCC utilized the 25-year amortization of goodwill authorized by the government's counteroffer, Tr. at 88 (Def.'s Counsel) ("They [FCC] utilized the 25-year forbearance."). In addition, this court found, in First Commerce I, that FCC complied with all of the conditions set by FHLBB for the acquisition. *53 Fed. Cl. at 45 n.14*. Therefore, there was performance by plaintiff in response to the government's counteroffer, and this performance was an unambiguous acceptance through conduct.

b. Mutuality of Intent

The parties appear to dispute whether offer and acceptance, which have been proved in this case, are enough to show mutuality of intent, or whether a separate inquiry must be made into mutuality of intent. Compare Pl.'s Mot. at 30 ("Mutuality of intent usually 'takes **[*35]** the form of an offer or proposal by one party followed by an acceptance by the other party or parties.'" (citing *Restatement (Second) of Contracts § 22*(1))) and Pl.'s Reply at 2-3 (stating that "it is clear that 'mutual intent' is not a separate hurdle for plaintiff to jump if it has demonstrated the unambiguous offer and acceptance involved in its contract") with Def.'s Mot. at 17 ("In this case, there is no evidence of FCC's 'acceptance' or 'intent' because there is no evidence that FCC intended to be contractually bound.") and Def.'s Reply at 14 n.11 ("Here, again, FCC indicated throughout the entire application process that it would proceed without a forbearance from GAAP [i.e., proceeded without intent to contract for a forbearance from GAAP for the amortization of goodwill]."). The Federal Circuit leaves room for some doubt as to the relationship between mutuality of intent and offer and acceptance in the formation of contracts with the government, because its statements of the required conditions for contract formation vary slightly. Compare *First Commerce II, 335 F.3d at 1379-80* ("The requisite **[*36]** elements of a contract with the government are . . .: mutual intent, including an unambiguous offer and acceptance; consideration; and authority on the part of the government representative to bind the government.") with *Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995)* ("Like an express contract, an implied-in-fact contract requires '(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance.' . . . When the United States is a party, a fourth requirement is . . . [that] the government representative . . . 'must have actual authority to bind the government in contract.'" (citations and quotations omitted)).

In Lewis, for example, the Federal Circuit tested the government's actions for contract liability, both by examining statutory language to see whether it provided an unambiguous offer, see *70 F.3d at 601* ("Section 1619 [the statute upon which plaintiff relied for a contractual offer] also does not contain sufficiently definite terms to serve as the basis for a contract."), and by examining the same statute for the government's intent to enter into a contract, see *id. at 600-01* **[*37]** ("Section 1619 expresses no intent to bind the government if the statutory requirements are not met . . . . [And] if all the statutory conditions are met, the Secretary of the Treasury may . . . award . . . up to a specified amount from government funds." (emphasis added)). The Federal Circuit stated in Lewis that the plaintiff's contract claims failed "on the first and third of the conditions for establishing an implied-in-fact contract," treating mutuality of intent, and the requirement for unambiguous offer and acceptance, as separate requirements. *Id. at 600*. In a recent Winstar-related case, the Federal Circuit cited Lewis for its formulation of the four separate elements required for contracts with the government. See *D & N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003)* (citing *Lewis, 70 F.3d at 600*, for the almost identical formulation of the standard quoted above). The Federal Circuit in D & N Bank also treated the mutuality of intent requirement and the unambiguous offer and acceptance requirement as separate conditions. *See id.* ("We need not reach all four requirements in this case because **[*38]** D & N's proof fails on the first-there is no proof of mutuality of intent to contract.").

In Anderson v. United States, another recent Winstar-related case, the Federal Circuit again stated the four conditions required for contracts with the government, with separately stated conditions of mutuality of intent and of unambiguous offer and acceptance. *344 F.3d 1343, 1353 (Fed. Cir. 2003)*. However, the Federal Circuit appeared to hold in Anderson that an unambiguous offer and acceptance were enough to prove mutuality of intent by themselves. See id. ("To satisfy its burden to prove such a mutuality of intent, a plaintiff must show, by objective evidence,

the existence of an offer and a reciprocal acceptance."). In Anderson, plaintiff failed to prove that the government's response to plaintiff's offer was a "'manifest assent to the same bargain proposed by the offer.'" *Id. at 1356* (quoting *Restatement (Second) of Contracts § 50 cmt. a*). An acceptance expressing such a manifest assent would appear to suffice for demonstrating mutuality of intent. See *id. at 1357* (stating that "to **[*39]** create a contract, 'the offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly.'" (quotation omitted)). In Anderson, the analysis of mutual intent turned on whether the government's response exactly matched the term in plaintiff's offer concerning the accounting of goodwill. *Id. at 1355-58.*

Defendant cites no authority, and the court has found none, where a court has found an unambiguous offer and acceptance and then has conducted a separate inquiry for mutuality of intent. Therefore, this court follows Anderson and finds that [HN12] mutuality of intent is demonstrated when an unambiguous offer, here a counteroffer, is answered by an unambiguous acceptance which manifests assent to the terms of the offer. Accord *Am. Fed. Bank, FSB v. United States, 58 Fed. Cl. 429, 436 (2003)* (citing *Anderson, 344 F.3d at 1353*, for the proposition that "to prove mutual assent, a plaintiff must proffer evidence demonstrating the existence of an offer and reciprocal acceptance"). In this case, it is undisputed that FCC accounted for the **[*40]** goodwill from the Mutual acquisition according to the forbearance offered by the government, utilizing straight-line amortization for up to 25 years. Tr. at 88; Def.'s Counter-Facts P 42(d). Because it is uncontested that FCC acquired Mutual and met the conditions of the FHLBB counteroffer, *First Commerce I, 53 Fed. Cl. at 40, 45 n.14*, and utilized the 25-year amortization of goodwill as allowed by the government's forbearance, Tr. at 88, the court finds that FCC manifested assent to the terms of the government's counteroffer. Therefore, the parties had mutuality of intent to contract for the 25-year amortization of goodwill.

c. Consideration

The court now addresses two aspects of the law of consideration relevant to the circumstances of this case. The first is whether consideration flowed to the government and to FCC from the promises exchanged in the Mutual acquisition. See Pl.'s Reply at 4 (stating that the "court should also confirm the exchange of consideration so that the existence of FCC's contract is confirmed"). The second is whether the exchange of consideration was bargained for by the parties. See Def.'s Mot. at 14 (stating that "there is absolutely **[*41]** no evidence of any negotiations or bargained-for exchange between FCC and the FHLBB for the accounting forbearance ultimately granted by the FHLBB"). Because this court takes as its point of departure that the government made a counteroffer to FCC proposing the terms for the Mutual acquisition, these two aspects of consideration are not difficult to discern.

Consideration flowed to the government, when, as here, it found a buyer for an ailing thrift, because such acquisitions reduced the government's liquidation costs. See *First Commerce I, 53 Fed. Cl. at 39* (stating that FSLIC and FHLBB "adopted a policy of encouraging healthy thrifts to acquire financially troubled thrifts to reduce their [FSLIC's and FHLBB's] liquidation costs"). In this case, Mutual was an ailing thrift and the FHLBB made its counteroffer to "prevent the probable failure of Mutual Federal." Def.'s App. at 1100. Defendant does not contest that consideration was received by the government from FCC here. Tr. at 89 (Def.'s Counsel) ("We're not contesting that when Plaintiff acquired Mutual Federal they provided some value to the government . . . ."). There is no doubt that the government received **[*42]** consideration from FCC through its acquisition of Mutual.

