express the government's promise to offer favorable accounting treatment, and thereby constitute a counteroffer to First Commerce's application"). Because there was no judicial acceptance of plaintiff's prior position on contract formation, there was no "success;" therefore, judicial estoppel is not warranted against plaintiff's current contract formation arguments before the court. See *New Hampshire, 532 U.S. at 751* ("Absent success **[*24]** in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." (citations omitted)).

As to defendant's second request for judicial estoppel regarding plaintiff's prior and current positions on statute sections that might give the government authority to contract in this case, Def.'s Reply at 16 n.12, the court notes that this court did not reach the issue of authority and thus could not have accepted plaintiff's prior position on statute sections that were or were not involved in the facts of this case, see *First Commerce I, 53 Fed. Cl. at 43 n.10* (stating that "the court does not reach the authority issue in this case"). The Federal Circuit also did not reach the issue of statutory authority for the government to enter this contract. See *First Commerce II, 335 F.3d at 1382-83* (stating that "we decline to address" the remaining defenses of the government (including the issue of statutory authority) because this "court did not reach [them] in light of its disposition of the case on summary judgment"). To the extent that the Federal Circuit's **[*25]** discussion of "regulatory capacity" might be construed to have indirectly addressed the issue of authority, see *id. at 1383* (stating that "the government surely was acting in its regulatory capacity"), the Federal Circuit did not discuss, rely on or refute plaintiff's arguments regarding particular statutory provisions, but relied instead on Federal Circuit and Supreme Court precedent, *id.* (stating that defendant's "argument that the government is immune from contractual liability because it was acting in its regulatory capacity was rejected squarely by this court and the Supreme Court in Winstar"). There was no judicial acceptance of plaintiff's prior position regarding the applicability or inapplicability of certain statutory provisions to the facts of this case.

It is also not clear that plaintiff's current position on statutory authority is truly inconsistent with its prior position. Compare Pl.'s Mot. at 34 n.24 (quoting *Hughes v. United States, 58 Fed. Cl. 291, 302 (2003)*, for the proposition that "'*sections 1729(f)(3) and 1730a(m)* provide ample statutory authority for FSLIC to enter into a contract [with a holding company] **[*26]** in this situation [specifically, acquiring a troubled thrift in a particular set of circumstances]'" with Plaintiff First Commerce Corporation's Reply to Defendant's Response to Plaintiff FCC's Motion for Partial Summary Judgment on Liability and Opposition to Defendant's Cross Motion for Summary Judgment on Liability, filed on November 16, 2000, at 27 n.27, found at Def.'s App. at 1664 n.27 ("Three additional FHLBB statutes provided express authority for various kinds of FHLBB/FSLIC assistance agreements: *12 U.S.C. § 1730a(m)*, *§ 1730(f)(2)* and *§ 1729(f)(3)*. . . . Thus, FSLIC was authorized to provide companies acquiring troubled thrifts with the same kind of assistance it could provide to acquiring thrifts.").

Because there was no judicial acceptance of plaintiff's prior position regarding the applicability or inapplicability of certain statutory provisions to the facts of this case, and because these prior and current positions do not appear to the court to be truly inconsistent, plaintiff's current position on these provisions is not estopped.

2. Contract Formation

[HN10] "The requisite elements of a contract[,]" as set out by the Federal Circuit, **[*27]** are "mutual intent, including an unambiguous offer and acceptance; consideration; and authority on the part of the government representative to bind the government." *First Commerce II, 335 F.3d at 1380.*

a. Acceptance by Conduct

Because the point of departure of the court's analysis is that the FHLBB forbearance letter was a counteroffer to FCC, the initial pertinent inquiry is whether FCC accepted the government's counteroffer with its beneficial terms related to the amortization of goodwill from the Mutual acquisition. Compare Pl.'s Mot. at 24 ("FCC accepted the FHLBB's counteroffer of 25-years goodwill amortization by performance, i.e., by its acquisition of Mutual Federal.") with Def.'s Mot. at 17 ("In this case, there is no evidence of FCC's 'acceptance' or 'intent' because there is no evidence that FCC intended to be contractually bound.").

Defendant concedes that, in contract law, "an offer (or counteroffer) generally may be accepted . . . by actually rendering the requested performance." Def.'s Mot. at 17. Defendant, however, in the very next sentence of its brief, advances a different formulation of the law of acceptance: "Acceptance requires **[*28]** more than mere approval and acceptance of an offeror's promise; it requires a showing of inducement, and intent to be contractually bound." Id. Defendant argues that, in the Federal Circuit, "acting in conformance with an offer is not enough to establish acceptance" and "that performance must have been induced by, and rendered in reliance upon, the offer." Id. at 18.

