*1730h(d)*, when discussing contracting authority in *Winstar III, id. at 891*. The Supreme Court also cited to a secondary source for the proposition that "'the authority of the executive to use contracts in carrying out authorized programs is . . . generally assumed in the absence of express statutory prohibitions or limitations.'" *Winstar III, 518 U.S. at 890 n.36* (citing 1 R. Nash & J. Cibinic, Federal Procurement Law 5 (3d ed. 1977)) (ellipsis in original).

The approval letter in this case, Def.'s App. at 1099, cited to *12 U.S.C. § 1730a(e) (1988)*, which forbade a holding company "to acquire, except with the prior written approval of the Corporation [FSLIC], the control of an insured institution," *§ 1730a(e)(1)(A)(i)*. The approval letter also contained language stating the government's authority to grant forbearances. See Def.'s App. at 1102 ("Pursuant to the delegated authority to approve the applications noted herein, the [FHLBB official] is hereby directed and authorized to issue to Mutual Federal a letter concerning supervisory forbearances. . . ."). None of this contemporary documentation directs the court to any particular statutory authority for contracting for the amortization of goodwill. In the absence of such direction, the court relies on controlling precedent for the government's statutory authority to contract for the treatment of goodwill in a Winstar-related case.

**[*59]**

e. Delegated Authority to Contract

Defendant argues that plaintiff has failed "to satisfy its burden of proving that OGC [Office of the General Counsel] and/or ORPOS [Office of Regulatory Policy, Oversight and Supervision] had the requisite delegated authority [to contract for supervisory goodwill amortization]." Def.'s Mot. at 26. Defendant cites only one decision, *Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 637 (2002)* (Fifth Third I), in support of its argument that "neither OGC nor ORPOS had delegated authority to enter into this alleged contract," Def.'s Mot. at 27 n.15. This court in Fifth Third I, however, concluded that a regional FHLBB official "had implied actual authority to bind FHLBB to promises regarding the amortization and use of supervisory goodwill." *52 Fed. Cl. at 643* (emphasis added). Because Fifth Third I discussed the delegated authority possessed by a regional FHLBB official, not the authority possessed by OGC or ORPOS, and because Fifth Third I found that actual authority to contract did exist in that case, the court does not find defendant's argument persuasive.

Plaintiff notes that the **[*60]** FHLBB approval letter for the Mutual acquisition mentioned that authority was delegated from the FHLBB and the FSLIC to the signatories of the letter, OGC and ORPOS officials, by 12 C.F.R. § 563b.28(c) (1988). Pl.'s Mot. at 38; Def.'s App. at 1099, 1102. Section 563b.28(c) stated in relevant part:

> [HN16] (c) The Board delegates to the General Counsel or his designee, the authority to approve applications for voluntary supervisory conversions, and to exercise the authority of the Board pursuant to this section, provided that (1) the application does not present a significant issue of law or policy, and (2) that ORPOS does not raise supervisory objection to the application based upon significant unresolved supervisory issues with respect to the financial or managerial resources of the converting institution, the items specified in § § 563b.24, 563b.25, and 563b.26, or the items required to be submitted pursuant to paragraphs (b), (d), (h), (j), (l), (m), (n), (o), (p), (r) and (s) of § 563b.27.

12 C.F.R. § 563b.28(c). This court has found that this regulation, in the context of thrift acquisition approval documents including **[*61]** references to delegated authority, properly delegated actual authority to contract to OGC and ORPOS officials. See *Hughes, 58 Fed. Cl. at 303-04* (citing 12 C.F.R. § 563b.28(c) (1988) and stating that "the FHLBB . . . properly delegated its authority under the regulations [to OGC and ORPOS]"); see also *Franklin, 53 Fed. Cl. at 708-09* (citing similar FHLBB approval letter language concerning delegated authority, and holding that the signatories, OGC and ORA n20 officials, "acted with delegated authority"). The court finds that OGC and ORPOS in this case had been delegated actual authority to contract with FCC for the 25-year amortization of supervisory goodwill from the Mutual acquisition.

