No. 01-46C, 01-251C, 01-416C
(Judge Allegra)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CUYAHOGA METROPOLITAN HOUSING AUTHORITY,

Plaintiff,
v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S SUPPLEMENTAL BRIEF WITH RESPECT TO DAMAGES**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

ANDREW P. AVERBACH
Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:
CAROLE W. WILSON
Associate General Counsel
for Litigation

HOWARD SCHMELTZER
Assistant General Counsel
for Litigation

ALLEN C. VILLAFUERTE
Trial Attorney
Office of General Counsel

CHARLES W. WILLIAMS
Office of the Assistant General
Counsel
Department of Housing and
Urban Development

August 23, 2004

## TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Amendments And Directive Result In A Series Of Partial Breaches . . . . . . . 1

II. Plaintiff's Obligation To Comply With The Legislation And Directive That Caused The Breach . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Methods Of Calculating Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV. The 120 Percent Threshold As A "Floor" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

**Cases**

Bank United of Tex. v. United States,
50 Fed. Cl. 645 (2001) . . . . . . . . 8

Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,
477 U.S. 41 (1986) . . . . . . . . 5

Cisneros v. Alpine Ridge Group,
508 U.S. 10 (1993) . . . . . . . . 10, 12

Cuyahoga Metro. Hous. Auth. v. United States,
57 Fed. Cl. 751 (2003) . . . . . . . . 2

Franconia Assocs. v. United States,
536 U.S. 129 (2002) . . . . . . . . 1, 2

Glendale Fed. Savs. Bank v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . 10

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2003) . . . . . . . . 3, 10

Koby v. United States,
53 Fed. Cl. 493 (2002) . . . . . . . . 8

Park Village Apartments v. United States,
25 Cl. Ct. 729 (1994), aff'd, 152 F.3d 943 (Fed. Cir. 1998) (table) . . . . . . . . 12-14

Park Village Apartments v. United States,
32 Fed. Cl. 441 (1994), aff'd, 152 F.3d 943 (Fed. Cir. 1998) (table) . . . . . . . . 13

Tennessee Valley Auth. v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . 3

United States v. Winstar Corp.,
518 U.S. 839 (1996) . . . . . . . . 5-6

Young Eng'rs, Inc. v. United States Int'l Trade Comm'n,
721 F.2d 1305 (Fed. Cir. 1983) . . . . . . . . 4

**Other Materials**

Corbin on Contracts (interim ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Restatement (Second) of Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6-8

Restatement (Second) of Judgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 01-46C, 01-251C, 01-416C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL BRIEF WITH RESPECT TO DAMAGES**

Pursuant to the Court's order dated June 22, 2004, defendant, the United States, submits the following supplemental brief in further support of its cross-motion for summary judgment with respect to damages and in opposition to plaintiff's motion for summary judgment with respect to damages.

## I. The Amendments And Directive Result In A Series Of Partial Breaches

The Court has inquired whether the 1994 amendments and Notice 95-12 result in a series of breaches, damages for which would accumulate over time, or whether these enactments result in a single breach marked, at the latest, by the time of filing suit (and for which the Court should, presumably, calculate damages on a prospective basis). In our view, the damages fall into the former category.

In Franconia Assocs. v. United States, 536 U.S. 129, 142-43 (2002), the Supreme Court ruled that legislation governing the right of borrowers to prepay loans provided by the Government effected a repudiation, as opposed to an "immediate breach," of the loan agreements between the parties. Plaintiffs' claims ripened into a breach of contract (and plaintiffs' claims accrued for purposes of the statute of limitations) either at the time when performance (in the

form of acceptance of attempts to prepay the loans) was due, or at the time that plaintiffs elected to treat the offending legislation as a present breach. Id. at 143 (citing Restatement (Second) of Contracts § 250). This Court employed a similar analysis in defining the breach in this case. Cuyahoga Metro. Housing Auth. v. United States, 57 Fed. Cl. 751, 762 (2003) (ruling that an "apparent" breach of contract took place when the Government failed to perform a contractual duty when it was due).

