**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CUYAHOGA METROPOLITAN HOUSING AUTHORITY,** | ) | **CONSOLIDATED CASE NOS. 01-46C, 01-251C AND 01-416C** |
| **Plaintiff,** | ) | **JUDGE ALLEGRA** |
| **v.** | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | **PLAINTIFF'S SUPPLEMENTAL BRIEF SUBMITTED IN RESPONSE TO THE COURT'S JUNE 22, 2004 ORDER** |
| **Defendant.** | ) | |

Fred J. Livingstone (Ohio No. 0009528)
*flivingstone@taftlaw.com*
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 (facsimile)

*Attorney for Plaintiff*

Of Counsel:

Mark J. Valponi (Ohio No. 0009527)
Majeed G. Makhlouf (Ohio No. 0073853; District of Columbia No. 481643)
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838

August 23, 2004

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

QUESTION NO. 1: (Annual Partial Breaches or One Total Breach) .......... 1

QUESTION NO. 2: (Enforceability of Legislation Provisions Repudiating Contract) .......... 5

QUESTION NO. 3: (State Case Law on Party's Inability to Control the Contract Price) .......... 7

QUESTION NO. 4: (120% Limitation) .......... 9

CERTIFICATE OF SERVICE .......... 14

# TABLE OF AUTHORITIES

**Cases** **Page**

*Adrienne Village v. United States*, 25 Cl.Ct. 457 (1992) ....................4

*Boston v. Sealmaster Indus.*, 2004 Ohio 4278, (Ohio Ct. App., 6th Dist. 2004) ....................7

*Billings Associates, Inc. v. Basham*, 27 A.D.2d 124, 276 N.Y.S.2d 446 (1967) ....................5

*C.D.S., Inc. v. Village of Gates Mills*,
26 Ohio St.3d 166, 168, 497 N.E.2d 295 (Ohio 1986) ....................7

*Cuyahoga Metropolitan Housing Auth. v. United States*,
57 Fed. Cl. 751 (2003) (Opinion) ....................6, 7, 8

*Doyon, Ltd. v. United States*, 214 F.3d 1309 (Fed.Cir. 2000) ....................7

*Duncan v. TheraTx, Inc.*, 775 A.2d 1019 (Del. 2001) ....................7

*Eden Realty Co. v. Weather-Seal*,
102 Ohio App. 219, 142 N.E. 2d 541 (Ohio Ct. App. 1957) ....................1

*Franconia Assoc. v. United States*, 536 U.S. 129, 122 S.Ct. 1993 (2002) ....................4

*GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203 (D.C.N.Y. 1981) ....................4

*Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334 (C.A.Tex. 1982) ....................4

*Indiana Michigan Power v. United States*, 60 Fed. Cl. 6-39 (2004) ....................3

*Kansas v. Colorado*, 533 U.S. 1 (2001) ....................5

*National Leased Hous. Assn. v. United States*, 32 Fed. Cl. 411 (1994) ....................10, 11

*National Leased Housing Assn. v. United States*, 22 Cl.Ct. 649 (1991) ....................10

*Norfolk Southern Railway Co. v. Shankin*, 529 U.S. 344 (2000) ....................12

*Oregon v. Ashcroft*, 368 F.3d 1118 (9th Cir. 2004) ....................6

*Park Village Apts. v. United States*, 32 Fed. Cl. 454 (1994) ....................9, 10, 11

*Park Village Apts. v. United States*, 25 Cl. Ct. 729 (1992) ....................2, 10

*San Carlos Irrigation and Drainage Dist. v. United States*, 23 Cl.Ctl. 276 (1991) ........................2

*Sheridan Square Partnership v. United States*, 761 F.Supp. 738 (D. Colo. 1991).................10, 12

*Taylor-Edwards Warehouse & Transfer Co., of Spokane, Inc. v. Burlington Northern, Inc.*, 715 F.2d 1330, 1336 (9th Cir. 1983) ........................................................................8

*Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665 (2004)..........................................2, 3, 4

**Statutes**

5 U.S.C. §706(2)(D)..................................................................................................6

28 U.S.C. § 2501 ......................................................................................................4

**HUD Documents**

1986 HUD Memorandum .....................................................................................10, 11, 12

1994 Amendments ...........................................................................................6, 7, 10, 12

HUD Directive 95-12............................................................................................5, 6, 7, 12

**Other**

Am Jur. Contracts, Section 661 ................................................................................8

