# In the United States Court of Federal Claims

Nos. 01-46C, 01-251C, 01-416C

(Filed: June 2, 2005)

_____

|  |  |  |
|---|---|---|
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | * | Summary judgment; Breach of contract; HUD section 8 housing program; HAP contracts; 1994 amendments to Housing Act of 1937; |
|  | * | HUD Notice 95-12; Damages; One-percent |
| Plaintiff, | * | rule of 42 U.S.C. § 1437f(c)(2)(A); Expectancy |
|  | * | damages; Legal impact of law effectuating a |
| v. | * | breach; Causation v. mitigation; Construction |
|  | * | of overall limitation in HAP contracts and 42 |
| THE UNITED STATES, | * | U.S.C. § 1437f(c)(2)(C); Judicial estoppel; |
|  | * | Cost of comparability studies; Prejudgment |
| Defendant. | * | interest. |

_____

### OPINION

_____

*Fred Joseph Livingstone*, Taft, Stettinus & Hollister, Cleveland, OH, for plaintiff.

*Andrew P. Averbach*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Assistant Attorney General Peter D. Keisler*.

**ALLEGRA, Judge:**

> *"If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach."*[1]

This is the second leg of a jurisprudential voyage having its genesis in a series of contracts entered into between the plaintiff, Cuyahoga Metropolitan Housing Authority (CMHA or plaintiff), and the Department of Housing and Urban Development (HUD) to provide low-income housing under the United States Housing Act of 1937 (the Housing Act). This court previously held that plaintiff's rights under these contracts were repudiated by Congress in 1994, when it amended the Housing Act to alter how rent subsidies were to be determined. *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 762 (2003) (*CMHA I*). That repudiation was exacerbated, this court further opined, when HUD, in a 1995 directive, imposed additional requirements on obtaining rent increases that were not envisioned in either the contracts or the

_____

[1]  *Globe Ref. Co. v. Landa Cotton Oil Co*., 190 U.S. 540, 544 (1903) (Holmes, J.).

1994 legislation.  *Id.*  In so concluding, the court rejected defendant's banner defense – that no repudiation or breach arose under the so-called unmistakability doctrine.  *Id.* at 777-80.  At issue in the pending cross-motions for partial summary judgment are what damages are awardable for the resulting partial breaches of the HAP contracts.

## I.    BACKGROUND

A detailed recitation of the factual and statutory background of this case may be found in this court's prior opinion.  *Id.* at 752-58.  This court will rehearse here only those details necessary to provide context, filling in a few additional facts as necessary.

In 1974, Congress amended the Housing Act of 1937 to create what is known as the Section 8 housing program.  *See* 42 U.S.C. § 1437f.  Under the program, tenants make rental payments based on their income and ability to pay; HUD then makes "assistance payments" to the private landlords to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD.  42 U.S.C. §§ 1437a(a), 1437f(c)(3); *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997) (describing the program); *CMHA I*, 57 Fed. Cl. at 753-55 (same).  In 1978 and 1979, CMHA and HUD entered into three Housing Assistance Payments ("HAP") contracts under this program.  Each contract concerned one of three properties: Quarrytown Tower Apartments (Quarrytown), with 180 one-bedroom units; Severance Tower Apartments (Severance), with 190 one-bedroom units; and Ambleside Tower Apartments (Ambleside), with 201 one-bedroom units.  The contracts' anniversary dates are January 31, May 1, and August 15, respectively.

The framework for these contracts was governed, in part, by 42 U.S.C. § 1437f(c)(1), under which an initial maximum monthly contract rent was established for each dwelling unit.  As originally enacted, 42 U.S.C. §1437f(c)(2) provided for adjustments in this maximum monthly rent thusly –

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

> \*          \*          \*          \*          \*

> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(A) and (C) (1982).  The HAP contracts in question implemented these provisions by providing that adjustment of rents will be made annually on the basis of a

reasonable formula, subject to an "overall limitation" preventing adjustments from producing material differences between the rents at comparable assisted and unassisted units.

The annual adjustment was implemented through Section 1.8b ("Automatic Annual Adjustments") of the HAP contracts, which provides, in pertinent part –

> (1)     Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. . . .

> (2)     On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Consistent with 42 U.S.C. § 1437f(c)(2)(C), the HAP contracts also contain, in Section 1.8d, an "Overall Limitation," that states:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HUD regulations in effect at the time the contracts in question were executed mirrored these requirements. *See* 24 C.F.R. § 880.609(c) (1979). To protect the differences which "may have existed with respect to the initial Contract Rents," HUD developed what is known as the "initial difference," equal to the difference between the initial Section 8 contract rents and the original comparables.[2]

---

[2]  On January 14, 1986, HUD's Deputy Assistant Secretary for Multifamily Housing Programs issued a memorandum setting forth two alternate ways for determining whether a material difference exists. This memorandum explained that a material difference would exist "whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference" or where –

> (1) The adjusted Section 8 rent would exceed the correlated unassisted rent for comparable units by more than the initial difference for that unit type.

In the early 1980s, HUD began using "comparability studies" – surveys of rents at comparable unassisted buildings – to enforce the "overall limitation" in its various HAP contracts. This practice was challenged in court as violating the contracts. Attempting to resolve this litigation, Congress, in 1987, added the following sentence to section 1437f(c)(2)(C): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988), *codified at* 42 U.S.C. 1437f(c)(2)(C). But, litigation over the rent adjustment method continued, prompting Congress, in 1989, to enact Section 801 of the Reform Act (the Reform Act), Pub. L. No. 101-235, 103 Stat. 2057-2059 (codified at 42 U.S.C. 1437f(c)(2)(C) (Supp. II 1990) and 42 U.S.C. 1437f note (Supp. II 1990)). The Reform Act prescribed new procedures for calculating rent adjustments. Retrospectively, it required HUD to pay landlords an increased amount, above what the studies required HUD to pay under its interpretation of the contracts; prospectively, it established a limited role, under defined criteria, for HUD's future use of comparability studies.

The Reform Act required HUD to promulgate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments . . . would result in such material differences" between assisted and unassisted units, and to use those studies to establish a "modified annual adjustment factor" for a geographically smaller area. § 801(c), 103 Stat. 2058 (1989). The statute described, in detail, the methodology the Secretary was to use in conducting these studies. It also stated that if a modified adjustment factor could not be established or failed to eliminate material differences between rents at comparable assisted and unassisted units, the Secretary could employ another methodology "for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units." *Id.* In keeping with those provisions, HUD promulgated regulations to govern the conduct and use of comparability studies to generate modified adjustment factors, and, in cases in which such factors were ineffective, to provide for a system of adjusting rents through comparability studies. *See* 24 C.F.R. § 888.301 *et seq.*. In 1993, the Supreme Court, in *Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993), upheld the amendments to section 801 made by the Reform Act.

Following *Alpine Ridge*, Congress remained concerned that subsidized rents were still higher than warranted. In response, it amended section 1437f(c)(2)(A) of Title 42 by adding the following language:

---

(2) The adjusted Section 8 rents would exceed the amount needed to 'operate' comparable projects.

An attachment to the memorandum set forth guidelines for determining the amount needed to operate comparable projects.

However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) ("the 1994 Act" or "1994 amendments"). The 1994 Act provided that the amendment "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under section 8(c)(2)(A) of [the United States Housing Act of 1937] by applying an annual adjustment factor." *Id.* Subsequent amendments cumulatively made the provision applicable to "fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, during fiscal year 1999 and thereafter."[3]

The 1994 Act made at least one other potentially significant change – reducing the annual adjustment factor in situations where a given unit was occupied by the same tenant during a prior year. In this regard, the amended statute provided:

Except for assistance under the certificate program, for any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0. In the case of assistance under the certificate program, 0.01 shall be subtracted from the amount of the annual adjustment factor (except that the factor shall not be reduced to less than 1.0), and the adjusted rent shall not exceed the rent for a comparable unassisted unit of similar quality, type, and age in the market area.

Pub. L. No. 103-327, 108 Stat. 2298 at 2315 (1994) (codified at 42 U.S.C. § 1437f(c)(2)(A)). As with the modification above, this "1-percent deduction" was originally applicable only during

---

[3] *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub. L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub. L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

fiscal year 1995, but subsequently was extended to cover "fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter."[4]

On March 7, 1995, HUD issued Notice 95-12, by its terms designed "[t]o effect all applicable contracts with HAP anniversary dates from [March 7, 1995] to the end of Federal [fiscal year] 1995 (through September 30, 1995)." This directive prescribed, with exceptions not herein relevant –

> If current project rents on a . . . contract (before the application of the AAF) are above the published [fair market rent] for the area then in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date, form HUD 92273, Estimates of Market Rent by Comparison, . . . completed by a non-identity of interest, state certified, general appraiser, FOR EACH UNIT TYPE (e.g. 1BR, 2BR, etc.). This form must contain at least three examples of unassisted housing in the same market area of similar age, type and quality.

Regarding the consequences of not filing a comparability study, the notice indicated –

> If the owner fails to submit the information required by this Notice at least 60 days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date, rather the new rent levels will go into effect 60 days after receipt of the required information. However, if the owner fails to submit this information by the date of the FY 1996 HAP contract anniversary, then no increase will be granted for the FY 1995 contract year.

At several other points, the notice reiterated the consequences of not filing a timely request for increase.[5]  According to the directive, if the owner demonstrated that comparable, unassisted rents were more than five percent over contract rents, HUD would increase contract rents to the lesser of: (i) contract rents adjusted according to the AAAF; or (ii) the comparable, unassisted rent plus the so-called "initial difference."[6]  Although Notice 95-12 expired, by its terms, on

---

[4]  *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub. L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub. L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

[5]  For example, at another point, it stated that – "[i]f an owner does not request an increase or fails to submit a request based on the guidelines in this chapter, then the rents will remain the same as the current contract rents, unmodified by HUD or the Contract Administrator."

[6]  The directive gave several examples of how these rules should be implemented, including one in which the project was eligible to receive the AAAF based on the comparable and another in which the project was eligible only for the comparable rents.

September 30, 1995, later notices reinstated and made permanent its provisions.  *See, e.g.,* HUD Notice 97-14 (March 17, 1997); HUD Notice 00-14 (Aug. 9, 2000).[7]

Except as noted below, CMHA last received rent adjustments based upon published AAAFs in 1994.[8]  CMHA took no action with regard to contract rent adjustments until 1999, when it requested payment of the past due annual rent increases that HUD failed to make after the 1994 contract year.  CMHA first provided information regarding comparable unassisted units for Quarrytown on November 17, 2000, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $560 contract rent in every year from 1995 through 2000.  On January 23, 2001, it filed complaint No. 01-46C in this court, seeking contract rent increases for Quarrytown for 1995 through 2000.  On January 26, 2001, HUD retroactively increased Quarrytown's 1995 rents to $576, after determining that Notice 95-12 did not apply to 1995 for Quarrytown because of its effective date.

---

[7]  These notices all contain provisions that do not require HUD field offices to revisit rent increases based on AAAFs approved during periods that notices were not in effect.  For example, Notice 95-12 stated:

> If the Field Office has already issued the rent increase approval letter and/or a new Rent Schedule implementing the [AAAF](s) for FY 1995, these rents will remain the approved rents regardless of whether or not they have been made effective at the property by the issuance date of the Notice.  If a Field Office has approved the application of the AAF to contract rents, for FY 1995, the approved rents will not be reconsidered under the procedures of this Notice.