Consideration flowed to FCC from the government's counteroffer because the counteroffer provided a promise of benefits to FCC, including favorable accounting treatment of the acquisition, see *First Commerce II, 335 F.3d at 1382* ("We conclude that the written documents in this case express the government's promise to offer favorable accounting treatment . . . ."); Pl.'s App. at 53-54 (showing that the FHLBB forbearance letter granted four regulatory and accounting forbearances), and the approval of FCC's acquisition of Mutual if certain conditions were met, see Pl.'s Facts PP 31-38. There is no doubt that FCC received consideration from the government's counteroffer setting the terms for the acquisition of Mutual.

Defendant argues, however, that FCC's performance in acquiring Mutual did not constitute a bargained-for exchange for the promise of the government's forbearance regarding the accounting for goodwill. See Def.'s Reply at 2 ("To constitute consideration, FCC's performance must have been 'bargained for.'"). Defendant claims that FCC would have acquired Mutual without the favorable accounting **[*43]** treatment of goodwill, Def.'s Reply at 6, that FCC had proposed GAAP accounting for goodwill in its offer to the government, id. at 5-6, and argues that such "overwhelming" evidence shows that FCC was not induced to acquire Mutual by the government's counteroffer terms related to goodwill, Tr. at 90. The fundamental flaw in the government's argument is that it relies on proof of inducement that predates the government's counteroffer to FCC. See Def.'s Mot. at 10-

17. Once a counteroffer has been made, it is this court's task to discern whether the terms of the counteroffer induced FCC's performance in the new bargain, not the old one. This inquiry is made easier by examining four sections of the Restatement (Second) of Contracts (1981).

*Section 39* of the Restatement defines counteroffers:

> Counter-Offers
> (1) [HN13] A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer.

*Restatement (Second) of Contracts § 39*(1) (emphasis added). Here, FCC was the original offeror and the government **[*44]** the offeree. See *First Commerce II, 335 F.3d at 1381* (stating that "we agree . . . that First Commerce's formal [acquisition of Mutual] application . . . [was] definite enough to constitute an offer"). The government's counteroffer "proposed a substituted bargain differing from that proposed by" FCC. *Restatement § 39*(1). Because the substituted bargain contained the favorable accounting treatment of goodwill term, it is that term, not FCC's previous negotiating term, that is being analyzed by the court here as a possible inducement for FCC's performance.

*Section 71* of the Restatement defines the bargained-for exchange aspect of consideration:

> Requirement of Exchange; Types of Exchange
> (1) [HN14] To constitute consideration, a performance or a return promise must be bargained for.
> (2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

*Restatement (Second) of Contracts § 71*(1)-(2) (emphasis added). Here, the government is the promisor of favorable accounting treatment for goodwill. FCC, the **[*45]** promisee, performed in response to that promise. The fundamental question is whether FCC bargained for the terms of the government's promise. The court need not inquire into the mental state of FCC as it performed in response to the government's counteroffer; it need only determine whether FCC acted in accordance with the inducement. See id. *cmt. b* ("Here, as in the matter of mutual assent, the law is concerned with the external manifestation rather than the undisclosed mental state; it is enough that the . . . [promisee] responds in accordance with the inducement."). Here, the 25-year amortization period for goodwill from the Mutual acquisition was bargained for, because FCC's performance in acquiring Mutual, FCC's meeting the conditions for the purchase, and FCC's accounting for goodwill according to the forbearance given by the government together constituted performance in accordance with the inducement of the government's counteroffer.

As further support for this court's conclusion that FCC was "induced" to perform by the government's counteroffer of favorable accounting treatment for goodwill, the court relies on Restatement *Sections 81 and 80*. *Section 81* states in relevant **[*46]** part that:

> Consideration as Motive or Inducing Cause
> . . . .
> (2) The fact that a promise does not of itself induce a performance or return promise does not prevent the performance or return promise from being consideration for the promise.

*Restatement (Second) of Contracts § 81*. *Comment b* of this section explains that the "bargained for" concept is limited by the fact that promisor and promisee may have more than one motive and that even an "incidental" consideration is bargained for. Id. *cmt. b*. Even if the forbearance for accounting of goodwill was merely incidental to the bargain between FCC and the government, FCC bargained for this term.

*Section 80* states in relevant part:

> Multiple Exchanges
> (1) There is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone.
> (2) The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration.

Restatement (Second) of Contracts *§ 80* **[*47]** . Here the government offered approval of the Mutual acquisition and forbearances to FCC, a set of promises. FCC's performance of acquiring Mutual was consideration for each of those promises, most obviously for the FHLBB approval of the acquisition. See id. *cmt. a* (stating that "two or more promises may be binding even

though made for the price of one"); see also *First Nationwide Bank v. United States, 48 Fed. Cl. 248, 261 (2000)* (refuting the plaintiff's claim that separate consideration must be offered for each promise in a contract and citing Restatement *§ 80*). Therefore, FCC did bargain for and give consideration for the forbearance related to the 25-year amortization of goodwill, because it was one promise of a set of promises made by the government in that counteroffer. n11

n11 It may seem odd that the government's counteroffer includes a term which is more favorable to FCC (25-year amortization of goodwill) than the term in FCC's offer (GAAP accounting of goodwill), but even a partial gift may constitute valid consideration for a contract. See *Restatement (Second) of Contracts § 71 illus. 6* (showing that a buyer who pays double for an item may have a motive of making a partial gift but that the sales price still provides valid consideration for the transfer of ownership).

**[*48]**

d. Authority to Contract with a Holding Company

FCC's acquisition of Mutual was a "voluntary supervisory conversion," Pl.'s Supp. at 10; see Tr. at 35, 38 (Def.'s Counsel) (stating that the acquisition was "processed as a supervisory conversion" and that FCC "filed a voluntary supervisory application"), which did not require financial assistance from the FSLIC, see Def.'s Mot. at 21 (referring to the Mutual acquisition as "this unassisted transaction"); Pl.'s Mot. at 34 n.24 (stating that FCC's acquisition of Mutual presented the "same factual setting" as the "unassisted 1988 acquisition by a new holding company in a supervisory stock conversion transaction" discussed in *Hughes, 58 Fed. Cl. at 292-96*). There is no doubt that if FCC had been an institution insured by the FSLIC, rather than a holding company, the FHLBB would have had authority to contract for the 25-year amortization of goodwill, even in an unassisted transaction. See *Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1347 (Fed. Cir. 2001)* (CalFed) (stating that "the FHLBB and the FSLIC have the authority to enter into contracts like these [unassisted acquisitions of **[*49]** thrifts by other thrifts]"). n12 Here, defendant argues, because FCC was a holding company and not a thrift, there was no statutory authority for FHLBB to have bound the government in a contract. Def.'s Mot. at 20.

n12 The plaintiff in CalFed was a thrift, not a holding company. See *Cal. Fed. Bank v. United States, 43 Fed. Cl. 445, 447 (1999)* ("Cal Fed was a relatively healthy thrift before it entered into this contract, and it is healthy today."), vacated in part on other grounds, *245 F.3d 1342 (Fed. Cir. 2001)* (CalFed).