For its "showing of inducement" and "reliance" components of acceptance, defendant relies upon *Wells*

*Fargo Bank, N.A. v. United States, 88 F.3d 1012 (Fed. Cir. 1996)* (Wells Fargo II). Def.'s Mot. at 17. Defendant relies, in particular, on a portion of a sentence in the Wells Fargo II opinion: "As that court [the United States Claims Court] pointed out, '"a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon."'" See id. at 18 (quoting *Wells Fargo II, 88 F.3d at 1018* (quoting *Wells Fargo Bank, N.A. v. United States, 26 Cl. Ct. 805, 810 (1992)* (Wells Fargo I) (quoting *Nat'l Rural Utils. Coop. Fin. Corp. v. United States, 14 Cl. Ct. 130, 137 (1988)* **[*29]** (National Rural), aff'd, *867 F.2d 1393 (Fed. Cir. 1989))))*. The court notes that the Wells Fargo I court did indeed characterize the government's offer as having "induced plaintiff to make loans it otherwise would not have made." *26 Cl. Ct. at 810*. And, in National Rural, the court held that a unilateral contract was formed when the plaintiff "advised [the government] that it was prepared to make a long-term loan to [an electric power cooperative] if [the government] . . . would provide security." *14 Cl. Ct. at 132*. In National Rural, the court observed that the plaintiff was "surely apprised of the terms and conditions for a lien accommodation [from the government, by receiving a copy of a letter stating the conditions for receiving such a lien accommodation]," and that plaintiff "was entitled to rely on [the government's promise] in deciding on its course of action with respect to the proposed loan to [the electric power cooperative]." *Id. at 137*. Certainly, as Wells Fargo I and National Rural demonstrate, the concepts of inducement and reliance are helpful in analyzing the circumstances **[*30]** giving rise to a contract, but defendant's assertion that these concepts are elements of acceptance appears doubtful to this court.

These cases could be cited just as aptly, however, for the simple proposition that performing in response to an offer in a unilateral contract proves unambiguous acceptance. See *Wells Fargo I, 26 Cl. Ct. at 810* ("A [unilateral] contract comes into existence as soon as the other party commences performance."); *National Rural, 14 Cl. Ct. at 137* (stating that once the plaintiff "had wired $ 8 million to [the electric power cooperative's creditor] on behalf of [the electric power cooperative], [the government's] obligation to grant a lien accommodation for this and any future sums advanced depended solely on whether [conditions put on performance] set forth in the lien accommodation letter were satisfied."). Neither court stated that inducement and/or reliance were separate elements that were required to supplement requested performance in order to accept an offer in a unilateral contract. Rather than construct a test for acceptance out of a phrase in Wells Fargo I and National Rural that appears to focus **[*31]** on the circumstances surrounding a contract rather than acceptance, this court chooses to follow the Federal Circuit's guidance in First Commerce II on the subject of acceptance.

[HN11] "As a general matter, . . . counteroffers may be accepted by conduct." *First Commerce II, 335 F.3d at 1382* (citing *Union Realty Co. v. Moses, 984 F.2d 715, 721 n.6 (6th Cir. 1993)*; *Buesing v. United States, 47 Fed. Cl. 621, 633 (2000))*. A closer examination of these two cases cited by the Federal Circuit is helpful in elucidating the standard for acceptance of a counteroffer.

In Union Realty, a seller was trying to enforce an earnest money forfeiture condition of a real estate sales agreement. *984 F.2d at 716-17*. In the trial court, the buyers avoided contract liability because it appeared that the seller had made a counteroffer, after the execution of the original agreement, setting conditions with which the buyers never complied. *Id. at 720*. But the Sixth Circuit found that the buyers had later responded with what might be deemed a counter-counteroffer, which was accepted by conduct of the seller. n10 *Id. at 720-21.* **[*32]** None of the Sixth Circuit's reasoning required inducement or reliance to supplement the seller's acceptance by conduct. The issue was whether the accepting party proceeded with the deal in accordance with the terms of the counteroffer (or, in that case, the counter-counteroffer). See *id. at 721-22* (holding that seller's counsel "responded affirmatively" by acting in conformity with the contract modifications proposed in the buyers' counter-counteroffer and thus created a contract where the buyers and the seller were bound).