> n20 ORA, the Office of Regulatory Activities, was a previous incarnation of ORPOS. Pl.'s Mot. at 38; Office of Thrift Supervision Glossary of Terms, at http://www.ots.treas.gov/glossary/acronyms.html (last visited May 14, 2004).

3. Allocation of Risk of Regulatory **[*62]** Change

Defendant asserts that in this case, "the parties expressly and unequivocally allocated the risk of

regulatory change to FCC." Def.'s Reply at 23. Plaintiff disagrees, stating that "plaintiff FCC did not assume the risk of regulatory change." Pl.'s Mot. at 38 (emphasis omitted). The arguments of the parties focus on three topics. The first focus is on the contract documents themselves and how their terms should be read. See Pl.'s Mot. at 43 & n.33 (discussing the FHLBB approval letter, the FCC RCMA and the forbearance letter and their significance); Def.'s Reply at 31 (discussing the forbearance letter and stating that its terms "must be read in conjunction with and coexist with the other provisions in the relevant documents"). The second focus is on the holding, if any, of the "Guaranty footnote" n21 in Winstar III concerning when the language of such contract documents allocates the risk of regulatory change to plaintiff or defendant. See Def.'s Mot. at 30-33; Pl.'s Reply at 15 (asserting that "Winstar III's footnote 15 contains no 'holding' at all"). The third focus is on authority in the Federal Circuit deciding the question of the allocation of risk **[*63]** of regulatory change when similar contract documents are in play. Pl.'s Mot. at 38-42; Pl.'s Reply at 15-17; Def.'s Mot. at 33 n.17; Def.'s Reply at 27-30. The court discusses each of these topics in turn.

> n21 In a footnote in Winstar III, the Court discussed the holding of *Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991)* (Guaranty), which found, in that case, that the government did not have contract liability for regulatory changes due to the enactment of FIRREA. *518 U.S. at 869 n.15.*

a. Reading the Contract Documents in FCC's Acquisition of Mutual

The most relevant contract documents here are the FHLBB forbearance letter and the FCC RCMA. The most pertinent sections of the forbearance letter are numbered paragraph three and a portion of the concluding paragraph:

> 3. For purposes of reporting to the Board, the value of any intangible assets resulting from the application of push-down accounting in accounting for the purchase, may be **[*64]** amortized by Mutual over a period not to exceed 25 years by the straight line method.
>
> . . . .
>
> . . . This letter does not and shall not be construed to constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 4.

Def.'s App. at 1105.

There are three pertinent paragraphs of the FCC RCMA. The first is a definition statement:

> Regulatory Capital Requirement" means the Association's regulatory capital requirement at a given time computed in accordance with *12 C.F.R. 563.13(b)*, or any successor regulation thereto, but not less than 3% of the Association's total liabilities.

Def.'s App. at 1235 (FCC RCMA P I.C.). The second relevant paragraph describes an obligation undertaken by FCC:

> As long as the Acquiror controls the Association, the Acquiror will cause the regulatory capital of the Association to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such **[*65]** requirement during the first quarter after which the Association fails to meet its Regulatory Capital Requirement.

Id. (FCC RCMA P II.A.). The third relevant paragraph of the FCC RCMA is a "miscellaneous provision":

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.

Id. at 1238 (FCC RCMA P VII.D.).

Defendant asserts that the language of the FCC RCMA allocated the risk of regulatory change to FCC. See Def.'s Mot. at 33 (stating that "the language of the [FCC] RCMA allocating the risk of regulatory change to FCC is even clearer than the one in Guaranty"); id. at 35 (asserting that "the clear risk-shifting language found in the FCC RCMA . . . supports a finding that FCC assumed the risk of regulatory change"). Defendant

points to the terms "successor regulation" and the phrase "it being expressly understood that subsequent amendments to such regulations may be made and that such amendments **[*66]** may increase or decrease the Acquiror's obligation under this Agreement" as support for its contention that plaintiff assumed the risk of regulatory change. Def.'s Mot. at 31 (citations omitted).