Undoubtedly, Franconia indicates the plaintiffs in that case had a complete cause of action, and their claims "accrued," at the time they filed suit, even if they had not yet attempted to prepay their loans. However, a similar conclusion – that all of plaintiffs' claims, including those for "future" damages, accrued upon the commencement of the lawsuit –is not warranted in this case, because the plaintiffs here elected to treat the breach as a partial, rather than a total, breach. Indeed, in Franconia, the plaintiffs affirmatively alleged that the passage of the offending legislation "gave them the right to terminate their participation in the Government's housing program by exercising their option to prepay at any time," and sought damages upon that basis. 536 U.S. at 137 (quotation marks omitted). Here, by contrast, CMHA has elected to continue its performance of the contract, notwithstanding what the Court has referred to as a repudiation,[1] and to continue to provide housing to lower income occupants in accordance with its HAP contracts. The consequence of this election is that CMHA is only required to prove, and would not be

---

[1] Comment d to section 250 of the Restatement (Second) of Contracts provides that "[i]n order for a statement or an act to be a repudiation, the threatened breach must be of sufficient gravity that, if the breach actually occurred, it would itself give the obligee a claim for damages for total breach under § 243(1)." Given that CMHA has elected to continue performance under the contract, we agree with the Court's statement during oral argument on June 18, 2004 that "maybe that terminology [i.e., repudiation] was not correct and this is a partial breach." (Tr. at 85-86).

barred from pursuing through future litigation, damages resulting from the failure to provide annual adjustments for years after those at issue in this case. Cf. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 642 (2003) (injured party alleging partial breach cannot collect damages for future nonperformance).[2]

The result is consistent with the Court's recent decision in Tennessee Valley Auth. v. United States, 60 Fed. Cl. 665, 677-78 (2004), in which the Court deemed applicable the exceptions to the general rule of merger and bar set forth in Restatement (Second) of Judgments § 26(1)(b),(e), and determined that, following disposition of the case through trial, the plaintiff would "retain the right to bring subsequent actions for damages it sustains after the period encompassed by such trial." Indeed, the reason that the Court reserved plaintiff this opportunity was the partial, as opposed to total, nature of the breach it had alleged:

> TVA's claim for a partial breach of the TVA Contract is a limited claim that, by its nature, does not embrace all of TVA's rights and claims for redress with respect to the ongoing TVA Contract. "For a partial breach the injured party can maintain action at once[,] but he is not permitted to stop further performance by the wrongdoer and get damages for the anticipated future non-performance, as well as for the past non-performance constituting the partial breach." 9 Corbin on Contracts § 946 at 719. "A claim for damages for partial breach is one for damages based on only part of the injured party's remaining rights to performance." Restatement (Second) Contracts § 236(2). . . . TVA's claim is necessarily solely a claim for partial breach--a claim for total breach would abort the contract, thereby obviating DOE's obligation to collect TVA's SNF and HLW in the future and most likely resulting in the forfeiture of

[2] At oral argument on the cross-motion for summary judgment with respect to damages, counsel for CMHA stated that he understood that a new breach would take place on the anniversary date for each HAP contract. (Tr. at 89). Under this theory, CMHA would incur a new component of damages – in the form of unrealized rent adjustments – on each successive anniversary date, and its cause of action with respect to a particular breach would not accrue (and would thus not be recoverable) until the anniversary date for that year.

> TVA's operating licenses pursuant to 42 U.S.C. § 10222(b). As such, TVA's current claim for damages cannot be viewed as encompassing future damages, and the Court declines to treat it as such.

Id. at 677-78.[3]

Here, plaintiff had identified only a partial breach of the HAP contracts and only seeks damages for a limited number of years in which annual adjustments have not been provided. As a result, there is no reason it cannot pursue damages based upon possible future (partial) breaches in future litigation. Although it is conceivable that the results of such litigation could be different – for example, its failure to mitigate its damages by preparing comparability studies might become less reasonable over time – it is not barred from asserting such claims if and when they actually ripen into a breach.