Farnsworth, *Contracts*, § 9.6 (3rd edition)..............................................................................8

Moore's Federal Practice, § 132.02 ..........................................................................4

Restatement (Second) of Judgments, Section 26 ...............................................................1, 3

Restatement (Second) of Contracts, Section 236...............................................................1, 2

Restatement (Second) of Contracts, Section 264.................................................................8

Restatement (Second) of Contracts, Section 347.................................................................9

Williston on Contracts, § 64:2 (4th ed.).............................................................................7

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CUYAHOGA METROPOLITAN HOUSING AUTHORITY,** | ) | **CONSOLIDATED CASE NOS. 01-46C, 01-251C AND 01-416C** |
| **Plaintiff,** | ) | **JUDGE ALLEGRA** |
| **v.** | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | **PLAINTIFF'S SUPPLEMENTAL BRIEF SUBMITTED IN RESPONSE TO THE COURT'S JUNE 22, 2004 ORDER** |
| **Defendant.** | ) | |

Plaintiff, The Cuyahoga Metropolitan Housing Authority ("CMHA"), respectfully submits the following answers to the questions posed by the Court in its June 22, 2004 Order.

**Question No. 1: (Annual Partial Breaches or One Total Breach)**

This case presents a series of breaches occurring annually when HUD refuses to perform as required under its HAP Contracts with CMHA. HUD has not totally refused to so perform, but only in certain aspects of the HAP Contracts. The parties still continue in the relationship and neither evinces any intention to terminate same. CMHA has elected to treat this partial non-performance as a partial breach. It is only making a claim for part of its remaining rights under the HAP Contracts. *See* Restatement (Second) of Contracts, Section 236. Such action is similar to suits on installment contracts or under leases for payments then due which have been held not to bar recovery for installments subsequently becoming due. *See Eden Realty Co. v. Weather-Seal*, 102 Ohio App. 219, 142 N.E. 2d 541 (Ohio Ct. App.1957).

This Court has expressed concern that the merger or bar rules might preclude continuing annual claims. Clearly, the exceptions to the merger or bar rules in the Restatement (Second) of Judgments cover the type of case with which we are dealing. *See* Restatement (Second) of Judgments, Section 26. Both subsection (b), which permits the court to reserve the right to bring

future suits, and subsection (e) which precludes merger or bar for policy reasons involving a continuing or recurrent wrong, are applicable to the case at hand. In *San Carlos Irrigation and Drainage Dist. v. United States*, citing Corbin on Contracts, this Court explained:

> There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of 'partial' breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go 'to the essence' and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each 'partial' breach a separate action is maintainable, just as in the case of an 'installment' contract; and for a series of 'partial' breaches occurring before any action is brought only one action is maintainable.

*San Carlos Irrigation and Drainage Dist.*, 23 Cl.Ctl. 276, 279 (1991).

The Restatement (Second) of Judgments provides that a partial breach occurs "if the injured party [1] elects to or [2] is required to await the balance of the other party's performance under the contract." Both elements are present here. CMHA always maintained, relying on *Park Village Apts. v. United States*, 25 Cl. Ct. 729, 734 (1992), that HUD is committing annual breaches. *See* Restatement (Second) of Contracts, Section 236, comment b. The HAP Contracts have a long duration, and neither party has terminated them. HUD's contractual obligations in question arise on an annual basis and continue into the future.

*Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665 (2004), is analogous to the case at bar. The Tennessee Valley Authority ("TVA") had a contract with the U.S. Department of Energy ("DOE") which obligated DOE to accept annually TVA's spent nuclear fuel. Because the DOE never completed a facility to accept such spent fuel, it was not able to do so and TVA was obligated to incur expenses to store such spent fuel. TVA brought suit against the DOE for expenses it had incurred to date. The Court recognized that its final judgment could result in extinguishing TVA's claims for future damages because of the merger or bar rules. *Id.* at 666-

667. But the Court noted that consideration of future damages could require a high degree of speculation and uncertainty. Like the Court in *Indiana Michigan Power v. United States*, 60 Fed. Cl. 6-39 (2004), another spent fuel case, it decided there was no need to engage in such speculation. It therefore ordered past damages and reserved future damages either for later suits or retention of the case.

Under the Restatement (Second) of Judgments, Section 26(1), the Court can invoke the exceptions to the merger rule and expressly reserve a plaintiff's right to maintain future actions under the contract. The exceptions provide that in cases involving a continuing or recurrent wrong, the Court should give the plaintiff the "option to sue once for total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course." Restatement (Second) of Judgments, Section 26(1)(e). Here, CMHA elected the latter approach because calculation of future damages will be speculative only at this time but not after each annual breach occurs.