Notably, while Notice 95-12 did not provide a procedure for waiving any of its requirements, subsequent notices appear to contain such a provision.  For example, HUD Notice 97-14 indicated that "the provisions for comparability where gross project rents exceeded FMR and lower [AAAF]s for units with no-turnover" could be waived via "explicit approval of the Assistant Secretary of Housing – FHA Commissioner."

[8]  The following chart reflects the 1994 rents and compares them to the initial rents and "initial difference" for each property

| Name | Initial Contract Rent | Initial Difference | 1994 Contract Rent |
|------|----------------------|--------------------|--------------------|
| Quarrytown | $310 | $62 | $560 |
| Severance | $299 | $61 | $572 |
| Ambleside | $298 | $60 | $575 |

As for Severance, CMHA first provided comparability information for that property on March 2, 2001, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $572 contract rent in every year from 1995 to 1997.  On March 27, 2001, HUD retroactively increased the 1996 Severance rents to $582 after determining that Notice 95-12 did not apply to the property for 1996.  On April 26, 2001, CMHA filed complaint No. 01-251C in this court, seeking contract rent increases for Severance for 1995 through 2000.  On May 16, 2002, HUD increased Severance contract rents to $601 for 2000, and to $603 for 2001.

Lastly, CMHA provided its first comparability study for the Ambleside property on May 15, 2001, indicating that the sum of comparable rents plus the initial difference did not exceed the 1994, $575 contract rent until 1997.  On July 17, 2001, CMHA filed complaint No. 01-416C in this court, seeking contract rent increases for Ambleside for 1995 through 2001.  On March 19, 2002, HUD retroactively increased 1996 Ambleside rents to $585, and on May 16, 2002, increased contract rents for Ambleside for 2000 to $604, and for 2001 to $606.  On September 26, 2003, Cuyahoga filed an amended complaint with respect to the Ambleside property, seeking damages for 2001.

Thus, in approximately the first half of 2001, CMHA filed three independent actions in this court – one per project.  On July 24, 2001, this court ordered the cases consolidated. Thereafter, the parties filed cross-motions for summary judgment.  On September 22, 2003, this court concluded that plaintiff's rights under these contracts were repudiated when Congress, in 1994, amended the Housing Act to alter how rent subsidies were to be determined, which repudiation was exacerbated when HUD issued and then followed Notice 95-12.  *CMHA I*, 57 Fed. Cl. at 762.  The court, however, ruled that, based upon the pending motions, it was unable to resolve the damages to which plaintiff was entitled, stating:

> Finally, both parties would have this court press ahead and consider specifically what damages are owed CMHA. On brief, plaintiff proceeds from the notion that this court's rejection of defendant's unmistakability doctrine argument means that the 1994 amendments do not apply to it and that, instead, it is entitled to the adjustments owed under the original HAP contracts. For its part, defendant contends that the court should enter judgment in its favor to the extent that CMHA failed to timely demonstrate entitlement to contract rent increases under the 1994 amendments. At this point, both contentions seem wrong--this court does not hold that either the 1994 amendments or the 1995 HUD directive are inapplicable to CMHA, as would be the case, for example, were such amendments unconstitutional or the directive invalid; rather; it holds that the amendments and the directive ultimately effectuated a breach of plaintiff's HAP contracts. In the court's view, this means that plaintiff is entitled to whatever damages are appropriate, under the circumstances, on account of that breach. In theory, such damages may hinge on the extent of the breach here and likely will fall within the traditional categories of expectancy, reliance or restitution damages. As such, they may or may not track those damages that have been awarded in *Winstar* savings

and loan cases, such as *LaSalle Talman Bank v. United States*, 317 F.3d 1363
(Fed. Cir. 2003) and *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348 (Fed.
Cir. 2001). To determine this, however, the court believes that additional briefing
and, potentially, fact-finding is required.  Accordingly, the court declines to award
any damages at this time.

*CMHA I*, 57 Fed. Cl. at 781.  Subsequently, the parties filed cross-motions for partial summary
judgment zeroing in on damages issues.  Oral argument on those motions was held on June 18,
2004.  Thereafter, the court ordered two rounds of supplemental briefing that addressed various
issues.[9]  That briefing has now been completed.

## II.    DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the
moving party is entitled to judgment as a matter of law.  RCFC 56; *Hunt v. Cromartie*, 526 U.S.
541, 549 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

CMHA essentially seeks two types of damages.  First, it claims expectancy damages
based upon HUD's failure to adjust its rents by application of the AAAFs subject to the overall
limitation.  Significantly, plaintiff contends these adjustments should be made: (i) without regard
to the 1-percent deduction for units with no turnover, as required by 42 U.S.C. § 1437f(c)(2)(A),
as amended by the 1994 Act; and (ii) employing an overall limitation equal to 120 percent of the
sum of the comparable rents and the so-called "initial difference."  Second, CMHA seeks
restitution damages to cover the cost of the comparability studies it has submitted to HUD in
connection with the requested annual adjustments.  While defendant has little quarrel with the
latter category of damages, it strenuously objects to the first.  On the latter count, it remonstrates,
*inter alia*, that expectancy damages are not recoverable here because plaintiff failed to comply
with the new rent adjustment procedures set forth in the 1994 amendments and Notice 95-12.
Defendant also asserts that, in calculating damages here, there is neither basis upon which to
disregard the 1-percent deduction required by section 1437f(c)(2)(A), nor grounds to support
plaintiff's limning of the overall limitation.

_____

[9]  Specifically, the court ordered the parties to provide their views on four issues:
(i) whether the repudiation of a contract by legislation results in a series of breaches or in a single
breach marked, at the latest, by the time of filing suit; (ii) whether the specific provisions of
legislation that repudiate a prior contract are enforceable in determining damages for a breach
and, if so, under what circumstances; (iii) how damages are calculated where the breaching party,
by virtue of his breach, puts himself in a position where he can no longer regulate the contract
price under the terms of the original agreement; and (iv) whether the "material difference"
threshold – allegedly, 120 percent of the comparable rent plus initial difference – is not only a
ceiling that cannot be exceeded, but also a floor on the rent to which plaintiff is entitled.

### A.      Did the One-Percent Rule in the 1994 Act Effectuate a Breach?

The first ruling herein dealt exclusively with liability issues; this second was to deal with damages.  Yet, in its pending motion, CMHA elliptically argues – for the first time in this case – that the 1994 Act effectuated a breach by reducing the AAAFs by 1 percent "for any unit occupied by the same family at the time of the last annual rental adjustment."  42 U.S.C. § 1437f(c)(2)(A).  It claims that this court's prior opinion "recognized that the [1994] Amendments were proposed to Congress by HUD and adopted by Congress as a way to save money on its HAP contracts" and asseverates that because the 1-percent deduction was part of this "money-savings package," it also gave rise to a breach.  But, the second proposition does not flow from the first – that the 1-percent modification of the AAAF formula for occupied properties reduced program costs does not, *ipso facto*, mean that it was inconsistent with any of the provisions of the HAP contracts.  In relevant terms, those contracts merely provide that "Automatic Adjustment Factors will be determined by the Government at least annually," and that "[s]uch Factors and the basis for their determination will be published in the Federal Register."  Nothing in this language suggests that there will be a single, monolithic factor for all units at a given property or that Congress could not authorize HUD, in determining the AAAF for a given unit, to make a different adjustments for those in which no turnover had occurred.  Accordingly, there is no indication that the statutory 1-percent deduction constituted the abrogation of any right or obligation established under the HAP contracts.  *Cf. Franconia*, 61 Fed. Cl. at 732-33; *CMHA I*, 57 Fed. Cl. at 762.  On this issue, this court need go no further.[10]

### B.      Expectancy Damages Based Upon the Failure to Make Adjustments

Plaintiff's primary claim is that it is entitled to expectancy damages corresponding to the rent adjustments it would have received but for the partial breach of its HAP contracts.  "The general rule in common law breach of contract cases," the Federal Circuit has oft-stated, "is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed," *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997), in short, to give the injured party "the benefits [it] expected to receive had the breach not occurred."  *Glendale Federal Bank FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts, §

---

[10]   CMHA arguably waived this argument by failing to raise it in its motion for summary judgment on liability issues.  *See Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001).  Indeed, even in its current briefs, plaintiff deals with this issue in a cursory fashion.  But, plaintiff is not alone in belatedly raising new arguments regarding liability.  While claiming that it is not seeking reconsideration of this court's prior liability ruling, defendant, nonetheless, argues that HUD could require plaintiff to provide comparability studies under a provision in the HAP contract that requires owners to "furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government."  In the court's view, taken in the context of the entire contract, and particularly given the detailed adjustment provisions therein, there is no way that this clause could reasonably be construed to require owners to provide comparability studies as part of a revised adjustment regime.

344(1)(a)) (hereinafter "Restatement"); *see also Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 746 (2004).  Conversely, it is also axiomatic that "the non-breaching party should not be placed in a better position through the award of [expectancy] damages than if there had been no breach."  *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003).  As such, "[e]xpectation damages are recoverable provided they are 'actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty.'" *National Australia Bank v. United States*, 63 Fed. Cl. 352, 355 (2004) (quoting *Bluebonnet*, 266 F.3d at 1355).

### (1)    Availability of Expectancy Damages

The above principles are undisputed.  To facilitate resolution of the cross-motions, the parties also agree that: (i) any expectation damages recoverable here should be calculated by treating each contract year as giving rise to a separate breach; and (ii) to the extent expectation damages are allowable, the overall limitation should apply even though HUD did not prepare comparability studies during any of the relevant years and plaintiff supplied such studies later. The latter point represents a significant concession by CMHA, which, while seeking the equivalent of the rent adjustments, cedes that those adjustments remain subject to the overall limitation in the HAP contracts.  Finally, defendant apparently neither contests that the damages plaintiff seeks in the form of increased rents were "reasonably foreseeable" nor that these damages can be proven with reasonable certainty, at least, once certain parameters (*e.g.*, the overall limitation) are established.  At this juncture, the parties part company, adopting widely divergent courses.

In particular, they strenuously disagree as to whether expectation damages in the form of increased rents may be recovered for any of the years in which plaintiff did not provide a comparability study within the time periods set by Notice 95-12.  Recall, that notice requires, at a minimum, that the request and study be provided within the relevant contract year.[11]  But, the required documents were not so provided for the years remaining at issue, leading defendant to rejoin that by virtue of its failure to comply timely with Notice 95-12, CMHA may not receive the damage equivalent of the rent increases it seeks *via* this litigation.  In defendant's view, the rents in question were lost neither because of the passage of the 1994 amendments nor the adoption of Notice 95-12, but because plaintiff did not timely comply with the post-1994 regime for obtaining rent increases.  This nonfeasance, defendant maintains, constitutes both an intervening cause, severing the chain of causation between the breaches and the lost increases, as well as a failure to mitigate damages.  On both counts, it repeatedly stresses that the 1994 Act and Notice 95-12 (and the time limitations in the latter) are valid and fully apply to CMHA, despite the fact, of course, that these same authorities effectuated the breaches here.