Defendant's argument concerning the lack of statutory authority has been presented in several cases before this court and has been unsuccessful in circumstances similar to this case. See, e.g., *Hughes, 58 Fed. Cl. at 301-303* (dismissing defendant's lack of authority argument as "unconvincing and contrary to controlling precedent"); *Admiral Fin. Corp. v. United States, 54 Fed. Cl. 247, 258 (2002)* (finding authority **[*50]** for the FHLBB to contract with a holding company under similar facts); *Hometown Fin. Inc. v. United States, 53 Fed. Cl. 326, 334-35* & nn.10-11 (2002) (finding that the government had "legal authority" to enter into a contract with a holding company under similar facts). n13 The court follows these holdings on statutory authority for the following reasons.

n13In *Fifth Third Bank of W. Ohio, 52 Fed. Cl. 829, 832-836 (2002)* (Fifth Third II) and Home Sa v. of *Am., FSB v. United States, 50 Fed. Cl. 427, 441-42 (2001)* (Home Savings), defendant's argument met with greater success. But because Fifth Third II is distinguishable as an alternative holding to support summary judgment, *52 Fed. Cl. at 832*, and Home Savings is distinguishable because in that case the court was dismissing claims related to supervisory goodwill from non-FSLIC-insured acquired institutions, *50 Fed. Cl. at 441*, the court finds that the weight of precedent supports statutory authority in this case.

**[*51]**

Plaintiff asserts that the government "had authority to contract with FCC under *12 U.S.C. § 1725(c)* [(1988)]" and "under its implied authority to make contracts necessary to implement the functions and programs of the FHLBB and FSLIC." Pl.'s Reply at 13. This statute, titled "Creation of Federal Savings and Loan Insurance Corporation," states in relevant part in *subsection (c)*:

[HN15] (c) Powers

> On June 27, 1934, the Corporation shall become a body corporate, and shall be an instrumentality of the United States, and as such shall have power-
>
> . . . .

(3) To make contracts

*12 U.S.C. § 1725*. The plain language of the statute supports plaintiff's assertion that the FSLIC and the FHLBB had authority to make contracts. See *CalFed, 245 F.3d at 1347* (stating that "the FSLIC has had the authority under *12 U.S.C. § 1725(c)(3)* to make contracts like these [for supervisory goodwill]" and that "both the FSLIC and its supervisory agency, the FHLBB, have had 'the authority both to extend assistance to acquirers of insolvent . . . thrifts, *12 U.S.C. § 1729(f)(2)(A)* (repealed) **[*52]** [ n14 ], and to set minimum capital limits on a case-by-case basis, *12 U.S.C. § 1730(t)(2)* (repealed) [ n15 ]'" (citing *Winstar Corp. v. United States, 64 F.3d 1531, 1548 (Fed. Cir. 1995)* (Winstar II)); *Winstar II, 64 F.3d at 1548* ("We are also persuaded, as the Court of Federal Claims held, that the Bank Board [FHLBB] and the FSLIC, as the principal regulators of the thrift industry, were fully empowered to enter into the contracts at issue here."). Defendant asserts that *§ 1725(c)* "is merely a general housekeeping provision of FSLIC's 'organic statute,'" Def.'s Mot. at 22 (quoting, for the term "organic statute," *United States v. Winstar Corp., 518 U.S. 839, 890, 135 L. Ed. 2d 964, 116 S. Ct. 2432 (1996)* (Winstar III)), and further asserts that "it does not, standing alone, empower the agency to create vested rights and entitlements," *id.*

n14 Titled "Liquidation of insured institutions," *12 U.S.C. § 1729 (1988)*, states, in *subsection (f)* "Assistance to thrift institutions," in *subsection (2)*:

> (A) In order to facilitate a merger or consolidation of an insured institution . . . with another insured institution . . ., the Corporation is authorized . . . -
> . . . .
> (iii) to guarantee such other insured institution . . . against loss by reason of such other insured institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution . . . .

Id. *§ 1729(f)(2)(A)(iii)*. **[*53]**

n15 In *12 U.S.C. § 1730(t) (1988)* "Minimum capital requirements," *subsection (2)* titled "Minimum capital levels may be determined by corporation on case-by-case basis" provides:

> The Corporation may establish the minimum level of capital for an insured institution at such amount or at such ratio of capital-to-assets as the Corporation determines to be necessary or appropriate for such insured institution in light of the particular circumstances of the insured institution.

Id. *§ 1730(t)(2)*.

Defendant's position relies principally n16 on its interpretation of the short discussion of authority in Winstar III, which defendant claims "expressly predicates" the government's contracting authority in the Winstar context on the Court's analysis of *12 U.S.C. § 1729(f)(2) (1988)*. Def.'s Mot. at 20 (citing to *Winstar III, 518 U.S. at 883, 890-91 )*. This court does not read Winstar III as supporting defendant's allegation that *§ 1725(c)* may not stand alone as authority to contract in this case. The court in **[*54]** Franklin Federal Savings Bank v. United States responded to defendant's suggested reading of Winstar III on the subject of authority and found that defendant's arguments were "less than compelling":

> The Government's cavalier dismissal of *12 U.S.C. § 1725(c)* as a "housekeeping" statute does not square with the Supreme Court's reference to that statute in Winstar III. . . . The juxtaposition of those two statements [statements including the words "the Bank Board and FSLIC had ample statutory authority " and "the organic statute . . . generally empowered it [the FSLIC] 'to make contracts'"] implies a more expansive interpretation by the Supreme Court of the FSLIC's general contracting authority in *12 U.S.C. § 1725(c)*.

*53 Fed. Cl. 690, 708 (2002)* (quoting *Winstar III, 518 U.S. at 890*) (Franklin); accord *Globe Sav. Bank, FSB v. United States, 55 Fed. Cl. 247, 257-58 (2003)* (concluding that "while these decisions [CalFed, Winstar II and III] illustrate certain dimensions of the FSLIC's and the FHLBB's authority by discussing subsection *1729(f)(2)*, **[*55]** the full breadth of the agencies' contractual authority is properly found in subsection *1725(c)(3)*"). The Franklin court also cited CalFed as "controlling case law" for its holding that the FHLBB

and the FSLIC have contracting authority even in unassisted transactions. *53 Fed. Cl. at 708*; accord *Hughes, 58 Fed. Cl. at 302* (after explaining that *§ 1729(f)(3)* [(1988) n17 ] and *§ 1730a(m)* [(1988) n18 ] gave FSLIC "ample statutory authority," if *§ 1729(f)(2)* did not apply, the court further explained that "controlling case law establishes FHLBB's broad authority to enter into contracts under *12 U.S.C. 1725(c)*"); *Hometown, 53 Fed. Cl. at 335* & n.10 (holding that an unassisted acquisition by a holding company was "legally similar" to the acquisition in CalFed and therefore the "issue of the government's legal authority" was "resolved in favor of plaintiffs"); cf. *Globe, 55 Fed. Cl. at 257* (stating, in a case involving an assisted acquisition by a holding company, that "the controlling case law clearly indicates that the FHLBB and the FSLIC had broad authority to enter into contracts"). **[*56]**