n10 The Sixth Circuit did not exclude the possibility that other acceptance theories would support the existence of a contract in that case, but focused on the acceptance of the countercounteroffer as adequate justification for reversing and remanding for judgment in favor of seller. *Union Realty, 984 F.2d at 720 n.4, 722.*

In Buesing, a taxpayer asserted that he and the IRS had a contract "'to settle the value of tax liens on his property . . . .'" *47 Fed. Cl. at 629* **[*33]** (quoting the plaintiff). In the course of negotiating with the IRS, the taxpayer made "an offer in compromise," including a $ 30,000 payment and certain other terms. *Id. at 631*. The IRS made a counteroffer which accepted all of the contract terms except a timing term. *Id. at 631-33*. The taxpayer claimed he had accepted this counteroffer by performing. *Id. at 633*. This court disagreed, stating that "a close examination of plaintiff's conduct indicates that he [the taxpayer] was not accepting the counteroffer. Instead, plaintiff still was attempting to implement the terms of his original . . . offer which had not been

accepted [because of the material term concerning timing] by the IRS." *Id. at 633-34*. Because the taxpayer was proceeding on the timing term of the original offer and not on the timing term of the counteroffer, the court found there was no "meeting of the minds" and no contract. *Id. at 634*. Again, the court's analysis rested on whether or not the accepting party was proceeding with the deal according to the terms of the counteroffer. *See id.* (finding that plaintiff "was not assenting **[*34]** to the terms of defendant's counteroffer" and that there "could not have been an acceptance").

Therefore, the court, in this case, limits its analysis of acceptance to an examination of whether FCC proceeded with the Mutual acquisition according to the terms of the government's counteroffer. Defendant does not dispute the fact that FCC acquired Mutual, Def.'s Counter-Facts P 41, or the fact that FCC utilized the 25-year amortization of goodwill authorized by the government's counteroffer, Tr. at 88 (Def.'s Counsel) ("They [FCC] utilized the 25-year forbearance."). In addition, this court found, in First Commerce I, that FCC complied with all of the conditions set by FHLBB for the acquisition. *53 Fed. Cl. at 45 n.14*. Therefore, there was performance by plaintiff in response to the government's counteroffer, and this performance was an unambiguous acceptance through conduct.

b. Mutuality of Intent

The parties appear to dispute whether offer and acceptance, which have been proved in this case, are enough to show mutuality of intent, or whether a separate inquiry must be made into mutuality of intent. Compare Pl.'s Mot. at 30 ("Mutuality of intent usually 'takes **[*35]** the form of an offer or proposal by one party followed by an acceptance by the other party or parties.'" (citing *Restatement (Second) of Contracts § 22*(1))) and Pl.'s Reply at 2-3 (stating that "it is clear that 'mutual intent' is not a separate hurdle for plaintiff to jump if it has demonstrated the unambiguous offer and acceptance involved in its contract") with Def.'s Mot. at 17 ("In this case, there is no evidence of FCC's 'acceptance' or 'intent' because there is no evidence that FCC intended to be contractually bound.") and Def.'s Reply at 14 n.11 ("Here, again, FCC indicated throughout the entire application process that it would proceed without a forbearance from GAAP [i.e., proceeded without intent to contract for a forbearance from GAAP for the amortization of goodwill]."). The Federal Circuit leaves room for some doubt as to the relationship between mutuality of intent and offer and acceptance in the formation of contracts with the government, because its statements of the required conditions for contract formation vary slightly. Compare *First Commerce II, 335 F.3d at 1379-80* ("The requisite **[*36]** elements of a contract with the government are . . .: mutual intent, including an unambiguous offer and acceptance; consideration; and authority on the part of the government representative to bind the government.") with *Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995)* ("Like an express contract, an implied-in-fact contract requires '(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance.' . . . When the United States is a party, a fourth requirement is . . . [that] the government representative . . . 'must have actual authority to bind the government in contract.'" (citations and quotations omitted)).