Plaintiff counters that the language of the forbearance letter "takes precedence over the right-to-amend-the-rules statement in FCC's [RCMA]." Pl.'s Mot. at 40. This is so, plaintiff argues, because the more specific 25-year amortization promise of numbered paragraph three of the forbearance letter takes precedence over the more general "successor regulation" language of the FCC RCMA. Id. at 41. Plaintiff also advances a separate argument that the forbearance letter term of 25-year amortization of goodwill and the FCC RCMA term of "successor regulation" are not "inconsistent." Pl.'s Reply at 17; see Pl.'s Mot. at 42-43 (discussing how these terms are "not in conflict"). In this separate argument, plaintiff asserts that FHLBB could "strictly enforce a higher capital requirement while leaving intact the government's promise that supervisory goodwill would count as capital for the full 25-year term set out in the FHLBB forbearance letter." Pl.'s Reply at 17.

Finally, defendant argues **[*67]** that the "'realities of the transaction'" are a factor in deciding the allocation of risk of regulatory change in this type of contract. Def.'s Mot. at 30 (quoting *Winstar III, 518 U.S. at 863*). Defendant asserts that, in this case, "the 'realities of the transaction' are the exact opposite of the 'realities relied upon by the Supreme Court to determine that the risk of regulatory change was shifted to the Government [in Winstar III] . . . ." Id. at 35. Defendant cites a variety of business reasons that, in its view, show that FCC would have been willing to acquire Mutual without the forbearance related to the accounting of goodwill, and would have therefore been willing to assume the risk of regulatory change regarding the 25-year amortization of goodwill term. Id. at 33-35. Defendant appears to suggest that the test for risk allocation is different in cases where the circumstances make the 25-year amortization of goodwill crucial to the transaction, than the test in other cases where the 25-year amortization of goodwill is relatively unimportant. See Def.'s Reply at 27 (arguing that "a case-by-case fact-specific inquiry into each transaction [is **[*68]** needed]-taking into consideration the respective documents and surrounding circumstances," and faulting plaintiff for "proferring no case in which the court found that the risk of regulatory change was shifted to the Government where the "very different" Supreme Court recognized language was used in the context of a transaction in which such risk allocation would have been wholly rational"). Defendant refers to this inquiry into factual circumstances, those outside the corners of the contractual documents in a Winstar-related case, as "the second prong of the Supreme Court's risk-shifting analysis-the economic 'realities of [this] transaction.'" Id.

The court responds to defendant's last contention first: defendant's claim that there is a second prong to the Supreme Court's risk-shifting analysis that requires an analysis of a plaintiff's "economic realities." The court first notes that defendant cites no authority for this formulation of either "the Supreme Court's risk-shifting analysis [in Winstar III]" or a so-called "the second prong." It is true that the Supreme Court, when discussing each of the three transactions in Winstar III, specifically mentioned **[*69]** the circumstances surrounding the transactions, as well as the language of the contract documents. See *518 U.S. at 861-68.*

But upon a closer reading of the Winstar III decision, the quoted phrase "realities of the transaction" is employed to distinguish the government's promise in the Glendale transaction from policy statements that do not manifest an intent to be bound in a contract. See *id. at 863* (stating that "the realities of the transaction favored reading those documents as contractual commitments, not mere statements of policy"). This discussion and the phrase excerpted by defendant are part of the Court's review of whether contract obligations had been undertaken by the government, not a specific inquiry into the allocation of the risk of regulatory change. See *id. at 860-861* (stating that although "the anterior question whether there were contracts at all between the Government and respondents . . . is not strictly before us[,]" the "resolution of the legal issues . . . required some consideration of the nature of the underlying transactions"). Within this section of the plurality opinion, when discussing the Winstar **[*70]** transaction the Court specifically addressed the allocation of the risk of regulatory change question and in doing so reviewed a contract document. See *id. at 865* (disapproving the government's interpretation of documents which "barred any inference that the Government assumed the risk of regulatory change" and stating that "the accounting principles clause [in the Winstar Assistance Agreement] tilts in favor of interpreting the contract to lock in the then-current regulatory treatment of supervisory goodwill"). Absent authority supporting defendant's proposed "second prong" of the risk-shifting analysis in Winstar III, the court reads the Winstar III analysis of risk allocation to be one requiring an examination of the language in the contract documents. n22