Finally, we do not believe that the rule set forth in Restatement (Second) of Judgments § 24 is applicable, or that it is necessary to reach the issue of whether exceptions set forth in section 26 apply. The principle of claim preclusion "rests on the assumption that all forms of relief could have been requested in the first action." Young Eng'rs, Inc. v. United States Int'l Trade Comm'n, 721 F.2d 1305, 1314 (Fed. Cir. 1983). However, any "future" damages CMHA plaintiff seeks will be based upon separate, partial breaches that have not yet occurred (and that

---

[3] In the omitted portion of this passage, the Court offered another reason for declining to award damages incurred after the completion of trial, namely, the inherently speculative nature of an award based upon future damages. 60 Fed. Cl. at 678. ("Any consideration of future damages in this case would require a high degree of speculation and uncertainty both as to whether such damages even would be incurred as well as what their quantum might be."). In this case, predicting the amount of future annual adjustment factors and the amount of future comparable rents is not only a speculative endeavor, but is one that can be calculated with significant accuracy only after the annual adjustment factors have been promulgated by HUD. It is, of course, also possible that the breach that the Court identified will be cured by future legislation.

may not occur in the future), and are therefore not available in this litigation. As a result, permitting CMHA to commence future litigation does result in a "split" of its cause of action in the first instance.

## II. Plaintiff's Obligation To Comply With The Legislation And Directive That Caused The Breach

The Court's second inquiry focuses upon the obligation of an injured party to comply with Federal legislation that effectuates a breach. At bottom, this obligation derives from the Supremacy Clause of the U.S. Constitution, U.S. Const., Art. VI, Cl. 2. We are aware of no authority for the proposition that a party is not subject to otherwise valid legislation or regulation merely because that legislation or regulation happens to be inconsistent with a contract that that party has entered into with the Government. Although the Government may be liable for breach in these circumstances (subject to the Government's sovereign defenses), the fact of the breach does not in and of itself create an exemption from the statute.

Further, the mere fact the Court deemed the unmistakability doctrine and sovereign acts doctrine to be inapplicable to the facts of the case does not mean that CMHA is exempt from what are otherwise valid legislative and regulatory enactments. This is evident from the decision in United States v. Winstar Corp., 518 U.S. 839 (1996). Writing for the plurality in Winstar (which determined that the unmistakability doctrine did not apply to the contracts at issue), Justice Souter noted that, unlike the plaintiff in Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41 (1986), in which the Court determined that a damage award would have the effect of foreclosing the exercise of sovereign authority, a damage award would be appropriate in Winstar precisely because such an award would not create an exemption to

FIRREA. Compare Winstar, 518 U.S. at 878 (award of damages as requested in Bowen "would have been the equivalent of exemption from the terms of the subsequent statute") with id. at 880 ("Nor do the damages respondents seek amount to exemption from the new law, in the manner of the compensation sought in Bowen . . . "). Justice Souter further explained that, even if the plaintiffs recovered damages, they still would be required to comply with FIRREA:

> Even if respondents were asking that the Government be required to make up any capital deficiency arising from the exclusion of goodwill and capital credits from the relevant calculations, such relief would hardly amount to an exemption from the capital requirements of FIRREA; after all, Glendale (the only respondent thrift still in operation) would still be required to maintain adequate tangible capital reserves under FIRREA, and the purpose of the statute, the protection of the insurance fund, would be served.

Id. Creating an exemption for CMHA based upon the breach would be inconsistent with the Court's determination that the Government's sovereign defenses are not available.

The Court has also asked for additional authority concerning the contention that, as a prerequisite to recovering damages, CMHA must have complied with, and must comply in the future with, the legislation and directives that effectuated the breach. We have not located any authority that addresses directly this issue, or the issue of whether it makes a difference that the provision effectuated a breach or adopts a new requirement unrelated to the breach. However, as discussed above and in our motion for summary judgment, the fact that the breach that the Court has identified is a partial, rather than total, breach, compels the conclusion that plaintiff must "live in" the world created by the breach and, notwithstanding its effort to collect damages as a result of the breach, is subject to the rules and regulations of that world. In this regard, the illustration 2 to Restatement (Second) of Contracts § 243 may be instructive:

> [A promises to sell B a lot in a subdivision for $8,000. B promises to pay in four installments of $2,000 each, beginning one year after execution of the contract. A promises to begin to make improvements and pave the streets within 60 days and to complete work within a reasonable time and promises to deliver a deed at the time of the final payment. A commits a material breach by unjustifiably failing to pave the streets.] B pays the first installment although he knows of A's material breach. B's payment operates as a promise to pay the remaining installments in spite of the non-occurrence of a condition of his duty to do so. . . . B's duty to pay the price is not discharged, and he has a claim against A merely for damages for partial breach because of the delay.