In the case at bar, there are two major speculative factors as far as the future is concerned: what will be the rate of inflation (which affects the AAAF) and what will be the level of comparable rent (which affects the Over-all Limitation)? Each of these factors affects how each year's damages must be calculated and any attempt to predict what those factors will be over the fifteen years left in the HAP Contracts would be an impossible exercise. Accordingly, CMHA respectfully requests the Court to adopt the exceptions to the merger or bar rules and reserve CMHA's right to bring future claims under the HAP Contracts.

Two questions result from this approach: will CMHA's future breaches be precluded by the statute of limitations? And will this approach result in protracted future litigation which the merger and bar rules are designed to prevent? The answer to both questions is no.

For purposes of the statute of limitations, a claim does not accrue until the injured party has suffered damages. *Tennessee Valley Auth. v. United States*, 60 Fed. Cl. at 678. Neither party terminated the subject contracts. CMHA will not suffer damages for the future breaches until HUD denies the requested increases. *See Franconia Assoc. v. United States*, 536 U.S. 129, 139, 122 S.Ct. 1993, 2000 (2002). Under the federal statute of limitations, CMHA will have six years from each future breach to bring a new claim. 28 U.S.C. § 2501; *Tennessee Valley Auth.*, 60 Fed.Cl. at 678.

Neither will this approach result in protracted litigation. Although the parties can litigate future *claims*, HUD cannot re-litigate the *issues* that have been litigated to finality in this case. Under the doctrine of issue preclusion, a "right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction as a ground of recovery cannot be disputed in a subsequent suit between the parties." Moore's Federal Practice, § 132.02. *Accord Adrienne Village v. U.S.,* 25 Cl.Ct. 457, 460 (1992); *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 341 (C.A.Tex. 1982); *GAF Corp. v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1211 (D.C.N.Y. 1981), particularly footnote 2.

This case will be litigated to finality. As to the future, the parties will be the same: CMHA and HUD/USA; the issues of breach will be the same; and the method to calculate damages will be the same. This Court, in its judgment, can make findings on each of the issues raised and thereby preclude future litigation of same. The only remaining issues for litigation as to the future claims will be whether HUD refused to grant the requested increases and the applicable damages for that year.

As a practical matter, the parties can stipulate to facts such as the AAAF and comparable rent as they have done here. This will avoid the need for protracted litigation in the future. With

the preclusive findings in this case, HUD will know it cannot re-litigate those issues and should settle each year's claim without resort to litigation.

CMHA requests the Court to adopt the exceptions to the merger or bar rules and expressly reserve CMHA's right to bring future actions as the annual breaches occur.

**Question No. 2: (Enforceability of Legislation Provisions Repudiating Contract)**

The Court's question is two-fold: (1) whether the specific provisions of legislation that repudiate only certain provisions of an existing contract are enforceable in determining damages for a breach, and (2) whether CMHA is required to comply with the Federal legislation that effectuated that breach. Within the first question, the Court inquired if it makes a difference if the subject provision effectuated the breach or if the provision adopted a new requirement unrelated to the breach.

The Court should not consider the enforceability of the breaching provisions in calculating damages. They are irrelevant for at least two independent reasons. First, a party's expectancy interest should be measured as it existed prior to the breach. To do otherwise here is to allow HUD—the breaching party— to reap the benefits of its own breach. *See, e.g.*, *Kansas v. Colorado*, 533 U.S. 1, 11, n. 4 (2001) (courts should not allow breaching parties to reap the benefits of their breach). *Accord Billings Associates, Inc. v. Basham* , 27 A.D.2d 124, 276 N.Y.S.2d 446 (1967). Second, any compliance with the breaching provisions will not result in mitigation of damages.[1] To the contrary, CMHA's compliance with Directive 95-12 will increase HUD's damages because it will have to compensate CMHA for the comparability studies.

[1] The Government argues that damages could have been mitigated by applying for each year's increases at that time because HUD would have granted increases up to the amount of the Sum. This is a technical argument without substance because if the lesser damages are combined with the amount then granted, the result is the same amount of damages as CMHA is seeking.