---

[11]  To apply to an entire contract year, a request for adjustment and supporting study must, under Notice 95-12, be supplied at least 60 days prior to the beginning of the contract year; no increase would forthcoming under the notice if the request was not received during the relevant contact year.

Defendant views this case as boiling down to a simple "fast-fish, loose-fish" distinction:[12] without exception, either one submits a timely and complying request for a rent increase or can never receive that increase, either directly or in the form of damages. But, while defendant views this proposition as almost self-evident, it most certainly is not – as was said of Melville's "Moby Dick," there is more here than a simple story about a fish.

There is no real debate that the 1994 Act is the law of the land. But, that says nothing about whether plaintiff may recover expectation damages, for the issue here is not the validity of the 1994 Act, but how that statute impacts, if at all, within the established analytical framework governing the availability of expectation damages. Defendant would go further and ascribe to the statute an overarching impact – one that transcends any of the specific prongs of the expectation damages analysis and overtrumps plaintiff's right to such damages based on its failure to comply with the new rent adjustment regime. But, in so contending, defendant seemingly dons blinders to a critical point, *to wit*, that expectation damages, by design, provide a claimant "the benefits [it] expected to receive **had the breach not occurred**," *Glendale Federal Bank*, 239 F.3d at 1380 (emphasis added); *see also LaVan v. United States*, 382 F.3d 1340, 1350 (Fed. Cir. 2004); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004) (quoting Restatement § 344 cmt.a) ("[c]ompensation of a party's expectation interest 'attempt[s] to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach.'"). Logic suggests that, consistent with the theory of expectation damages, this court cannot afford controlling and preclusive effect to the very statutory provisions that triggered the breach. Defendant cites no case to the contrary – and there is none. Certainly, no case involving a statutorily-triggered breach of contract has treated the offending statute as insulating the government from damages. To the contrary, in determining expectation damages, courts have disregarded the breaching provisions in determining, for example, what profits a plaintiff would have received but for the passage of the statute.[13]

Were the law otherwise, Congress could negate, with impunity, the inflation adjustment provisions in any government contract merely by adopting a moratorium on increases – such a law would breach prior contracts, but assertedly not require the payment of damages. This scenario, if effective, would reduce the notion of having enforceable government contracts to a

---

[12]  *See* Herman Melville, *Moby-Dick: or, the Whale* ch. 89 (1851).

[13]  *See, e.g., Comm. Fed. Bank v. United States*, 59 Fed. Cl. 338, 350-51 (2004) (calculating expectation damages in *Winstar*-type case by estimating what plaintiff's profits would have been in the "but-for world" of the previously existing capital requirements); *Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 53, 55 (2001) ("It is immaterial whether, for purposes of calculating plaintiff's damages by hypothesizing a "no breach" world that differs from the real world only by eliminating the breach, the resulting scenario is unrealistic. Any scenario that assumes that plaintiff's contract was not breached is in some measure unrealistic, since it assumes away all the events that led to that breach of contract.").

whimsy, unleashing the same sort of intense legal discomfort that led this court soundly to reject defendant's unmistakability defense.  *See CMHA I*, 57 Fed. Cl. at 777-80; *see also United States v. Winstar*, 518 U.S. 839, 921-22 (1996) (Scalia, J., concurring) (noting that broad application of the unmistakability defense would render government contracts "illusory").  Although the circumstances *sub judice* are less startling, this case is fundamentally no different – as with the moratorium, defendant seeks to invoke here provisions of a statute that the theory of expectation damages treats as nonexistent.  The decisional law demonstrates that, for a statute to have the preclusive effect defendant desires, it must either bluntly withdraw the government's waiver of sovereign immunity, or more subtly impact, in defendant's favor, one or more of the prongs of the legal algorithm governing expectation damages.  The former is not the case here. Determining whether the latter is true requires the court to consider, *ab ovo*, whether defendant's invocation of the new adjustment regime presents either an issue of causation or one of mitigation.

In *Franconia*, *supra*, this court confronted a similar question.  There, it held that the enactment of two statutes, which permanently restricted the prepayment of certain Farmers' Home Administration loans, constituted a repudiation of prior loan agreements that contained unrestricted prepayment provisions.  *Franconia*, 61 Fed. Cl. at 730-33.  When this repudiation blossomed into a series of breaches, the obligors on the mortgages sought damages equal to the profits they allegedly lost when they could not prepay their mortgages and convert their housing complexes to private, commercial use.  Yet, defendant claimed that these property owners only had themselves to blame – that their failure to elect one or more of the economic incentives offered by Congress to encourage property owners to remain in the rural housing program constituted an intervening cause that precluded the owners from recovering the lost profits.  *Id*. at 749-50.  Unpersuaded, the court observed:

> While "in the workaday world, the conceptual distinctions between damage, 'duty' to minimize, mitigation, and proximate cause are frequently blurred," . . . the fact is these concepts have distinct purposes and definitions.  In order to prove that losses were "proximately caused" by defendant's breach, plaintiffs need not show that they might have avoided or minimized such losses or that defendant's conduct was the "sole" cause of their damages. *See Long Island Sav. Bank, FSB v. United States*, 60 Fed. Cl. 80, 90 (2004); *Westfed Holdings*, 55 Fed. Cl. [544, 553 (2003)]. . . . Rather, they must only show that the breach was a "substantial factor" and that the damages flowed "inevitably and naturally" therefrom. *Bluebonnet*, 266 F.3d at 1356; *Long Island*, 60 Fed. Cl. at 90; *Ramsey*, 101 F. Supp. [353, 357 (Ct. Cl. 1951)].  Thus, plaintiffs need not show that each dollar claimed was entirely unaffected by outside events. *Citizens*, 59 Fed. Cl. [507, 514-15 (2004)]. By comparison, where instead the question presented involves an injured party's failure to act to lessen damages, the issue does not involve proximate causation, but rather mitigation.  *See Deere & Co. v. Reinhold*, 2000 WL 486607 at *8 (E .D. Pa. Apr.24, 2000).  As one leading commentator has summarized, "[a]lthough the injured party's own failure to avoid a loss may bar recovery for that loss, this is

not thought of as a consequence of a requirement of causation, but of a limitation
under a 'mitigation' rule."  III. E Allen Farnsworth, Farnsworth on Contracts
(Farnsworth) § 12.1 at p. 149 (2d ed.1998); see also id. at § 12.12 at p. 228.

*Franconia*, 61 Fed. Cl. at 750 (additional case citations omitted).  It continued:

> Were these distinctions untrue, "the doctrine of mitigation of damages would lose
> much of its significance," *Willems Indus. Inc. v. United States*, 295 F.2d 822, 831
> (Ct. Cl. 1961).  Indeed, in every case, a breaching party could simply recast its
> mitigation defense in causation terms and thereby avoid the hurdles imposed by
> the established case law.  Under this scenario, such a party would never be called
> upon affirmatively to plead, let alone prove, mitigation, and instead would benefit
> from a pervasive causation defense not subject, like mitigation, to the bounds of
> reasoned decisionmaking.

*Id*.  Cementing its views, the court concluded that "[t]he decisional law [thus] demonstrates that,
as between the concepts of causation and mitigation, [defendant's] contentions sound only under
the latter doctrine, the contours of which have been carefully charted by the courts to avoid
placing exactly the sort of burdens on injured parties that defendant would assign here."  *Id*.

So it is here.  For the same reasons as in *Franconia,* defendant's arguments sound in
mitigation, not causation, and must be tested as such.[14]  Notably, apart from asserting that
plaintiff timely should have availed itself of the new adjustment process, defendant neither
contests that the breach was a "substantial factor" in plaintiff not receiving what otherwise would
have been automatic rent adjustments, nor that the damages corresponding to the failure to
receive those adjustments flowed "inevitably and naturally" from the breach.  *Bluebonnet*, 266
F.3d at 1356; *Long Island*, 60 Fed. Cl. at 90; *Ramsey v. United States*, 101 F. Supp. 353, 357 (Ct.
Cl. 1951).  Stated in the affirmative, it appears that the causal connection between the breach and
the loss of the additional rent has been "definitely established" as the increases would not have
been lost "but for the breach."  *California Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed.
Cir. 2005).[15]  The question that remains is whether plaintiff should have mitigated its damages by

---

[14]  *See Globe Savings Bank, F.S.B. v. United States*, 2005 WL 1023484 at * 18 (Fed. Cl.
Apr. 29, 2005) (rejecting, following *Franconia*, the government's effort "to avoid the
consequences of . . . [the] shift in the burden of proof" by "fram[ing] its arguments regarding
mitigation in terms of causation and foreseeability"); *see also Long Island*, 60 Fed. Cl. at 93
(distinguishing between causation and mitigation).

[15]  In *California Federal*, the Federal Circuit rejected the notion that a breach need only
be a "substantial factor" contributing to a loss.  395 F.3d at 1267.  But, a fuller reading of that
opinion suggests that prior cases employing some forms of the "substantial factor" test are not
necessarily erroneous.  In fact, the Federal Circuit and the Court of Claims both have held that
satisfaction of that test, in combination with other factors, can demonstrate causation.  This was

seeking rent increases during the years in question using the new mechanism established by the 1994 Act and HUD Notice 95-12.

On the latter issue, we espy familiar *terra firma* – "a non-breaching party generally may not recover damages attributable to that party's failure to take reasonable, non-burdensome steps to avoid its loss." *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002). Damages that the plaintiffs might have "avoided without undue risk, burden or humiliation" are hence not recoverable. Restatement § 350; *see also Middleton v. United States*, 175 Ct. Cl. 786, 792 (1966); *Old Stone Corp. v. United States*, 63 Fed. Cl. 65, 79 (2004); *Franconia*, 61 Fed. Cl. at 740. "Application of this principle," this court has stated, "requires the court to consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages." *Koby*, 53 Fed. Cl. at 497. As this court explained in *Franconia* –

> Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable

---

certainly true in *Bluebonnet*, *supra*, where the Federal Circuit affirmed a causation finding that this court had rendered in reliance upon a "substantial factor" test, stating –

> The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs because it forced Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive. The government's various arguments regarding alternative causes for the damages lack merit.

266 F.3d at 1356, *rev'g, on other grounds*, 47 Fed. Cl. 156, 173 (2000); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1328-29 (Fed. Cir. 2002) (affirming award of expectation damages in which this court had relied, in part, on the substantial factor test); Arthur L. Corbin, 5 Corbin on Contracts § 999 at 25 (1964) (discussing the substantial factor test). Indeed, in *Franconia*, this court did not find causation based solely upon the "substantial factor" test, but also concluded that the damages flowed "inevitably and naturally" from the breach. 61 Fed. Cl. at 750. Moreover, in *California Federal*, the Federal Circuit made clear that its holding should not be read "to say that the breach must be the sole factor or sole cause in the loss of profits," stating further that "[t]he existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." 395 F.3d at 1268; *see also Westfed Holdings, Inc. v. United States*, 2005 WL 1119654 at *6 (Fed. Cir. May 12, 2005). At least two subsequent decisions of this court have recognized that some of the differences in the decisional law on this count may be attributable to different formulations of the "substantial factor" test, noting that the standard mapped by *California Federal* is essentially the same as the multi-faceted approach traditionally employed by this court in considering causation issues. *See, e.g., Precision Pine & Timber, Inc. v. United States*, 64 Fed. Cl. 165, 166 (2005); *Scott Timber Co. v. United States*, 64 Fed. Cl. 130, 138 n.2 (2005); *see also Alaska Pulp Co. v. United States*, 59 Fed. Cl. 400, 414 (2004).

conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented.  Where a choice has been required between two reasonable courses, the person whose wrong forced the choice cannot complain that one rather than the other was chosen.