n16 The other challenge defendant makes to contract authority is based on its assertion that *Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002)*, cert. denied, *539 U.S. 910, 156 L. Ed. 2d 125, 123 S. Ct. 2246 (2003)*, is applicable here to the issue of statutory authority. Def.'s Mot. at 20, 23 & nn.11-12, 25. However, at oral argument defendant was unable to cite any caselaw applying Schism to the authority issue in the Winstar context, Tr. at 7-8, and the court does not find the statutory authority issues in Schism relevant to the statutory authority issues in this case. At the time of oral argument, the court commented that it had found no Winstar-related case citing to Schism, Tr. at 7, but the court's comment is no longer true. A recent Federal Circuit decision in a Winstar-related case does contain a cite to Schism, but not to an issue helpful to defendant here. *See Barron Bancshares, Inc. v. United States, 2004 U.S. App. LEXIS 9154, Nos. 03-5048, 03-5049, 2004 WL 1048197, at *15 (Fed. Cir. May 11, 2004).*

n17 The text of *12 U.S.C. § 1729(f)(3) (1988)* states in its entirety:

> The Corporation may provide any person acquiring control of, merging with, consolidating with or acquiring the assets of an insured institution under *section 1730a(m)* of this title with such financial assistance as it could provide an insured institution under this subsection.

Id. **[*57]**

n18 Titled "Regulation of holding companies," *12 U.S.C. § 1730a (1988)*, states in *subsection (m)* "Emergency thrift acquisitions":

> (1)(A)(i) . . . the Corporation . . . may authorize, in its discretion and where it determines such authorization would lessen the risk to the Corporation, an insured institution that is eligible for assistance pursuant to *section 1729(f)* of this title to merge or consolidate with . . . or may authorize any company to acquire control of said insured institution . . . .

Id. *§ 1730a(m)(1)(A)(i).*

The facts in Franklin are analogous to the facts in this case: a holding company, without requiring financial assistance from the FSLIC, acquired a failing thrift in a "voluntary supervisory conversion." *Id. at 694*. In Franklin, the court found that "the contractual undertaking between [the plaintiffs] and the Government clearly included a promise by [the FHLBB] and FSLIC officials, acting with delegated authority, that [the new thrift] could amortize its supervisory goodwill over 25 years." *Id. at 709*. Here, **[*58]** the court finds that *§ 1725(c)* provided adequate authority for a contract regarding the 25-year amortization of goodwill between the government and FCC. n19

n19 There may have been other statutes which gave additional authority for the government's contractual promise but the court declines to speculate as to how properly to reconcile the sparse comments on authority from the Supreme Court, *Winstar III, 518 U.S. at 883, 890-891*, and the text of a host of statutory sections and subsections. The court does note that, in addition to the statutes mentioned by courts, cited supra, the Supreme Court referred to and quoted *12 U.S.C. § 1730h(d) (1988)*, "No provision of this section [titled "Accounting principles and other standards and requirements"] shall affect the authority of the [FSLIC] to authorize insured institutions to utilize subordinated debt and goodwill in meeting reserve and other regulatory requirements," *§*

*1730h(d)*, when discussing contracting authority in *Winstar III, id. at 891*. The Supreme Court also cited to a secondary source for the proposition that "'the authority of the executive to use contracts in carrying out authorized programs is . . . generally assumed in the absence of express statutory prohibitions or limitations.'" *Winstar III, 518 U.S. at 890 n.36* (citing 1 R. Nash & J. Cibinic, Federal Procurement Law 5 (3d ed. 1977)) (ellipsis in original).

The approval letter in this case, Def.'s App. at 1099, cited to *12 U.S.C. § 1730a(e) (1988)*, which forbade a holding company "to acquire, except with the prior written approval of the Corporation [FSLIC], the control of an insured institution," *§ 1730a(e)(1)(A)(i)*. The approval letter also contained language stating the government's authority to grant forbearances. See Def.'s App. at 1102 ("Pursuant to the delegated authority to approve the applications noted herein, the [FHLBB official] is hereby directed and authorized to issue to Mutual Federal a letter concerning supervisory forbearances. . . ."). None of this contemporary documentation directs the court to any particular statutory authority for contracting for the amortization of goodwill. In the absence of such direction, the court relies on controlling precedent for the government's statutory authority to contract for the treatment of goodwill in a Winstar-related case.

**[*59]**

e. Delegated Authority to Contract

Defendant argues that plaintiff has failed "to satisfy its burden of proving that OGC [Office of the General Counsel] and/or ORPOS [Office of Regulatory Policy, Oversight and Supervision] had the requisite delegated authority [to contract for supervisory goodwill amortization]." Def.'s Mot. at 26. Defendant cites only one decision, *Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 637 (2002)* (Fifth Third I), in support of its argument that "neither OGC nor ORPOS had delegated authority to enter into this alleged contract," Def.'s Mot. at 27 n.15. This court in Fifth Third I, however, concluded that a regional FHLBB official "had implied actual authority to bind FHLBB to promises regarding the amortization and use of supervisory goodwill." *52 Fed. Cl. at 643* (emphasis added). Because Fifth Third I discussed the delegated authority possessed by a regional FHLBB official, not the authority possessed by OGC or ORPOS, and because Fifth Third I found that actual authority to contract did exist in that case, the court does not find defendant's argument persuasive.

Plaintiff notes that the **[*60]** FHLBB approval letter for the Mutual acquisition mentioned that authority was delegated from the FHLBB and the FSLIC to the signatories of the letter, OGC and ORPOS officials, by 12 C.F.R. § 563b.28(c) (1988). Pl.'s Mot. at 38; Def.'s App. at 1099, 1102. Section 563b.28(c) stated in relevant part:

> [HN16] (c) The Board delegates to the General Counsel or his designee, the authority to approve applications for voluntary supervisory conversions, and to exercise the authority of the Board pursuant to this section, provided that (1) the application does not present a significant issue of law or policy, and (2) that ORPOS does not raise supervisory objection to the application based upon significant unresolved supervisory issues with respect to the financial or managerial resources of the converting institution, the items specified in § § 563b.24, 563b.25, and 563b.26, or the items required to be submitted pursuant to paragraphs (b), (d), (h), (j), (l), (m), (n), (o), (p), (r) and (s) of § 563b.27.

12 C.F.R. § 563b.28(c). This court has found that this regulation, in the context of thrift acquisition approval documents including **[*61]** references to delegated authority, properly delegated actual authority to contract to OGC and ORPOS officials. See *Hughes, 58 Fed. Cl. at 303-04* (citing 12 C.F.R. § 563b.28(c) (1988) and stating that "the FHLBB . . . properly delegated its authority under the regulations [to OGC and ORPOS]"); see also *Franklin, 53 Fed. Cl. at 708-09* (citing similar FHLBB approval letter language concerning delegated authority, and holding that the signatories, OGC and ORA n20 officials, "acted with delegated authority"). The court finds that OGC and ORPOS in this case had been delegated actual authority to contract with FCC for the 25-year amortization of supervisory goodwill from the Mutual acquisition.