In Lewis, for example, the Federal Circuit tested the government's actions for contract liability, both by examining statutory language to see whether it provided an unambiguous offer, see *70 F.3d at 601* ("Section 1619 [the statute upon which plaintiff relied for a contractual offer] also does not contain sufficiently definite terms to serve as the basis for a contract."), and by examining the same statute for the government's intent to enter into a contract, see *id. at 600-01* **[*37]** ("Section 1619 expresses no intent to bind the government if the statutory requirements are not met . . . . [And] if all the statutory conditions are met, the Secretary of the Treasury may . . . award . . . up to a specified amount from government funds." (emphasis added)). The Federal Circuit stated in Lewis that the plaintiff's contract claims failed "on the first and third of the conditions for establishing an implied-in-fact contract," treating mutuality of intent, and the requirement for unambiguous offer and acceptance, as separate requirements. *Id. at 600*. In a recent Winstar-related case, the Federal Circuit cited Lewis for its formulation of the four separate elements required for contracts with the government. See *D & N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003)* (citing *Lewis, 70 F.3d at 600*, for the almost identical formulation of the standard quoted above). The Federal Circuit in D & N Bank also treated the mutuality of intent requirement and the unambiguous offer and acceptance requirement as separate conditions. *See id.* ("We need not reach all four requirements in this case because **[*38]** D & N's proof fails on the first-there is no proof of mutuality of intent to contract.").

In Anderson v. United States, another recent Winstar-related case, the Federal Circuit again stated the four conditions required for contracts with the government, with separately stated conditions of mutuality of intent and of unambiguous offer and acceptance. *344 F.3d 1343, 1353 (Fed. Cir. 2003)*. However, the Federal Circuit appeared to hold in Anderson that an unambiguous offer and acceptance were enough to prove mutuality of intent by themselves. See id. ("To satisfy its burden to prove such a mutuality of intent, a plaintiff must show, by objective evidence,

the existence of an offer and a reciprocal acceptance."). In Anderson, plaintiff failed to prove that the government's response to plaintiff's offer was a "'manifest assent to the same bargain proposed by the offer.'" *Id. at 1356* (quoting *Restatement (Second) of Contracts § 50 cmt. a*). An acceptance expressing such a manifest assent would appear to suffice for demonstrating mutuality of intent. See *id. at 1357* (stating that "to **[*39]** create a contract, 'the offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly.'" (quotation omitted)). In Anderson, the analysis of mutual intent turned on whether the government's response exactly matched the term in plaintiff's offer concerning the accounting of goodwill. *Id. at 1355-58.*

Defendant cites no authority, and the court has found none, where a court has found an unambiguous offer and acceptance and then has conducted a separate inquiry for mutuality of intent. Therefore, this court follows Anderson and finds that [HN12] mutuality of intent is demonstrated when an unambiguous offer, here a counteroffer, is answered by an unambiguous acceptance which manifests assent to the terms of the offer. Accord *Am. Fed. Bank, FSB v. United States, 58 Fed. Cl. 429, 436 (2003)* (citing *Anderson, 344 F.3d at 1353*, for the proposition that "to prove mutual assent, a plaintiff must proffer evidence demonstrating the existence of an offer and reciprocal acceptance"). In this case, it is undisputed that FCC accounted for the **[*40]** goodwill from the Mutual acquisition according to the forbearance offered by the government, utilizing straight-line amortization for up to 25 years. Tr. at 88; Def.'s Counter-Facts P 42(d). Because it is uncontested that FCC acquired Mutual and met the conditions of the FHLBB counteroffer, *First Commerce I, 53 Fed. Cl. at 40, 45 n.14*, and utilized the 25-year amortization of goodwill as allowed by the government's forbearance, Tr. at 88, the court finds that FCC manifested assent to the terms of the government's counteroffer. Therefore, the parties had mutuality of intent to contract for the 25-year amortization of goodwill.

c. Consideration

The court now addresses two aspects of the law of consideration relevant to the circumstances of this case. The first is whether consideration flowed to the government and to FCC from the promises exchanged in the Mutual acquisition. See Pl.'s Reply at 4 (stating that the "court should also confirm the exchange of consideration so that the existence of FCC's contract is confirmed"). The second is whether the exchange of consideration was bargained for by the parties. See Def.'s Mot. at 14 (stating that "there is absolutely **[*41]** no evidence of any negotiations or bargained-for exchange between FCC and the FHLBB for the accounting forbearance ultimately granted by the FHLBB"). Because this court takes as its point of departure that the government made a counteroffer to FCC proposing the terms for the Mutual acquisition, these two aspects of consideration are not difficult to discern.