n22 If defendant's view were correct, the factual circumstances of the transaction, not the contract documents themselves, would be repeatedly examined, first to determine whether each of several elements of contract formation was present, then to determine whether a rational decision by a plaintiff to accept the risk of regulatory change was possible under the circumstances. As the court has previously discussed, acceptance, mutuality of intent to contract, and consideration have all been established in this transaction-further inquiry into the state of mind of FCC's decision-makers is not warranted in this case. See *Restatement (Second) of Contracts § 71 cmt. b* (stating that "the law is concerned with the external manifestation rather than the undisclosed mental state; it is enough that . . . the [promisee] responds in accordance with the inducement"); supra part II.B.2.a-c of this opinion discussing contract formation elements.

**[*71]**

The court agrees with the parties here that the terms of the relevant contract documents must be construed together to discern where the risk of regulatory change was allocated in this case. There is an apparent conflict, if not a real conflict, between the forbearance letter term allowing FCC a 25-year amortization of goodwill, Def.'s App. at 1105, and the FCC RCMA term stating that FCC's obligations to the government may vary depending upon successor regulations, id. at 1238. The first step in resolving this apparent conflict is to analyze the footnote in Winstar III that discusses "clearer" contract language that allocated the risk of regulatory change to a plaintiff in this type of contract. *518 U.S. at 869 n.15.*

b. The Guaranty Footnote and its Applicability to FCC's Acquisition of Mutual

The Supreme Court discussed the topic of exactly what promise was made in the Winstar III transactions by offering forbearances involving straight-line amortization of goodwill as a component of regulatory capital:

> It is important to be clear about what these contracts did and did not require of the Government. Nothing in the documentation or the circumstances **[*72]** of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry. Rather, what the Federal Circuit said of the Glendale transaction [in Winstar II] is true of the Winstar and Statesman deals as well: "the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected" in the agreements between the parties. 64 F.3d[] at 1541-1542. We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence.

*518 U.S. at 868-869.* The court then commented, in a footnote, as to how the government could avoid liability for losses due to regulatory change by using clearer contract language: n23

> To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. See, e.g., *Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991)* (finding, based on very **[*73]** different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift). The failure to be even more explicit is perhaps more surprising here, given the size and complexity of these transactions. But few contract cases would be in court if contract language had articulated the parties' postbreach positions as clearly as might have been done, and the failure to specify remedies in the contract is no reason to find that the parties intended no remedy at all. The Court of Claims and Federal Circuit were thus left with the familiar task of determining which party's interpretation was more nearly supported by the evidence.

*Winstar III, 518 U.S. at 869 n.15.* If, indeed, there is a holding in the Guaranty footnote, it appears to rest, at least in part (citing Guaranty using the signal see, e.g.,), upon the Eleventh Circuit's decision in *Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991)* (Guaranty), and in particular upon the contract documents reviewed by the Eleventh Circuit in Guaranty. See *518 U.S. at 869 n.15* **[*74]** (stating that "very different contract language" was the basis for the

finding in Guaranty). Because defendant in this case repeatedly asserts that the contract language in Guaranty is the same as the contract language in this case, see Def.'s Mot. at 32 ("The RCMA in Guaranty is identical to the RCMA in this action."); id. at 37 ("The forbearance letters sent to Guaranty Federal and FCC contain identical provisions relating to the amortization of intangible assets."), the court reviews the decision in Guaranty and the documents upon which it is based.

> n23 Here, again, the Court's focus is on the language of contract documents, not the circumstances of the transaction, when considering the allocation of risk of regulatory change. See supra text accompanying note 22.

In Guaranty, the Eleventh Circuit reviewed a supervisory merger/conversion from mutual to stock thrift which created a contract between the plaintiff and the government. *928 F.2d at 996*. After the enactment **[*75]** of FIRREA, the plaintiff sought and received a preliminary injunction from a United States District Court to force the government to honor its promise to treat supervisory goodwill from the merger as regulatory capital. *Id. at 996-997*. The Eleventh Circuit reviewed the contract documents in that case, five in number according to the plaintiff, but focused primarily on two, a RCMA and a forbearance letter. *Id. at 996, 998-1000*. The Eleventh Circuit found, based on those documents, that there was a way to "harmonize[]" the contract terms in the different documents that might otherwise be interpreted as being in conflict. *Id. at 999-1000*. Thus, in Guaranty, the "forbearance provision [allowing 25-year amortization of goodwill] . . . meant that the agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory [scheme] remained as it was when the contract was signed." *Id. at 999*; see also *id. at 1001* (stating that "we interpret the contract to mean that Guaranty had the right to treat its goodwill as regulatory capital and amortize it over a twenty-five **[*76]** year period for so long as the statutes and regulations governing the area remained as they were when the agreement was signed").