As in this illustration, the fact that CMHA has elected to treat the breach as a partial, rather than a total, breach means that it must "live in" the world created by the partial breach and is only entitled to damages directly resulting from that partial breach – in this case, the cost of additional performance. The Court has determined that, like party B in the illustration, CMHA's contracting partner has failed to perform at the time performance became due. However, CMHA has elected to continue to perform its obligations in spite of its partner's breach and has thus "excused" the non-occurrence of the conditions of its performance. Having so excused this non-occurrence (and having elected to sue for damages based upon this nonoccurrence), CMHA cannot now be heard to argue that, in calculating damages, the Court cannot require CMHA to conduct itself in accordance with the conditions that exist in this changed world. To conclude otherwise would be to conclude that the non-occurrence was not excused at all, and would be inconsistent with a party's obligation, pursuant to the implied covenant of good faith and fair dealing and its duty to mitigate (as discussed in the next section), to take such reasonable steps that are necessary to avoid the accumulation of additional damages.

## III. **Methods Of Calculating Damages**

It is well settled that the goal of an award of "expectation" damages for breach of contract is, to the extent possible, to "put the injured party in as good a position as he would have had if performance had been rendered as promised." 11 Corbin on Contracts § 992, at 5 (interim ed. 2002); see also Restatement (Second) of Contracts § 344(a) (defining a party's expectation interest). As the drafters of the Restatement recognized, however, the rules governing the availability of damages "are not inflexible limits on relief and in situations in which a court grants such relief as justice requires, the relief may not correspond precisely" to the expectation, reliance or restitution interests of the non-breaching party. Id. cmt. a; see also 11 Corbin, supra, § 992, at 5 (stated rules in First Restatement of Contracts are merely "guidelines in the estimation of damages").

Restoration of a party to the position it would have occupied in the absence of breach necessarily requires consideration of the steps that the breaching party might have taken to avoid losses, i.e., to mitigate its damages. The general rule, as expressed in the Restatement, is that "damages are not recoverable for a loss that the injured party could have avoided without undue risk, burden or humiliation." Restatement (Second) of Contracts § 350(1); see, e.g., Koby v. United States, 53 Fed. Cl. 493, 496-97 (2002) (relevant inquiry is whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages). In recognition of this rule, courts have held that where damages can be avoided without undue risk, burden or humiliation, the cost of mitigation is recoverable by the non-breaching party. See, e.g., Bank United of Tex. v. United States, 50 Fed. Cl. 645, 665 (2001)

(when recovering expectancy damages, "[p]laintiffs are entitled to recover their actual costs incurred in mitigation of the lost leverage capacity caused by FIRREA").

In this case, applying the "general" rule concerning expectation damages would require the Court, as a first step, to ascertain what would have happened in the hypothetical world in which the 1994 amendments and Notice 95-12 had not been implemented – in other words, to determine what annual adjustments, if any, CMHA would have received had HUD, as opposed to CMHA, been responsible for comparability studies.

CMHA contends, in connection with this first step, that the amount it would have received in the absence of a breach would be the full amount of the AAAF adjustments published by HUD, subject to any limitations upon these adjustments necessitated by comparability studies. Indeed, counsel for CMHA conceded at oral argument that the Court should conduct the inquiry "as if [the] studies had been around one way or the other at the time that the adjustments were being pursued." (Tr. at 28).

We agree. We have not located any authority considering the specific question posed by the Court in connection with this issue – that is, how damages should be calculated where the breaching party, by virtue of his breach, puts himself in a position where he can no longer regulate the contract price under the terms of the original agreement. Conceivably, examination of what might have occurred in the absence of a breach by the Government could entail an inquiry into the likelihood that HUD would have conducted comparability studies in the first instance. However, engaging in this inquiry would be inconsistent with the principles underlying the award of damages and, for that reason, a more flexible approach, as contemplated by the Restatement, is warranted.