With respect to the second question, it is necessary to distinguish 1) the provisions of legislation and the specific provisions of HUD issuances, such as the Directive, implementing those legislative provisions which caused the breach, from 2) the provisions of the agency issuance which have no basis in legislation. Where an agency issuance has no authorization by legislation, it is unlawful and not enforceable. *See* 5 U.S.C. §706(2)(D); *Oregon v. Ashcroft*, 368 F.3d 1118, 1125, 1129 (9th Cir. 2004).

The provisions of Directive 95-12 required CMHA to provide a comparability study; deduct 1% from the AAAF for non-turnover tenants; limit any adjustment of rent to the sum of comparable rent plus the initial difference ("Sum"); and not make any provision for a material difference from said Sum. These provisions all reflected the 1994 Amendments. However, the 60-Day Requirement in the Directive did not have any authorization by legislation and was strictly HUD's own creation. In fact, this Court so found in its Opinion. *See*, Opinion, at 15.[2] Accordingly, the 60-Day Requirement is not enforceable against CMHA, and it does not have to comply with it.

CMHA agrees that it is obligated to comply with the new legislation and the Directive insofar as the Directive carried out the 1994 Amendments. It has to go through the motions of providing the comparability study, and HUD is legally obligated to deduct 1% from its factor for non-turnover units and not provide a material difference factor in calculating the material difference even though that requirement and HUD's actions effectuate breaches of the HAP Contracts.

[2] The decision is published at *Cuyahoga Metropolitan Housing Auth. v. United States*, 57 Fed. Cl. 751 (Sept. 22, 2003). For the Court's convenience here, CMHA will cite to the decision as "Opinion" and provide the page citation within the Opinion.

The above cited statutory provisions and Directive provisions are related to the breach because they required HUD to perform in a way contrary to the provisions of the HAP Contracts. Where legislation and implementing agency issuances require the agency to perform contrary to the material terms of a contract, each of those performance events is part of the breach of the contract. *See* Opinion, p. 15 (Sept. 22, 2003).

At oral argument, the Court was concerned that its holding may create an anomaly where CMHA is subject to a different statutory scheme than that imposed on other HAP contractors:

> We do an expectation thing but at some point you're subject to the legislation. Because we can't have a situation in which one party in the world here stumbled off on one particular statutory regime that no longer exists while the rest of the world proceeds along the path of the existing statute.

Transcript of Oral Argument, p. 100 (June 18, 2004). Sometimes, legislatures grandfather old contracts in new legislation. *See, e.g.*, *Doyon, Ltd. v. United States*, 214 F.3d 1309, 1311, n. 1 (Fed.Cir. 2000) (Congress grandfathered existing contracts in repealing § 60(b)(5) of the Deficit Reduction Act of 1984); *C.D.S., Inc. v. Village of Gates Mills*, 26 Ohio St.3d 166, 168, 497 N.E.2d 295 (Ohio 1986) (operations predating legislation grandfathered in its enactment). Congress did not do so here, and CMHA is subject to the legislatively authorized provisions. However, such provisions constituted a breach of its contracts and the Government should not be allowed to reap the benefits of its breach in calculating damages.

**Question No. 3: (State Case Law on Party's Inability to Control the Contract Price)**

The United States through the passage by Congress of the 1994 Amendments has placed itself in a position where it is legally unable to perform in accordance with the provisions of the HAP Contracts. State law employs the standard expectancy damages for breaches of contract. *See* Williston on Contracts, § 64:2 (4th ed.); *Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (amout of money that would put the promisee in the same position as if the promisor had

performed the contract) (*citing* Restatement (Second) of Contracts, Section 347, comment a). *Accord Boston v. Sealmaster Indus.*, 2004-Ohio-4278, at ¶ 30 (Ohio Ct. App. 2004) ("being put in as good a position as he would have been had the contract been performed"). It also excuses a party's performance in cases where such performance becomes impracticable or impossible. *See* Am Jur. Contracts, Section 661 (May 2004). However, in order to do so, the party seeking to eschew performance under the contract must show that the impracticability did not result from its own fault:

> The party that claims that a supervening event or 'contingency' prevented performance must meet four requirements. First, the event must have made 'performance as agreed . . . impracticable.' Second, the nonoccurence of the event must have been 'a basic assumption on which the contract was made.' Third, **the impracticability must have resulted without the fault of the party seeking to be excused.** Fourth, the party must not have assumed a greater obligation than the law imposes. (Emphasis added)

Farnsworth, *Contracts*, § 9.6 (3rd edition) (emphasis added). *Accord Taylor-Edwards Warehouse & Transfer Co., of Spokane, Inc. v. Burlington Northern, Inc.*, 715 F.2d 1330, 1336 (9th Cir. 1983).