61 Fed. Cl. at 741 (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3rd Cir.1950)); *see also Beckman Cotton Co. v. First Nat'l Bank of Atlanta*, 666 F.2d 181, 184 (5th Cir.1982); *First Nationwide Bank v. United States*, 56 Fed. Cl. 438, 444 (2003); *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F.Supp. 647, 652 (M. D. Tenn.1963). "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter."  *In re Kellett Aircraft*, 186 F.2d at 198-99; *see also Apex Min. Co. v. Chicago Copper & Chem. Co.*, 306 F.2d 725, 731 (8th Cir.1962); *Franconia*, 61 Fed. Cl. at 741.  Rather, the burden is on the breaching party to show that reasonable possibilities for mitigation existed and were ignored.  *See T.C. Bateson Construction Co. v. United States*, 319 F.2d 135, 160 (Ct. Cl. 1963); *Franconia*, 61 Fed. Cl. at 741; *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 561-62 (2003); *Robinson v. United States*, 50 Fed. Cl. 368, 370 (2001).

Burnishing this "undue risk and expense" standard, Williston on Contracts provides that "almost any risk of considerable loss to the injured person if he attempts to mitigate damages should be considered undue."  11 Samuel Williston, A Treatise on the Law of Contracts § 1353 (3d ed.1968); *see also Brazos Electric Power Coop., Inc. v. United States*, 52 Fed. Cl. 121, 129 (2002). While reasonable cost-avoiding steps include affirmative efforts to make substitute arrangements compensating for the lack of contract performance, such arrangements need not be entered into if they would expose the party to undue risk or significantly compromise its interests.  *See* Restatement, § 350 cmts. c & g; *see also Westamerica Mortgage Co. v. First Nationwide Bank*, 1988 WL 76377 at *5 (D.Colo. Jul.15, 1988).  Thus, an injured party is not expected to "'exalt the interests of the defaulter to his own probable detriment.'"  *Koby*, 53 Fed. Cl. at 497 (quoting *In re Kellett Aircraft*, 186 F.2d at 199); *see also Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 554-55 (7th Cir. 2000), *cert. denied*, 531 U.S. 1078 (2001); *Franconia*, 61 Fed. Cl. at 741; John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14-15 (3d ed.1987).  Accordingly, courts have been reluctant to require parties, under the duty to mitigate, to deal further with the breaching party, especially if the breacher's alternative terms differ substantially from those of the original contract.  *Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972); *Campfield v. Sauer*, 189 F. 576, 579 (6th Cir. 1911); *Franconia*, 61 Fed. Cl. at 741; *Koby*, 53 Fed.Cl. at 497.[16]  In particular, a

_____

[16]   *See also Cain v. Grosshans & Petersen, Inc.*, 196 Kan. 497, 413 P.2d 98, 102 (1966) ("[A]n innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement."); *Coppola v. Marden, Orth & Hastings Co.*, 282 Ill. 281, 118 N.E. 499, 500 (1917) (purchaser has no duty to pay in cash when credit terms are

plaintiff is not required to mitigate losses by "accepting an arrangement with the breaching party made conditional on the plaintiff's surrender of its rights under the repudiated contract." *Brazos*, 52 Fed. Cl. at 129; *see also Teradyne, Inc. v. Teledyne Indus., Inc.*, 676 F.2d 865, 870 (1st Cir. 1982); Restatement, § 350, cmt. e.

Would a reasonable person, acting in like circumstances, have sought increases under the revised mechanism adopted by Congress and implemented by HUD?  And, how quickly would they have done so?  Certainly, even a casual observer might readily draw parallels between this case and *Franconia* and *Koby* – in the latter cases, defendant's mitigation arguments failed.  Like CMHA, the plaintiffs in *Franconia and Koby* cases were offered less desirable, alternative transactions by the same party that had breached their original contracts – the Federal government – and they declined.  *See Franconia*, 61 Fed. Cl. at 742-45 ; *Koby*, 53 Fed. Cl. at 498.  Ironically, in *Franconia*, the plaintiffs' hesitancy to deal further with the government was deemed reasonable based not only upon Congress' twice repudiating their contracts, but also its repudiation of a variety of contracts under other Federal housing programs – including those at issue here.  *Franconia*, 61 Fed. Cl. at 742 ("During this same general period, Congress also saw fit to alter other low-income housing contracts, limiting the prepayment provisions in some HUD agreements and modifying the rent increase provisions in others.").  In the case *sub judice*, the situation is the reverse and CMHA seemingly also was entitled to measure its response to the new rent adjustment regime by taking into account how HUD had performed – or not – under its other housing contracts.  Finally, in *Franconia*, as may be the case here, there were issues as to how well balanced the alternative transactions offered by Congress were – whether they could fairly compensate the property owners, yet still effectuate Congress' strong desire to reduce program outlays.

But, *Koby* and *Franconia* were decided only after a full exploration and explication of the evidence surrounding the mitigation issue.  In this case, discovery has not yet occurred.  An armada of factual questions lurk over the horizon.  Among them is whether – given the cost and burdens of conducting the comparability studies, and without assurances that cost of those studies would be reimbursed or that significant increases would flow therefrom – plaintiff reasonably delayed performing and submitting such studies while apparently contemplating whether to sue.  Also relevant is whether plaintiff reasonably hesitated to make requests under the new regime, concerned that its compliance with that regime would be viewed by HUD, defendant and potentially this court as waiving its breach claims.  While defendant complains that CMHA should not have hesitated to embrace the new adjustment regime, it has aggressively pursued waiver arguments in other cases, when a party aggrieved by a government breach has elected to proceed with performance.  *See, e.g., Westfed Holdings, Inc. v. United States*, 2005

---

material part of the contract); Charles J. Goetz & Robert E. Scott, *The Mitigation Principle: Toward A General Theory of Contractual Obligation*, 69 Va. L.Rev. 967, 993 n. 57 (1983).

WL 1119654 (Fed. Cir. May 12, 2005) (rejecting government's assertion of waiver doctrine).[17] Seemingly, defendant cannot have it both ways – to urge conduct in this case that it would seek to penalize elsewhere.  And, of course, these and other issues must be judged not from damning hindsight, but rather "'in the light of one viewing the situation at the time the problem was presented.'"  *Franconia*, 61 Fed. Cl. at 741 (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950)).  Ultimately, however, while both *Franconia* and *Koby* suggest that defendant will face rough waters in proving that plaintiff should have readily accepted the alternate adjustment mechanism, that issue must be resolved based only upon a full evidentiary record.

Left unresolved by this approach is whether the timing limitations of HUD Notice 95-12 are valid.  Under the mitigation approach, the court need not reach the issue – the question, rather, is whether plaintiff acted reasonably in not filing its requests and studies within the time periods prescribed by the notice and its successors.  Contrary to defendant's importunings, to approach the issue in this fashion is not effectively to grant plaintiff a perpetual license to ignore the notice requirements.  Assuming *arguendo* those requirements are valid, plaintiff must comply with them if it wishes to receive rent increases in the ordinary course; if it chooses instead to litigate, it will face a mitigation defense which stature will only grow over time.  This will be so because even if CMHA's failure to comply with the new regime is deemed reasonable in this case, there is no assurance that, with the passage of time and the clarification of its rights, its further refusal to comply will be deemed reasonable *in futuro*.  Plaintiff's actions in filing requests for increases under the new regime prior to filing these lawsuits – albeit in defendant's view, belatedly – suggest that it understands this.  At all events, this court perceives no reason why the breaching procedural rules adopted by HUD should fare any better than breaching statutes enacted by Congress – in accordance with the decisional law, neither should be given effect in calculating expectation damages, except, of course, in evaluating mitigation.

### (2)   The Overall Limitation

The parties next vigorously disagree as to the meaning of the overall limitation contained in the HAP contracts, an issue that significantly impacts the amount of rents recoverable.  Recall, section 1.8d of those contracts defines what is denoted as an "overall limitation," stating that "[n]otwithstanding any other provisions of this contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government."  As noted previously, this limitation closely

---

[17]   Arguing that CMHA did not act reasonably, defendant harps that "Cuyahoga's failure to submit comparability studies in a timely manner has resulted in complex and time-consuming litigation that might not have been necessary had it submitted its studies in time."  One might note that this litigation also would have been unnecessary had defendant not repudiated the HAP contracts and forced plaintiff to litigate not only that question, but its entitlement to the costs of the relevant comparability studies.  Notably, defendant did not concede that the latter costs were recoverable (and then, only in part) until it briefed the pending motions.

tracks the 1937 Housing Act, which provides that "[a]djustments in the maximum rents," whether based on market surveys or on a reasonable formula, "shall not result in material differences" between Section 8 rents and the rents for comparable housing on the private market. 42 U.S.C. § 1437f(c)(2)(C).  Similar language has long been incorporated in HUD's regulations. *See* 24 C.F.R. § 880.609(c); *see also* 40 Fed. Reg. 18,687 (1975) (promulgating the original version of this regulation, 24 C.F.R. § 880.110(d)).  Unfortunately, these sources provide little guidance as to what is meant by a "material difference," leaving the parties room to dispute, for damage calculation purposes, whether a material difference exists between any of the adjusted rents at issue here and those charged for comparable unassisted units.

### a.    "Material Difference"

While judicial constructions of the "overall limitation" language abound, no case has addressed the precise question at hand.  As defendant notes, the Supreme Court has made clear that the contract language – particularly, the phrase "as determined by the Government" – as well as the underlying statute, affords HUD discretion both in comparing the rents of assisted and unassisted units and in determining "whether there exist material differences between the rents charged for assisted and comparable unassisted units."  *Alpine Ridge*, 508 U.S. at 21; *see also Fed. Housing Partners IV v. Cisneros*, 55 F.3d 362, 368 (8th Cir. 1995) (discussing this discretion); *Park Village* (*Park Village II*), 32 Fed. Cl. 441, 447 (1994) ("Hence, the overall limitation grants HUD discretion in determining which units are comparable, what rents are charged for those comparable units, and whether AAAF-based adjustments would result in differences between assisted and comparable unassisted rents that are 'material.'").  Owing to this grant of discretion, HUD was authorized to adopt, and apply within the context of the HAP contracts, a reasonable interpretation of the "material difference" requirement that is consistent with the Housing Act.  *See Chevron U.S.A. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.").

One of HUD's earliest constructions of the overall limitation occurred in a 1986 memorandum from the Office of the Assistant Secretary for Housing to HUD field offices.  This memorandum sets forth two ways for determining whether a difference between an adjusted Section 8 rent and comparable rents is "material."  First, it indicates that "[a] material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference."  Second, it states –

> So long as the adjusted Section 8 rent would NOT exceed 120 percent times the sum of the comparable rent and the initial difference, the difference between a Section 8 rent and a correlated unassisted rent is "material" only if BOTH of the following conditions are met.