> n20 ORA, the Office of Regulatory Activities, was a previous incarnation of ORPOS. Pl.'s Mot. at 38; Office of Thrift Supervision Glossary of Terms, at http://www.ots.treas.gov/glossary/acronyms.html (last visited May 14, 2004).

3. Allocation of Risk of Regulatory **[*62]** Change

Defendant asserts that in this case, "the parties expressly and unequivocally allocated the risk of

regulatory change to FCC." Def.'s Reply at 23. Plaintiff disagrees, stating that "plaintiff FCC did not assume the risk of regulatory change." Pl.'s Mot. at 38 (emphasis omitted). The arguments of the parties focus on three topics. The first focus is on the contract documents themselves and how their terms should be read. See Pl.'s Mot. at 43 & n.33 (discussing the FHLBB approval letter, the FCC RCMA and the forbearance letter and their significance); Def.'s Reply at 31 (discussing the forbearance letter and stating that its terms "must be read in conjunction with and coexist with the other provisions in the relevant documents"). The second focus is on the holding, if any, of the "Guaranty footnote" n21 in Winstar III concerning when the language of such contract documents allocates the risk of regulatory change to plaintiff or defendant. See Def.'s Mot. at 30-33; Pl.'s Reply at 15 (asserting that "Winstar III's footnote 15 contains no 'holding' at all"). The third focus is on authority in the Federal Circuit deciding the question of the allocation of risk **[*63]** of regulatory change when similar contract documents are in play. Pl.'s Mot. at 38-42; Pl.'s Reply at 15-17; Def.'s Mot. at 33 n.17; Def.'s Reply at 27-30. The court discusses each of these topics in turn.

> n21 In a footnote in Winstar III, the Court discussed the holding of *Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991)* (Guaranty), which found, in that case, that the government did not have contract liability for regulatory changes due to the enactment of FIRREA. *518 U.S. at 869 n.15.*

a. Reading the Contract Documents in FCC's Acquisition of Mutual

The most relevant contract documents here are the FHLBB forbearance letter and the FCC RCMA. The most pertinent sections of the forbearance letter are numbered paragraph three and a portion of the concluding paragraph:

> 3. For purposes of reporting to the Board, the value of any intangible assets resulting from the application of push-down accounting in accounting for the purchase, may be **[*64]** amortized by Mutual over a period not to exceed 25 years by the straight line method.
>
> . . . .
>
> . . . This letter does not and shall not be construed to constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 4.

Def.'s App. at 1105.

There are three pertinent paragraphs of the FCC RCMA. The first is a definition statement:

> Regulatory Capital Requirement" means the Association's regulatory capital requirement at a given time computed in accordance with *12 C.F.R. 563.13(b)*, or any successor regulation thereto, but not less than 3% of the Association's total liabilities.

Def.'s App. at 1235 (FCC RCMA P I.C.). The second relevant paragraph describes an obligation undertaken by FCC:

> As long as the Acquiror controls the Association, the Acquiror will cause the regulatory capital of the Association to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such **[*65]** requirement during the first quarter after which the Association fails to meet its Regulatory Capital Requirement.

Id. (FCC RCMA P II.A.). The third relevant paragraph of the FCC RCMA is a "miscellaneous provision":

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.

Id. at 1238 (FCC RCMA P VII.D.).

Defendant asserts that the language of the FCC RCMA allocated the risk of regulatory change to FCC. See Def.'s Mot. at 33 (stating that "the language of the [FCC] RCMA allocating the risk of regulatory change to FCC is even clearer than the one in Guaranty"); id. at 35 (asserting that "the clear risk-shifting language found in the FCC RCMA . . . supports a finding that FCC assumed the risk of regulatory change"). Defendant

points to the terms "successor regulation" and the phrase "it being expressly understood that subsequent amendments to such regulations may be made and that such amendments **[*66]** may increase or decrease the Acquiror's obligation under this Agreement" as support for its contention that plaintiff assumed the risk of regulatory change. Def.'s Mot. at 31 (citations omitted).

Plaintiff counters that the language of the forbearance letter "takes precedence over the right-to-amend-the-rules statement in FCC's [RCMA]." Pl.'s Mot. at 40. This is so, plaintiff argues, because the more specific 25-year amortization promise of numbered paragraph three of the forbearance letter takes precedence over the more general "successor regulation" language of the FCC RCMA. Id. at 41. Plaintiff also advances a separate argument that the forbearance letter term of 25-year amortization of goodwill and the FCC RCMA term of "successor regulation" are not "inconsistent." Pl.'s Reply at 17; see Pl.'s Mot. at 42-43 (discussing how these terms are "not in conflict"). In this separate argument, plaintiff asserts that FHLBB could "strictly enforce a higher capital requirement while leaving intact the government's promise that supervisory goodwill would count as capital for the full 25-year term set out in the FHLBB forbearance letter." Pl.'s Reply at 17.

Finally, defendant argues **[*67]** that the "'realities of the transaction'" are a factor in deciding the allocation of risk of regulatory change in this type of contract. Def.'s Mot. at 30 (quoting *Winstar III, 518 U.S. at 863*). Defendant asserts that, in this case, "the 'realities of the transaction' are the exact opposite of the 'realities relied upon by the Supreme Court to determine that the risk of regulatory change was shifted to the Government [in Winstar III] . . . ." Id. at 35. Defendant cites a variety of business reasons that, in its view, show that FCC would have been willing to acquire Mutual without the forbearance related to the accounting of goodwill, and would have therefore been willing to assume the risk of regulatory change regarding the 25-year amortization of goodwill term. Id. at 33-35. Defendant appears to suggest that the test for risk allocation is different in cases where the circumstances make the 25-year amortization of goodwill crucial to the transaction, than the test in other cases where the 25-year amortization of goodwill is relatively unimportant. See Def.'s Reply at 27 (arguing that "a case-by-case fact-specific inquiry into each transaction [is **[*68]** needed]-taking into consideration the respective documents and surrounding circumstances," and faulting plaintiff for "proferring no case in which the court found that the risk of regulatory change was shifted to the Government where the "very different" Supreme Court recognized language was used in the context of a transaction in which such risk allocation would have been wholly rational"). Defendant refers to this inquiry into factual circumstances, those outside the corners of the contractual documents in a Winstar-related case, as "the second prong of the Supreme Court's risk-shifting analysis-the economic 'realities of [this] transaction.'" Id.