Consideration flowed to the government, when, as here, it found a buyer for an ailing thrift, because such acquisitions reduced the government's liquidation costs. See *First Commerce I, 53 Fed. Cl. at 39* (stating that FSLIC and FHLBB "adopted a policy of encouraging healthy thrifts to acquire financially troubled thrifts to reduce their [FSLIC's and FHLBB's] liquidation costs"). In this case, Mutual was an ailing thrift and the FHLBB made its counteroffer to "prevent the probable failure of Mutual Federal." Def.'s App. at 1100. Defendant does not contest that consideration was received by the government from FCC here. Tr. at 89 (Def.'s Counsel) ("We're not contesting that when Plaintiff acquired Mutual Federal they provided some value to the government . . . ."). There is no doubt that the government received **[*42]** consideration from FCC through its acquisition of Mutual.

Consideration flowed to FCC from the government's counteroffer because the counteroffer provided a promise of benefits to FCC, including favorable accounting treatment of the acquisition, see *First Commerce II, 335 F.3d at 1382* ("We conclude that the written documents in this case express the government's promise to offer favorable accounting treatment . . . ."); Pl.'s App. at 53-54 (showing that the FHLBB forbearance letter granted four regulatory and accounting forbearances), and the approval of FCC's acquisition of Mutual if certain conditions were met, see Pl.'s Facts PP 31-38. There is no doubt that FCC received consideration from the government's counteroffer setting the terms for the acquisition of Mutual.

Defendant argues, however, that FCC's performance in acquiring Mutual did not constitute a bargained-for exchange for the promise of the government's forbearance regarding the accounting for goodwill. See Def.'s Reply at 2 ("To constitute consideration, FCC's performance must have been 'bargained for.'"). Defendant claims that FCC would have acquired Mutual without the favorable accounting **[*43]** treatment of goodwill, Def.'s Reply at 6, that FCC had proposed GAAP accounting for goodwill in its offer to the government, id. at 5-6, and argues that such "overwhelming" evidence shows that FCC was not induced to acquire Mutual by the government's counteroffer terms related to goodwill, Tr. at 90. The fundamental flaw in the government's argument is that it relies on proof of inducement that predates the government's counteroffer to FCC. See Def.'s Mot. at 10-

17. Once a counteroffer has been made, it is this court's task to discern whether the terms of the counteroffer induced FCC's performance in the new bargain, not the old one. This inquiry is made easier by examining four sections of the Restatement (Second) of Contracts (1981).

*Section 39* of the Restatement defines counteroffers:

> Counter-Offers
> (1) [HN13] A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer.

*Restatement (Second) of Contracts § 39*(1) (emphasis added). Here, FCC was the original offeror and the government **[*44]** the offeree. See *First Commerce II, 335 F.3d at 1381* (stating that "we agree . . . that First Commerce's formal [acquisition of Mutual] application . . . [was] definite enough to constitute an offer"). The government's counteroffer "proposed a substituted bargain differing from that proposed by" FCC. *Restatement § 39*(1). Because the substituted bargain contained the favorable accounting treatment of goodwill term, it is that term, not FCC's previous negotiating term, that is being analyzed by the court here as a possible inducement for FCC's performance.

*Section 71* of the Restatement defines the bargained-for exchange aspect of consideration:

> Requirement of Exchange; Types of Exchange
> (1) [HN14] To constitute consideration, a performance or a return promise must be bargained for.
> (2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

*Restatement (Second) of Contracts § 71*(1)-(2) (emphasis added). Here, the government is the promisor of favorable accounting treatment for goodwill. FCC, the **[*45]** promisee, performed in response to that promise. The fundamental question is whether FCC bargained for the terms of the government's promise. The court need not inquire into the mental state of FCC as it performed in response to the government's counteroffer; it need only determine whether FCC acted in accordance with the inducement. See id. *cmt. b* ("Here, as in the matter of mutual assent, the law is concerned with the external manifestation rather than the undisclosed mental state; it is enough that the . . . [promisee] responds in accordance with the inducement."). Here, the 25-year amortization period for goodwill from the Mutual acquisition was bargained for, because FCC's performance in acquiring Mutual, FCC's meeting the conditions for the purchase, and FCC's accounting for goodwill according to the forbearance given by the government together constituted performance in accordance with the inducement of the government's counteroffer.

As further support for this court's conclusion that FCC was "induced" to perform by the government's counteroffer of favorable accounting treatment for goodwill, the court relies on Restatement *Sections 81 and 80*. *Section 81* states in relevant **[*46]** part that:

> Consideration as Motive or Inducing Cause
> . . . .
> (2) The fact that a promise does not of itself induce a performance or return promise does not prevent the performance or return promise from being consideration for the promise.