There are several differences between the contract documents in Guaranty and those in this case, however. Tr. at 68-73. While the parties did not point out any significant differences between the text of the forbearance letter in Guaranty and the forbearance letter in this case, the Guaranty RCMA and the FCC RCMA are different. There are five portions of the Guaranty RCMA quoted in the Guaranty opinion, *928 F.2d at 996, 998-99*, and the language in three of these quoted sections is different from the language of the FCC RCMA. See Def.'s Ex. 14 (FCC RCMA), found in Def.'s App. at 1234-40; Def.'s Ex. 34 (Guaranty RCMA). The differences between quoted sections of the Guaranty RCMA and the FCC RCMA appear to the court to be significant.

First, paragraph VI(B) of the Guaranty RCMA states that "this Agreement shall be deemed a contract made under and governed by Federal law," Def.'s Ex. 34 at 5, whereas paragraph VII(B) of the FCC RCMA states that "this Agreement shall be deemed a contract made under and governed by the laws of the State **[*77]** of Indiana," Def.'s App. at 1238. In Guaranty, the Eleventh Circuit cited paragraph VI(B) for its statement that "we assume without deciding that the [government] agencies did indeed make a contract with Guaranty." *928 F.2d at 998*. In this case, the court has decided the contract issue after finding unambiguous offer and acceptance, mutuality of intent, consideration and governmental authority to contract, and does not rely specifically on paragraph VII(B) of the FCC RCMA for this conclusion. n24

> n24 Indeed, several factors explain why the analysis of contract formation was truncated in Guaranty. The Eleventh Circuit was reviewing a preliminary injunction, rather than a summary judgment motion on contract liability. See *Winstar II, 64 F.3d at 1546-48* (disapproving of the government's argument that a preliminary injunction denial by the District of Columbia Circuit offered an analogous analysis of contract issues). Also, Winstar III had not yet been decided, and had not yet defined the parameters of contract formation in this type of case. Similarly, the Federal Circuit and the United States Court of Federal Claims decisions elaborating these contract issues were yet to be decided. It is not surprising that the Eleventh Circuit's analysis of contract issues in Guaranty is different from the court's analysis in this case.

**[*78]**

Second, paragraph I(D) of the Guaranty RCMA defines "regulatory capital" and cites to *12 C.F.R. § 561.13* [1988] n25 "or any successor regulation" but there is no similar provision in the FCC RCMA. Compare Def.'s Ex. 34 at 2 with Def.'s App. at 1235. This is a significant difference because, as plaintiff argues, contracting specifically for certain types of assets to qualify as regulatory capital is not the same as contracting for the level of capital that will be needed to remain in regulatory compliance. Tr. at 76-77.

n25 The introductory paragraph of this regulation, titled "Regulatory capital," stated:

> (a) The term "regulatory capital" means the sum of all reserve accounts, retained earnings, permanent common stock, permanent preferred stock, non-permanent preferred stock issued prior to July 23, 1985, mutual capital certificates (issued pursuant to *§ 563.7-4* of this subchapter), securities which constitute permanent equity capital in accordance with generally accepted accounting principles (if approved by the Corporation), appraised equity capital (as defined in *§ 563.13(c)* of this subchapter), allowances for loan losses except specific allowances, (including those specific allowances established pursuant to *§ § 561.16c, 563.17-2, and 571.1a* of this subchapter) and any other nonwithdrawable accounts of an insured institution (excluding any Treasury shares held by the insured institution): Provided, That for any nonpermanent instrument qualifying as regulatory capital under this paragraph, either.