First, such an inquiry would require the Court to engage in rank speculation as to how a Government agency would have conducted its business. This task is made even more complicated when one considers that Congress was clearly concerned, as the Court's analysis of the 1994 Amendment indicates, that HUD was too frequently paying above-market rates. It is certainly possible that, in lieu of statutory amendment, HUD might have stepped up its efforts to conduct comparability studies. The question of what HUD would have done with respect to these properties had the 1994 Amendment not been enacted is inherently unpredictable and, for that reason, cannot serve as the basis for a damage award. See, e.g., Indiana Michigan Power, 60 Fed. Cl. at 651 (questions of what Department of Energy and Nuclear Regulatory Commission might do in the future is too speculative a basis upon which to award relief); cf. Glendale Fed. Savs. Bank v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (noting that in some cases, problems associated with proving what might have been can be insurmountable).

Second, determining that HUD would not have prepared comparability studies for the years in question would have the effect of granting annual adjustments that exceeded CMHA's contractual expectation – that is, to be compensated at an amount reasonably consistent with prevailing market rents. Indeed, the "Overall Limitation" provision of the HAP contracts expressly provides that "[n]ot withstanding [sic] any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units." Def. App. at 6, 17, 29 ¶ 1.8(d). Because CMHA has no contractual entitlement to receive rental income in an amount that is inconsistent with the overall limitation of its HAP contracts, see Cisneros v. Alpine Ridge Group, 508 U.S. 10, 17 (1993), ascertainment of the world that might have existed in the absence of a breach

should be informed by the fact that CMHA is entitled to no more than the benefit of its bargain. To calculate what rents would have been without regard to the "overall limitation" that formed a part of the parties' agreement would require the Court not only to engage in errant speculation, but to provide CMHA with a windfall to which it is not contractually entitled.

Of course, ascertaining what the adjusted rents would have been is only the first step in determining what damages were in fact caused by the breach. As we previously explained in our motion for summary judgment with respect to damages, any damage award should also consider the steps CMHA could have taken to minimize the amount of its injury, with due allowance for the cost of taking such steps.[4] Even if, as the Court has determined, the 1994 Amendments and Notice 95-12 effected a breach of CMHA's HAP contracts, there is no reason why, given the totality of the circumstances, CMHA could not have taken the reasonable mitigative step of performing and submitting comparability studies to HUD. Indeed, CMHA demonstrated the feasibility of performing such studies by virtue of having provided them in connection with this litigation. Moreover, such efforts would not have been futile. As the tables provided in connection with our motion for summary judgment indicate (DPFUF at 8), the comparability studies that CMHA performed would not have barred all of the adjustments that CMHA seeks for either the Severance or Ambleside properties, even if one assumes that HUD would have calculated rent adjustments in accordance with 95-12, rather than the 1986 Memorandum.[5] As a

---

[4] Using this framework, the cost of performing comparability studies would not, as CMHA contends, constitute "restitution," but, rather, would be a component of CMHA's expectation damages.

[5] For example, with respect to the Ambleside properties, the annual adjustments now sought by CMHA would have been permitted in whole or in part from 1997 through 2001, up to the (continued...)

result, the amount that CMHA currently seeks as damages would have been significantly reduced had it engaged in the simple expedient of submitting comparability studies in accordance with Notice 95-12. CMHA has supplied no authority, and we are aware of none, suggesting that a party need not mitigate damages merely because the procedures for engaging in such mitigation are the procedures that effectuated the breach in the first instance. Indeed, there is no rational reason for creating such a rule. CMHA could have avoided at least a portion of the damages that it now seeks to recover, and its failure to engage in any effort to mitigate damages has provided HUD with an independent reason not to award any of the annual adjustments it seeks. Under the circumstances, CMHA's failure to comply with the terms of Notice 95-12 bars it from recovering the annual adjustments it seeks.