Section 264 of Restatement (Second) of Contracts also addresses a party's ability to perform under the contract. In its fifth illustration, it posits a situation where A and B contract, but B is unable to perform because he is convicted and jailed. Because it was B's fault that made it impractical for him to perform, B is liable to A for breach of contract. As this Court found in its Opinion, Congress changed the law in 1994 specifically to evade its obligations under the HAP Contracts. Opinion, at 35 (Sept. 22, 2003). HUD cannot therefore claim that the impracticability relieved it from performance. It knowingly created the impracticability.

The Restatement (Second) of Contracts provides that the injured party has a right to damages based on its expectation interest as measured by:

(a) the loss in the value to him[it] of the other party's performance caused by its failure or deficiency, plus
(b) any other loss, including incidental or consequential loss, caused by the breach, less
(c) any cost or other loss that he has avoided by not having to perform.

Restatement (Second) of Contracts, Section 347. There is no excuse from performance as demonstrated above, and CMHA is therefore entitled to the difference between what the HAP Contracts provide (the value of HUD's performance under the contract terms) and what HUD has paid along with the other loss occasioned by CMHA having to obtain comparability studies.

**Question No. 4: (120% Limitation)**

To be clear: CMHA only seeks the AAAF-adjusted rents to which it is entitled under the HAP Contracts. These adjusted rents are subject to an overall limitation of 120 percent of the sum of comparable rent and initial difference (120% Limitation). If the AAAF-adjusted rents exceed the 120% Limitation, a material difference results and the AAAF adjusted rents are capped at the 120% Limitation. If the AAAF-adjusted rents are less than the 120% Limitation, no material difference results and CMHA only receives the AAAF-adjusted rents. This position is well grounded in the HAP Contract terms and the law.

The HAP Contracts provide for an overall limitation as follows:

> Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the intial Contract Rents.

HAP Contract, Section 1.8(d) (copy attached as Exhibit A to Plaintiff's Complaint). It is undisputed that the first clause of that provision has built into it substantial HUD discretion. It grants HUD discretion to determine comparable rent and material difference. HUD must exercise its discretion without abusing it. *See Park Village Apts.*, 32 Fed. Cl. 441, 447, n. 4 (1994).

However, CMHA suggests that the wording of the second clause of that provision does not give HUD the discretion to determine the initial difference. How has HUD exercised its discretion in regard to the first clause? Prior to the 1994 Amendments, it focused on defining "material difference" and left comparable rent to be determined by appraisal. The last definition of "material difference" was embodied in the 1986 Memorandum and has not been changed since then.

Courts have addressed the exercise of that discretion in a number of decisions. *See National Leased Housing Assn. v. United States*, 22 Cl.Ct. 649 (Mar. 1, 1991); *Park Village Apts v. United States*, 25 Cl. Ct. 729 (1992); *Park Village Apts. v. United States*, 32 Fed. Cl. 441 (1994), aff'd 105 F.3d 1612 (Fed. Cir. 1997); *National Leased Hous. Assn. v. United States*, 32 Fed. Cl. 454 (1994), aff'd 152 F.3d 943 (Fed. Cir. 1998). *See also Sheridan Square Partnership v. United States*, 761 F.Supp. 738, 743, n. 2 (D. Colo. 1991). They consistently held—based on HUD's 1986 Memorandum—that a material difference only exists when the adjusted Section 8 rent exceeds 120 percent of the sum of the comparable rent and initial difference. *Id.*

In *Park Village Apartments v. United States*, 32 Fed.Cl. 441 (Dec. 21, 1994), the Court did not leave any wiggle room for material differences to exist between 0 and 20 percent. It held that a material difference only exists if the difference is over 20%, whether the adjusted rent was above or below the sum of comparable rent and initial difference. It explained that the 120 percent factor allows for a "fairly substantial difference in rents **before** that difference is held to be material." *Id.* at 453 (emphasis added). The policy rationale for establishing such a difference was to avoid having to do comparability studies as part of its ordinary procedure at significant increase in cost to HUD. It noted that the difference between $500 and $600 is 20 percent, and

the $100 difference is substantial from the perspectives of both the tenants and the project owners. But it upheld the 120 percent threshold:

> If HUD had classified small percentage differences in rents as 'material,' then HUD would be required to base many more adjustments on comparability studies. As a result, HUD's costs would increase significantly and comparability would become an ordinary rather than extraordinary method for calculating Section 8 contract rents. On the other hand, if HUD limited material differences to very high percentage differences, then the safety net would seldom save. HUD's selection of a 20 percent differential as the minimum threshold for materiality appears to represent a reasonable balance of the competing factors embodied in Section 1.8 of the HAP contracts and hence, a reasonable exercise of the discretion allowed HUD in Section 1.8(d).