1.     The adjusted Section 8 rent would exceed the correlated unassisted
       rent for comparable units by more than the initial difference for
       that unit type. . . . [and]

2.     The adjusted Section 8 rents would exceed the amount needed to
       "operate" comparable projects.

(Emphasis in original).  Under the latter formulation, a material difference could exist even if the
adjusted rent did not exceed 120 percent times the sum of the comparable rent and the initial
difference.  Indeed, if the adjusted rent exceeded the amount necessary to operate a comparable
project, a difference could  be "material" simply because the adjusted rent exceeded the
comparable rent plus the initial difference.

       In 1992, HUD proposed a regulation that took a somewhat different tack.  That regulation
stated that "[a] material difference between the assisted and comparable unassisted rent is defined
as a dollar amount equal to five percent of the comparable rent plus one dollar, or the initial
difference plus one dollar, whichever is greater."  57 Fed. Reg. 49,120, 49,125 (proposed Oct. 29,
1992) (to have been codified at 24 C.F.R. § 888.205(c)(1)).  But, this regulation was never
adopted, perhaps overtaken by the passage of the 1994 amendments.  To effectuate the latter
amendments, HUD instead issued Notice 95-12, in which it employed yet another formulation of
the "material difference," albeit without specifically mentioning the phrase.  There, it stated:

       Once the initial difference is determined for each unit type, . . . , it should be
       added on to the comparable rent for each unit type to determine what is the
       maximum permissible rent level allowed for each unit.  This will be referred to as
       the Adjusted Comparable Rent.  This rent level will then be compared to the rent
       level adjusted by the Table One [AAAF], for each unit type.  The lower of the two
       rent levels will become the new effective rents (unless this would require a rent
       reduction, then the current contract rent level will be maintained).

This last formulation echoes the 1986 memorandum in concluding that a "material" difference
exists provided there is any difference between the adjusted rent and the sum of the comparable
rent plus the initial difference; it differs, however, significantly from the 1992 proposed
regulation which, at a minimum, treated a difference of five percent of the comparable rent as
being material.

       Invoking this 1995 notice, defendant argues that a material difference exists under the
HAP contracts if the adjusted rent would exceed the comparable rent plus the initial difference.
Under this formulation, the material difference corresponds to the initial difference – the addition
of the initial difference to the comparable rent is presumed to result in a figure materially
different than the comparable rents.  By comparison, plaintiff asseverates that there must be a
material difference beyond that attributable to the initial difference – that the contract and the
statute anticipate that a material difference would arise only if the adjusted rent exceeded the

-20-

product of the sum of the comparable rent plus the initial difference times some other factor creating a material distinction. Citing various authorities, plaintiff asserts that the latter factor is 1.2, that is, that a material difference exists only if the adjusted rent exceeds the sum of the comparable rent plus the initial difference by 20 percent or more.[18]

Where the initial difference is significant, defendant's construction of the contract and the underlying statute seems, at least at first blush, reasonable. After all, neither the contract nor the statute requires that there be a material difference between the adjusted rent and the sum of the comparable rent plus the initial difference; rather, by their terms, both require merely that the adjustment "not result in material differences between the rents charged for assisted and comparable unassisted units." Defendant's construction of the overall limitation works as long as the "initial difference" is sufficiently large so that its addition to the comparable rents results in a sum materially greater than the comparable rents themselves. But, what if the facts are otherwise, that is, if the initial difference is *de minimis* or nonexistent? Then, defendant's formulation of the "overall limitation" collapses, yielding a limitation that is not materially greater than the comparable rents, thereby seemingly violating both the contracts and the statute. Indeed, where there is no initial difference, HUD's notion of materiality evaporates in a puff – even under the most strained definition of the term, one simply cannot talk about a "material" difference of zero. HUD apparently recognized this in crafting the 1992 proposed regulation, which stated that the material difference would be the "greater" of the "initial difference plus one dollar" or "five percent of the comparable rent plus one dollar." Under this formulation, the material difference could never fall below "five percent of the comparable rent plus one dollar," thereby effectuating the language of the HAP contracts and the statute even where no initial difference existed.

Overlooking these difficulties (or perhaps because of them), defendant would have this court heavily defer to HUD's current view of what is "material." But, beyond determining whether HUD's view is reasonable, any claim to deference here is severely diminished not only

---

[18] To illustrate the parties's differences on this point, assume a comparable rent of $400, an initial difference of $50, and an AAAF-adjusted rent of $525. Defendant, applying Notice 95-12, asserts that a material difference exists if the AAAF-adjusted rent exceeds the sum of the initial difference and the comparable rent – here, $450. Under this interpretation, the AAAF-adjusted rent of $525 would substantially exceed the maximum permissible rent, the overall limitation would be triggered and the adjusted rent would be limited to $450. By comparison, plaintiff argues that a material difference exists only if the AAAF-adjusted rent exceeds 120 percent of the sum of the initial difference and the comparable rent. Under this theory, a material difference exists only if the AAAF-adjusted rent exceeds ($450) times (1.2), or $540. Under this formulation, the hypothetical AAAF-adjusted rent of $525 would not create a material difference and plaintiff thus would be entitled to the higher figure.

because the agency has never formally promulgated its views,[19] but also because it has periodically shifted its position, employing at least three different formulations within the last twenty years.  *See, e.g., Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due"); *INS v. Cardoza- Fonseca*, 480 U.S. 421, 446, n. 30 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.").  Indeed, as will be discussed in greater detail below, HUD's current interpretation of what is a "material" starkly contrasts with the more accommodating view defendant offered in defending HUD's use of comparability studies in cases that predated the passage of the 1994 Act. In those cases, defendant suggested that a material difference occurred when the adjusted rent exceeded 120 percent of the sum of the comparable rent and the initial difference, thus allowing it to argue that overall limitation would be rarely triggered.  *See, e.g. Park Village Apartments v. United States* (*Park Village I*), 25 Cl. Ct. 729, 732 n.2 (1992); *Sheridan Square P'ship v. United States*, 761 F. Supp. 738, 743 n.2 (D.Colo. 1991).  In light of this history, HUD's claim that it has consistently applied a long-standing interpretation of the "overall limitation" does not hold water. *See Good Samaritan Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212-13 (1988).

So, where does this leave us?  The question here is not whether, in every circumstance imaginable, HUD's definition of materiality is arbitrary, capricious, or otherwise contrary to law, as might be true in a facial challenge under the Administrative Procedures Act.  Rather, this court must synchronically view HUD's definition in terms of whether it yields a proper measure of expectancy damages in this case – that which CMHA would have received had no breach occurred.  The latter inquiry, in turn, requires this court to determine whether HUD's definition of materiality is reasonable, as applied to the facts *sub judice*.  *See Nat'l Leased Housing II*, 32 Fed. Cl. at 764; *Park Village II*, 32 Fed. Cl. at 447.  Here, the initial differences are not *de minimis* and range from \$60 to \$62.  Nonetheless, the theoretical cracks lurking in HUD's current interpretation of materiality are question-begging and oblige this court to consider further whether that interpretation is reasonable as applied to these HAP contracts.  This court answers that question in the affirmative – HUD's interpretation is reasonable, at least in the context of a case that involves significant initial differences.  Several reasons lead to this conclusion.

_____

[19]  In *Christensen v. Harris County*, 529 U.S. 576, 587 (2000), the Supreme Court held that "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference."  The Court held that such agency interpretations of the law are entitled to respect, but only "to the extent that those interpretations have the 'power to persuade.'"  *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  More recently, in *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Court emphasized that interpretations that do not have the force of law – particularly, those that are not subjected to notice and comment – are "beyond the *Chevron* pale." *Id.* at 234; *see also Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 8 n.5 (2001).

First, as its text makes plain, the contract language envisions that the material difference may correspond to the initial difference, provided the latter itself is material.  To be sure, by closely linking the notion of what is material to the size of the initial difference, HUD risks deeming a *de minimis* difference "material."  Such a finding would run counter to the ordinary understanding of the term "material," which Black's defines as "significant" or "essential," in the sense that the object described is "of such a nature that knowledge of the item would affect a person's decisionmaking."  *Black's Law Dictionary* 998 (8th ed. 2004).[20]  It would also conflict with how this court has construed the "material difference" language in the context of the HAP contracts, albeit in resolving other issues.[21]  But, that is not ***this*** case.  The initial differences here are such that, viewed in the way envisioned by Notice 95-12, they equal approximately 10

_____

[20]  Employing this common meaning, various courts have defined "material" as meaning "significant," "having real importance," or "something substantially greater than *de minimis*."  *See Kungys v. United States*, 485 U.S. 759, 786 (1988) (Stevens, J., concurring) ("'material' means 'having real importance' or 'great consequences.'") (quoting *Webster's Ninth New College Dictionary* 733 (1983)); *Doebereiner v. Sohio Oil Co.*, 880 F.2d 329, 334 (11th Cir. 1989) (same); *see also Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004) (defining "materially adverse acts" to exclude those that are "*de minimis*"); *Elkind v. Liggett & Myers Inc.*, 635 F.2d 156, 166 (2d Cir. 1980) (defining "materiality," in securities fraud context, as meaning "reasonably certain to have a substantial effect on the market price of the security"); *Williams v. Port Authority of New York and New Jersey*, 813 A.2d 531 (N.J. 2003) ("substantially greater than *de minimis*"); *Magaw v. Middletown Board of Education*, 731 A.2d 1196, 1202 (N. J. Super. 1999) (same); *Lohstreter v. Lohstreter*, 623 N.W.2d 350, 355 (N.D. 2001) (defining "material change" as a change in circumstances that "substantially affects" a party's financial standing).

[21]  In construing the HAP contracts, this court has rejected the notion that the "overall limitation" could be triggered where there was a *de minimis*, rather than material, difference between the adjusted and comparable rents.  For example, in concluding that HUD's use of comparability studies was a reasonable application of the overall limitation, this court, in *Nat'l Leased Housing Ass'n v. United States* (*Nat'l Leased Housing I*), 22 Cl. Ct. 649, 661 (1991), stated:

> Plaintiffs would be entitled to the full AAAF-based rent adjustments when a difference exists but that difference is not 'material.'  While HUD's definition of 'material' has allegedly varied over the years, the definition apparently has never been so broad as to encompass all economically significant differences.  Indeed, since 1986,  pursuant to a HUD memorandum, HUD has maintained that '[a] material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference.'

*Id.* at 661.  In a subsequent opinion, this court reiterated its view that "the overall limitation does not prohibit every difference between rents charged for assisted and comparable unassisted units," but rather "proscribes only material differences." *Nat'l Leased Housing Ass'n v. United States* (*Nat'l Leased Housing II*), 32 Fed. Cl. 454, 466 (1994).

percent of the comparable rents – a figure that certainly appears, even in raw dollars (let alone plain language), to be "material." Indeed, in percentage terms, the initial differences here exceed the 5-percent minimum rule that would have been adopted had HUD finally promulgated the 1992 regulation. *See Park Village II*, 32 Fed. Cl. at 453.