The court responds to defendant's last contention first: defendant's claim that there is a second prong to the Supreme Court's risk-shifting analysis that requires an analysis of a plaintiff's "economic realities." The court first notes that defendant cites no authority for this formulation of either "the Supreme Court's risk-shifting analysis [in Winstar III]" or a so-called "the second prong." It is true that the Supreme Court, when discussing each of the three transactions in Winstar III, specifically mentioned **[*69]** the circumstances surrounding the transactions, as well as the language of the contract documents. See *518 U.S. at 861-68.*

But upon a closer reading of the Winstar III decision, the quoted phrase "realities of the transaction" is employed to distinguish the government's promise in the Glendale transaction from policy statements that do not manifest an intent to be bound in a contract. See *id. at 863* (stating that "the realities of the transaction favored reading those documents as contractual commitments, not mere statements of policy"). This discussion and the phrase excerpted by defendant are part of the Court's review of whether contract obligations had been undertaken by the government, not a specific inquiry into the allocation of the risk of regulatory change. See *id. at 860-861* (stating that although "the anterior question whether there were contracts at all between the Government and respondents . . . is not strictly before us[,]" the "resolution of the legal issues . . . required some consideration of the nature of the underlying transactions"). Within this section of the plurality opinion, when discussing the Winstar **[*70]** transaction the Court specifically addressed the allocation of the risk of regulatory change question and in doing so reviewed a contract document. See *id. at 865* (disapproving the government's interpretation of documents which "barred any inference that the Government assumed the risk of regulatory change" and stating that "the accounting principles clause [in the Winstar Assistance Agreement] tilts in favor of interpreting the contract to lock in the then-current regulatory treatment of supervisory goodwill"). Absent authority supporting defendant's proposed "second prong" of the risk-shifting analysis in Winstar III, the court reads the Winstar III analysis of risk allocation to be one requiring an examination of the language in the contract documents. n22

n22 If defendant's view were correct, the factual circumstances of the transaction, not the contract documents themselves, would be repeatedly examined, first to determine whether each of several elements of contract formation was present, then to determine whether a rational decision by a plaintiff to accept the risk of regulatory change was possible under the circumstances. As the court has previously discussed, acceptance, mutuality of intent to contract, and consideration have all been established in this transaction-further inquiry into the state of mind of FCC's decision-makers is not warranted in this case. See *Restatement (Second) of Contracts § 71 cmt. b* (stating that "the law is concerned with the external manifestation rather than the undisclosed mental state; it is enough that . . . the [promisee] responds in accordance with the inducement"); supra part II.B.2.a-c of this opinion discussing contract formation elements.

**[*71]**

The court agrees with the parties here that the terms of the relevant contract documents must be construed together to discern where the risk of regulatory change was allocated in this case. There is an apparent conflict, if not a real conflict, between the forbearance letter term allowing FCC a 25-year amortization of goodwill, Def.'s App. at 1105, and the FCC RCMA term stating that FCC's obligations to the government may vary depending upon successor regulations, id. at 1238. The first step in resolving this apparent conflict is to analyze the footnote in Winstar III that discusses "clearer" contract language that allocated the risk of regulatory change to a plaintiff in this type of contract. *518 U.S. at 869 n.15.*

b. The Guaranty Footnote and its Applicability to FCC's Acquisition of Mutual

The Supreme Court discussed the topic of exactly what promise was made in the Winstar III transactions by offering forbearances involving straight-line amortization of goodwill as a component of regulatory capital:

> It is important to be clear about what these contracts did and did not require of the Government. Nothing in the documentation or the circumstances **[*72]** of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry. Rather, what the Federal Circuit said of the Glendale transaction [in Winstar II] is true of the Winstar and Statesman deals as well: "the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected" in the agreements between the parties. 64 F.3d[] at 1541-1542. We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence.

*518 U.S. at 868-869.* The court then commented, in a footnote, as to how the government could avoid liability for losses due to regulatory change by using clearer contract language: n23

> To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. See, e.g., *Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991)* (finding, based on very **[*73]** different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift). The failure to be even more explicit is perhaps more surprising here, given the size and complexity of these transactions. But few contract cases would be in court if contract language had articulated the parties' postbreach positions as clearly as might have been done, and the failure to specify remedies in the contract is no reason to find that the parties intended no remedy at all. The Court of Claims and Federal Circuit were thus left with the familiar task of determining which party's interpretation was more nearly supported by the evidence.

*Winstar III, 518 U.S. at 869 n.15.* If, indeed, there is a holding in the Guaranty footnote, it appears to rest, at least in part (citing Guaranty using the signal see, e.g.,), upon the Eleventh Circuit's decision in *Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991)* (Guaranty), and in particular upon the contract documents reviewed by the Eleventh Circuit in Guaranty. See *518 U.S. at 869 n.15* **[*74]** (stating that "very different contract language" was the basis for the

finding in Guaranty). Because defendant in this case repeatedly asserts that the contract language in Guaranty is the same as the contract language in this case, see Def.'s Mot. at 32 ("The RCMA in Guaranty is identical to the RCMA in this action."); id. at 37 ("The forbearance letters sent to Guaranty Federal and FCC contain identical provisions relating to the amortization of intangible assets."), the court reviews the decision in Guaranty and the documents upon which it is based.

n23 Here, again, the Court's focus is on the language of contract documents, not the circumstances of the transaction, when considering the allocation of risk of regulatory change. See supra text accompanying note 22.

In Guaranty, the Eleventh Circuit reviewed a supervisory merger/conversion from mutual to stock thrift which created a contract between the plaintiff and the government. *928 F.2d at 996*. After the enactment **[*75]** of FIRREA, the plaintiff sought and received a preliminary injunction from a United States District Court to force the government to honor its promise to treat supervisory goodwill from the merger as regulatory capital. *Id. at 996-997*. The Eleventh Circuit reviewed the contract documents in that case, five in number according to the plaintiff, but focused primarily on two, a RCMA and a forbearance letter. *Id. at 996, 998-1000*. The Eleventh Circuit found, based on those documents, that there was a way to "harmonize[]" the contract terms in the different documents that might otherwise be interpreted as being in conflict. *Id. at 999-1000*. Thus, in Guaranty, the "forbearance provision [allowing 25-year amortization of goodwill] . . . meant that the agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory [scheme] remained as it was when the contract was signed." *Id. at 999*; see also *id. at 1001* (stating that "we interpret the contract to mean that Guaranty had the right to treat its goodwill as regulatory capital and amortize it over a twenty-five **[*76]** year period for so long as the statutes and regulations governing the area remained as they were when the agreement was signed").

There are several differences between the contract documents in Guaranty and those in this case, however. Tr. at 68-73. While the parties did not point out any significant differences between the text of the forbearance letter in Guaranty and the forbearance letter in this case, the Guaranty RCMA and the FCC RCMA are different. There are five portions of the Guaranty RCMA quoted in the Guaranty opinion, *928 F.2d at 996, 998-99*, and the language in three of these quoted sections is different from the language of the FCC RCMA. See Def.'s Ex. 14 (FCC RCMA), found in Def.'s App. at 1234-40; Def.'s Ex. 34 (Guaranty RCMA). The differences between quoted sections of the Guaranty RCMA and the FCC RCMA appear to the court to be significant.