*Restatement (Second) of Contracts § 81*. *Comment b* of this section explains that the "bargained for" concept is limited by the fact that promisor and promisee may have more than one motive and that even an "incidental" consideration is bargained for. Id. *cmt. b*. Even if the forbearance for accounting of goodwill was merely incidental to the bargain between FCC and the government, FCC bargained for this term.

*Section 80* states in relevant part:

> Multiple Exchanges
> (1) There is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone.
> (2) The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration.

Restatement (Second) of Contracts *§ 80* **[*47]** . Here the government offered approval of the Mutual acquisition and forbearances to FCC, a set of promises. FCC's performance of acquiring Mutual was consideration for each of those promises, most obviously for the FHLBB approval of the acquisition. See id. *cmt. a* (stating that "two or more promises may be binding even

though made for the price of one"); see also *First Nationwide Bank v. United States, 48 Fed. Cl. 248, 261 (2000)* (refuting the plaintiff's claim that separate consideration must be offered for each promise in a contract and citing Restatement *§ 80*). Therefore, FCC did bargain for and give consideration for the forbearance related to the 25-year amortization of goodwill, because it was one promise of a set of promises made by the government in that counteroffer. n11

n11 It may seem odd that the government's counteroffer includes a term which is more favorable to FCC (25-year amortization of goodwill) than the term in FCC's offer (GAAP accounting of goodwill), but even a partial gift may constitute valid consideration for a contract. See *Restatement (Second) of Contracts § 71 illus. 6* (showing that a buyer who pays double for an item may have a motive of making a partial gift but that the sales price still provides valid consideration for the transfer of ownership).

**[*48]**

d. Authority to Contract with a Holding Company

FCC's acquisition of Mutual was a "voluntary supervisory conversion," Pl.'s Supp. at 10; see Tr. at 35, 38 (Def.'s Counsel) (stating that the acquisition was "processed as a supervisory conversion" and that FCC "filed a voluntary supervisory application"), which did not require financial assistance from the FSLIC, see Def.'s Mot. at 21 (referring to the Mutual acquisition as "this unassisted transaction"); Pl.'s Mot. at 34 n.24 (stating that FCC's acquisition of Mutual presented the "same factual setting" as the "unassisted 1988 acquisition by a new holding company in a supervisory stock conversion transaction" discussed in *Hughes, 58 Fed. Cl. at 292-96*). There is no doubt that if FCC had been an institution insured by the FSLIC, rather than a holding company, the FHLBB would have had authority to contract for the 25-year amortization of goodwill, even in an unassisted transaction. See *Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1347 (Fed. Cir. 2001)* (CalFed) (stating that "the FHLBB and the FSLIC have the authority to enter into contracts like these [unassisted acquisitions of **[*49]** thrifts by other thrifts]"). n12 Here, defendant argues, because FCC was a holding company and not a thrift, there was no statutory authority for FHLBB to have bound the government in a contract. Def.'s Mot. at 20.

n12 The plaintiff in CalFed was a thrift, not a holding company. See *Cal. Fed. Bank v. United States, 43 Fed. Cl. 445, 447 (1999)* ("Cal Fed was a relatively healthy thrift before it entered into this contract, and it is healthy today."), vacated in part on other grounds, *245 F.3d 1342 (Fed. Cir. 2001)* (CalFed).

Defendant's argument concerning the lack of statutory authority has been presented in several cases before this court and has been unsuccessful in circumstances similar to this case. See, e.g., *Hughes, 58 Fed. Cl. at 301-303* (dismissing defendant's lack of authority argument as "unconvincing and contrary to controlling precedent"); *Admiral Fin. Corp. v. United States, 54 Fed. Cl. 247, 258 (2002)* (finding authority **[*50]** for the FHLBB to contract with a holding company under similar facts); *Hometown Fin. Inc. v. United States, 53 Fed. Cl. 326, 334-35* & nn.10-11 (2002) (finding that the government had "legal authority" to enter into a contract with a holding company under similar facts). n13 The court follows these holdings on statutory authority for the following reasons.

n13In *Fifth Third Bank of W. Ohio, 52 Fed. Cl. 829, 832-836 (2002)* (Fifth Third II) and Home Sa v. of *Am., FSB v. United States, 50 Fed. Cl. 427, 441-42 (2001)* (Home Savings), defendant's argument met with greater success. But because Fifth Third II is distinguishable as an alternative holding to support summary judgment, *52 Fed. Cl. at 832*, and Home Savings is distinguishable because in that case the court was dismissing claims related to supervisory goodwill from non-FSLIC-insured acquired institutions, *50 Fed. Cl. at 441*, the court finds that the weight of precedent supports statutory authority in this case.