*12 C.F.R. § 561.13(a) (1988).*

**[*79]**

Third, paragraph I(E) of the Guaranty RCMA, differs in two respects from paragraph I(C) of the FCC RCMA. See Def.'s Ex. 34 at 2; Def.'s App. at 1235. While both paragraphs are titled "Regulatory Capital Requirement" and reference "*12 C.F.R. 563.13(b)* [1988],[ n26 ] or any successor regulation thereto," the FCC RCMA paragraph I(C) adds a clause setting a minimum capital ratio of "not less than 3 % of the Association's total liabilities." Def.'s Ex. 34 at 2; Def.'s App. at 1235. The final difference is also in the Guaranty RCMA paragraph I(E), where an asterisk directs the reader to the Guaranty forbearance letter, which is attached to the Guaranty RCMA as Exhibit A. Def.'s Ex. 34 at 2. The fact that the Guaranty forbearance letter was attached to the Guaranty RCMA, and the fact that it is paragraph I(E) of the Guaranty RCMA that makes reference to the Guaranty forbearance letter, are both significant. The Eleventh Circuit in Guaranty mentions the asterisk or the paragraph I(E) reference to the forbearance letter or the attachment of the forbearance letter in three different paragraphs of its opinion. *928 F.2d at 996, 999.* The Eleventh **[*80]** Circuit stated that the forbearance allowing the 25-year amortization of goodwill was "incorporated into the agreement by the asterisk in Article [paragraph] I(E)." *Id. at 999.* No such incorporation of the FHLBB forbearance letter into the FCC RCMA occurred, by asterisk or any other reference in the text of the FCC RCMA. See Def.'s Ex. 14. n27

n26 The second paragraph of the regulation titled "Regulatory capital requirement" stated:

> (b) Minimum required amount. Except as otherwise provided in this section, the minimum regulatory capital requirement for any calendar quarter (commencing with the quarter ending March 31, 1987) shall be an amount equal to the sum of an institution's liability component and contingency component minus its maturity matching credit. An institution shall not use the maturity matching credit to reduce its required amount of regulatory capital below 3 percent of total liabilities for the period from December 31, 1986, until December 31, 1989, or to reduce its required capital below 4 percent of total liabilities on or after January 1, 1990.

*12 C.F.R. § 563.13(b) (1988).* **[*81]**

n27 The court agrees with the parties that the FHLBB forbearance letter and the FCC RCMA must be read together to discern the contract terms in this case, but such a reading does not begin here, as it did in Guaranty, with an express term incorporating an attached exhibit into a particular paragraph of the RCMA.

There are significant differences between the language of the Guaranty RCMA and the FCC RCMA, including differences in the paragraphs relied upon by the Eleventh Circuit in its finding that the allocation of the risk of regulatory change was upon the plaintiff in that case. See *Guaranty, 928 F.2d at 999* (quoting from

the Guaranty RCMA paragraphs I(D) and I(E), along with paragraph VI(D), which is identical to paragraph VII(D) of the FCC RCMA, as language that "warned that the regulatory scheme may be changed to Guaranty's detriment"). Because of these differences in contract language, the court does not find that the contract language in this case is necessarily included in the "very different contract language" that the Supreme Court mentioned in its Guaranty **[*82]** footnote. See *Winstar III, 518 U.S. at 869 n.15* (stating that the "very different contract language" in Guaranty was the basis for a finding that the allocation of risk of regulatory change was not on the government).