## IV. The 120 Percent Threshold As A "Floor"

The Court's final question concerns the so-called 120 percent threshold, and the rationale that supports using this threshold as a "floor" with respect to the rent to which an owner of Section 8 housing is entitled. As an initial matter, two points warrant consideration. First, even under the 1986 memorandum, the 120 percent threshold was an exception to the general rule that set rents at the lesser of the AAAF rent or the sum of comparable rent and the initial difference. Def. App. at 179. Second, the 1986 memorandum was rendered obsolete, pursuant to the exercise of HUD's discretionary authority to define what constitutes a "material difference," see Alpine Ridge, 508 U.S. at 21; Park Village Apartments v. United States, 32 Fed. Cl. 441, 448 (1994), aff'd, 152 F.3d 943 (Fed. Cir. 1998) (table), by Notice 95-12. That notice limited rent

---

[5](...continued)
amount of the sum of comparable rents and the initial difference for each year (designated in the tables as "COMP PLUS ID").

adjustments to the "lesser of (1) contract rents adjusted according to the annual adjustment factor and (2) the comparable, unassisted rent plus the initial difference." Def. App. at 52. As a result, as the HAP program is currently administered, there is no justification for using a 20 percent variance as a "floor" for setting contract rents.

To the extent the Court deems the (now obsolete) 1986 memorandum applicable, and to the extent the Court concludes that the overall limitation does, in fact, also mandate a floor, the only case authority of which we are aware that provides a rationale for the use of a 20 percent variance as a floor is the Park Village line of cases. In Park Village Apartments v. United States, 25 Cl. Ct. 729 (1994), aff'd, 152 F.3d 943 (Fed. Cir. 1998) (table) ("Park Village I"), Judge Andewelt ruled, over the Government's objection, that the requirement in the HAP contracts that AAAFs "not result in material differences between the rents charged for assisted and comparable unassisted units" dictated not only that adjusted rents not be materially higher than market rents, but also that they not be materially lower than market rents. Id. at 721. In Park Village Apartments v. United Sates, 25 Cl. Ct. 441 (1994), aff'd, 152 F.3d 943 (Fed. Cir. 1998) (table) ("Park Village II"), Judge Andewelt re-affirmed this conclusion. In so doing, Judge Andewelt explained that inasmuch as "HUD has determined that a material difference exists only where the contract rent would exceed comparable rents by 20 percent or more," an "analogous definition of material differences would be required" where contract rents were less than comparable rents, and that "the overall limitation would be triggered [in such an instance] only where the rents charged for comparable unassisted rents are at least 20 percent higher than the AAAF-based contract rent." Id. at 448. Judge Andewelt further explained that, in such a circumstance, rent adjustments in accordance with the AAAFs would "remain the norm," and that comparability

studies would only dictate the amount of the adjustment if the comparable rents turned out to be 20 percent greater or 20 percent smaller than adjusted rents. Id.

This reasoning suffers from one factual flaw, namely, the assertion in Park Village II that HUD "determined that a material difference exists only where the contract rent would exceed comparable rents by 20 percent or more." Id. As we explained in our motion for summary judgment with respect to damages, even if we apply the "general rule" set forth in the 1986 memorandum, this rule directs HUD to raise rent to the lesser of the AAAF rent and the sum of comparable rent and the initial difference, and thus may direct a rent that is lower than the 120 percent threshold. Further, the 1986 memorandum expressly sets forth an alternative method of ascertaining the existence of a material difference other the 120 percent threshold, based upon the cost of operating the project. Def. App. at 178-79. Simply stated, the 120 percent threshold is sufficient, but not necessary, to establish a material difference. Although it would be, under the 1986 memorandum, the simplest way of measuring a material difference in the event that a mirror-image rule were deemed warranted in cases where comparable rents exceed AAAF-adjusted rents, using a 20 percent variance as a "floor" would not be required as a matter of logic.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Andrew P. Averbach
ANDREW P. AVERBACH
Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:
CAROLE W. WILSON
Associate General Counsel
for Litigation

HOWARD SCHMELTZER
Assistant General Counsel
for Litigation

ALLEN C. VILLAFUERTE
Trial Attorney
Office of General Counsel

CHARLES W. WILLIAMS
Office of the Assistant General
Counsel

Department of Housing and
Urban Development

August 23, 2004