*Park Village Apts.*, 32 Fed.Cl. at 453.

The Court reached the same conclusion in *National Leased Housing Assn. v. United States*, 32 Fed.Cl. 454 (1994). It again held that no material difference exists between 0 and 20%. Instead, a material difference only results if the AAAF-adjusted Section 8 rent is above the 120 percent threshold:

> [T]he overall limitation does not prohibit every difference between rents charged for assisted and comparable unassisted units. The overall limitation proscribes only material differences, and since 1986, HUD has interpreted material differences according to a 1986 HUD memorandum which provides that 'a material difference exists whenever the adjusted Section 8 rent would exceed 120 times the sum of the comparable rent and the initial difference.' This approach appears to be a reasonable application of the overall limitation, and therefore, given the 120 percent threshold, the overall limitation should apply only in exceptional circumstances.

*National Leased Housing Assn.*, 32 Fed.Cl. at 466 (internal citations omitted).

The Court also held that the 120% Limitation does not only apply as a ceiling but also as a floor. *Park Village Apartments* presented a fact pattern that is opposite to the facts of this case: the AAAF-adjustments resulted in below-market rents. The Court held that a symmetrical approach applies "if the 20 percent differential is employed where AAAF-based contract rents would be too high, then the mirror image approach should be employed where AAAF-based

contract rents would be too low." *Park Village Apts.*, 32 Fed.Cl. at 453. As such, the Court held that the 120 percent approach applied not only as a ceiling but also as a floor. *Id.* It found that using the 120 percent cap as a ceiling and a floor gives HUD an incentive to establish a reasonable threshold because it can cut both ways. A "comparability check helps project owners when the AAAF-based rents trail comparable rents, but helps HUD when the AAAF-based rents exceed comparable rents." *Id.*

HUD now argues that the general overall limitation only consists of the sum of comparable rent and initial difference ("Sum"). It further argues that that Memorandum also provides an average operating cost exception which allows the general limit to be exceeded but in no case more than by 20%. Normally, an agency's construction of its own regulations is entitled to substantial deference by the courts. *Norfolk Southern Railway Co. v. Shankin*, 529 U.S. 344, 385 (2000). However, this deference does not apply when a later interpretation is inconsistent with what the court has previously adopted as the correct interpretation at the urging of the agency. *Id.* It is interesting to note that HUD not only consistently interpreted its 1986 Memorandum as providing only for the 120% Limitation in this Court, but also in the Federal District Court in Colorado. *See Sheridan Sq.*, *supra*. It is interesting to note that HUD not only consistently urged the 120% Limitation interpretation in this Court, but also in the Federal District Court in Colorado. *Id.*.

If HUD disagrees with the courts' interpretation of the 1986 Memorandum, HUD had the power to amend it. It did not. The changes made by the 1994 Amendments and Directive 95-12 did not mention "material difference." In fact, they ignored it. The 1986 Memorandum cannot be read at this late date in a vacuum and ignore the Courts' prior interpretation of it. Accordingly, this Court should affirm its previous interpretations of

the 1986 Memorandum, the last pronouncement on material difference, and hold that the 120% Limitation is the correct limitation for adjustment of rents for CMHA's contracts.

Respectfully submitted,

Dated: August 23, 2004

/s/ Fred J. Livingstone
Fred J. Livingstone (Ohio No. 0009528)
*flivingstone@taftlaw.com*
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 (facsimile)

*Attorney for Plaintiff*

Of Counsel:

Mark J. Valponi (Ohio No. 0009527)
Majeed G. Makhlouf (Ohio No. 0073853; District of Columbia No. 481643)
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838

**CERTIFICATE OF SERVICE**

This is to certify that on August 23, 2004, a copy of the foregoing *Supplemental Brief Submitted in Response to the Court's June 22, 2004 Order* was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ Fred J. Livingstone
Fred J. Livingstone (Ohio No. 0009528)
*flivingstone@taftlaw.com*
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 (facsimile)

*Attorney for Plaintiff*