Since the contracts here originated in legislation passed by Congress, it is also appropriate to view the reasonableness of HUD's interpretation through the prism of that legislation. *See, e.g., Bennett v. Kentucky Dept. of Educ.*, 470 U.S. 656, 669-70 (1985); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1480-81 (Fed. Cir. 1997) (construing an agreement in light of the underlying legislation); *CMHA I*, 57 Fed. Cl. at 761 (same). Significantly, HUD's current definition of "material" comports not only with the 1994 version of the 1937 Housing Act, but, more importantly, with the 1974 version, *i.e.*, the one in effect at the time the HAP contracts were executed. Had Congress wanted the material difference to be an amount above and beyond the sum of the comparable rent and the initial difference, it could have said so in section 1437f(c)(2)(C). It did not do so – either in 1974 or in any of the subsequent versions of the statute. Instead, throughout these versions, Congress consistently defined the material difference solely based upon a comparison of the rents charged for assisted and comparable unassisted units. Moreover, the reports accompanying reports the 1974 Act heralded that the limitation was designed to ensure that increases corresponded to "fair market rentals" and that "inefficient management practices" were not "compensated [for] by increases in either the subsidy or in the amount of rent paid by a tenant." H. Rep. 93-1114, 2d Sess. 21, 59 (1974); *see also* H. Conf. Rep. No. 94-1279 at 140 (1974) (adjustments are "to reflect changes in fair market rentals in the area"). This legislative purpose certainly is not violated by equating the material difference with the initial difference, provided the latter itself is material.

Accordingly, there is no indication that HUD's current formulation is inconsistent with plaintiff's reasonable expectations when it entered into the HAP contracts – expectations that then could be based only upon the plain meaning of the language employed in the contracts, as amplified by the underlying statute and its legislative history. *See Nat. Leased Hous. II*, 32 Fed. Cl. at 466; *Park Village II*, 32 Fed. Cl. at 447. Shedding further light on this issue, this court, in *National Leased Housing II*, noted that, in entering into similar HAP contracts, both HUD and the project owners could reasonably expect only that the adjustment process would yield rents comparable to those that would be obtained in the marketplace –

> Interpreting the overall limitation and Section 8(c)(2)(C) as expressing an overarching concern that Section 8 rents not be materially different from rents charged for comparable unassisted units would seem consistent with the parties' reasonable economic expectations when they entered the HAP contracts. If the project owners did not enter HAP contracts with HUD, they could expect to rent their units to tenants on the open market at rents approximating those charged for comparable unassisted units. Similarly, if HUD, without the benefit of the HAP contracts, tried to find apartments for low-income families, HUD could expect to pay approximately market rents. Therefore, interpreting the overall limitation

> provision to require adjustment of the contract rents in order to eliminate any material difference between the rents charged for assisted and comparable unassisted units would be generally consistent with the reasonable expectations of both HUD and the project owners as to the value of the rented units.  HUD and the project owners would both be assured that contract rents would not stray too far from market rents.  HUD could expect to pay and the project owners could expect to receive rents not materially different from the rents charged for comparable units on the open market.

*Nat. Leased Hous. II*, 32 Fed. Cl. at 466.  As in *National Leased Housing*, market considerations underlie HUD's interpretation of the HAP contracts here, under which CMHA could expect to receive adjusted rents no greater than what it could have received in renting its units on the open market.  *See Alpine Ridge*, 508 U.S. at 18-19 (overall limitation "provides that contract rents 'shall not' be adjusted so as to exceed materially the rents charged for 'comparable unassisted units' on the private rental market – even if other provisions of the contracts might seem to require such a result."); *Park Village II*, 32 Fed. Cl. at 446.  As such, it would appear that HUD's definition of "material" is reasonable, at least insofar as it applies to the facts of this case.

### b.      Judicial Estoppel

Plaintiff, however, asserts that defendant should be judicially estopped from taking a more restrictive view of the overall limitation in this case than it did in prior litigation in this court.  "The doctrine of judicial estoppel," the Federal Circuit has stated, "is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed."  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)); *see also New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *Franconia*, 61 Fed. Cl. at 755.[22]  The decision whether to invoke judicial estoppel "lies within the court's discretion."  *Data General Corp.*, 78 F.3d at 1565; *see also New Hampshire*, 532 U.S. at 750 (judicial estoppel "'is an equitable doctrine invoked by a court at its discretion'") (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)).  Not surprisingly, each case must be decided upon its own facts and circumstances.  *Motley v. New Jersey State Police*, 196 F.3d 160, 163 (3d Cir. 1999).

---

[22]  As colorfully described by the Sixth Circuit:

> Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against "playing 'fast and loose with the courts,'" "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." Emerson's dictum that "a foolish consistency is the hobgoblin of little minds" cuts no ice in this context.

*Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir. 1988) (citations omitted).

While the situations under which the doctrine may be applied are not "reducible to any general formulation of principle," *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982), according to Supreme Court, "several factors typically inform the decision whether to apply the doctrine in a particular case." *New Hampshire*, 532 U.S. at 750. "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id*. "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id*. (internal quotations omitted). Finally, "[a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*. at 751; *see also Minn. Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1303 (Fed. Cir. 2002); *Westinghouse Elec. Co. v. United States*, 56 Fed. Cl. 564, 570-01 (2003).

Before considering these factors, the court must address a threshold issue – whether the doctrine of judicial estoppel applies to the United States – a question on which the courts certainly are not unified and on which the Federal Circuit has yet to express an opinion.[23]  The Supreme Court has recognized that "ordinarily the doctrine of estoppel or that part of it which precludes inconsistent positions in judicial proceedings is not applied to states." *Illinois ex rel. Gordon v. Campbell*, 329 U.S. 362, 369 (1946); *see also New Hampshire*, 532 U.S. at 755.  And, the same level of hesitation ought to apply in deciding whether to invoke the doctrine against the United States.  Nonetheless, in its watershed decision in *New Hampshire*, *supra*, the Supreme Court concluded that the doctrine applied to a state, thereby plainly suggesting that the same might be true of the United States.  Indeed, there are several reasons why the doctrine ought to apply to the United States, albeit in limited circumstances.

---

[23] There are pronounced differences among the courts regarding application of judicial estoppel against the government.  The Sixth Circuit, for example, has held that the doctrine is applicable to government actors, but should be "construed narrowly," *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995), while the Seventh Circuit has apparently concluded that "government entities are not necessarily treated differently [than private litigants] when applying judicial estoppel," *United States v. Sherwin-Williams Co.*, 165 F. Supp.2d 797, 810 (C.D. Ill. 2001) (construing Seventh Circuit cases); *see also United States v. Christian*, 342 F.3d 744, 747-50 (7th Cir. 2003).  Several circuits have noted that they have never applied judicial estoppel to the government in a criminal case, *see United States v. Kattar*, 840 F.2d 118, 129 n.7 (1st Cir. 1988) and *Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995), while others have applied the doctrine in such cases, *see Owens*, 54 F.3d at 275, *United States v. Christian*, 342 F.3d at 747-50. The Tenth Circuit did not recognize the doctrine of judicial estoppel for *any* litigant until 2005, *see Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068-69 (10th Cir. 2005), and has yet to address its applicability to state actors.

More so than other preclusion doctrines, the purpose of judicial estoppel is "'to protect the integrity of the judicial process,'"[24] rather than individual litigants. *See In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) ("the doctrine is intended to project the judicial system, rather than the litigants"). As such, this form of estoppel is less akin to equitable or nonmutual collateral estoppel, and more like concepts of waiver by litigation conduct (*e.g.*, failing to raise an argument at the appropriate time) or sanctions for spoliation of evidence, discovery abuse, or perpetrating fraud upon the court.[25] Though the latter principles are not often invoked against the United States, they undoubtedly apply, at least to the extent that direct monetary sanctions are not imposed.[26] And if these principles apply to the United States, as they do, based upon the need to protect the integrity of the judicial system, so too should the doctrine of judicial estoppel, which is predicated upon the same vital need. Various cases so hold.[27]

---

[24] *New Hampshire*, 532 U.S. at 743; *see also In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process."); *Allen*, 667 F.2d at 1166 (judicial estoppel "protect [s] the essential integrity of the judicial process"); *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980) (rule is intended to prevent "improper use of judicial machinery"); *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts'" (quoting *Stretch v. Watson*, 6 N.J.Super. 456, 469, 69 A.2d 596, 603 (1949)).

[25] *See New Hampshire v. Ramsey*, 366 F.3d 1, 16 (1st Cir. 2004) ("The concept of waiver by litigation conduct is related to the doctrine of judicial estoppel."); *Lowey v Stovall*, 92 F.3d 219, 223 n.3 (4th Cir. 1996) ("Unlike equitable estoppel . . . judicial estoppel is designed to protect the integrity of the courts rather than any interests of the litigants."); *Owens*, 54 F.3d at 275 ("Judicial estoppel serves a different function from other forms of estoppel, such as equitable estoppel or collateral estoppel. . . . Consequently, judicial estoppel may apply in contexts when other forms of estoppel do not."); *Nat. Medical Enterprise v. United States*, 28 Fed. Cl. 540, 546 n.2 (1993) ("Moreover, in contrast to equitable estoppel which generally fails against the Government, . . . judicial estoppel implicates dissimilar purposes"); *see also* 18B Wright, Miller & Cooper, § 4477 ("judicial estoppel has little to do with preclusion by judgment;" "the preclusion of inconsistent positions rests on concerns independent of the concerns that support preclusion by judgment;" "distinctive policies . . . shape 'preclusion of inconsistent positions'").

[26] *See, e.g., Pentax Corp v. Robison*, 135 F.3d 760, 762 (Fed. Cir. 1998) (waiver of argument not previously raised applies to government); *Mundy v. United States*, 983 F.2d 950, 953 (9th Cir. 1993); *United States v. Horn*, 29 F.3d 754, 766-67 (1st Cir. 1994) (government misconduct); *Chilcutt v. United States*, 4 F.3d 1313, 1326 (5th Cir. 1993) (Rule 37 sanctions applicable to government); *see also United States v. Stauffer Chemical Co.*, 464 U.S. 169-73 (1984) (doctrine of collateral estoppel applies to the United States).