First, paragraph VI(B) of the Guaranty RCMA states that "this Agreement shall be deemed a contract made under and governed by Federal law," Def.'s Ex. 34 at 5, whereas paragraph VII(B) of the FCC RCMA states that "this Agreement shall be deemed a contract made under and governed by the laws of the State **[*77]** of Indiana," Def.'s App. at 1238. In Guaranty, the Eleventh Circuit cited paragraph VI(B) for its statement that "we assume without deciding that the [government] agencies did indeed make a contract with Guaranty." *928 F.2d at 998*. In this case, the court has decided the contract issue after finding unambiguous offer and acceptance, mutuality of intent, consideration and governmental authority to contract, and does not rely specifically on paragraph VII(B) of the FCC RCMA for this conclusion. n24

n24 Indeed, several factors explain why the analysis of contract formation was truncated in Guaranty. The Eleventh Circuit was reviewing a preliminary injunction, rather than a summary judgment motion on contract liability. See *Winstar II, 64 F.3d at 1546-48* (disapproving of the government's argument that a preliminary injunction denial by the District of Columbia Circuit offered an analogous analysis of contract issues). Also, Winstar III had not yet been decided, and had not yet defined the parameters of contract formation in this type of case. Similarly, the Federal Circuit and the United States Court of Federal Claims decisions elaborating these contract issues were yet to be decided. It is not surprising that the Eleventh Circuit's analysis of contract issues in Guaranty is different from the court's analysis in this case.

**[*78]**

Second, paragraph I(D) of the Guaranty RCMA defines "regulatory capital" and cites to *12 C.F.R. § 561.13* [1988] n25 "or any successor regulation" but there is no similar provision in the FCC RCMA. Compare Def.'s Ex. 34 at 2 with Def.'s App. at 1235. This is a significant difference because, as plaintiff argues, contracting specifically for certain types of assets to qualify as regulatory capital is not the same as contracting for the level of capital that will be needed to remain in regulatory compliance. Tr. at 76-77.

n25 The introductory paragraph of this regulation, titled "Regulatory capital," stated:

> (a) The term "regulatory capital" means the sum of all reserve accounts, retained earnings, permanent common stock, permanent preferred stock, non-permanent preferred stock issued prior to July 23, 1985, mutual capital certificates (issued pursuant to *§ 563.7-4* of this subchapter), securities which constitute permanent equity capital in accordance with generally accepted accounting principles (if approved by the Corporation), appraised equity capital (as defined in *§ 563.13(c)* of this subchapter), allowances for loan losses except specific allowances, (including those specific allowances established pursuant to *§ § 561.16c, 563.17-2, and 571.1a* of this subchapter) and any other nonwithdrawable accounts of an insured institution (excluding any Treasury shares held by the insured institution): Provided, That for any nonpermanent instrument qualifying as regulatory capital under this paragraph, either.

*12 C.F.R. § 561.13(a) (1988).*

**[*79]**

Third, paragraph I(E) of the Guaranty RCMA, differs in two respects from paragraph I(C) of the FCC RCMA. See Def.'s Ex. 34 at 2; Def.'s App. at 1235. While both paragraphs are titled "Regulatory Capital Requirement" and reference "*12 C.F.R. 563.13(b)* [1988],[ n26 ] or any successor regulation thereto," the FCC RCMA paragraph I(C) adds a clause setting a minimum capital ratio of "not less than 3 % of the Association's total liabilities." Def.'s Ex. 34 at 2; Def.'s App. at 1235. The final difference is also in the Guaranty RCMA paragraph I(E), where an asterisk directs the reader to the Guaranty forbearance letter, which is attached to the Guaranty RCMA as Exhibit A. Def.'s Ex. 34 at 2. The fact that the Guaranty forbearance letter was attached to the Guaranty RCMA, and the fact that it is paragraph I(E) of the Guaranty RCMA that makes reference to the Guaranty forbearance letter, are both significant. The Eleventh Circuit in Guaranty mentions the asterisk or the paragraph I(E) reference to the forbearance letter or the attachment of the forbearance letter in three different paragraphs of its opinion. *928 F.2d at 996, 999*. The Eleventh **[*80]** Circuit stated that the forbearance allowing the 25-year amortization of goodwill was "incorporated into the agreement by the asterisk in Article [paragraph] I(E)." *Id. at 999*. No such incorporation of the FHLBB forbearance letter into the FCC RCMA occurred, by asterisk or any other reference in the text of the FCC RCMA. See Def.'s Ex. 14. n27

n26 The second paragraph of the regulation titled "Regulatory capital requirement" stated:

> (b) Minimum required amount. Except as otherwise provided in this section, the minimum regulatory capital requirement for any calendar quarter (commencing with the quarter ending March 31, 1987) shall be an amount equal to the sum of an institution's liability component and contingency component minus its maturity matching credit. An institution shall not use the maturity matching credit to reduce its required amount of regulatory capital below 3 percent of total liabilities for the period from December 31, 1986, until December 31, 1989, or to reduce its required capital below 4 percent of total liabilities on or after January 1, 1990.

*12 C.F.R. § 563.13(b) (1988).* **[*81]**

n27 The court agrees with the parties that the FHLBB forbearance letter and the FCC RCMA must be read together to discern the contract terms in this case, but such a reading does not begin here, as it did in Guaranty, with an express term incorporating an attached exhibit into a particular paragraph of the RCMA.

There are significant differences between the language of the Guaranty RCMA and the FCC RCMA, including differences in the paragraphs relied upon by the Eleventh Circuit in its finding that the allocation of the risk of regulatory change was upon the plaintiff in that case. See *Guaranty, 928 F.2d at 999* (quoting from

the Guaranty RCMA paragraphs I(D) and I(E), along with paragraph VI(D), which is identical to paragraph VII(D) of the FCC RCMA, as language that "warned that the regulatory scheme may be changed to Guaranty's detriment"). Because of these differences in contract language, the court does not find that the contract language in this case is necessarily included in the "very different contract language" that the Supreme Court mentioned in its Guaranty **[*82]** footnote. See *Winstar III, 518 U.S. at 869 n.15* (stating that the "very different contract language" in Guaranty was the basis for a finding that the allocation of risk of regulatory change was not on the government).

Even if there were not significant differences between the FCC RCMA and the Guaranty RCMA, this court has previously considered whether the Guaranty footnote in Winstar III is a precedential holding and whether its defensive use by the government is justified. In Hughes, this court rejected the precedential value of the Guaranty footnote and noted that the "successor regulation" argument for allocating the risk of regulatory change to plaintiffs in Winstar-type cases has been "consistently rejected." *58 Fed. Cl. at 305*. In Franklin, this court noted that the plurality in Winstar III, not a majority of the Court, had only briefly mentioned Guaranty in a footnote, and concluded that "the reference to Guaranty in Winstar III was too fleeting and peripheral to be accorded precedential weight." *53 Fed. Cl. at 714*. In Castle v. United States, this court held that the Guaranty footnote **[*83]** was not "directly determinative" of the allocation of risk of regulatory change question, rather, that it only stands for two propositions: "courts interpret contracts" and "clear contract language is easier for courts . . . to interpret than unclear language." *42 Fed. Cl. 859, 862 (1999)*. The Castle court did go on to harmonize the apparently conflicting provisions warning of successor regulations and promising accounting forbearances, by allowing the government to raise minimum capital levels without liability, but not so as to trump the accounting forbearances allowed by the contract. See *id. at 863-64*; see also *Sterling Sav. v. United States, 53 Fed. Cl. 599, 613-14 (2002)* (also rejecting the government's argument based on the Guaranty footnote in Winstar III because it would create an "illusory" goodwill promise and harmonizing the contract terms to preserve the goodwill promise); cf. Part III.B.3.c of this opinion, infra. Even if the differences between the contract documents in this case and those in Guaranty were less significant, the court finds that the authority of the Guaranty footnote in Winstar **[*84]** III would not, by itself, give enough guidance to resolve the allocation of risk of regulatory change question.