**[*51]**

Plaintiff asserts that the government "had authority to contract with FCC under *12 U.S.C. § 1725(c)* [(1988)]" and "under its implied authority to make contracts necessary to implement the functions and programs of the FHLBB and FSLIC." Pl.'s Reply at 13. This statute, titled "Creation of Federal Savings and Loan Insurance Corporation," states in relevant part in *subsection (c)*:

[HN15] (c) Powers

> On June 27, 1934, the Corporation shall become a body corporate, and shall be an instrumentality of the United States, and as such shall have power-
>
> . . . .

(3) To make contracts

*12 U.S.C. § 1725*. The plain language of the statute supports plaintiff's assertion that the FSLIC and the FHLBB had authority to make contracts. See *CalFed, 245 F.3d at 1347* (stating that "the FSLIC has had the authority under *12 U.S.C. § 1725(c)(3)* to make contracts like these [for supervisory goodwill]" and that "both the FSLIC and its supervisory agency, the FHLBB, have had 'the authority both to extend assistance to acquirers of insolvent . . . thrifts, *12 U.S.C. § 1729(f)(2)(A)* (repealed) **[*52]** [ n14 ], and to set minimum capital limits on a case-by-case basis, *12 U.S.C. § 1730(t)(2)* (repealed) [ n15 ]'" (citing *Winstar Corp. v. United States, 64 F.3d 1531, 1548 (Fed. Cir. 1995)* (Winstar II)); *Winstar II, 64 F.3d at 1548* ("We are also persuaded, as the Court of Federal Claims held, that the Bank Board [FHLBB] and the FSLIC, as the principal regulators of the thrift industry, were fully empowered to enter into the contracts at issue here."). Defendant asserts that *§ 1725(c)* "is merely a general housekeeping provision of FSLIC's 'organic statute,'" Def.'s Mot. at 22 (quoting, for the term "organic statute," *United States v. Winstar Corp., 518 U.S. 839, 890, 135 L. Ed. 2d 964, 116 S. Ct. 2432 (1996)* (Winstar III)), and further asserts that "it does not, standing alone, empower the agency to create vested rights and entitlements," *id.*

n14 Titled "Liquidation of insured institutions," *12 U.S.C. § 1729 (1988)*, states, in *subsection (f)* "Assistance to thrift institutions," in *subsection (2)*:

> (A) In order to facilitate a merger or consolidation of an insured institution . . . with another insured institution . . ., the Corporation is authorized . . . -
> . . . .
> (iii) to guarantee such other insured institution . . . against loss by reason of such other insured institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution . . . .

Id. *§ 1729(f)(2)(A)(iii)*. **[*53]**

n15 In *12 U.S.C. § 1730(t) (1988)* "Minimum capital requirements," *subsection (2)* titled "Minimum capital levels may be determined by corporation on case-by-case basis" provides:

> The Corporation may establish the minimum level of capital for an insured institution at such amount or at such ratio of capital-to-assets as the Corporation determines to be necessary or appropriate for such insured institution in light of the particular circumstances of the insured institution.

Id. *§ 1730(t)(2)*.

Defendant's position relies principally n16 on its interpretation of the short discussion of authority in Winstar III, which defendant claims "expressly predicates" the government's contracting authority in the Winstar context on the Court's analysis of *12 U.S.C. § 1729(f)(2) (1988)*. Def.'s Mot. at 20 (citing to *Winstar III, 518 U.S. at 883, 890-91 )*. This court does not read Winstar III as supporting defendant's allegation that *§ 1725(c)* may not stand alone as authority to contract in this case. The court in **[*54]** Franklin Federal Savings Bank v. United States responded to defendant's suggested reading of Winstar III on the subject of authority and found that defendant's arguments were "less than compelling":

> The Government's cavalier dismissal of *12 U.S.C. § 1725(c)* as a "housekeeping" statute does not square with the Supreme Court's reference to that statute in Winstar III. . . . The juxtaposition of those two statements [statements including the words "the Bank Board and FSLIC had ample statutory authority " and "the organic statute . . . generally empowered it [the FSLIC] 'to make contracts'"] implies a more expansive interpretation by the Supreme Court of the FSLIC's general contracting authority in *12 U.S.C. § 1725(c)*.