Even if there were not significant differences between the FCC RCMA and the Guaranty RCMA, this court has previously considered whether the Guaranty footnote in Winstar III is a precedential holding and whether its defensive use by the government is justified. In Hughes, this court rejected the precedential value of the Guaranty footnote and noted that the "successor regulation" argument for allocating the risk of regulatory change to plaintiffs in Winstar-type cases has been "consistently rejected." *58 Fed. Cl. at 305*. In Franklin, this court noted that the plurality in Winstar III, not a majority of the Court, had only briefly mentioned Guaranty in a footnote, and concluded that "the reference to Guaranty in Winstar III was too fleeting and peripheral to be accorded precedential weight." *53 Fed. Cl. at 714*. In Castle v. United States, this court held that the Guaranty footnote **[*83]** was not "directly determinative" of the allocation of risk of regulatory change question, rather, that it only stands for two propositions: "courts interpret contracts" and "clear contract language is easier for courts . . . to interpret than unclear language." *42 Fed. Cl. 859, 862 (1999)*. The Castle court did go on to harmonize the apparently conflicting provisions warning of successor regulations and promising accounting forbearances, by allowing the government to raise minimum capital levels without liability, but not so as to trump the accounting forbearances allowed by the contract. See *id. at 863-64*; see also *Sterling Sav. v. United States, 53 Fed. Cl. 599, 613-14 (2002)* (also rejecting the government's argument based on the Guaranty footnote in Winstar III because it would create an "illusory" goodwill promise and harmonizing the contract terms to preserve the goodwill promise); cf. Part III.B.3.c of this opinion, infra. Even if the differences between the contract documents in this case and those in Guaranty were less significant, the court finds that the authority of the Guaranty footnote in Winstar **[*84]** III would not, by itself, give enough guidance to resolve the allocation of risk of regulatory change question.

The court now turns to Winstar-related decisions in this circuit interpreting contract provisions that were in apparent conflict, when the 25-year amortization of goodwill was promised yet other documents warned of successor regulations and varying obligations of thrifts.

c. Decisions Reconciling Forbearances and the Risk of Regulatory Change

Defendant relies principally on *Southtrust of Georgia, Inc. v. United States, 54 Fed. Cl. 741 (2002)* (Southtrust), appeal voluntarily dismissed, *68 Fed. Appx. 191, No. 03-5069 (Fed. Cir. June 16, 2003)*, for its argument that trial court decisions on the allocation of risk of regulatory change are divided in the Winstar-context. See Def.'s Mot. at 39 n.21 (stating that "Southtrust found the opposite [that the RCMA terms were enforceable] and supports our argument [allocating the risk of regulatory change to plaintiff]. With trial court decisions supporting both sides . . . ."). Plaintiff, however, argues that numerous decisions of this court have allocated the risk of regulatory change to the government **[*85]** when analyzing similar documents containing apparently conflicting terms regarding the amortization of goodwill and successor regulations. See Pl.'s Mot. at 39-41. These decisions are cited by plaintiff for two arguments. First, plaintiff asserts that this court enforces the specific forbearance term over the general successor regulation term. Id. at 40-41. Second, plaintiff asserts that this court, when enforcing RCMA terms and forbearance letter terms, harmonizes those terms to eliminate the apparent conflict so that the amortization of goodwill survives successor regulation. Id. at 42-43. The court turns first to Southtrust, and then to plaintiff's two arguments.

Southtrust does not support defendant's argument that, in this case, risk of regulatory change should be allocated to FCC. In Southtrust, there was no forbearance letter. See *54 Fed. Cl. at 746* (noting that some cases involved forbearance letters but that in Southtrust "none of the indicia of a bargained[-]for exchange in connection with goodwill exists"). Because Southtrust held that there was no contract concerning goodwill, see *id. at 747* ("Under the **[*86]** unique facts of this case, the court finds that there was no contract regarding the plaintiffs' right to continued use of goodwill after FIRREA."), the Southtrust court went on to discuss the plaintiffs' rights embodied solely in the RCMA and found that the government could change the regulatory scheme without liability, *see id.* ("Where, as here, the acquirers expressly committed in the RCMA to meet any new regulatory capital requirements, did not secure protection of that goodwill in the event of a regulatory change, and no other agreement regarding goodwill exists, the court has no basis for finding a breach of contract following the regulatory change occasioned by

FIRREA."). Because there was no forbearance letter in Southtrust, and because there were no conflicting contract terms to reconcile in that transaction, the allocation of risk of regulatory change to the plaintiff in that case is inapposite to the case before the court.