[27] *See Valentine-Johnson v. Roche*, 386 F.3d 800, 811-12 (6th Cir. 2004); *Owens*, 54 F.3d at 275-76; *North Alaska Environmental Ctr. v. Lujan*, 961 F.2d 886, 891 (9th Cir. 1992); *Reynolds*, 861 F.2d at 474; *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 763-64 (1994); *Manning*

The rationales commonly employed in shielding the United States from other forms of estoppel simply do not resonate in this very different context.  For example, while courts have expressed concern that application of estoppel principles could convert inadvertent statements by government employees into legally binding precedents, the concept of judicial estoppel applies only to "a knowing assault upon the integrity of the judicial system."  *Reynolds*, 861 F.2d at 474; *see also Scarano*, 203 F.2d at 513 (judicial estoppel involves "intentional self-contradiction").  Moreover, application of the doctrine to actions undertaken in litigation neither requires the government to "secure perfect performance from its hundred of thousands of employees," *Richmond*, 496 U.S. at 433, nor "invite[s] endless litigation over both real and imagined claims of misinformation by disgruntled citizens," *id.*.  Rather, it merely enforces the responsibilities of ordinary diligence and candor that the cadre of attorneys representing the United States already owe and is applicable only when a clearly inconsistent position is documented, usually by reference to briefs or transcripts.  Nor does subjecting the United States to this doctrine violate the doctrine of separation powers, any more than other rules designed to protect the integrity of the judicial system are viewed as a threat to that separation.  *See, e.g., Chilcutt*, 4 F.3d at 1327 (imposition of discovery sanctions does not violate separation of powers).  To the contrary, if anything, the reverse is true – application of the doctrine to the United States reinforces that delicate separation, by ensuring that agencies of the executive and legislative branches, no less than any other litigant, do not lead the third branch astray.[28]

_____

*v. Buchan*, 357 F. Supp.2d 1036, 1054 (N.D. Ill. 2004); *Seward v. U.S. Dept. of Agriculture*, 229 F. Supp. 2d 557, 569 (S.D. Miss. 2002); *Sherwin-Williams Co.*, 165 F. Supp.2d at 810, *FDIC v. Duffy*, 835 F. Supp. 307, 322 (E. D. La.  1993); *Donovan v. U.S. Postal Service*, 530 F. Supp. 894, 902 (D.C.D.C. 1981); *see also Yniguez v. Arizona*, 939 F.2d 727, 738-39 (9th Cir. 1991) (holding the State of Arizona was judicially estopped); *Russell v. Rolf*, 893 F.2d 1033, 1038-39 (9th Cir. 1990) (same as to the State of Washington); *Czajkowski v. City of Chicago*, 810 F. Supp. 1428, 1444-47 (N. D. Ill.1992) (same as to the City of Chicago); *see generally*, 18B Wright, Miller & Cooper § 4477 ("It has been suggested that the United States – and presumably any other government – may enjoy special respect for changes of position based on changed approaches to public policy,  but even a government may be precluded from blatant inconsistency, particularly when the matter does not involve broad formulation and reformulation of public policy.").  There are numerous other cases in which this court and others have analyzed whether the multi-factored test for judicial estoppel was met, without addressing significantly the threshold issue whether the doctrine could ever apply to the United States.  *See, e g., Data General Corp.*, 78 F.3d at 1565; *Navajo Refining Co., LP v. United States*, 58 Fed. Cl. 200, 215 (2003); *Westinghouse Elec. Co. v. United States*, 56 Fed. Cl. 564, 571-72 (2003); *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed Cl. 174, 190 (1997); *Nat. Medical Enterprise*, 28 Fed. Cl. at 546 n.2.  Notably, defendant has not hesitated to invoke the doctrine against plaintiffs in this court.  *See, e.g., San Carlos Irr. and Drainage Dist. v. United States*, 111 F.3d 1557, 1568 (Fed. Cir. 1997).

[28]  The court sees no other constitutional impediments to invoking judicial estoppel against the United states.  To be sure, in *OPM v. Richmond*, *supra*, the Supreme Court held that equitable estoppel would not lie against the United States for certain monetary claims because

This is, of course, not to suggest that the doctrine should be applied as readily to the United States as it is to private parties.  "[B]road interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests." 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4477, p. 784.  Thus, as stressed by the Supreme Court, judicial estoppel seemingly should not apply to the United States where its invocation "would compromise a governmental interest in enforcing the law."  *New Hampshire*, 532 U.S. at 755; *see also United States v. Simmons*, 247 F.3d 118, 124 (4th Cir. 2001).  As noted by the Court in a somewhat different context: "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.  It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant."  *Heckler v. Community Health Services of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984)  Nor ordinarily should the doctrine apply where the shift in the government's position is "'the result of a change in public policy,'" *New Hampshire*, 532 U.S. at 755 (quoting *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995)), or a "change in facts essential to the prior

---

application of the doctrine would violate the Appropriations Clause of the Constitution.  *Id*. at 424-28.  The Federal Circuit, however, has made clear that this rule should not be interpreted to bar application of equitable estoppel in all cases involving monetary claims.  In *Burnside-Ott Aviation Training Ctr. v. United States*, 985 F.2d 1574 (Fed. Cir. 1993), that court reversed a ruling of this court that had improperly relied upon *Richmond* as barring an equitable estoppel claim, explaining:

> [T]he Claims Court erred in concluding that *Richmond* stands for the proposition that equitable estoppel will not lie against the government for any monetary claim.  The *Richmond* holding is not so broad. *Richmond* is limited to "claim[s] for the payment of money from the Public Treasury **contrary to a statutory appropriation**." 496 U.S. at 424, 110 S.Ct. at 2471 (emphasis added).  Indeed, because the Supreme Court's analysis in *Richmond* is based entirely on the Appropriations Clause of the Constitution, Article 1, Section 9, Clause 7, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," its holding must be limited to claims of entitlement contrary to statutory appropriations.

*Id*. at 1581.  By way of further contradistinction to *Richmond*, the Federal Circuit stated: "Burnside-Ott's assertion of a right to payment of money from the Public Treasury, however, is not based upon a statutory entitlement.  Burnside-Ott's assertion is instead based upon its contract with the Navy.  Nor does Burnside-Ott claim entitlement contrary to statutory eligibility criteria, as did *Richmond*." *Id*.; *see also Westinghouse Elec. Corp. v. United States*, 41 Fed. Cl. 229, 240 (1998).  For similar reasons, the Appropriations Clause provides no obstacle to the application of the judicial estoppel doctrine in a case such as this.

judgment," *New Hampshire*, 532 U.S. at 755.[29]  As the Supreme Court concluded in *New Hampshire*, while the foregoing considerations do not shield governmental entities from the judicial estoppel doctrine, they undoubtedly delimit further the doctrine's application.

Judged by these standards, this case is a multilayered story.  Defendant contends that it has never "conceded that the 120 percent threshold represented the exclusive means of calculating the rent following a comparability study, or of defining a material difference."  But, a review of several of its prior briefs reveals that defendant has come perilously close to arguing that the 120 percent rule was the exclusive HUD standard for materiality – so close, perhaps, as to lead a reasonable jurist into believing this proposition, even though it is not true.

In *National Leased Housing*, the primary issue was whether the contracts authorized HUD to use comparability studies to decrease contract rents.  Defendant's briefs did not describe the 1986 memorandum as establishing a singular 120 percent rule.  Rather, in briefing cross-motions for partial summary judgment, defendant first mapped the contours of the overall limitation by stating that the annual adjustments "may not materially differ from comparable unassisted rents that may have existed with respect to the initial contract rents."  Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross-Motion for Partial Summary Judgment 64 (Nov. 10, 1988).  But, this brief did not mention the 1986 memorandum's definition of a "material difference."  Indeed, defendant did not discuss that definition until it responded to another set of cross-motions in 1994.  Then, in one of its briefs, defendant summarily recounted, in a footnote, the substance of the 1986 memorandum, stating:

> At any rate, under the rent adjustment guidelines contained in the January 14, 1986 . . . memorandum, if the sum of the comparable unassisted rent and the initial difference (expressed as a fixed dollar amount) is less than (a) the rent that would result from application of the relevant AAAF to the existing contract rent and (b) the rent level needed to cover reasonable and necessary operating expenses plus an allowance for owner distributions or operating contingencies, the owner will receive a rent adjustment of no less than the lowest of the AAAF rent, 120 percent of the sum of the comparable unassisted rent and the initial dollar difference, or 'the rent needed to cover the Section 8 project's debt service, operating costs of comparable projects and any allowance [for owner distributions or operating contingencies permitted by Attachment #1 to the [1986] memorandum.'

---

[29]  A like consideration underlies the Supreme Court's hesitancy to apply too broadly the doctrine of collateral estoppel to the government.  *See Montana v. United States*, 440 U.S. 147, 159 (1979) ("changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues"); *Commissioner v. Sunnen*, 333 U.S. 591, 600-01 (1948) (collateral estoppel does not apply to Commissioner of Internal Revenue where pertinent statutory provisions or Treasury regulations have changed between the first and second proceeding).

Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment Upon Counts II, III and VI of the Complaint and Upon Other Matters and Defendant's Cross-Motion to Dismiss in Part and for Summary Judgment Upon Counts II, III and VI of the Complaint 81 n. 36 (March 25, 1994).  Though phrased differently than the 1986 memorandum, this footnote appears accurately to capture the substance of the memorandum.

Nonetheless, different – and potentially misleading – statements about the 1986 memorandum crept into defendant's briefs in *Park Village.*  That case involved whether the "overall limitation" in the HAP contracts constituted not only a ceiling, but a floor on adjusted rents.  Park Village argued that that the floor should be the comparable rents, without significant diminution.  In its post-trial brief, defendant countered that any floor created by the overall limitation should mirror the ceiling created by the limitation – since the latter was 20 percent above the comparables, it said, the floor should be 20 percent below.  In this regard, defendant adumbrated that –

> The 1986 memorandum demonstrates that HUD's goal was to eliminate material differences, not all differences.  If the comparable rent plus initial difference equaled $360, the 120 percent material difference limitation would cap the annual adjustment at $432.  A factored rent that exceeded $432 would be materially different from the comparable rent plus initial difference.  Accordingly, HUD would eliminate the material difference by approving an adjusted contract rent of $432.  The Section 8 program participant would receive an adjusted contract rent that was 120 percent greater than the comparable rent plus initial difference.  Nonetheless, this would not constitute a material difference.

Park Village, Defendant's Post-Trial Brief 18 (June 17, 1994) (citations omitted).  Taking this example to its logical conclusion, defendant asserted that, for the floor created by the overall limitation, "[t]he material difference threshold should be calculated by subtracting 20 percent from the comparable rent."  *Id.*  This court eventually embraced defendant's exegesis, stating that "[a]ssuming the same 20 percent threshold is employed where AAAF-based adjustments result in below-market rents, the overall limitation would be triggered only when the rents charged for comparable unassisted units are at least 20 percent higher than the AAAF-based contract rent."  *Park Village II*, 32 Fed. Cl. at 448.

Park Village sought reconsideration, arguing that this court had misconstrued the concept of "material difference."  In response, defendant reiterated:

> Park Village appears to argue that once a comparability study is performed by HUD, there should be no difference, material or immaterial, between the adjusted contract rent and the sum of the comparable rent and initial difference.  Such an interpretation of the 'overall limitation' clause would effectively remove the adjective 'material' from the statute, regulation and contract . . .   The plain

> language of the overall limitation contemplates and tolerates some difference
> between the adjusted HAP contract rent and comparable rent.  HUD properly
> exercised its regulatory authority to establish the 120 percent level as the point
> where such differences become material.

Park Village, Defendant's Response to Plaintiff's Motion for Reconsideration 3-4 (Feb. 8, 1995).
This court denied the motion on March 2, 1995.  *See* Order Denying Motion for Reconsideration
of Judgment Order (Ct. Cl. March 2, 1995).  Finally, on appeal, Park Village argued that it was
improper for this court to conclude that a difference between adjusted rents and comparable rents
was not "material" unless the magnitude of difference was 20 percent or more.  To the contrary,
defendant asserted before the Federal Circuit –

> Park Village offered no evidence at trial in support of its apparent belief that all
> differences are 'material' for the purposes of the overall limitation clause.  The
> only evidence before the trial court was contained in the January 1986 HUD
> memo stating that a difference is material if the adjusted contract rent exceeded
> comparable rent by more than 120 percent.  The trial court properly deferred to the
> Government's determination that, based upon this evidence, the 20 percent
> magnitude for determining the materiality of the difference was applicable in
> those situations, such as this, where the adjusted rent was lower than comparable
> rent.

Park Village, Brief for the Appellee, 1997 WL 33512955 (Nov. 12, 1997).