The court now turns to Winstar-related decisions in this circuit interpreting contract provisions that were in apparent conflict, when the 25-year amortization of goodwill was promised yet other documents warned of successor regulations and varying obligations of thrifts.

c. Decisions Reconciling Forbearances and the Risk of Regulatory Change

Defendant relies principally on *Southtrust of Georgia, Inc. v. United States, 54 Fed. Cl. 741 (2002)* (Southtrust), appeal voluntarily dismissed, *68 Fed. Appx. 191, No. 03-5069 (Fed. Cir. June 16, 2003)*, for its argument that trial court decisions on the allocation of risk of regulatory change are divided in the Winstar-context. See Def.'s Mot. at 39 n.21 (stating that "Southtrust found the opposite [that the RCMA terms were enforceable] and supports our argument [allocating the risk of regulatory change to plaintiff]. With trial court decisions supporting both sides . . . ."). Plaintiff, however, argues that numerous decisions of this court have allocated the risk of regulatory change to the government **[*85]** when analyzing similar documents containing apparently conflicting terms regarding the amortization of goodwill and successor regulations. See Pl.'s Mot. at 39-41. These decisions are cited by plaintiff for two arguments. First, plaintiff asserts that this court enforces the specific forbearance term over the general successor regulation term. Id. at 40-41. Second, plaintiff asserts that this court, when enforcing RCMA terms and forbearance letter terms, harmonizes those terms to eliminate the apparent conflict so that the amortization of goodwill survives successor regulation. Id. at 42-43. The court turns first to Southtrust, and then to plaintiff's two arguments.

Southtrust does not support defendant's argument that, in this case, risk of regulatory change should be allocated to FCC. In Southtrust, there was no forbearance letter. See *54 Fed. Cl. at 746* (noting that some cases involved forbearance letters but that in Southtrust "none of the indicia of a bargained[-]for exchange in connection with goodwill exists"). Because Southtrust held that there was no contract concerning goodwill, see *id. at 747* ("Under the **[*86]** unique facts of this case, the court finds that there was no contract regarding the plaintiffs' right to continued use of goodwill after FIRREA."), the Southtrust court went on to discuss the plaintiffs' rights embodied solely in the RCMA and found that the government could change the regulatory scheme without liability, *see id.* ("Where, as here, the acquirers expressly committed in the RCMA to meet any new regulatory capital requirements, did not secure protection of that goodwill in the event of a regulatory change, and no other agreement regarding goodwill exists, the court has no basis for finding a breach of contract following the regulatory change occasioned by

FIRREA."). Because there was no forbearance letter in Southtrust, and because there were no conflicting contract terms to reconcile in that transaction, the allocation of risk of regulatory change to the plaintiff in that case is inapposite to the case before the court.

Plaintiff cites numerous decisions of this court that allocate the risk of regulatory change to the government when apparently conflicting contract terms exist in an RCMA and a forbearance letter. Pl.'s Mot. at 39-41. This court has held that **[*87]** the more general successor regulation term must yield to the specific promise of an accounting forbearance for the amortization of goodwill. See, e.g., *Hughes, 58 Fed. Cl. at 305* (quoting *Winstar II, 64 F.3d at 1544*, for the principle that the contract term "'to maintain [the plaintiff's] regulatory net worth at whatever level the regulators set does not, however, eclipse the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply'"); *Admiral, 54 Fed. Cl. at 257* (stating that "the purported risk-shifting provisions do not avoid liability on the part of the Government"); *Franklin, 53 Fed. Cl. at 715* (stating that "the specific language of the Forbearance Letter . . . takes precedence over the more general 'successor regulation' provision . . . of the Dividend Agreement"). The court agrees with these holdings.

Plaintiff also argues that the contract language can be interpreted so that there is no conflict between the terms of the FCC RCMA and the FHLBB forbearance letter, Pl.'s Mot. at 42-43, and cites numerous decisions **[*88]** of this court that have come to a similar conclusion when faced with similar contract terms, *id. at 38-42*. This court has held that when the contract terms are read together, the successor regulation language must refer to regulatory capital requirement levels or other regulatory constraints, not to regulatory capital rules that would void the promises given in the forbearance letter. See, e.g., *Admiral, 54 Fed. Cl. at 257* ("We read the provision as anticipating potential changes in the level of capital that thrifts must maintain-'increase or decrease' the obligation to maintain capital-or perhaps some other aspect of regulatory compliance. The provision should not be interpreted as exposing Admiral to the risk of sweeping changes in the bargained[-] for method by which capital is accounted for by the FHLBB."); *Sterling, 53 Fed. Cl. at 614* (quoting the plaintiff's "convincing[]" argument that "while Plaintiff's obligation with respect to capital requirements could be increased or decreased, the successor regulation clause does not in any way purport to alter Defendant's obligation to allow Plaintiff to count goodwill"); **[*89]** *Castle, 42 Fed. Cl. at 863-64* (approving plaintiff's interpretation that the contract terms were harmonized so that the "successor regulation provision put the parties on notice that regulations 'may' change obligations . . . [but] it does not trump the specific contractual rights set forth to meet capital levels as specified in [another contract term]"). In this case, plaintiff argues, a similar harmonization of contract terms preserves the government's promise regarding the accounting forbearance, a 25-year amortization of supervisory goodwill from the Mutual acquisition. Pl.'s Mot. at 43 & n.33.

Whether this court gives precedence to the specific promise regarding the amortization of goodwill, or harmonizes the accounting forbearance with the successor regulation contract term in order to preserve the forbearance, the end result is the same: the risk of regulatory change is with the government. Because the cases on which plaintiff relies were persuasively decided on similar facts, the court here also allocates the risk of regulatory change to defendant.

Although the parties have not pointed the court to any Federal Circuit decisions reconciling the successor **[*90]** regulation and varying obligation terms in a RCMA and the amortization of goodwill term in a forbearance letter, plaintiff did suggest that Winstar II rejected defendant's allocation of risk of regulatory change defense to contract liability. Pl.'s Mot. at 41. The court finds that the statement in Winstar II concerning the allocation of risk of regulatory change, while not dispositive of the issue in this case, supports the analysis utilized by the authorities cited above and the court's resolution of this issue in favor of plaintiff:

> Finally, the government argues the Net Worth Maintenance Stipulation signed by Winstar required Winstar to abide by any changes in the law regarding regulatory capital. We agree to the extent the Stipulation requires Winstar to maintain its capital at levels set by the bank regulators. Winstar, like other thrifts, was bound to keep in compliance with banking regulations and laws regarding capital levels except to the extent the Bank Board expressly agreed to forbear from enforcing its regulations against it. This stipulation by Winstar to maintain its regulatory net worth at whatever level the regulators set does not, however, eclipse **[*91]** the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply.

*64 F.3d at 1544.*

III. Conclusion

For the foregoing reasons, FCC has proved that it had a contract with the government permitting the 25-year amortization of supervisory goodwill that could be counted as regulatory capital. Accordingly, the court GRANTS plaintiff's motion and DENIES defendant's motion.

IT IS SO ORDERED.

EMILY C. HEWITT

Judge