*53 Fed. Cl. 690, 708 (2002)* (quoting *Winstar III, 518 U.S. at 890*) (Franklin); accord *Globe Sav. Bank, FSB v. United States, 55 Fed. Cl. 247, 257-58 (2003)* (concluding that "while these decisions [CalFed, Winstar II and III] illustrate certain dimensions of the FSLIC's and the FHLBB's authority by discussing subsection *1729(f)(2)*, **[*55]** the full breadth of the agencies' contractual authority is properly found in subsection *1725(c)(3)*"). The Franklin court also cited CalFed as "controlling case law" for its holding that the FHLBB

and the FSLIC have contracting authority even in unassisted transactions. *53 Fed. Cl. at 708*; accord *Hughes, 58 Fed. Cl. at 302* (after explaining that *§ 1729(f)(3)* [(1988) n17 ] and *§ 1730a(m)* [(1988) n18 ] gave FSLIC "ample statutory authority," if *§ 1729(f)(2)* did not apply, the court further explained that "controlling case law establishes FHLBB's broad authority to enter into contracts under *12 U.S.C. 1725(c)*"); *Hometown, 53 Fed. Cl. at 335* & n.10 (holding that an unassisted acquisition by a holding company was "legally similar" to the acquisition in CalFed and therefore the "issue of the government's legal authority" was "resolved in favor of plaintiffs"); cf. *Globe, 55 Fed. Cl. at 257* (stating, in a case involving an assisted acquisition by a holding company, that "the controlling case law clearly indicates that the FHLBB and the FSLIC had broad authority to enter into contracts"). **[*56]**

n16 The other challenge defendant makes to contract authority is based on its assertion that *Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002)*, cert. denied, *539 U.S. 910, 156 L. Ed. 2d 125, 123 S. Ct. 2246 (2003)*, is applicable here to the issue of statutory authority. Def.'s Mot. at 20, 23 & nn.11-12, 25. However, at oral argument defendant was unable to cite any caselaw applying Schism to the authority issue in the Winstar context, Tr. at 7-8, and the court does not find the statutory authority issues in Schism relevant to the statutory authority issues in this case. At the time of oral argument, the court commented that it had found no Winstar-related case citing to Schism, Tr. at 7, but the court's comment is no longer true. A recent Federal Circuit decision in a Winstar-related case does contain a cite to Schism, but not to an issue helpful to defendant here. *See Barron Bancshares, Inc. v. United States, 2004 U.S. App. LEXIS 9154, Nos. 03-5048, 03-5049, 2004 WL 1048197, at *15 (Fed. Cir. May 11, 2004).*

n17 The text of *12 U.S.C. § 1729(f)(3) (1988)* states in its entirety:

> The Corporation may provide any person acquiring control of, merging with, consolidating with or acquiring the assets of an insured institution under *section 1730a(m)* of this title with such financial assistance as it could provide an insured institution under this subsection.

Id. **[*57]**

n18 Titled "Regulation of holding companies," *12 U.S.C. § 1730a (1988)*, states in *subsection (m)* "Emergency thrift acquisitions":

> (1)(A)(i) . . . the Corporation . . . may authorize, in its discretion and where it determines such authorization would lessen the risk to the Corporation, an insured institution that is eligible for assistance pursuant to *section 1729(f)* of this title to merge or consolidate with . . . or may authorize any company to acquire control of said insured institution . . . .

Id. *§ 1730a(m)(1)(A)(i).*

The facts in Franklin are analogous to the facts in this case: a holding company, without requiring financial assistance from the FSLIC, acquired a failing thrift in a "voluntary supervisory conversion." *Id. at 694.* In Franklin, the court found that "the contractual undertaking between [the plaintiffs] and the Government clearly included a promise by [the FHLBB] and FSLIC officials, acting with delegated authority, that [the new thrift] could amortize its supervisory goodwill over 25 years." *Id. at 709.* Here, **[*58]** the court finds that *§ 1725(c)* provided adequate authority for a contract regarding the 25-year amortization of goodwill between the government and FCC. n19

n19 There may have been other statutes which gave additional authority for the government's contractual promise but the court declines to speculate as to how properly to reconcile the sparse comments on authority from the Supreme Court, *Winstar III, 518 U.S. at 883, 890-891*, and the text of a host of statutory sections and subsections. The court does note that, in addition to the statutes mentioned by courts, cited supra, the Supreme Court referred to and quoted *12 U.S.C. § 1730h(d) (1988)*, "No provision of this section [titled "Accounting principles and other standards and requirements"] shall affect the authority of the [FSLIC] to authorize insured institutions to utilize subordinated debt and goodwill in meeting reserve and other regulatory requirements," *§*