Plaintiff cites numerous decisions of this court that allocate the risk of regulatory change to the government when apparently conflicting contract terms exist in an RCMA and a forbearance letter. Pl.'s Mot. at 39-41. This court has held that **[*87]** the more general successor regulation term must yield to the specific promise of an accounting forbearance for the amortization of goodwill. See, e.g., *Hughes, 58 Fed. Cl. at 305* (quoting *Winstar II, 64 F.3d at 1544*, for the principle that the contract term "'to maintain [the plaintiff's] regulatory net worth at whatever level the regulators set does not, however, eclipse the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply'"); *Admiral, 54 Fed. Cl. at 257* (stating that "the purported risk-shifting provisions do not avoid liability on the part of the Government"); *Franklin, 53 Fed. Cl. at 715* (stating that "the specific language of the Forbearance Letter . . . takes precedence over the more general 'successor regulation' provision . . . of the Dividend Agreement"). The court agrees with these holdings.

Plaintiff also argues that the contract language can be interpreted so that there is no conflict between the terms of the FCC RCMA and the FHLBB forbearance letter, Pl.'s Mot. at 42-43, and cites numerous decisions **[*88]** of this court that have come to a similar conclusion when faced with similar contract terms, *id. at 38-42*. This court has held that when the contract terms are read together, the successor regulation language must refer to regulatory capital requirement levels or other regulatory constraints, not to regulatory capital rules that would void the promises given in the forbearance letter. See, e.g., *Admiral, 54 Fed. Cl. at 257* ("We read the provision as anticipating potential changes in the level of capital that thrifts must maintain-'increase or decrease' the obligation to maintain capital-or perhaps some other aspect of regulatory compliance. The provision should not be interpreted as exposing Admiral to the risk of sweeping changes in the bargained[-] for method by which capital is accounted for by the FHLBB."); *Sterling, 53 Fed. Cl. at 614* (quoting the plaintiff's "convincing[]" argument that "while Plaintiff's obligation with respect to capital requirements could be increased or decreased, the successor regulation clause does not in any way purport to alter Defendant's obligation to allow Plaintiff to count goodwill"); **[*89]** *Castle, 42 Fed. Cl. at 863-64* (approving plaintiff's interpretation that the contract terms were harmonized so that the "successor regulation provision put the parties on notice that regulations 'may' change obligations . . . [but] it does not trump the specific contractual rights set forth to meet capital levels as specified in [another contract term]"). In this case, plaintiff argues, a similar harmonization of contract terms preserves the government's promise regarding the accounting forbearance, a 25-year amortization of supervisory goodwill from the Mutual acquisition. Pl.'s Mot. at 43 & n.33.

Whether this court gives precedence to the specific promise regarding the amortization of goodwill, or harmonizes the accounting forbearance with the successor regulation contract term in order to preserve the forbearance, the end result is the same: the risk of regulatory change is with the government. Because the cases on which plaintiff relies were persuasively decided on similar facts, the court here also allocates the risk of regulatory change to defendant.

Although the parties have not pointed the court to any Federal Circuit decisions reconciling the successor **[*90]** regulation and varying obligation terms in a RCMA and the amortization of goodwill term in a forbearance letter, plaintiff did suggest that Winstar II rejected defendant's allocation of risk of regulatory change defense to contract liability. Pl.'s Mot. at 41. The court finds that the statement in Winstar II concerning the allocation of risk of regulatory change, while not dispositive of the issue in this case, supports the analysis utilized by the authorities cited above and the court's resolution of this issue in favor of plaintiff:

> Finally, the government argues the Net Worth Maintenance Stipulation signed by Winstar required Winstar to abide by any changes in the law regarding regulatory capital. We agree to the extent the Stipulation requires Winstar to maintain its capital at levels set by the bank regulators. Winstar, like other thrifts, was bound to keep in compliance with banking regulations and laws regarding capital levels except to the extent the Bank Board expressly agreed to forbear from enforcing its regulations against it. This stipulation by Winstar to maintain its regulatory net worth at whatever level the regulators set does not, however, eclipse **[*91]** the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply.

*64 F.3d at 1544.*

III. Conclusion

For the foregoing reasons, FCC has proved that it had a contract with the government permitting the 25-year amortization of supervisory goodwill that could be counted as regulatory capital. Accordingly, the court GRANTS plaintiff's motion and DENIES defendant's motion.

IT IS SO ORDERED.

EMILY C. HEWITT

Judge