Based, in particular, on the latter two excerpts, the court finds that defendant hitherto has
argued constructions of the 1986 memorandum, and derivatively the concept of "material
difference" contained therein, that differ from what it asserts here.  At the least, it appears
defendant never alerted the court in *Park Village*, as it did in *National Leased Housing*, that the
1986 memorandum contained not one, but **two** distinct definitions of "materiality."  Defendant's
reliance on the more lenient 120-percent rule plainly redounded to its advantage in *Park Village*,
where this court concluded that the overall limitation "creates both a ceiling and a floor on
periodic rent adjustments." *Park Village I*, 25 Cl. Ct. at 731.  Relying on defendant's
interpretation, this court concluded that the floor of the overall limitation would not be triggered
unless the adjusted rent was more than twenty percent below the comparable rents.[30]  Moreover,
since both *Park Village II*, *supra*, and *National Leased Housing II, supra,* were decided by the
same judge and around the same time, it is conceivable that defendant's briefs in *Park Village*

---

[30]  That defendant made this argument in a losing cause is of no moment.  Judicial
estoppel "may apply because a court accepted the party's position, even though the party lost the
judgment."  18B Wright, Miller & Cooper, § 4477; *see also U.S. Phillips Corp. v. Sears
Roebuck & Co.*, 55 F.3d 592, 595-97 (Fed. Cir. 1995); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.
1992).

caused this court in *National Leased Housing* to describe the overall limitation in the following less than complete terms:

> The overall limitation proscribes only material differences, and since 1986, HUD has interpreted material differences according to a 1986 HUD memorandum which provides that 'a material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference.' This approach appears to be a reasonable application of the overall limitation, *see Park Village Apartments v. United States*, 32 Fed. Cl. 441, 451-53 (1994), and therefore, given, the 120 percent threshold, the overall limitation should apply only in exceptional circumstances.

*Nat'l Leased Housing Ass'n II*, 32 Fed. Cl. at 466. Note, that like defendant's briefs in *Park Village* the above passage suggests that the 1986 memorandum only had a single test for determining whether a material difference exists – the 120 percent rule. Whatever the origin of this quote, this court plainly was influenced by this characterization of the material difference in concluding that HUD's use of comparability studies was permissible. *See Nat'l Leased Housing Ass'n I*, 32 Cl. Ct. at 466-67.

But is defendant's position in the case *sub judice* "clearly inconsistent" with its earlier positions? In fact, defendant's position here is consistent with its rendition of the 1986 memorandum in *National Leased Housing*. Moreover, all defendant's statements in *Park Village* regarding the 120 percent rule related to the 1974 version of the 1937 Housing Act – not the 1994 version. Throughout the instant litigation, defendant has stressed repeatedly that its current view of what is a material difference derives neither from the 1986 memorandum nor from HUD's 1992 proposed regulation, but from Notice 95-12, which was issued to effectuate the 1994 amendments. Accordingly, even if defendant were locked into its prior interpretation of the 1986 memorandum, that does not preclude it from construing the 1994 amendments by reference to Notice 95-12. Without a doubt, in the latter notice, HUD recalibrated somewhat its interpretation of what is a "material difference." While defendant's use of that newly-minted interpretation in administering HAP contracts executed years earlier raises issues regarding the reasonableness of HUD's exercise of discretion under the contract, it is not precluded by the doctrine of judicial estoppel. *See Folio v. City of Clarksburg*, 134 F.3d 1211, 1217-18 (4th Cir. 1998) (judicial estoppel not invoked where second position was based upon a change in the law); *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 735 (11th Cir. 1984) (same). A contrary view would be tantamount to precluding HUD from reexamining its view of what is a material difference based upon the 1994 amendments, a position seemingly at odds with the Supreme Court's admonition that judicial estoppel not be applied to a state actor if it "would compromise a governmental interest in enforcing the law." *New Hampshire*, 532 U.S. at 755; *see also United States v. Simmons*, 247 F.3d 118, 124 (4th Cir. 2001).[31]

---

[31] Since this court has exclusive, nationwide jurisdiction over the issues presented, it must consider whether defendant's conduct is egregious enough to warrant potentially estopping

-33-

At all events, it is far from clear that any such inconsistency here was either knowing or purposeful.  For one thing, defendant made no attempt whatsoever to hide the actual contents of the 1986 memorandum – this relatively short document was repeatedly included in various appendices filed in both of the relevant cases.  And, defendant accurately described that memorandum in *National Housing*.  Indeed, although it came close, defendant never actually argued that HUD had determined that a material difference exists "only" when the 120-percent rule was met.  This leaves one to wonder why this court in *Park Village II*, 32 Fed. Cl. at 448 (emphasis added), stated that "[a]pplying that discretion in situations where AAAF-based adjustments produce above-market rents, HUD has determined that a material difference exists *only* where the contract rent would exceed comparable rents by 20 percent or more."  Indeed, several of the briefs filed after *Park Village II* was decided, including two filed by the Solicitor General in the Supreme Court, did not set forth separate interpretations of the 1986 memorandum, but merely parroted the latter sentence from *Park Village II*.  This leads to the distinct possibility that the description of the 1986 memorandum in those briefs was based upon inadvertence or mistake.[32]  Moreover, the plaintiffs in *National Housing* and *Park Village* clearly alerted this court and the Federal Circuit that HUD's position on what constituted a "material" difference had metamorphosed over time. This court recognized as much in *National Leased Housing I, supra*, noting, *inter alia*, that "[p]rior to 1981, there was generally no attempt to invoke the 'Overall Limitation' provision of the HAP contracts," 22 Cl. Ct. at 651, and that "HUD's definition of 'material' has allegedly varied over the years," *id*. at 661.  Accordingly, although the circumstances here remain somewhat foggy, there is no clear indication that this court was misled by defendant's briefs, and at least some possibility that this court, for reasons unexplained, was aware of, but discounted, the alternative method for determining a "material difference" stated in the 1986 memorandum.

Based on the foregoing, the court must conclude that the doctrine of judicial estoppel does not apply here.  Again, this case does not turn on what HUD believed in 1986 or 1995, but rather on whether its construction of what is "material" as applied here and now is reasonable within the meaning of contracts that were executed in 1978 and 1979, before the 1986 memorandum was even issued.  In adjudging similar circumstances, this court's predecessor asked whether an agency imbued with discretion by a contract, exercised that discretion reasonably in administering a contract provision.  *See Pacific Far East Line v. United States*, 394 F.2d 990, 998 (Ct. Cl. 1968) (where contract and underlying statute authorized agency to determine method for calculating subsidies, change in methodology was analyzed to determine

---

the government in every case involving the issue presented.  While this point, standing alone, does not preclude the invocation of estoppel here, it seemingly must be considered.

[32]  *See New Hampshire*, 532 U.S. at 753 (noting that it "may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.'") (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995); *see also Lampi Corp. v. American Power Products, Inc*., 228 F.3d 1365, 1377 (Fed. Cir. 2000).

whether it was reasonable); *see also Everett Plywood Corp. v. United States*, 512 F.2d 1082, 1090 (Ct. Cl. 1975) (where discretion afforded United States under a contract, "exercise of that discretion must be fair and reasonable, not arbitrary and capricious"). That is the question here, as well. And the answer is – that HUD's actions in administering the contract are reasonable, given the language of the HAP contracts, as amplified by the statute as it existed at the time those contract were executed. It follows, *a fortiori*, that its construction of the "material difference" applies in determining the expectation damages owed plaintiff.

## C.    Cost of Comparability Studies

Plaintiff also seeks, as restitution damages, the cost of the comparability studies that it completed in requesting rent increases shortly before it filed suit. Defendant does not contest that if a breach occurred here, plaintiff should be reimbursed for the cost of any study it prepared to obtain an increase. However, defendant asserts that its obligation to reimburse these costs should be limited to those for studies that were timely submitted under Notice 95-12.

The Federal Circuit has made clear that restitution damages are "'available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.'" *Hansen Bancorp*, 367 F.3d at 1309 (quoting Restatement § 373); *see also Caroline Hunt Trust Estate v. United States*, 2005 WL 1023483 at *30 (Fed. Cl. Apr. 29, 2005). Accordingly, restitution damages are not available here. However, the cost of performing comparability studies seemingly is recoverable as another form of expectation damages, that is, to put plaintiff in as good a position as it would have been had the contract been performed. *See Glendale*, 239 F.3d at 1380; *see also* Restatement §§ 344(1)(a), 347. Various cases, indeed, have indicated that an injured party may recover, as expectancy damages, the increased costs associated with performance of a contract, where the breach has imposed a new performance requirement upon the injured party. *See Home Savings of America v. United States*, 399 F.3d 1341,1353-54 (Fed. Cir. 2005); *see also Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 184-85 (2005). This rule supports the parties' view that the cost of studies potentially leading to increases is recoverable.

Defendant, however, asserts that, as to other study costs, there is a lack of causation – that the breach here did not cause plaintiff to incur the costs for the studies that defendant alleges were filed untimely under Notice 95-12. This contention, of course, assumes that the timing provisions of Notice 95-12 are valid – that HUD could, without specific statutory authority, refuse to grant increases retroactively. But, even if that assumption proves correct, the cost of the studies that HUD viewed as not supporting increases, nonetheless, is recoverable as an incidental cost plainly relating to a reasonable attempt to mitigate. *See Old Stone Corp.*, 63 Fed. Cl. 65, 79 (2004); *Globe Savings*, 2005 WL 1023484 at * 32-35; Restatement § 347 cmt. c. ("[i]ncidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss"). While the recovery of such costs ordinarily would present questions of fact, defendant has not suggested either that the costs for the studies would not have been incurred but for the breach or that plaintiff acted unreasonably in attempting to obtain increases before filing suit. Indeed, part

and parcel of any such argument would be the notion that plaintiff acted unreasonably in believing that the timing requirements of Notice 95-12 were invalid – a highly dubious proposition. Therefore, the court concludes that, as to the years in question, plaintiff may recover the reasonable costs associated with any of the studies it conducted with respect to the subject properties prior to filing suit.

### D.    Prejudgment Interest

Finally, plaintiff originally sought prejudgment interest on the amount of rents it should have obtained for the years in question. On brief, however, defendant notes the well-accepted rule that interest is not recoverable against the United States, absent an express waiver of sovereign immunity. *See, e.g., Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award."); *Smyth v. United States*, 302 U.S. 329, 353 (1937) ("[I]n the absence of contract or statute evincing a contrary intention, interest does not run upon claims against the Government."); *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 798 (Fed. Cir. 1993) ("[I]nterest may not be recovered against the government in the absence of an explicit waiver of sovereign immunity for that purpose."). Surrounded by an impressive fleet of adverse precedent, plaintiff, at oral argument, surrendered its claim to prejudgment interest.

## III.    CONCLUSION

The second leg of this case is at an end. Based on the foregoing, the court **GRANTS, IN PART**, and **DENIES, IN PART**, plaintiff's motion for partial summary judgment and **GRANTS, IN PART**, and **DENIES, IN PART**, defendant's cross-motion for partial summary judgment. On or before, June 24, 2005, the parties shall file a joint status report, indicating how this case should proceed. If appropriate, the status report shall include a schedule for further proceedings, due allowance within which shall be made for the parties to conduct settlement discussions.

**IT IS SO ORDERED**.

s/Francis M. Allegra
Francis M. Allegra
Judge